ORIGINAL

FILED
JAN 13 2004
U.S. COURT OF FEDERAL CLAIMS

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| CONSOLIDATED EDISON COMPANY OF NEW YORK, INC., Plaintiff, | ) | |
| v. | ) | No. 04-0033C |
| UNITED STATES OF AMERICA, Defendant. | ) | |

COMPLAINT

1. This is an action for damages by Plaintiff, Consolidated Edison Company of New York, Inc. ("Con Edison"), against Defendant, the United States of America, acting by and through the U.S. Department of Energy ("DOE"), for breach of contract and breach of the implied covenant of good faith and fair dealing, and for just compensation for uncompensated taking in violation of the Fifth Amendment to the U.S. Constitution. These damages have been caused by DOE's failure to meet its obligations under the Nuclear Waste Policy Act of 1982 ("NWPA" or "Act"), as amended, 42 U.S.C. § 10101 *et seq.*, and its contract with Con Edison to begin removal and disposal of Spent Nuclear Fuel and high-level nuclear waste ("SNF") from the Indian Point 1 and 2 (collectively, "Indian Point") nuclear electric generating facilities.

2. From the 1960s, and prior to September 6, 2001, Con Edison was the sole owner and operator of the Indian Point nuclear electric generating facilities in Buchanan, New York.

3. Pursuant to NWPA, DOE entered into a "Standard Contract" with each of the nation's commercial nuclear power plant owners, including Con Edison, which required DOE, in return for payments of substantial fees by the owners into a Nuclear

Waste Fund created by NWPA, to commence accepting and permanently disposing of the SNF from these nuclear facilities by January 31, 1998. The Standard Contract was an important and integral element of Con Edison's conduct of its business of generating electricity at Indian Point, in that it provided for the orderly disposal of SNF and high-level nuclear waste produced during the normal course of operations. The Standard Contract also facilitated the timely and orderly completion of post-retirement activities following the end of Indian Point's life as a nuclear electric generating facility.

4. Con Edison sold Indian Point to Entergy Nuclear Indian Point 2, LLC ("Entergy") on September 6, 2001. As part of the sales transaction for Indian Point, Con Edison assigned its DOE Standard Contract (which was then in breach) to Entergy, subject to a reservation of certain rights and claims which are the subject of this complaint. By the closing date of Con Edison's sale of Indian Point, Con Edison's payments into the Nuclear Waste Fund exceeded $115 million.

5. Notwithstanding Con Edison's payments and DOE's corresponding SNF disposal obligations under NWPA, DOE did not take custody or dispose of any of Con Edison's SNF either by January 31, 1998, the performance deadline specified in NWPA and the Standard Contract, or by the closing date of Con Edison's sale of Indian Point. By the closing date of Con Edison's sale of Indian Point, there was no prospect that DOE would take custody or dispose of SNF from Indian Point in the foreseeable future because DOE had not then (and has not to this day) sited, licensed, constructed, or placed in operation an SNF disposal facility, or made provisions for the temporary storage of SNF until such time as a permanent SNF facility becomes available.

6. As a direct and proximate result of DOE's failure to meet its statutory and contractual obligations to remove SNF, the value of Con Edison's nuclear electric

generating assets was substantially reduced, such that Con Edison realized significantly less value upon the sale of Indian Point than would have been the case had DOE properly fulfilled its contractual and statutory obligations. The value of Indian Point was significantly diminished when it became apparent that DOE would not begin accepting and removing SNF by January 31, 1998, and this diminution continued after this deadline as DOE's statutory violation continued and no SNF disposal solution was in sight. This caused potential buyers to elect not to participate in the sales process for nuclear facilities or to drastically reduce the price they were prepared to pay, taking into account the increased risk associated with DOE's failure to perform, the attendant uncertain life expectancy of Indian Point as a viable nuclear electric generating facility, and the capital expenses and other costs associated with storing SNF at Indian Point indefinitely.

7. In addition, as an integral part of the Indian Point sales process, Con Edison was required by rules and regulations of the federal Nuclear Regulatory Commission (the "NRC") to fully fund the costs of retirement, dismantlement, decontamination, decommissioning, and SNF management of Indian Point in such amounts as Entergy and the NRC determined sufficient. Such amounts were substantially in excess of what would have been required if DOE had met its obligations under the Standard Contract and NWPA.

8. Con Edison also incurred significant costs associated with the interim storage of its SNF up to the closing date of its sale of Indian Point, including additional capital expenses, as well as related operating and maintenance expenses. These costs would not have been incurred had DOE begun the acceptance and removal of SNF by January 31, 1998, as required. Con Edison seeks damages for such costs as it incurred

up to the date of sale of Indian Point that would not have been incurred had DOE performed its statutory and contractual obligations pertaining to SNF disposal.

9. Con Edison's case is distinguishable from the SNF cases previously filed and presently pending before this Court. The pending cases have been filed predominately by the existing owner/operators of nuclear facilities seeking damages related to on-going SNF storage costs. By contrast, as a seller of a nuclear electric generating facility, Con Edison is seeking damages associated with the diminished value it realized in the sale of Indian Point which are a direct and proximate result of DOE's failure to meet its obligations under the Act and Standard Contract, as well as other related costs incurred up to the closing date of the sale. Unlike the existing owner/operator cases, Con Edison's damages are fixed and readily ascertainable as of the closing date of its sales transaction.

## JURISDICTION

10. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1491(a)(1).

## PARTIES

11. Plaintiff Con Edison is a public utility company incorporated under the laws of the State of New York, and is subject to the regulatory jurisdiction and oversight of the New York Public Service Commission ("NYPSC") with respect to the disposition of its regulated assets (such as Indian Point) and the rates it can charge with respect to the use of those assets.

12. Con Edison is an investor-owned energy company, with approximately $9 billion in annual revenues and approximately $19 billion in assets. Pursuant to the regulatory jurisdiction of NYPSC, Con Edison provides a wide range of

energy-related products and services to its customers. Con Edison serves over 3.3 million electric customers in the New York City metropolitan area and Westchester County, New York.

13. Defendant is the United States of America, acting by and through DOE.

## BACKGROUND

14. For more than fifty years, the federal government systematically acted to induce electric utilities, including Con Edison, to invest in nuclear technology on the promise, both implied and explicit, that key issues affecting utilities' utilization of the technology would be resolved in a timely and economic manner. Among the promises of the federal government was that it would adequately provide for assuming custody and disposal of SNF. Con Edison relied on these representations and made substantial capital investments in the construction of nuclear facilities in order to support their continued operation. It was reasonable for electric utilities, including Con Edison, to have relied on the federal government to exercise its reasonable efforts to perform and fulfill its own promises.

15. On December 8, 1953, President Dwight D. Eisenhower announced to the United Nations his intent to employ nuclear materials "to provide abundant electrical energy in the power-starved areas of the world." Dwight D. Eisenhower, Address Before the General Assembly of the United Nations on Peaceful Uses of Atomic Energy, New York City (Dec. 8, 1953), *in Public Papers of the Presidents: Dwight D. Eisenhower* ¶ 256, at 821 (1953). The Atomic Energy Act of 1954 was subsequently passed on August 30, 1954. Notably, the Atomic Energy Act instructed the U.S. Atomic Energy Commission ("AEC"), the predecessor agency to the NRC, to encourage

commercial development and use of nuclear energy, and to issue licenses to private companies to build and operate nuclear power stations.

16. Guided by the Atoms for Peace initiatives, the AEC announced the "Power Reactor Demonstration Program" in January 1955 with the objective of encouraging and supporting the commercial development of nuclear power. Consolidated Edison's Indian Point 1 reactor was a participant in the Power Reactor Demonstration Program. Less than six months after the program's announcement, Indian Point 1 construction began in May 1955, and that facility entered commercial operation in October 1962.

17. In 1959, six years following President Eisenhower's Atoms for Peace speech, it was becoming clear that the then-current levels of federal promotion of commercial nuclear power plant construction were not sufficient to move the technology toward wider commercialization. In March 1962, President John F. Kennedy asked AEC Chairman Glenn Seaborg to report on the role of nuclear power in the country. Notably, Chairman Seaborg urged the President to continue to encourage and support the commitment of electric utilities to nuclear generation.

18. Encouraged by AEC initiatives, Con Edison undertook on November 23, 1965 to build a second nuclear reactor at Indian Point. A construction permit application was filed in April 1967, and approved by the AEC in August 1969.

19. Throughout this period, the federal government continued to represent that it would provide mechanisms for SNF storage and disposal, among which would be the continued utilization of nuclear fuel reprocessing. Consequently, electric utilities, including Con Edison, designed, and the AEC (and subsequently the NRC) licensed and approved for operation, nuclear power facilities with SNF pools

intended only for temporary storage and for only a fraction of the plants' forty-year license lives.

20. In 1976, President Gerald R. Ford announced a moratorium on reprocessing SNF consistent with new arms control initiatives. This moratorium coincided with a surge in the number of commercial operating reactors entering service. Whereas reprocessing had previously been expected to limit the growth of SNF inventories at commercial nuclear power reactor sites, in the absence of reprocessing, the inventory of SNF at reactor sites began to rapidly increase until the limited, temporary storage capacity of the SNF pools at these plants was consumed.

21. In 1977, President Jimmy Carter announced that SNF would be transferred to a federally approved "away from reactor" facility for storage until a federal government repository became available. President Carter said the federal government would charge a one-time fee for storage. The President also established the Interagency Review Group on Nuclear Waste Management ("IRG"). IRG issued its findings in 1979, which proposed, among other things, that the federal government construct and operate a repository for permanent SNF disposal by the early 1990s.

**THE NUCLEAR WASTE POLICY ACT OF 1982**

22. NWPA was signed into law by President Ronald Reagan in January 1983, 42 U.S.C. § 10101 *et seq.* Congress passed NWPA to address and ameliorate the accumulation of SNF from nuclear reactors, and to fulfill the federal government's long-standing policy of assuming responsibility for the disposal of SNF. Recognizing that reprocessing of SNF was not a viable alternative to disposal of SNF, Congress created the Act "to establish programs for the development of repositories for the safe permanent disposal of high level nuclear waste and spent fuel." H.R. Rep. No. 97-491,

pt. 1, at 26 (1982), *reprinted in* 1982 U.S.C.C.A.N. 3792, 3792. Congress also made clear that time was of the essence, and made the disposal of SNF an immediate federal priority:

> The failure of the government to provide a permanent waste disposal facility during more than 30 years of Federal nuclear activities is unmitigated. . . . Failures in the Federal repository development program, the collapse of the domestic spent fuel reprocessing industry and quickly deteriorating public confidence in our ability to deal safely with nuclear waste, together with other critical safety and economic issues, were seriously undermining the strength of the domestic nuclear industry.

*Id.* at 28, 1982 U.S.C.C.A.N. at 3794.

23. Congress recognized in 1982 that neither reprocessing nor a federal waste repository would be available for at least ten years, and that interim storage of SNF would be needed. *Id.* at 31, 37-38, 67, 1982 U.S.C.C.A.N. at 3797, 3803-04, 3833. Notwithstanding this, Congress did not specifically authorize any particular interim storage program or facility, leaving to nuclear licensees the burden of safely storing SNF on-site until such time as DOE would take custody. Congress gave DOE until January 31, 1998, a full sixteen years, to complete what Congress felt could be accomplished in less time. Twenty-one years have now passed and DOE still cannot state when, or if, a national SNF repository will be available.

24. Pursuant to NWPA, DOE became obligated to carry out three primary tasks. First, the DOE Secretary was to establish a schedule for siting, constructing, and operating repositories for SNF disposal, and, in furtherance thereof, to publish written criteria setting forth the terms and conditions under which disposal was to occur. 42 U.S.C. §§ 10131(b)(1), 10222(a)(6). Among these terms was a requirement that title to SNF pass to DOE at the time it was to be transported from the power plant site to a DOE facility. *Id.* § 10222(a)(1), (5)(A). Second, DOE was required to begin acceptance

and disposal of SNF no later than January 31, 1998. *Id.* § 10222(a)(5)(B). Third, DOE's obligations were to be formalized in contracts between DOE and the generators of SNF. *Id.* § 10222(a). Thus, NWPA established the federal government's exclusive responsibility for the disposal of SNF beginning in January 1998. This responsibility was not tied to or contingent upon the availability of a permanent SNF storage facility.

25. NWPA also provided that the costs of fulfilling DOE's obligations as specified in the statute were to be borne by the generators of SNF in the form of annual fees levied by DOE on a per kilowatt hour basis from electric generation produced by the SNF to be disposed of by DOE. Such fees are paid into a Nuclear Waste Fund established by NWPA. In order to match DOE costs incurred in providing for permanent SNF disposal with Nuclear Waste Fund fee revenues, NWPA specified that the DOE Secretary was to conduct an annual review of the fees collected to determine if fee revenues were sufficient to cover the costs associated with SNF disposal activities undertaken pursuant to NWPA. 42 U.S.C. § 10222(a)(4). In the event that the DOE Secretary determined that either insufficient or excess funds were being collected, then an adjustment to the fee schedule was to be proposed by the Secretary to Congress, which had ninety days to reject the Secretary's fee adjustment proposal. Unless the Secretary's fee adjustment proposal was rejected by Congress, it automatically went into effect. *Id.*

26. NWPA invested DOE with the sole authority to accept title to, transport, and dispose of SNF. The Act authorized DOE to contract with utilities and other producers of high-level nuclear waste to collect and take custody of SNF. Accordingly, in 1983, DOE drafted a Standard Contract for use with participants in the

program, published it in the Federal Register, and accepted comments from the public regarding the terms of the Standard Contract.

## THE STANDARD CONTRACT

27. On April 18, 1983, DOE codified the Standard Contract in the Code of Federal Regulations. *See* 10 C.F.R. § 961.11. Consistent with NWPA, the Standard Contract provides that DOE would begin acceptance of SNF no later than January 31, 1998 in return for a one-time fee for pre-1983-generated nuclear waste, as well as for an ongoing fee assessed by DOE against SNF generators. *Id.* Arts. II, VIII.A. The fee was initially set at 1.0 mill per kilowatt hour (1 mil/kwh) of electricity generated and sold by Standard Contract holders. *Id.* Art. VIII.A. DOE was authorized under the Standard Contract to collect only those fees which were sufficient to achieve full cost recovery for a nuclear waste disposal program that was in compliance with the requirements of NWPA. With respect to DOE's performance obligations, the Standard Contract provides that "[t]he services to be provided by DOE under this contract shall begin, after commencement of facility operations, not later than January 31, 1998 and shall continue until such time as all SNF . . . has been disposed of." *Id.* Art. II.

28. The fees paid by all Standard Contract holders pursuant to the Act were intended to fund DOE's development and implementation of a national SNF disposal facility and program as contemplated by Congress. All such fees have been, and continue to be, paid into a Nuclear Waste Fund established by DOE.

29. DOE, since the passage of NWPA, has been under an ongoing obligation to implement an on-time program for the construction and operation of a permanent, national repository for SNF by January 31, 1998, and to fully recover the costs of meeting this objective. In addressing the fee payment obligations the utilities

were to assume under NWPA, the Congressional Budget Office noted on April 26, 1982, when the bill was before Congress, that in order to match program funding with the mandated January 31, 1998 repository operational date, "[i]t is expected that the majority of the costs of this bill will be incurred by the year 2000 when repository construction is expected to be completed and the facility operational." H.R. Rep. No. 97-491, pt. 1, at 67, 1982 U.S.C.C.A.N. at 3833.

30. Utilities and other producers of SNF, including Con Edison, have been required to pay, through Nuclear Waste Fund fees assessed by DOE, all of the costs associated with the SNF disposal program. Since its inception, consumers of nuclear-generated power nationwide have paid in excess of $19 billion, directly and through earned interest, into the Nuclear Waste Fund.

31. Execution of the Standard Contract was mandatory for generators of high-level nuclear waste. NWPA provided that commercial nuclear plant owners or operators seeking an operating license from the NRC shall not have such license issued or renewed to them by the NRC unless these owners or operators have signed the Standard Contract. 42 U.S.C. § 10222(b)(1)(A). NWPA also requires that holders of nuclear electric generating licenses issued by the NRC shall not be entitled to dispose of SNF either through DOE's federal repository program, or through any other means or facility, without first having executed the Standard Contract.

32. On June 17, 1983, Con Edison and DOE entered into a Standard Contract (No. DE-CR01-83-NE44373). Con Edison has at all times relevant hereto fully and timely complied with all of its obligations under the Standard Contract. By the time of the closing date of Con Edison's sale of Indian Point, Con Edison had paid in excess of $115 million into the Nuclear Waste Fund. At the time of such closing, Con

Edison assigned its Standard Contract to Entergy, reserving all claims arising under that contract against DOE up to the date of closing. By such date, it was clear that DOE had not begun acceptance of Con Edison's SNF by January 31, 1998, as required by NWPA and the Standard Contract, nor had such acceptance of SNF begun by the closing date of Con Edison's sale of Indian Point. DOE has not commenced removal of SNF at Indian Point or at any of the country's nuclear facilities to this day.

**DOE'S BREACH OF THE STANDARD CONTRACT**

33. In the two decades since the enactment of NWPA, DOE has failed to develop and implement the SNF disposal program that Congress defined as a "national priority."

34. In 1987, Congress designated Yucca Mountain, Nevada as the only candidate site eligible for permanent status as a repository to store high-level radioactive waste and SNF. DOE was obligated to develop a schedule for the construction and operation of the Yucca Mountain repository and publish terms and conditions for acceptance and removal of SNF that are compliant with NWPA. 42 U.S.C. §§ 10131(b)(1), 10222(a)(6).

35. Despite its statutory and contractual obligations, DOE failed to timely adhere to its obligations and responsibilities as established by NWPA and the Standard Contract. These failures had a significant negative impact on DOE's ability to adhere to a program schedule, particularly as it related to the establishment of a geological repository for the disposal of SNF.

36. In 1995, DOE published a "Final Interpretation of Nuclear Waste Acceptance Issues" ("Final Interpretation") in the Federal Register. The Final Interpretation purported to disclaim DOE's obligations under NWPA and the Standard

Contract, stating that DOE was not obligated to begin accepting SNF by January 31, 1998 because it did not have an SNF repository.

37. Con Edison and several other Standard Contract holders sought review of the Final Interpretation in the U.S. Court of Appeals for the District of Columbia Circuit. The D.C. Circuit held that NWPA imposed an unconditional obligation on DOE to begin accepting SNF on or before January 31, 1998. *Ind. Mich. Power Co. v. Dep't of Energy*, 88 F.3d 1272 (D.C. Cir. 1996). The court found that DOE's obligations were reciprocal to the obligation of the nuclear generators to pay fees into the Nuclear Waste Fund. The court rejected DOE's Final Interpretation and stated:

> DOE's duty under subsection (B) to dispose of the SNF is conditioned on the payment of fees by the owner and is triggered, at the latest, by the arrival of January 31, 1998. . . . Under the plain language of the statute, the utilities anticipated paying fees "in return for [which] the Secretary" had a commensurate duty. She was to begin disposing of the high-level radioactive waste or SNF by a day certain.

*Id.* at 1276.

38. Without regard for the court's ruling, DOE took no steps to commence acceptance and disposal of SNF by the January 31, 1998 date. Instead, in late 1996, DOE for the first time acknowledged in letters sent to all Standard Contract holders, including Con Edison, that it would not meet the statutory and contractual deadline of January 31, 1998 to begin acceptance and removal of SNF from the nation's nuclear facilities. DOE maintained that its failure to meet the January 31, 1998 deadline was excused under the terms of the Standard Contract because its delay was "unavoidable." DOE took no note of and in fact ignored, the reciprocity between its obligation to commence disposal by January 31, 1998 and the Standard Contract holders' obligation to pay fees that was at the heart of the court's ruling in *Indiana Michigan*.

39. Con Edison and several other Standard Contract holders filed a petition for a writ of mandamus to compel DOE to comply with the court's earlier mandate in *Indiana Michigan*. *Northern States Power Co. v. United States Dep't of Energy*, 128 F.3d 754 (D.C. Cir. 1997). In ruling upon the new petition, the D.C. Circuit reiterated DOE's unconditional statutory and contractual obligation to begin accepting SNF on or before January 31, 1998, and issued a writ of mandamus barring DOE from asserting that its failure to meet the January 31, 1998 deadline was unavoidable:

> [T]he Department has endeavored to proceed according to Article IX of the Standard Contract, by first informing the parties of its anticipated delay, and then evaluating whether its own delay is "unavoidable." Article IX describes an unavoidable delay as a party's "failure to perform its obligations . . . aris[ing] out of causes beyond the control and without the fault or negligence of the party failing to perform." . . . As we pointed out in *Indiana Michigan*, the NWPA directs DOE to undertake the duty to begin taking the SNF by January 31, 1998, whether or not it has a repository or interim storage facility. DOE cannot now render its obligation contingent, and free itself of the costs caused by its delay, by advancing the same failed position we rejected before.

*Id.* at 759-60.

40. Subsequent to January 31, 1998, the owners of several nuclear facilities filed lawsuits in the U.S. Court of Federal Claims ("COFC") alleging, among other counts, breach of the Standard Contract. DOE maintained that the COFC lacked jurisdiction over the breach of contract claims because the "Disputes" clause in the Standard Contract required the petitioners to first proceed through an administrative process. The U.S. Court of Appeals for the Federal Circuit ultimately ruled that the COFC was an appropriate forum for such claims. *See Maine Yankee Atomic Power Co. v. United States*, 225 F.3d 1336 (Fed. Cir. 2000); *Northern States Power Co. v. United States*, 224 F.3d 1361 (Fed. Cir. 2000).

41. The Federal Circuit further held that DOE's failure to begin acceptance of SNF by January 31, 1998 amounted to a violation of NWPA and a breach of the Standard Contract, thereby allowing Standard Contract holders to pursue claims for damages against DOE. The court stated, in pertinent part:

> In brief, we hold that the unavoidable delays provision [in the Standard Contract] deals with delays arising after performance of the contract has begun, and does not bar a suit seeking damages for the government's failure to begin performance at all by the statutory and contractual deadline of January 31, 1998.

*Northern States Power*, 224 F.3d at 1367.

42. On May 18, 1998, DOE announced a fee collection and expenditure plan for the nuclear waste disposal program through the year 2010 (the "1998 DOE Plan"). The 1998 DOE Plan asserted that DOE would be unable to meet its statutory and contractual obligations to begin removal and disposal of SNF until 2010 at the earliest. As of May 1998, the unspent balance in the Nuclear Waste Fund was approximately $8 billion. The 1998 DOE Plan also anticipated annual expenditures averaging $340 million, or approximately $4 billion in total, through 2010, the new date specified by DOE for the fulfillment of DOE's SNF disposal obligations under the Act. The Nuclear Waste Fund balance as of May 1998 of approximately $8 billion, not including the interest to be accumulated thereon through 2010, was twice the amount necessary to fully fund the entire nuclear waste program spending plan as announced by DOE in May 1998. Nonetheless, the 1998 DOE Plan projected that DOE would continue to collect fees from Standard Contract holders at the existing 1 mil/kwh fee rate through at least 2010, which would perpetuate aggregate collections into the Nuclear Waste Fund in excess of $600 million annually.

43. The Standard Contract provides that DOE "will annually review the adequacy of the fees and adjust the 1 mil/kwh fee, if necessary, in order to assure full cost recovery by the Government." 10 C.F.R. § 961.11 Art. VIII.A.4. The nuclear waste program expenditures contemplated by the 1998 DOE Plan to complete Yucca Mountain by 2010 would be fully funded, without any further collections of the 1 mil/kwh fee from utilities, by the then-existing Nuclear Waste Fund balance, and would in fact leave a balance in 2010 in excess of $4 billion, even disregarding the substantial interest that would accrue to existing Nuclear Waste Fund balances between 1998 and 2010. Nonetheless, the 1998 DOE Plan signaled DOE's intention to continue fee collections at the 1 mil/kwh rate. DOE continues to collect Nuclear Waste Fund fees from Standard Contract holders at the 1 mil/kwh rate to this day.

44. The 1998 DOE Plan acknowledged that DOE intended to collect Nuclear Waste Fund fees in excess of those authorized by NWPA, and to divert a major portion of Nuclear Waste Fund fee payments that would otherwise be due and payable for purposes proscribed by NWPA. The 1998 DOE Plan explicitly contemplated that fee collections at the rate projected in the plan would exceed DOE's programmatic requirements to such an extent that between $2.8 and $5 billion which would otherwise inure to the Nuclear Waste Fund could be used to defray costs incurred by nuclear utilities to mitigate the consequences of DOE's failure to commence SNF disposal by the January 31, 1998 date specified in NWPA and the Standard Contract. While that portion of the 1998 DOE Plan proposing diversions of Nuclear Waste Fund fee payments was never put into effect, it confirms DOE's intention to assess and collect Nuclear Waste Fund fees in excess of those required for a statutorily compliant program.

45. After the publication of the 1998 DOE Plan, it was clear to prospective buyers of nuclear electric generating facilities including Indian Point, which were themselves Standard Contract holders for plants that they already owned, that they should factor the continuing fee payments announced in the 1998 DOE Plan into their valuation models and reduce their purchase prices accordingly.

46. To date, twenty-nine cases have been filed in the COFC against DOE related to its breach of the Standard Contract, predominantly by owner/operators of nuclear facilities seeking damages related to on-going SNF storage costs. Con Edison was the Standard Contract holder for Indian Point at the time of DOE's breach on January 31, 1998, and subsequently sold Indian Point under circumstances which were profoundly affected, influenced, and altered by the DOE breach. In its capacity as a Standard Contract holder at the time of the DOE breach and a seller of a nuclear electric generating facility, Con Edison seeks damages directly and proximately caused by the DOE breach, including DOE's Nuclear Waste Fund fee assessment practices, as measured by the diminished value it realized in the sale of Indian Point as a result of DOE's failure to meet its obligations under NWPA and the Standard Contract. Con Edison also seeks damages for other related costs incurred up to the closing date of Con Edison's sale of Indian Point, all stemming from DOE's failure to meet its statutory and contractual obligations pertaining to SNF.

**THE INDIAN POINT NUCLEAR ELECTRIC GENERATING FACILITIES**

47. Indian Point is comprised of two nuclear electric generating plants, Indian Point 1 and Indian Point 2, both of which were sold to Entergy on September 6, 2001. Indian Point 1 was issued an operating license by the NRC on March 26, 1962. It had a net electrical capacity rating of approximately 205 MWs. Indian Point 1 ceased

commercial operations on October 31, 1974, at which time the unit was placed into a safe-storage condition. As part of this safe-storage program, Con Edison was required to maintain the SNF produced at Indian Point 1 at an on-site storage facility at considerable cost, rather than being able to transfer the SNF to DOE as contemplated by NWPA.

48. Indian Point 2 is a pressurized light water reactor electric generating plant of Westinghouse design with a net electrical capacity rating of approximately 971 MWs. Indian Point 2 received its operating license from the NRC on September 28, 1973, and is currently in commercial operation.

49. As the Indian Point 1 and 2 nuclear electric generating facilities were designed and constructed prior to the enactment of NWPA, all SNF produced at those facilities was expected to be shipped off-site for reprocessing in accordance with federal government policies and practices then in effect. As a result, the need for significant on-site storage capacity was not contemplated in the construction design of the facilities. With the adoption of NWPA and the elimination of the option of SNF reprocessing, Con Edison was reliant upon the federal government to accept and dispose of its SNF in accordance with the Standard Contract.

## THE INDIAN POINT SALES TRANSACTION

### The Regulatory Environment

50. In 1996, the Federal Energy Regulatory Commission ("FERC") issued FERC Orders 888 and 889. These FERC Orders were intended to eliminate institutional and structural barriers to achieving a national competitive market for electricity by requiring public utility companies such as Con Edison to provide open-access transmission services across their local transmission systems. FERC determined that,

by requiring restructuring of the nation's electric industry, conditions and circumstances that might inhibit the desired growth of a competitive electric generation industry would be alleviated. In response to the federal initiative to open energy markets to increased competition on a national level, a number of states, including New York, initiated their own industry-restructuring programs designed to promote open competition for energy services at the state level, and to vertically disaggregate the provision of electric services by encouraging or mandating the divestiture of electric generating units by regulated public utility companies.

51. In 1996, NYPSC issued Opinion 96-12 which required regulated electric utility companies in New York to submit proposals for restructuring the way they conducted their business, including the separation of their generation from their transmission and distribution functions, preferably through the divestiture of their electric generation assets (initially excluding nuclear facilities), for the purpose of fostering the creation of a competitive electric marketplace in the State.

52. In response to Opinion 96-12, in 1997, Con Edison entered into a Settlement Agreement adopted by NYPSC, which provided that Con Edison would commence the divestiture of its fossil generation assets.

53. On August 27, 1997, NYPSC issued a Notice Soliciting Comments ("Notice"), which included a discussion with respect to methodologies for the future valuation of nuclear assets, with the stated objective that by 2002, nuclear electric generating plants would compete with other forms of generation in a fully competitive marketplace for electrical generation. The Notice concluded that notwithstanding particular issues, such as post-retirement requirements involving SNF, associated with nuclear assets, nuclear electric generating facilities could participate in a competitive

divestiture process if those elements particular to nuclear electric generation were dealt with outside the divestiture process.

54. At the time of the Notice, no operating nuclear electric generating facility in the country had been sold to a third-party purchaser in an arms-length transaction. The Notice stated that a competitive market could be established for nuclear generation "provided the selling utility retains responsibility for decommissioning and disposal of spent fuel irradiated prior to implementation of a competitive market." Therefore, by 1997, the disposition of SNF in the context of a DOE breach was acknowledged by governmental authorities to be an impediment to achieving a true market price for nuclear electric generating assets.

55. Further, the Notice recognized that the sale of nuclear electric generating assets could fail due to a lack of qualified purchasers capable of dealing with, and willing to assume, SNF and related decommissioning issues. To attract additional qualified purchasers, the Staff of NYPSC recommended that selling utilities be required to retain the SNF and decommissioning risks.

**THE AUCTION PROCESS**

56. In 1999, in response to the Notice, and consistent with the efforts of NYPSC to establish a competitive wholesale market for electric generation, Con Edison offered Indian Point for sale through a competitive auction process.

57. Con Edison identified and solicited the interest of potentially eligible bidders that were preliminarily thought to be operationally and financially qualified to become holders of the NRC operating licenses for Indian Point. Each of the potential bidders was sent an Early Interest Letter ("EIL") that described in general terms the

assets to be marketed and the sales process that would be followed. EIL recipients were invited to express their interest in participating in the auction.

58. The EIL process produced only several potential bidders that expressed an interest in the auction and were deemed qualified to participate in Phase 1. Each of those bidders was provided a confidential Offering Memorandum and afforded the opportunity to engage in initial due diligence. The informational materials confidentially provided to potential bidders and such due diligence activities as were engaged in by them extensively covered Indian Point decommissioning and SNF issues. Confidentiality was maintained throughout the auction process regarding the number and identity of the bidders.

59. At the conclusion of Phase 1, the bidders were invited to submit non-binding indicative bids for Indian Point. Only half of the Phase 1 bidders submitted indicative bids and were invited to participate in Phase 2, during which additional detailed information regarding the facilities and operations of Indian Point was provided.

60. At the conclusion of Phase 2, the bidders were asked to submit final, binding bids. Entergy was ultimately selected as the winning bidder, and on November 9, 2000, Con Edison and Entergy entered into an Asset Purchase and Sale Agreement (the "APSA"), contemplating Con Edison's sale of Indian Point to Entergy.

61. On information and belief, the low level of participation in the auction process for Indian Point was due in large part to the enhanced risks perceived by potential buyers associated with the uncertainties created by DOE's breach for both SNF disposal and decommissioning generally.

62. In order to effectuate the transfer of the operating licenses for Indian Point as required by the APSA and NRC licensing requirements, on December 12, 2000, Con Edison and Entergy jointly filed a petition with the NRC seeking its approval for the license transfer. In that context and consistent therewith, pursuant to Section 2.03(v) of the APSA, upon license transfer, Entergy was to assume all future liabilities and obligations with respect to decommissioning and the management, storage, removal, transportation, and disposal of SNF, as well as any future payments into the Nuclear Waste Fund. Accordingly, it was incumbent on Con Edison and Entergy to satisfy the NRC that the transaction provided Entergy with sufficient resources to fulfill Indian Point SNF obligations in accordance with the NRC's rules and regulations.

63. As part of the NRC approval process, the NRC staff submitted a number of Requests for Additional Information ("RAI"), inquiring further as to the level of decommissioning trust funding that the parties had agreed upon, as well as Entergy's financial ability to fulfill Indian Point SNF-related obligations, both present and long-term. In particular, the NRC staff wanted to know how Entergy proposed to satisfy the need to make additional capital investments in order to ameliorate DOE's SNF default which imminently required the provision of additional and costly SNF storage at Indian Point 2. Entergy represented to the NRC staff in its responses to the RAIs that the terms of the transaction provided it with ample financial resources to meet all of its obligations with respect to SNF on-site storage and management, as well as for the future decommissioning of Indian Point, and that "there is no unfunded financial liability associated with the decommissioning of IP1 and IP2" (i.e., Indian Point). Being satisfied with Entergy's RAI responses, the NRC staff recommended

approval of the license transfer application, which approval was granted by the NRC by Order dated August 27, 2001.

64. By Petition dated January 11, 2001, Con Edison and Entergy sought approval from NYPSC of the terms and conditions of the APSA for Indian Point, and approval was granted on August 31, 2001.

65. The APSA expressly reserves to Con Edison all claims against DOE related to breaches of the Standard Contract up to the closing date of the sale.

**DAMAGES SUFFERED BY CON EDISON**

66. When on January 31, 1998 DOE reneged on its sixteen year-old statutory and contractual obligations to commence disposal of SNF, this failure on DOE's part to perform significantly diminished the value of Indian Point. When Indian Point was divested, this diminished value was reflected in the auction process, and ultimately in the terms and conditions of sale for an otherwise extremely valuable nuclear electric generating asset. DOE's failure to timely and completely fulfill its mandates under NWPA and its commitments under the Standard Contract directly resulted in such prospective purchasers, as were actually willing to entertain acquisition of nuclear electric generating facilities such as Indian Point, to account for the increased costs, risks, and uncertainties brought about by DOE in their respective valuations of the asset.

67. As a direct and proximate result of DOE's failure to perform its statutory and contractual obligations, Con Edison suffered significant damages. These damages fall into two general categories, namely (a) significant diminution in the market value for Indian Point which caused Con Edison to realize significantly less value as a result of the sale of Indian Point than would have been the case had DOE met

its obligations under NWPA and the Standard Contract, and (b) increased costs and expenditures incurred by Con Edison up to the closing date of Con Edison's sale of Indian Point to store and maintain SNF, and other related costs.

**DIMINISHED VALUE REALIZED BY CON EDISON**

68. DOE's failure to perform its statutory and contractual obligations to remove SNF caused a number of potential purchasers for nuclear electric generating facilities such as Indian Point to be artificially and improperly constrained, thereby reducing the beneficial effects of a competitive auction for these assets. Due to the increased risk and anticipated expense associated with storing SNF on-site indefinitely, potential buyers elected not to participate in the sales process for Indian Point, thereby shifting market power to a limited universe of potential buyers who were prepared to entertain assumption of SNF risks in the face of DOE's defaults. Had DOE been performing its SNF obligations, Con Edison would have received the benefits of a more competitive sales process, and the perceived future economic benefits of Indian Point as a source of electric sales revenues would have been significantly greater and more assured. However, DOE's failure to perform resulted in Con Edison receiving less value for Indian Point than it would and should have received had DOE fulfilled its statutory and contractual SNF obligations.

69. DOE's failure to meet its obligations under NWPA and the Standard Contract diminished the market value of Indian Point because the remaining useful economic life of the facility could not be determined. Absent a place to store the SNF or confidence DOE would fulfill its statutory and contractual obligations at any particular time, if ever, the continued operation of the plant for any significant period would not be possible. As a result, the value of the plant was substantially depleted, since the

future prospects of electric sales revenues were uncertain. The value of the plant was also diminished because the re-use value of the site will be deferred indefinitely until decommissioning and SNF removal are complete. Prospective purchasers of Indian Point reflected this limitation of prospects for assured future operation and re-use in their value assessments.

70. Shortly after DOE failed to initiate disposal of SNF on January 31, 1998, and as a result of DOE's failure, Indian Point began to rapidly approach the date by which it would have to shut down because there was no place to store its SNF. At the time of the sale of Indian Point, the need to construct and then operate for an indefinite period a costly on-site dry cask storage facility as a pre-condition to continued commercial operation of Indian Point 2 was immediately apparent.

71. Dry cask storage involves the construction of a large facility at the nuclear plant site within which SNF that has been removed from wet storage and placed in enormous casks weighing up to 100 tons each will be stored. The pursuit of a campaign to utilize dry cask storage technology at a particular site involves the design, local and federal permitting, and construction of the actual storage facility, equipment procurement and installation, and extensive procedure development and personnel training. A dry cask storage facility can take up to five years or longer to complete and make operational, assuming that all objections can be overcome and permits obtained, and can cost in the tens of millions of dollars. Each separate cask utilized in a dry cask storage facility costs approximately $1 million, with the initial cask order for a facility of Indian Point's size typically being more than a dozen casks. Further, at the time of the Indian Point sale, there was no assurance that such a facility would be approved,

whether capacity would be restricted, or as to what the nature of any permit or license conditions imposed and associated costs might be.

72. Obtaining NRC approval of the license transfer for Indian Point was an essential and critical element of the sales transaction between Con Edison and Entergy. An integral element of obtaining, maintaining, and transferring an NRC license for a nuclear power plant such as Indian Point is the obligation of the license holder to provide sufficient funds to cover the full costs of decommissioning the licensed facilities in accordance with NRC requirements, including the management and subsequent removal of all SNF from the site. Entergy assured the NRC that all future costs it would be required to bear as part of the decommissioning of Indian Point, including those costs related to the long term on-site maintenance of SNF, were being covered as part of the sales transaction, including the funds that Con Edison was required to transfer at closing. These costs were significantly greater than would otherwise have been the case due to DOE's failure to perform its obligations under NWPA and the Standard Contract.

73. As part of the NRC license transfer process and the NRC staff review of the license transfer application, the NRC staff performed a Safety Evaluation. A review of that staff analysis reveals that the NRC staff was significantly concerned with the lack of available storage capacity for SNF within the wet storage pool at Indian Point 2. The NRC staff posed specific and pointed questions to Entergy as to how it intended to address the rapidly approaching date when Indian Point 2 would no longer be able to operate because it had run out of SNF storage space. Entergy's response to the NRC stated that the NRC's concerns would be dealt with through the installation of an on-site dry cask storage facility, and that "the costs of dry cask storage have been

accounted for in the financial projections provided to the NRC in the application." Entergy therefore publicly acknowledged, for the purpose of and in order to obtain the NRC's approval to assume responsibility for the operation and ownership of Indian Point and its SNF, that it had been obliged to fully account for increased SNF storage costs in the Indian Point cost and revenue projections that Entergy had submitted to the NRC. Such increased SNF storage costs resulted from DOE's improper actions, in that they would not have been necessary but for DOE's failure to begin accepting SNF pursuant to NWPA and the Standard Contract. The recognition that significant on-site SNF storage costs would be imminently necessary at Indian Point lowered the perceived value of the asset.

74. Moreover, contemporaneous with Con Edison's divestiture activities, it became clear throughout the utility industry that DOE intended to continue fee collections at preexisting levels until at least 2010 (see, for example, the 1998 DOE Plan which was sent to all Standard Contract holders, including Con Edison, which plan set forth DOE's projected fee collections and expenditures for the SNF program). The fact that DOE had actually implemented the fee collection elements of the 1998 DOE Plan following the breach of its statutory and contractual obligations and the *Indiana Michigan* ruling finding SNF disposal and fee obligations to be reciprocal were also apparent and widely recognized in the utility industry. These factors, arising subsequent to the DOE's breach, caused potential buyers of Indian Point, including Entergy, necessarily to assume the continuation of such fees at the rate of approximately $6 to $8 million per year in the case of Indian Point, and to factor these payments into their valuation models, thereby further diminishing the value of Indian Point.

75. On information and belief, Entergy factored into its valuation and reduced the price for Indian Point to reflect all known and anticipated additional expenses associated with on-site storage of SNF and future Nuclear Waste Fund fees announced by DOE in the 1998 DOE Plan.

76. Under the Standard Contract, DOE was entitled to assess and collect, and the Standard Contract holder was obligated to pay into the Nuclear Waste Fund, only such fees as were authorized by NWPA. By the time of the Indian Point sales transaction, it was evident to potential buyers that DOE intended, and had already begun, to disregard the fee provisions of the Standard Contract, and instead to assess and collect amounts in excess of those authorized by NWPA and the Standard Contract. The 1998 DOE Plan made it clear that DOE intended to continue the over-collection of fees essentially indefinitely. However, the Standard Contract does not authorize DOE: a) to collect amounts to support DOE's breach of its obligations well into the 21st Century; b) to anticipate its liability as would ultimately be determined by the COFC and to embark upon a program of pre-collecting such amounts from Standard Contract holders; c) to pre-collect funds to repay or support operations damaged by DOE's failure to remove SNF; or d) to collect from and assign to Standard Contract holders cost responsibility for DOE's cost overruns associated with a noncompliant and significantly delayed waste disposal program. Notwithstanding this lack of authorization, DOE engaged in just such activities, which deprived Con Edison of the value of its assets and its entitlements under the Standard Contract, and, contrary to the provisions of the Standard Contract, improperly required Con Edison as the Indian Point Standard Contract holder to suffer the financial consequences of DOE's unauthorized actions.

## INCREASED SNF-RELATED COSTS INCURRED BY CON EDISON

77. Prior to its sale of Indian Point, Con Edison had been harmed as a direct and proximate result of DOE's failure to meet its statutory and contractual SNF obligations. That harm took the form of capital and operational expenditures it was obligated to incur due to DOE's misconduct which would otherwise not have been necessary.

78. As a result of DOE's inaction, Con Edison made substantial pre-closing capital and operating/maintenance expenditures to store and maintain Indian Point SNF. These outlays would not have been necessary had DOE fulfilled its obligation to begin accepting and disposing of SNF by January 31, 1998. As a result of DOE's failure to begin acceptance of SNF for disposal, Con Edison was required to incur costs in order to accommodate additional on-site SNF storage. Con Edison also incurred significant costs related to Indian Point's SNF storage, including developing an on-site dry cask storage facility, which costs would not have been incurred had DOE met its statutory and contractual SNF-related obligations.

## COUNT I

## BREACH OF CONTRACT

79. Con Edison repeats and re-alleges here all the allegations as set forth in paragraphs 1 through 78 above.

80. The Standard Contract creates unconditional obligations on DOE to begin accepting Con Edison's SNF by January 31, 1998. In consideration thereof, Con Edison paid more than $115 million into the Nuclear Waste Fund.

81. DOE has failed to perform its obligations under the Standard Contract to begin accepting SNF by January 31, 1998 (and has not done so to this day). DOE also

failed to perform its obligations under the Standard Contract pertaining to Nuclear Waste Fund fees. DOE's failure to do so constitutes a breach of the Standard Contract for which Con Edison is entitled to damages.

82. DOE's breach of the Standard Contract severely diminished the market value of Con Edison's nuclear electric generating facilities as reflected in the purchase price and other terms of the sales transaction, including the required levels of funding of the decommissioning trust accounts. Con Edison also incurred additional pre-closing costs, as well as other damages associated with efforts to provide for additional storage of SNF.

## COUNT II

## BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

83. Con Edison repeats and re-alleges here all the allegations as set forth in paragraphs 1 through 82 above.

84. The Standard Contract contains an implied covenant of good faith and fair dealing. This covenant requires DOE to cooperate with Con Edison and to reasonably and in good faith perform its duties under the Standard Contract and not to take actions that are detrimental to Con Edison's contractual rights.

85. DOE has breached the implied covenant of good faith and fair dealing by its fee assessment practices, and by failing to take appropriate action to meet its contractual commitment to begin accepting Con Edison's SNF for disposal by January 31, 1998. Prior to the closing date of Con Edison's sale of Indian Point (and to this day), DOE failed to provide a commitment as to when, if ever, it would accept SNF for disposal.

86. As a direct and proximate result of DOE's breach of the implied covenant of good faith and fair dealing, Con Edison has suffered damages as alleged above.

## COUNT III

## UNCOMPENSATED TAKING

87. Con Edison repeats and re-alleges here all the allegations as set forth in paragraphs 1 through 86 above.

88. DOE was unconditionally obligated under NWPA to begin acceptance of Con Edison's SNF by January 31, 1998. NWPA conferred upon Con Edison a right to have DOE dispose of Con Edison's SNF in a manner and at a cost consistent with the intent of Congress.

89. DOE's failure to commence taking custody of Con Edison's SNF by January 31, 1998 as required by the Act, and its fee assessment practices announced in the 1998 DOE Plan and subsequently implemented, deprived Con Edison of the full use and value of its nuclear electric generating facilities, caused it to incur substantial unnecessary capital and other expenses, and severely diminished the value of these facilities. This failure constitutes a taking of Con Edison's vested property rights without just compensation.

90. Con Edison possessed a protected property interest in the benefits of NWPA, including paying into the Nuclear Waste Fund only what the statute authorizes. DOE's disregard of this interest and its continued collection after January 31, 1998 of amounts in excess of those authorized by NWPA resulted in a systematic and unreasonable over-collection of those fees and a taking of Con Edison's property in violation of the Due Process and Takings Clauses of the Fifth Amendment. NWPA did

not authorize DOE: a) to collect amounts to support DOE's breach of its obligations well into the 21st Century; b) to anticipate its damage liability as would ultimately be determined by the COFC and to embark upon a program of pre-collecting such amounts from Standard Contract holders; c) to pre-collect funds to repay or support operations damaged by DOE's failure to remove SNF; or d) to collect from and assign to Standard Contract holders cost responsibility for DOE's cost overruns associated with a noncompliant and significantly delayed waste disposal program. Notwithstanding this lack of authorization, DOE has engaged in just such activities, depriving Con Edison of the value of its assets and property interest and improperly requiring Con Edison to suffer the financial consequences of DOE's unauthorized actions.

91. DOE's failure to begin acceptance of Con Edison's SNF has destroyed Con Edison's reasonable, investment-backed expectations arising from NWPA. DOE's conduct has deprived Con Edison of the full economic use of its nuclear electric generating facilities and related property, and reduced the tangible and intangible value of Indian Point as a going concern.

92. DOE's failure to perform its contractual and statutory responsibilities were clearly aimed at and intended to benefit the general public interest at the expense of Con Edison. DOE is obligated to undertake the exercise of proper procedures to ensure due process and the calculation of just compensation from the date of taking. DOE failed to exercise those procedures and failed to provide just compensation.

93. By reason of the foregoing, DOE has taken Con Edison's property in violation of the Fifth Amendment to the U.S. Constitution and is liable to Con Edison for just compensation.

## PRAYER FOR RELIEF

WHEREFORE, Con Edison respectfully requests that the Court enter judgment in its favor and against the United States as follows:

(1) On Count I, for damages in an amount to be established at trial;

(2) On Count II, for damages in an amount to be established at trial;

(3) On Count III, for just compensation in an amount to be established at trial;

(4) Pre-judgment and post-judgment interest as permitted by law;

(5) Costs of suit, including reasonable attorneys' fees, as permitted by law;

and

(6) Such other and further relief as this Court may deem proper.

Date: January 13, 2004

Respectfully submitted,

Richard J. Conway
DICKSTEIN SHAPIRO MORIN
& OSHINSKY LLP
2101 L Street, N.W.
Washington, D.C. 20037
(202) 785-9700
*Counsel of Record for*
*Consolidated Edison Company of New York, Inc.*

Of Counsel: David M. Nadler
Nicholas W. Mattia, Jr.
Bradley D. Wine
DICKSTEIN SHAPIRO MORIN
& OSHINSKY LLP
2101 L Street, N.W.
Washington, D.C. 20037
(202) 785-9700

Brent L. Brandenburg, Esq.
Assistant General Counsel
Consolidated Edison Company of New York, Inc.
4 Irving Place -- Room 1830
New York, NY 10003
(212) 460-4333

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| CONSOLIDATED EDISON COMPANY,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | ) | No. ______________ |

**CONSOLIDATED EDISON'S CORPORATE DISCLOSURE STATEMENT**

Pursuant to RCFC 7.1, Consolidated Edison Company of New York, Inc. ("Consolidated Edison"), through its undersigned counsel respectfully submits the following corporate disclosure statement:

Consolidated Edison is a wholly owned subsidiary of its parent holding company, Consolidated Edison, Inc. Consolidated Edison, Inc., incorporated in New York in 1997, is a publicly held corporation.

Dated: 1/13/04

Respectfully Submitted,

Richard J. Conway
Dickstein Shapiro Morin & Oshinsky LLP
2101 L Street, N.W.
Washington, DC 20037-1526

Counsel of Record for Plaintiff
Consolidated Edison Company