IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| CONSOLIDATED EDISON COMPANY OF NEW YORK, INC. Plaintiff, | ) | |
| v. | ) | No. 04-0033C (Judge Lettow) |
| UNITED STATES OF AMERICA, Defendant. | ) | |

DEFENDANT'S MOTION TO DISMISS
CONSOLIDATED EDISON COMPANY OF NEW YORK, INC.'S COMPLAINT

Pursuant to Rule 12(b)(6) of the Rules of the Court of Federal Claims, defendant, the United States, respectfully requests that this Court dismiss Counts I and II of the complaint of plaintiff, Consolidated Edison Company of New York ("ConEd"), with respect to its claim for the diminution in the value of the sale of its nuclear reactors, based upon the failure to state a claim upon which relief can be granted. In addition, we respectfully request that this Court dismiss Count III of ConEd's complaint in its entirety for failure to state a claim upon which relief can be granted. In support of this motion, we rely upon ConEd's complaint[1] and the following brief.

---

[1] For purposes of this motion only, we accept as true the factual allegations as set forth in ConEd's complaint. However, in the event that this motion is denied, we reserve the right to contest each and every factual allegation in the complaint. E.g., M. Snower & Co. v. United States, 140 F.2d 367, 370 (7th Cir. 1944).

## DEFENDANT'S BRIEF

## STATEMENT OF THE ISSUE

1. Whether ConEd may bring a breach of contract action seeking diminution in value for the sale of its nuclear reactors where the sale of the reactors was not directly related to the Standard Contract, but, rather, was the result of an independent and collateral transaction.

2. Whether ConEd's allegation that the Government's failure to dispose of ConEd's spent nuclear fuel ("SNF") and/or high-level radioactive waste ("HLW") has deprived ConEd of the full economic use of its nuclear electric generating facilities constitutes a viable claim under the Fifth Amendment of the United States Constitution, where any right that ConEd has to require the Government to accept SNF and/or HLW derives solely from the Standard Contract.

3. Whether this Court possesses jurisdiction to adjudicate ConEd's challenge to the Secretary of Energy's collection of fees under the Nuclear Waste Fund.

## STATEMENT OF FACTS

Prior to 1983, the Department of Energy ("DOE") had no statutory, regulatory, or other legal obligation to accept or dispose of the spent nuclear fuel ("SNF") and high-level radioactive waste ("HLW") that nuclear utilities generated through their production of nuclear power. In 1983, however, Congress enacted the Nuclear Waste Policy Act of 1982 ("NWPA"), 42 U.S.C. §§ 10101-10270. See Compl. ¶ 18. One of the purposes of the NWPA was "to establish the Federal responsibility, and a definite Federal policy, for the disposal of such waste and spent fuel." 42 U.S.C. § 10131(b)(2). The passage of NWPA represented the Government's acceptance of responsibility for the disposal of SNF. See Compl. ¶ 18. In passing the NWPA, Congress included statutory findings that the public health and safety necessitated that the

Government provide a solution for the permanent storage and disposal of SNF and HLW, although Congress also found that the costs of the interim and permanent storage and disposal of SNF and HLW were the responsibility of those entities that created the SNF and HLW:

> [W]hile the Federal Government has the responsibility to provide for the permanent disposal of high-level radioactive waste and such spent nuclear fuel as may be disposed of in order to protect the public health and safety and the environment, the costs of such disposal should be the responsibility of the generators and owners of such waste and spent fuel;
>
> * * *
>
> [T]he generators and owners of high-level radioactive waste and spent nuclear fuel have the primary responsibility to provide for, and the responsibility to pay the costs of, the interim storage of such waste and spent fuel until such waste and spent fuel is accepted by the Secretary of Energy in accordance with the provisions of this chapter . . . .

42 U.S.C. §§ 10131(a)(4) & (a)(5).

Pursuant to section 302(a) of the NWPA, the Secretary of Energy was "authorized to enter into contracts with any person who generates or holds title to [SNF] of domestic origin for the acceptance of title, subsequent transportation, and disposal of such [SNF]." 42 U.S.C. § 10222(a)(1). Further, the Secretary of Energy was barred from disposing of any SNF or HLW under the NWPA "unless the generator or owner of such [SNF] has entered into a contract with the Secretary under this section by not later than . . . June 30, 1983; or . . . the date on which such generator or owner commences generation of, or takes title to, such [SNF]; whichever occurs later." 42 U.S.C. § 10222(b)(2). As a result, DOE's obligation to dispose of a generator's or owner's SNF was conditioned upon the existence of a contract between the generator (or owner) and DOE. DOE implemented the requirements of section 302(a) of the NWPA by promulgating,

through notice-and-comment rulemaking in the Federal Register, the Standard Contract now published at 10 C.F.R. § 961.11. The Standard Contract required DOE to begin "[t]he services to be provided by DOE" under the Standard Contract "not later than January 31, 1998." 10 C.F.R. § 961.11, Art. II.

On June 17, 1983, ConEd, the then-owner of the Indian Point 1 and 2 (collectively, "Indian Point") nuclear electric generating facilities, entered into a Standard Contract with DOE for the disposal of SNF and HLW generated by Indian Point. Compl. ¶ 32. On September 6, 2001, ConEd entered into an Asset Purchase and Sale Agreement ("APSA") with Entergy Nuclear Indian Point 2 ("ENIP") for the sale of ConEd's interest in Indian Point to ENIP, and, subsequently, ConEd received all requisite state and Federal approvals to effectuate the sale. Compl. ¶¶ 61, 63-64. As part of the sale, ConEd assigned its contract with DOE to ENIP, "subject to a reservation of certain rights and claims." Compl. ¶ 4.

On January 31, 1998, DOE failed to begin accepting SNF as required by the NWPA and the Standard Contract. Compl. ¶ 5. Thereafter, the United States Court of Appeals for the Federal Circuit ruled that DOE's failure to begin acceptance of SNF by January 31, 1998 constituted a breach of the Standard Contract. Compl. ¶ 41 (citing Northern States Power Co. v. United States, 224 F.3d 1361 (Fed. Cir. 2000)).

To date, 66 cases have been filed against the Government in this Court based upon DOE's failure to begin SNF acceptance on January 31, 1998, 59 of which remain pending in the Court of Federal Claims.[2] The majority of these cases have been filed by existing owners/operators of

---

[2] ConEd alleges that 29 cases have been filed in this Court concerning DOE's breach of the Standard Contract. See Compl. ¶ 46. This Court may take judicial notice of the fact that 66 such cases have been filed. See, e.g., Allied Colloids Inc. v. Am. Cyanamid Co., 64 F.3d 1570, 1578

nuclear facilities seeking damages related to past and future SNF storage costs. Compl. ¶ 9. Indeed, ENIP, the entity that currently owns Indian Point, has filed suit against the Government, alleging entitlement to damages resulting from the breach of the Standard Contract. Entergy Nuclear Indian Point 2, LLC, 03-2622C (Lettow, J.). The Court can take judicial notice of that complaint and its contents. Allied Colloids, 64 F.3d at 1578.

On January 13, 2004, ConEd filed its complaint in this Court, alleging claims for a breach of the Standard Contract, a breach of the implied covenant of good faith and fair dealing, and a taking under the Fifth Amendment of the United States Constitution. With respect to its breach of contract claim, ConEd made the following allegations in its complaint:

> 80. The Standard Contract creates unconditional obligations on DOE to begin accepting Con Edison's SNF by January 31, 1998. In consideration thereof, Con Edison paid more than $115 million into the Nuclear Waste Fund.
>
> 81. DOE has failed to perform its obligations under the Standard Contract to begin accepting SNF by January 31, 1998 (and has not done so to this day). DOE also failed to perform its obligations under the Standard Contract pertaining to Nuclear Waste Fund fees. DOE's failure to do so constitutes a breach of the Standard Contract for which Con Edison is entitled to damages.
>
> 82. DOE's breach of the Standard Contract severely diminished the market value of Con Edison's nuclear electric generating facilities as reflected in the purchase price and

---

(Fed. Cir. 1995). Two of those 66 cases, GPU Nuclear, Inc. v. United States, No. 00-440C, and The United Illuminating Company v. United States, No. 04-0129C, were voluntarily withdrawn by the plaintiffs in those cases. In addition, the court's decision in Indiana Michigan Power Co. v. United States, No. 98-486C (Hodges, J.), is currently on appeal to the United States Court of Appeals For the Federal Circuit, Docket No. 04-5122. Finally, four cases, Commonwealth Edison Co. v. United States, No. 98-621C, Exelon Generation Co., LLC, No. 04-102C, Exelon Generation Co., LLC, No. 04-103C, and Exelon Generation Co., LLC, No. 04-104C, have been settled.

> other terms of the sales transaction, including the required levels of funding of the decommissioning trust accounts. Con Edison also incurred additional pre-closing costs, as well as other damages associated with efforts to provide for additional storage of SNF.

Compl. ¶¶ 80-82.

With respect to its claim for breach of the implied covenant of good faith and fair dealing, ConEd alleged:

> 85. DOE has breached the implied covenant of good faith and fair dealing by its fee assessment practices, and by failing to take appropriate action to meet its contractual commitment to begin accepting Con Edison's SNF for disposal by January 31, 1998. Prior to the closing date of Con Edison's sale of Indian Point (and to this day), DOE failed to provide a commitment as to when, if ever, it would accept SNF for disposal.
>
> 86. As a direct and proximate result of DOE's breach of the implied covenant of good faith and fair dealing, Con Edison has suffered damages as alleged above.

Compl. ¶¶ 85-86.

Finally, with respect to its takings claim, ConEd alleged:

> 88. DOE was unconditionally obligated under NWPA to begin acceptance of Con Edison's SNF by January 31, 1998. NWPA conferred upon Con Edison a right to have DOE dispose of Con Edison's SNF in a manner and at a cost consistent with the intent of Congress.
>
> 89. DOE's failure to dispose of Con Edison's SNF by January 31, 1998 as required by the [NWPA], and its fee assessment practices announced in the 1998 DOE Plan and subsequently implemented, deprived Con Edison of the full use and value of its nuclear facilities, caused it to incur substantial unnecessary capital and other expenses, and severely diminished the value of these facilities. This

> failure constitutes a taking of Con Edison's vested property rights without just compensation.

Compl. ¶¶ 88-89. ConEd also alleges that it "possessed a protected property interest in the benefits of the NWPA." Compl. ¶ 90.

ConEd claims three categories of damages resulting from the alleged breach of the Standard Contract and the taking of its alleged contractual rights: (i) a "significant diminution in market value" upon the sale of Indian Point (Compl. ¶ 67); (ii) increased costs and expenditures to store and maintain SNF (among other "related costs") up to the closing date of plaintiff's sale of Indian Point (Compl. ¶¶ 67, 77-78); and (iii) payments to the Government pursuant to the Standard Contract in excess of the requirements of the NWPA. Compl. ¶ 90.

<u>SUMMARY OF ARGUMENT</u>

The primary focus of ConEd's complaint is the alleged diminished price that it received when it sold its interest in the Indian Point facilities to ENIP. ConEd raises both breach of contract and takings claims, seeking damages under both theories associated with the purported decrease in value of the Indian Point facilities. However, for the reasons discussed below, ConEd has failed to state either a viable breach of contract or takings claim.

First, ConEd's sale of its interest in the Indian Point facilities is a transaction completely unrelated to the Standard Contract. The United States Court of Appeals for the Federal Circuit has consistently rejected consequential damages claims against the Government where those damages are not directly related to the contract that was allegedly breached. Here, the Standard Contract relates solely to the Government's obligation to accept and dispose of ConEd's SNF, with the corresponding obligation that ConEd pay for the cost of such acceptance and disposal.

ConEd's sale of its nuclear utilities to a third party is not a transaction that arises directly from the Standard Contract, but, rather, constitutes an independent and collateral transaction. Consequently, ConEd may not recover as damages the alleged diminution in value that it obtained in the sale of the Indian Point power plants.

Second, Count III of ConEd's complaint seeks recovery for DOE's partial breach of the Standard Contract pursuant to the Takings Clause of the Fifth Amendment. However, ConEd's alleged damages arise solely as a result of the Standard Contract that it executed with the Government. Absent the execution of the Standard Contract, ConEd was wholly responsible for the storage and disposal of the SNF and HLW that ConEd generated, at least until it sold its facilities and SNF. Accordingly, any remedy that ConEd possesses lies in contract, not the Fifth Amendment. As a result, ConEd's claim for damages for a taking of its "property" under the Fifth Amendment should be dismissed for failure to state a claim upon which relief may be granted.

Third, this Court lacks jurisdiction to adjudicate ConEd's challenge to the Secretary of Energy's fee assessments. Pursuant to the NWPA, the Courts of Appeals for the District of Columbia Circuit and the various regional circuits have original and exclusive jurisdiction to adjudicate, among other things, challenges to the Secretary of Energy's decisions related to the assessment and collection of fees for payment into the Nuclear Waste Fund. Therefore, this Court lacks jurisdiction to adjudicate ConEd's challenge to the Secretary of Energy's alleged overcollection of fees.

# ARGUMENT

## I. STANDARD OF REVIEW

In considering whether to dismiss a complaint for failure to state a claim upon which relief can be granted, this Court should grant dismissal if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45-46 (1957) (quoted in B & F Trawlers, Inc. v. United States, 27 Fed. Cl. 299, 302 (1992)). In making this decision, the Court will accept the factual allegations alleged in the complaint as true. Papasan v. Allain, 478 U.S. 265, 268 (1968); B & F Trawlers, 27 Fed. Cl. at 302. However, the Court should not place any weight upon any assertions in the complaint other than allegations of fact, because "legal conclusions, deductions, or opinions couched as factual allegations are not given a presumption of truthfulness." Rochman v. United States, 27 Fed. Cl. 162, 168 (1992) (quoting 2A J. Moore, Moore's Federal Practice, ¶ 12.07[2.-5] (2d ed. 1992)).

## II. CONSOLIDATED EDISON'S CONTRACT CLAIM FOR THE DIMINISHED SALES PRICE OF ITS REACTORS IS A CLAIM FOR UNRECOVERABLE CONSEQUENTIAL DAMAGES

### A. A Plaintiff May Not Obtain Consequential Damages For An Alleged Breach Of Contract

The Federal Circuit has repeatedly held that "remote and consequential damages are not recoverable in a common-law suit for breach of contract . . . especially . . . in suits against the United States for the recovery of common-law damages, such as the instant case." Wells Fargo Bank, N.A. v. United States, 88 F.3d 1012, 1021 (Fed. Cir. 1996), cert. denied, 520 U.S. 1116 (1997) (quoting Northern Helex Co. v. United States, 207 Ct. Cl. 862, 886, 524 F.2d 707, 720

(1975)); see LaVan v. United States, 382 F.2d 1340, 1351 (Fed. Cir. 2004); San Carlos Irrigation & Drainage Dist. v. United States, 111 F.3d 1557, 1563 (Fed. Cir. 1997). As the United States Court of Claims has explained:

> "The true concept of consequential damages involves consideration of the type of loss foreseeable by the contracting parties at the time of their agreement." Where such damages are the proximate result of a defendant's breach of contract, they are recoverable. However, while damages resulting from "the natural and probable consequences of the breach complained of [are recoverable], damages remotely or consequently resulting from the breach are not allowed."

Olin Jones Sand Co. v. United States, 225 Ct. Cl. 741, 742-43 (1980) (quoting Gardner Displays Co. v. United States, 171 Ct. Cl. 497, 504-05, 346 F.2d 585, 589 (1965), and Ramsey v. United States, 121 Ct. Cl. 426, 433, 101 F. Supp. 357 (1951)). Indeed, not "every injury resulting from a breach of contract is remediable in damages." San Carlos Irrigation, 111 F.3d at 1563 (quoting Wells Fargo, 88 F.3d at 1022).

The Federal Circuit routinely looks to the purpose of the breached contract to determine whether the claimed damages were "consequential" to the breach rather than a direct damage. In Wells Fargo, a bank filed a breach of contract action when the Government failed to honor its commitment to provide a guarantee for a particular construction loan that the bank extended pursuant to a Federal program. 88 F.3d at 1017. The Court of Federal Claims ruled that the Government had breached its contract with the bank and awarded profits that the bank allegedly lost because it was unable to make additional loans because the Government's refusal to issue the guarantee required the bank to reduce its capital. Id. at 1018. The Federal Circuit reversed the award of lost profit damages, explaining that the "purpose of the guarantee was to enable Wells

Fargo to make profits from the interest on its loan to High Plains, not on some other loans it might make." Id. In reaching this conclusion, the Federal Circuit explained that lost profits that would have been realized from "independent and collateral undertakings," rather than those that would have "grown out of the contract itself," are, as a matter of law, unrecoverable :

> [i]f the profits are such as would have accrued and grown out of the contract itself, as the direct and immediate results of its fulfillment, then they would form a just and proper item of damages, to be recovered against the delinquent party upon a breach of the agreement. . . . But if they are such as would have been realized by the party from other independent and collateral undertakings, although entered into in consequence and on the faith of the principal contract, then they are too uncertain and remote to be taken into consideration as a part of the damages occasioned by the breach of the contract in suit.

Id. at 1022-23 (emphasis added) (quoting Ramsey v. United States, 101 F. Supp. 353, 121 Ct. Cl. 426 (1951)).

Similarly, in Scott Timber Co. v. United States, 33 F.3d 1358 (Fed. Cir. 2003), a timber contractor claimed that the Government breached various timber sales contracts when the Government suspended performance on the contracts to protect an endangered bird species that was indigenous to the area covered by the contracts. In addition to claiming damages equal to the cost of obtaining replacement timber in the open market, the contractor also sought costs related to its sawmill operations, including labor, taxes and insurance. Id. at 1372. The Court of Federal Claims granted the Government's motion for summary judgment with respect to the costs related to the plaintiff's sawmill operations, concluding that they were "remote and speculative damages and therefore not recoverable." Id. The Federal Circuit affirmed, explaining that the plaintiff's "sawmill expenses are not directly related to the timber sales contracts. Any sawmill

costs were not a direct result of the suspensions in this case." Id.; see also First Height Banks v. United States, 57 Fed. Cl. 162, 174 (2003) ("We hold, as a matter of law, that the subject of the bargain was confined to the opportunity to take advantage of the tax laws; that it would not have been foreseeable to federal negotiators that plaintiffs were entering into the arrangement to secure future funds for homebuilding projects. Absent some specific reference, those projects, and the potential profits on them, were simply too remote to be within the parties' contemplation as a potential collateral damage from a breach.").

In fact, in Olin Jones, this Court's predecessor, the Court of Claims, recognized that the type of diminished business value damages that ConEd seeks in this case are too remote and consequential, as a matter of law, to constitute a recoverable damage. In Olin Jones, the plaintiff claimed that, based upon the Government's delay in making contract payments on a particular contract, the plaintiff could not obtain bonding on other contracts, thereby crippling its ability to obtain new contracts or work. Olin Jones, 225 Ct. Cl. at 742. The Court of Claims recognized that, to decide whether a damage is too remote or consequential for recovery, "it is necessary to examine the kinds of damages sought, and to decide which resulted directly and proximately from the asserted breach, and which, even if proven at trial, would be too remote or speculative to qualify as compensable damages." Id. at 743. Although the Court of Claims found that those damages relating to "completion of this particular contract" could be sufficiently direct to warrant a trial, there could, as a matter of law, "be no recovery for general loss of business, the claimed loss of the entire [company's] net worth, and losses [on] the non-federal work – all are all deemed too remote and consequential." Id. at 744 (emphasis added) (quoting William Green Constr. Co. v. United States, 201 Ct. Cl. 616, 626, 477 F.2d 930, 936 (1973)). Finding that the claimed

"speculative alleged loss of future contracts and work . . . comes within the losses of outside business, outside contracts, and general company worth referred to in Green," the Court of Claims barred the trial commissioner from further considering these damages "since we hold as a matter of law that, even assuming such damages could be proven, they are too remote and indirect to be recoverable in this breach action." Id.

Conversely, the Federal Circuit affirmed a ruling of the Court of Federal Claims that certain lost profits were not overly remote and uncertain as a matter of law because the plaintiff's anticipated profits flowed directly from the alleged breached contract. Energy Capital Corp. v. United States, 302 F.3d 1314, 1328-29 (Fed. Cir. 2002). In that case, a lender had entered into a contract with the Department of Housing and Urban Development ("HUD") to originate loans to owners of HUD properties in exchange for HUD's treatment of the lender's loans in a way that gave the lender security for its loans. Id. at 1317. Before the lender originated any loans, HUD terminated the contract. Id. at 1319. The lender sued the Government for breach of contract, asserting that it was entitled to lost profits. Id. The Federal Circuit held that the lender's damages were not overly remote or speculative because the lost transactions flowed directly from and were the intended purpose of the breached contract:

> [i]n the present case, Energy Capital's anticipated profits flowed directly from the AHELP agreement and not from "other independent and collateral undertakings." As the Court of Federal Claims found, the express purpose of the AHELP agreement was to permit Energy Capital to make up to $200 million worth of loans to HUD-assisted property owners. When the government breached the AHELP agreement, Energy Capital was no longer able to issue those loans, and its resulting loss of profits flowed directly from the government's breach.

Id. at 1328-29 (citations omitted) (emphasis added).

B. ConEd's Sale Of Its Utility Is Not Directly Related To The Standard Contract, But Rather Constitutes An Independent And Collateral Undertaking

The gravaman of ConEd's claim for damages is that "[a]s a direct and proximate result of DOE's failure to meet its statutory and contractual obligations to remove SNF, the value of Con Edison's generating assets was substantially reduced, such that Con Edison realized significantly less value upon the sale of Indian Point than would have been the case had DOE properly fulfilled its contractual and statutory obligations." Compl. ¶ 6. However, it is beyond dispute that the sale of ConEd's nuclear utility to a third-party does not flow directly from the Standard Contract, but, instead, constitutes an independent and collateral undertaking. Pursuant to the NWPA, the Secretary is authorized to enter into contracts "for the acceptance of title, subsequent transportation, and disposal" of SNF. 42 U.S.C. § 10222(a)(1) (2004).

Section 10131 of Title 42 of the United States Code provides the purposes behind the NWPA:

> (1) to establish a schedule for siting, construction, and operation of repositories that will provide a reasonable assurance that the public and the environment will be adequately protected from the hazards posed by high-level radioactive waste and such spent nuclear fuel as may be disposed of in a repository;
>
> (2) to establish the Federal responsibility, and a definite Federal policy, for the disposal of such waste and spent fuel;
>
> (3) to define the relationship between the Federal Government and the State governments with respect to the disposal of such waste and spent fuel; and
>
> (4) to establish a Nuclear Waste Fund, composed of payments made by the generators and owners of such waste and spent fuel, that will ensure that the costs of carrying out activities relating to the disposal of such waste and spent fuel will be borne

> by the persons responsible for generating such waste and spent fuel.

42 U.S.C. § 10131(b)(1)-(4) (2004).

Similarly, the purposes of the Standard Contract are set forth in its preamble and mirror those of the NWPA:

> Whereas, the DOE has the responsibility for the disposal of spent nuclear fuel and high-level radioactive waste of domestic origin from civilian nuclear power reactors in order to protect the public health and safety, and the environment; and
>
> Whereas, the DOE has the responsibility, following commencement of operation of a repository, to take title to the spent nuclear fuel or high-level radioactive waste involved as expeditiously as practicable upon the request of the generator or owner of such waste or spent nuclear fuel; and
>
> Whereas, all costs associated with the preparation, transportation, and the disposal of spent nuclear fuel and high-level radioactive waste from civilian nuclear power reactors shall be borne by the owners and generators of such fuel and waste; and
>
> Whereas, the DOE is required to collect a full cost recovery fee from owners and generators delivering to the DOE such spent nuclear fuel and/or high-level radioactive waste; and
>
> Whereas, the DOE is authorized to enter into contracts for the permanent disposal of spent nuclear fuel and/or high-level radioactive waste of domestic origin in DOE facilities; and
>
> Whereas the Purchaser desires to obtain disposal services from DOE; and
>
> Whereas, DOE is obligated and willing to provide such disposal services, under the terms and conditions hereinafter set forth[.]

10 C.F.R. § 961.11.

As the NWPA establishes, the sole purpose of the Standard Contract is to create a commitment on the part of the Federal Government to accept and dispose of commercial utilities' SNF, with a corresponding obligation on the part of commercial utilities to pay for the cost of such acceptance and disposal. The Standard Contract contains numerous provisions dealing with the manner in which SNF acceptance from an individual contract holder will be accomplished. However, although the Standard Contract permits assignment of the contract upon sale of the nuclear reactor to which the contract relates, 10 C.F.R. § 961.11, Art. XIV, it is not concerned with assisting in sales transactions or with the value or price of any sale. To the contrary, the potential sale of a nuclear utility from one private entity to another is a transaction wholly separate and distinct from the Standard Contract. The loss of sales value claimed here is no different in nature than the loss of profits on other transactions claimed in Wells Fargo and Scott Timber or the loss of general net worth discussed in Olin Jones and William Green. Like in those cases, the damages sought by ConEd for the alleged devaluation of its Indian Point plants and its reduced 2001 sales price are not recoverable because they do not directly flow from the breach, but, instead, arise from "independent and collateral undertakings."

## III. PLAINTIFF'S TAKINGS CLAIM IS PREDICATED SOLELY UPON THE GOVERNMENT'S ALLEGED BREACH OF THE STANDARD CONTRACT AND, THEREFORE, PLAINTIFF FAILS TO STATE A VIABLE CLAIM

### A. Standard For A Takings Claim

The Takings Clause of the Fifth Amendment of the United States Constitution provides, in pertinent part: "nor shall private property be taken for public use, without just compensation." U.S. Const. amend. V, cl. 4. The Federal Circuit has adopted a two-step approach for evaluating a takings claim:

> First, we determine whether the claimant possessed a cognizable property interest in the subject of the alleged taking for purposes of the Fifth Amendment, i.e., whether the claimant possessed a 'stick in the bundle of property rights.' Karuk Tribe of Cal. v. Ammon, 209 F.3d 1366, 1374 (Fed. Cir. 2000) (internal citation omitted). Second, once we have determined that such a property interest exists, we decide 'whether the governmental action at issue constituted a taking of that 'stick.'" Id. (citing M&J Coal Co. v. United States, 47 F.3d 1148, 1154 (Fed. Cir. 1995).

Adams v. United States, No. 04-5012, 2004 WL 2813765, at *5 (Fed. Cir. Dec. 9, 2004) (slip op.) at 10. Because the alleged property interest in this case derives solely from the Standard Contract, and the alleged governmental action in this case is a breach of that contract, ConEd has failed to state a cognizable takings claim.

### B. Because The "Property Right" To SNF Acceptance Underlying ConEd's Takings Claim Arises Solely From The Standard Contract, ConEd Has Not Alleged A Viable Takings Claim

Despite ConEd's acknowledgment that the Standard Contract "required DOE, in return for payments of substantial fees by the owners into a Nuclear Waste Fund created by the NWPA, to commence accepting and permanently disposing of the SNF from these utilities by January 31, 1998," (Compl. § 3), it inconsistently claims that the "NWPA conferred upon Con Edison a right to have DOE dispose of Con Edison's SNF in a manner and at a cost consistent with the intent of Congress." Compl. ¶ 88. The only potential property interest that ConEd has arises solely from the Standard Contract.

As previously discussed, pursuant to section 302(a) of the NWPA, the Secretary of Energy was "authorized to enter into contracts with any person who generates or holds title to [SNF] of domestic origin for the acceptance of title, subsequent transportation, and disposal of such [SNF]." 42 U.S.C. § 10222(a)(1). Indeed, the Secretary of Energy is expressly barred from

disposing of any SNF under the NWPA "unless the generator or owner of such [SNF] has entered into a contract with the Secretary under this section by not later than . . . June 30, 1983; or . . . the date on which such generator or owner commences generation of, or takes title to, such [SNF]; whichever occurs later." 42 U.S.C. § 10222(b)(2). Consequently, DOE's obligation to dispose of ConEd's SNF is conditioned solely upon the existence of a contract between ConEd and DOE. DOE implemented the requirements of section 302(a) of the NWPA by promulgating, through notice-and-comment rulemaking in the Federal Register, the Standard Contract now published at 10 C.F.R. § 961.11. The Standard Contract required DOE to begin "[t]he services to be provided by DOE" under the Standard Contract "not later than January 31, 1998." 10 C.F.R. § 961.11, Art. II. Moreover, the NWPA does not provide any schedule of acceptance by DOE for any SNF and/or HLW from any particularly utility. Rather, the Standard Contract provides a contractual mechanism – the delivery commitment schedule ("DCS") – as the exclusive mechanism for determining the schedule and amounts of SNF and/or HLW that DOE is obligated to accept from a particular utility. See 10 C.F.R. § 961.11, Art. V. Therefore, to the extent that ConEd asserts a "property interest" in the Government's acceptance and disposal of SNF, such a property interest derives exclusively from the Standard Contract.

Indeed, several courts have recognized that the only potential property interest an SNF plaintiff may have in the Government's acceptance and disposal of SNF arises solely from the Standard Contract. For example, in Consumers Energy Co. v. United States, 57 Fed. Cl. 278 (2003), the Court rejected a nuclear utility's illegal exaction claim, holding that any obligation the Government had to accept the utility's SNF arose from the Standard Contract:

> While this Court is obliged to acknowledge the Federal Circuit's recognition of the mandatory nature of the Standard Contract, nonetheless, absent the execution of the Standard Contract, there is no provision in the NWPA establishing January 31, 1998, as the deadline for the Government's assumption of the obligation to accept, store, and dispose of SNF. Under the NWPA, the Government did not gratuitously take over the burden of storage and disposal of SNF, but rather assumed the responsibility for that looming national problem contractually in return for payment of fees by the nuclear utilities into the NWF sufficient to cover the Government's costs. 42 U.S.C. § 10131(4).

Id. at 282 (emphasis in original).

Similarly, in Commonwealth Edison Co. v. United States, 56 Fed. Cl. 652 (2003), the Court was presented with a takings claims based upon the Government's breach of the Standard Contract. In its complaint, Commonwealth Edison alleged that the Government's breach prevented it from the full commercial use of its property because it was forced to store SNF that otherwise would have been removed. Id. at 655. The Court rejected this claim, holding that Commonwealth Edison did "not have a takings claim absent the rights and obligations granted to the parties by the Standard Contract." Id. at 656. In so holding, the Court explained that, because the Government had no obligation to accept the plaintiff's SNF absent the contract, Commonwealth Edison had no basis for seeking takings damages outside the context of the contract:

> [A]bsent the contract, plaintiff would have been obligated to conduct the same or similar storage activities that it now asserts create a takings claim. The court finds that plaintiff's claim for a taking is dependent upon the existence of the Standard Contract and therefore plaintiff's rights are enforceable through contract remedy.

Id.; see Southern Nuclear Operating Co. v. United States, No. 98-614C, slip op. at 5 (Fed. Cl. Apr. 7, 2004) (unpublished opinion) (dismissing Standard Contract holders' takings claim because it "is grounded on the SNF contracts that [two of the plaintiffs] executed with the United States").[3]

---

[3] In Detroit Edison Co. v. United States, 56 Fed. Cl. 299 (2003), this Court elected not to dismiss a Standard Contract holder's takings claim at that point in the litigation, given that there had not yet been any ruling regarding the Government's liability for breach of contract, and opined that, if the Government was not liable for a breach of contract to the contract holder in that case, the Court might be able to identify some taking of the contract holder's contract rights.

More recently, this Court denied a motion to dismiss one of the SNF plaintiff's takings claims in Sacramento Municipal Utility District v. United States, 61 Fed. Cl. 438 (2004) ("SMUD"), stating that "where the Government has forced storage on another's private property the Just Compensation Clause is implicated." Id. at 442. With all due respect, we respectfully disagree with the Court's decision to the extent that it applies to rights created by a contract with the Government. The contract, not the Constitution, imposed the only obligation upon the Government to relieve the plaintiff of its obligation to store the material. The fact that the plaintiff's rights to removal of the SNF by a date certain were created solely by contract requires that any damages claim focus upon the contract, not upon recovery for a Fifth Amendment taking.

Nevertheless, the Court in SMUD correctly noted that SMUD's alleged property interest was one arising from the Standard Contract. Id. at 441. Further, the takings claim in SMUD was different than the claim that ConEd raises. In SMUD, the Court allowed plaintiff the opportunity to amend its complaint to assert a takings claim predicated upon acceptance limits in the 1987 amendments to the NWPA, not one based upon a failure to accept any waste by January 31, 1998, as ConEd alleges here. Id. at 441-42. Additionally, the Court's decision to deny the Government's motion to dismiss as premature was based in large part upon the belief that takings claims are "ad hoc and fact intensive." Id. at 441. However, this Court has not hesitated to dismiss legally deficient takings claims. See, e.g., Consolidated Edison, 56 Fed. Cl. at 656; Granite Mgt. Corp. v. United States, 55 Fed. Cl. 164, 167 (2003) (dismissing takings claim for failure to state a claim (following court's show cause notice)); Westfed Holdings, Inc. v. United States, 52 Fed. Cl. 135, 152 (2002) (dismissing takings claim prior to trial for damages on breach of contract); Home Sav. of America, F.S.B. v. United States, 51 Fed. Cl. 487, 494-96 (2002) (same); Croman Corp. v. United States, 49 Fed. Cl. 776, 788-89 (2001) (same); Centex Corp. v. United States, 49 Fed. Cl. 691, 712 (2001) (same); Franklin Sav. Corp. v. United States, 46 Fed. Cl. 533, 537-38 (2000) (same). In light of the facially deficient nature of ConEd's takings claim, dismissal under the circumstances is appropriate.

It is well-established that, where a party's rights are created by contract, a party cannot state a takings claim founded upon a breach of that contract. See, e.g., Castle v. United States, 301 F.3d 1328, 1342 (Fed. Cir. 2002); Smith v. United States, 58 Fed. Cl. 374, 389 (2003); La Van v. United States, 56 Fed. Cl. 580 (2003), aff'd in part, vacated in part, 382 F.3d 1340 (Fed. Cir. 2004); Tyler House Apartments, Ltd. v. United States, 38 Fed. Cl. 1, 10 (1997) (citing J.J. Henry Co. v. United States, 188 Ct. Cl. 39, 46, 411 F.2d 1246, 1249 (1969)). As Justice Scalia has recognized, "[v]irtually every contract operates, not as a guarantee of particular future conduct, but as an assumption of liability in the event of nonperformance. The duty to keep a contract at common law means a predication that you must pay damages if you do not keep it – and nothing else." United States v. Winstar Corp., 518 U.S. 839, 919 (1996) (Scalia, J., concurring) (citations omitted). Likewise, this Court has held that, when a party enters into a contract, that party has either the right to receive performance or, if a breach occurs, the right to receive damages pursuant to contract law. Plaintiffs in Winstar-Related Cases v. United States, 37 Fed. Cl. 174, 187 n.9 (1997), aff'd, 133 F.3d 874 (Fed. Cir. 1998); see Northwest Airlines, Inc. v. United States Dep't of Transp., 15 F.3d 1112, 1121 n.5 (D.C. Cir. 1994). That is why "the concept of a taking as a compensable claim theory has limited application to the relative rights of party litigants when those rights have been voluntarily created by contract." Hughes Communications Galaxy, Inc. v. United States, 271 F.3d 1060, 1070 (Fed. Cir. 2001) (quoting Sun Oil Co. v. United States, 215 Ct. Cl. 716, 769-70, 572 F.2d 786, 818 (1978)).

In Castle v. United States, 48 Fed. Cl. 187 (2000), aff'd in relevant part, 301 F.3d 1328 (Fed. Cir. 2002), this Court rejected a takings claim based upon rights created by contract. In Castle, the plaintiffs alleged that the Government had effected a taking of "their contractual

agreement with the government" because the Government had not performed in strict accordance with the terms of the contract. Id. at 217. This Court recognized that "the formation of a contract does not entitle its signatories to absolute performance, but rather gives rise to the expectation either that the contract will be performed or that the non-breaching party will have available to it a contract-based remedy." Id. at 218 (citing United States v. Winstar, 518 U.S. 839, 919 (1996) (Scalia, J., concurring)). In its review of this Court's decision in Castle, the Federal Circuit reiterated that, because the Government did not deprive the plaintiff of its previously existing contract remedies, the Government had not effected a taking of the plaintiff's contract:

> The plaintiffs received no contractual guarantee that the government would refrain from regulating Western Empire. At most, the contract promised either to regulate Western Empire consistently with the contract's terms, or to pay damages for breach. Cf. Winstar, 518 U.S. at 919, 116 S. Ct. at 2432 (Scalia, J., concurring in judgment) ("Virtually every contract operates, not as a guarantee of particular future conduct, but as an assumption of liability in the event of nonperformance . . . ."). Thus, by enacting FIRREA, the government did not deprive the plaintiffs from a contractual remedy – injunctive relief – to which they otherwise might have been entitled against a private defendant. Nor did FIRREA remove the plaintiffs' cause of action for damages. We agree with the Court of Federal Claims that the plaintiffs retained the full range of remedies associated with any contractual property right they possessed. Consequently, we hold that even assuming the enactment and enforcement of FIRREA breached a contract the government had with Castle and Harlan, it did not constitute a taking of the contract.

Castle v. United States, 301 F.3d 1328, 1342 (Fed. Cir. 2002); see LaVan v. United States, 382 F.3d 1340, 1351-52 (Fed. Cir. 2004) (reaffirming principle in Castle that a taking claim may not be predicated upon a breach of contract where "the plaintiffs retained the full range of remedies associated with any contractual property right they possessed."); Admiral Financial Corp. v.

United States, 378 F.2d 1336, 1340 (Fed. Cir. 2004) (same); Bailey v. United States, 53 Fed. Cl. 251, 256-57 (2002) (same), aff'd, 341 F.3d 1342 (Fed. Cir. 2003); Integrated Logistics Support Sys. Int'l, Inc. v. United States, 42 Fed. Cl. 30, 34 (1998) (plaintiff "cannot exploit the Fifth Amendment to amend unilaterally a contract in an effort to rectify what hindsight reveals as an unappealing bargain").

Here, because ConEd does not allege – as it cannot – that DOE's breach of the Standard Contract resulted in the taking of the contract itself, or its potential contractual remedies, Castle and its progeny are dispositive of ConEd's takings claim here. Therefore, ConEd has failed to state a legally cognizable takings claim in this case.

C. Plaintiff May Not Rely Upon The NWPA To Establish A Property Interest

As we demonstrated above, any property interest that ConEd may have arises solely from the Standard Contract. To the extent that ConEd claims it has a cognizable property interest in the NWPA, this claim fails as a matter of law.

As an initial matter, and as previously discussed, the NWPA itself – absent execution of a contract contemplated under 42 U.S.C. § 10222 – does not create any obligation upon DOE to accept any individual SNF owner's waste, precluding any reliance upon the NWPA to create such a right. Nevertheless, even if the NWPA identified obligations to individual utilities without a contract, ConEd could still not assert a taking because ConEd cannot claim a property interest in the rule of law. "[T]he law itself, as a rule of conduct, may be changed at the will or even the whim, of the legislature, unless prevented by constitutional limitations." Fern v. United States, 908 F.2d 955, 959 (Fed. Cir. 1990) (quoting Munn v. Illinois, 94 U.S. 113 (1876)); see Branch v. United States, 69 F.3d 1571, 1577-78 (Fed. Cir. 1995) ("[i]f every time a man relied on the

existing law in arranging his affairs, he were made secure against any change in legal rules, the whole body of our law would be ossified forever") (quoting L. Fuller, The Morality of Law 60 (1964); Pittman v. Chicago Bd. of Education, 64 F.3d 1098, 1104-05 (7th Cir. 1995) ("A statute is not a commitment by the legislature never to repeal the statute . . . Statutes would be ratchets, creating rights that could never be retracted or even modified without buying off the groups upon which the rights had been conferred.") "Because Congress has the right to modify or terminate a federal program, the benefits of such a program do not constitute a property interest protected by the Fifth Amendment." Members of the Peanut Quota Holders Ass'n, Inc. v. United States, 60 Fed. Cl. 524, 529 (2004).

The Federal Circuit recently reaffirmed the principle that statutes may not form the basis for a property interest. In Adams v. United States, No. 04-5012, 2004 WL 2813765 (Fed. Cir. Dec. 9, 2004) (slip op.), a group of Federal employees claimed entitlement to overtime compensation at the rate specified under the Fair Labor Standards Act ("FLSA"), which was greater than the overtime that they were then receiving under the Federal Employees Pay Act ("FEPA"). Id. at *1. Plaintiffs raised a takings claim, asserting a property interest in the overtime payments under the FLSA. Id. The Federal Circuit rejected this claim, explaining, "We disagree that Appellants own any Fifth Amendment property interest pursuant to the FLSA statute." Id. at *7. The Federal Circuit distinguished between property rights derived from statutes for purposes of the Due Process Clause, which may create cognizable "rights" that a court could enforce, and property rights derived from statutes for purposes of the Takings Clause, which does not create such "rights." Id. Therefore, to the extent that ConEd is relying upon the

NWPA as creating a right to SNF acceptance, it cannot state a viable takings claim by identifying the NWPA as its "property right" to require that acceptance.

### D. The Government's Failure To Timely Perform Under The Standard Contract May Not Form The Basis For A Takings Claim

ConEd claims that the "taking" that occurred in this case was the Government's "failure to commence taking custody of Con Edison's SNF by January 31, 1998." Compl. ¶ 89. However, as we explained above, the Government action that forms the basis for ConEd's takings claim is DOE's alleged breach of the Standard Contract. However, ConEd has not and cannot allege that DOE has taken from it whatever "range of remedies" the Standard Contract provided and seek compensation under the Takings Clause for that breach of contract. Consequently, a takings claim will not lie based upon a breach of contract by the Government. When a party enters into a contract with the Government, it acquires the right, upon breach, to sue for contract damages, but it acquires no additional property rights and cannot allege a taking under the Fifth Amendment. ConEd's takings claim therefore fails as a matter of law.

### E. Even If ConEd Could Establish A "Property Right" To SNF Acceptance Independent Of The Standard Contract, ConEd Has Failed To State A Cognizable Takings Claim As A Matter Of Law

#### 1. Consequential Damages Are Not Recoverable In A Takings Action

As we established above, ConEd's takings claim is based upon its contract with the Government and, therefore, it may not pursue a takings claim. However, even if ConEd could somehow establish a takings theory that is not dependent upon rights arising from the Standard Contract, ConEd's primary claim for recovery for its takings theory is the diminished value realized upon its sale of Indian Point. Specifically, ConEd asserts in its complaint that, "[a]s a

direct and proximate result of DOE's failure to meet its statutory and contractual obligations to remove SNF, the value of Con Edison's nuclear electric generating assets were substantially reduced, such that Con Edison realized significantly less value upon the sale of Indian Point than would have been the case had DOE properly fulfilled its contractual and statutory obligations." Compl. ¶ 6 (emphasis added). ConEd has failed to state a viable takings claim based upon the alleged diminution in the value of Indian Point for two independent, but equally fatal, reasons.

As we previously discussed in the context of ConEd's breach claim, ConEd's claim for the diminution in the value of Indian Point constitutes a consequential damage. Consequential damages are not recoverable in a takings action. See Yuba Natural Resources, Inc. v. United States, 904 F.2d 1577, 1581 (Fed. Cir. 1990) ("It is a well settled principle of Fifth Amendment taking law, however, that the measure of just compensation is the fair value of what was taken, and not the consequential damage the owner suffers as a result of the taking.") (citing United States v. General Motors Corp., 323 U.S. 373, 360 (1945) ("that which is taken or damages is the group of rights which the so-called owner exercises in his dominion of the physical thing, and that damage to those rights of ownership does not include losses to his business or other consequential damage.")); see Klein v. United States, 179 Ct. Cl. 910, 375 F.2d 825, 828 (1967) ("[W]hile the special value of the land due to its adaptability for use in a particular business is an element which the owner of the land is entitled, under the Fifth Amendment, to have considered in determining the amount to be paid as just compensation upon a taking by eminent domain, there could be no recovery for consequential damages for loss to plaintiff's business or for its destruction.") (citing Mitchell v. United States, 267 U.S. 341 (1925)). Because ConEd's takings

theory based upon the diminution in the value of Indian Point constitutes a consequential damage, its theory fails as a matter of law.

2. ConEd Has Failed To Assert A Valid Regulatory Taking

Even if ConEd's claim for the diminution in value of its property were somehow deemed not to constitute a consequential damage, ConEd's assertion that the Government engaged in a regulatory taking does not withstand scrutiny.[4] The Supreme Court has stated that, for regulatory actions challenged on takings clause grounds, three factors have "particular significance" in the takings analysis: (1) the character of the government action; (2) the economic impact of the regulation on the claimant; and (3) the extent to which the regulation has interfered with "reasonable investment-backed expectations." Branch, 69 F.3d at 1579 (citing Connolly v. Pension Benefit Guarantee Corp., 475 U.S. 211, 224 (1986), and Ruckelshaus v. Monsanto Co., 467 U.S. 986, 1005 (1984)). ConEd has failed to satisfy any of these three requirements.

First, the "character of the governmental action" is contractual, because, as discussed above, absent the Standard Contract, ConEd (and now ENIP) would have to store the SNF generated by Indian Point indefinitely.

Second, with respect to the economic impact of the Government's action on ConEd, diminution in the value of property, standing alone, is insufficient to establish a legally cognizable takings claim. See Carolina Power & Light Co. v. United States, 48 Fed. Cl. 35, 48

[4] ConEd has not alleged in its complaint that the Government engaged in a physical occupation of ConEd's nuclear reactors. Indeed, ConEd cannot make such an allegation. Until the Government accepts ConEd's SNF pursuant to the Standard Contract, title to the SNF remains with the contract holder. See 10 C.F.R. § 961.11, Art. VI-VII. Therefore, the Government assumes, for purposes of this motion to dismiss, that ConEd is attempting to assert a regulatory taking.

(2000) ("In order to prove that an otherwise valid regulation has effected a taking, the claimant must establish more than a 'mere diminution in the value of the property.'"); Robbins v. United States, 40 Fed. Cl. 381, 386 (1998) (explaining that "long-standing precedent nevertheless holds that the mere 'diminution in a property's value, however serious, is insufficient to demonstrate a taking.'"). In Robbins, property owners claimed a taking when the Government designated their property as wetlands pursuant to the Clean Water Act. 40 Fed. Cl. at 383. The property owners asserted two different takings theories. Id. First, the property owners claimed that the Government's designation of their properties as wetlands constituted a taking because it resulted in the recision of a private contract to sell the property. Id. Second, the property owners claimed that the Government's designation constituted a taking of the properties themselves. Id. The court rejected both arguments. First, the court explained that it was the private parties to the land sale contract that caused the contract to fall through, and that although the Government's designation may have frustrated the land sale contract, "it is well-settled that government action that merely frustrates expectations under a contract does not constitute a taking." Id. at 385 (citing 767 Third Ave. Assoc. v. United States, 48 F.3d 1575, 1581 (Fed. Cir. 1995) (citing Omnia Commercial Co. v. United States, 261 U.S. 502, 510-11 (1923)). Second, the court rejected the property owners' contention that the Government's designation resulted in a taking of the property itself, explaining:

> As the Supreme Court noted in Lucas, 505 U.S. at 1004, 112 S. Ct. at 2888, the economic impact factor may be dispositive if the regulation categorically deprives the claimant of 'all economically viable use' of the property. Plaintiffs argue that the wetlands designation precludes them from maximizing the potential profit from selling the property. An inability to maximize profits, however, is insufficient to establish the deprivation of 'all

> economically beneficial or productive use' of the property, as required for a compensable taking under Lucas.

40 Fed. Cl. at 386.

In this case, ConEd has not contended that it received no value when it sold the Indian Point facilities to ENIP. Indeed, it has conceded that it did receive value for the nuclear facilities; it simply argues the Government's failure to perform under the Standard Contract "severely diminished" the value of Indian Point. Compl. ¶ 89. Under these circumstances, ConEd has failed to articulate a cognizable takings claim.

Finally, and importantly, in analyzing the "reasonable investment-backed expectations" prong, the Supreme Court has held that "[t]hose who do business in the regulated field cannot object if the legislative scheme is buttressed by subsequent amendments to achieve the legislative end." Connolly, 475 U.S. at 227. The "legislative end" of the NWPA is identified in the Act itself: to protect the public health and safety, to establish Federal responsibility and policy for disposal of SNF, and to ensure that the costs of carrying out activities relating to disposal are "borne by the persons responsible for generating such waste and spent fuel." 42 U.S.C. § 10131(b). Because of the important need to ensure the public health and safety, the nuclear industry is heavily regulated, see Rushton v. Nebraska Public Power Dist., 844 F.2d 562, 566 (8th Cir. 1988), weighing against the existence of any regulatory taking outside the context of a breach of contract action.

## VI. PLAINTIFF'S ASSERTION THAT PAYMENT OF FEES INTO THE NUCLEAR WASTE FUND SOMEHOW CONSTITUTES A "TAKING" OF ITS PROPERTY IS MERITLESS

### A. This Court Lacks Jurisdiction To Entertain Claims Relating To The Amount Of The Nuclear Waste Fund Fees

ConEd next contends that it "possessed a protected property interest in the benefits of the NWPA, including paying into the Nuclear Waste Fund only what the statute authorizes," Compl. ¶ 90, and that "DOE's disregard of this interest and its continued collection after January 31, 1998 of amounts in excess of those authorized by the NWPA resulted in a systematic and unreasonable over-collection of those fees and a taking of Con Edison's property in violation of the Due Process and Takings Clauses of the Fifth Amendment." Id. However, this Court lacks jurisdiction to adjudicate a challenge to the Secretary's fee assessment and collection practices.

The amount of the Nuclear Waste Fund fee was originally established by Congress in the NWPA itself. Specifically, the NWPA provides that, "[f]or electricity generated by a civilian nuclear power reactor and sold on or after the date 90 days after the date of enactment of this Act, the fee under paragraph (1) shall be equal to 1.0 mil per kilowatt-hour." 42 U.S.C. § 10222(a)(2). Section 302(a)(4) of the NWPA provides that the Secretary shall annually review the amount of the fee and, if he views it as insufficient or excessive, to report to Congress:

> The Secretary shall annually review the amount of the fees established by paragraphs (2) and (3) above to evaluate whether collection of the fee will provide sufficient revenues to offset the costs as defined in subsection (d) of this section. In the event the Secretary determines that either insufficient or excess revenues are being collected, in order to recover the costs incurred by the Federal Government that are specified in subsection (d) of this section, the Secretary shall propose an adjustment to the fee to insure full cost recovery. The Secretary shall immediately transmit this proposal for such an adjustment to Congress. The adjusted fee

> proposed by the Secretary shall be effective after a period of 90 days of continuous session have elapsed following the receipt of such transmittal.

42 U.S.C. § 10222(a)(4).

Section 119 of the NWPA, 42 U.S.C. § 10139, provides that the United States Courts of Appeals for the D.C. Circuit and the various regional circuits shall have original and exclusive jurisdiction over, among other things, any of the following civil actions: (1) review of any final decision or action of the Secretary of Energy; (2) allegations concerning the failure of the Secretary of Energy in making any decisions or taking any actions under this section; and (3) challenges to the constitutionality of any decision made, or action taken under this section. 42 U.S.C. § 10139(a)(1)(A), (B), & (C). The District of Columbia Circuit has held unequivocally that challenges relating to the collection of fees under the NWPA and the Secretary's decisions regarding the assessment of those fees are under the original and exclusive jurisdiction of the United States Court of Appeals. General Elec. Uranium Mgt. Corp. v. United States Dep't of Energy, 764 F.2d 896, 907 (D.C. Cir. 1985); see Natural Res. Def. Council, Inc. v. Abraham, 244 F.3d 742, 743 (D.C. Cir. 2001) (acknowledging original and exclusive jurisdiction of United States Courts of Appeals to entertain challenges relating to NWF); National Ass'n of Regulatory Util. Comm'n v. United States Dep't of Energy, 851 F.2d 1424, 1426, 1429-30 (D.C. Cir. 1988) (suggesting that D.C. Circuit is proper forum for challenges to DOE's proposed methodology for allocating the cost of nuclear waste repositories between waste resulting from defense activities and that generated by civilian commercial reactors, although ultimately finding that the issue was not ripe for review). Therefore, this Court lacks jurisdiction to adjudicate

ConEd's claim regarding the Secretary of Energy's decisions with respect to the collection of funds under the NWF.

B. The Obligation To Pay Money Into The NWF Cannot Form The Basis Of A Takings Claim

Even if this Court possessed jurisdiction to adjudicate ConEd's challenge to the Secretary's collection of fees under the NWF, and ConEd is not precluded from raising this challenge in this litigation, ConEd has failed to state a cognizable takings claim. "[W]hile a taking may occur when a specific fund of money [in a private party's possession] is involved, the mere imposition of an obligation to pay money . . . does not give rise to a claim under the Takings Clause of the Fifth Amendment." Commonwealth Edison Co. v. United States, 271 F.3d 1327, 1340 (Fed. Cir. 2001); see United States Shoe Corp. v. United States, 296 F.3d 1378, 1383 (Fed. Cir. 2002). "Unlike real or personal property, money is fungible." United States v. Sperry Corp., 493 U.S. 52, 62 n.9 (1989), quoted in Commonwealth, 271 F.3d at 1338. Accordingly, "[r]equiring money to be spent is not a taking of property." Atlas Corp. v. United States, 895 F.2d 745, 756, cert. denied, 498 U.S. 811 (1990). Indeed, in Adams, the Federal Circuit recently reaffirmed its previous decision in Commonwealth Edison and held that "no statutory obligation to pay money . . . can create a property interest within the meaning of the Takings Clause." Adams, 2004 WL 2813765, at *12. Therefore, even if the Court possessed jurisdiction to adjudicate this claim, and ConEd was not otherwise precluded from raising this claim in this litigation, ConEd has failed to state a claim upon which relief may be granted.[5]

[5] ConEd also asserts that the Secretary of Energy's alleged overcollection of fees constitutes a violation of the Due Process Clause of the Fifth Amendment. Compl. ¶ 31. This Court lacks jurisdiction to adjudicate due process challenges. See Perpetual Fin. Corp. v. United States, 61 Fed. Cl. 126, 139 (2004) (citing Crocker v. United States, 125 F.3d 1475, 1476 (Fed. Cir. 1997).

## CONCLUSION

For the foregoing reasons, defendant respectfully requests that the Court dismiss Counts I and II of ConEd's complaint with respect to ConEd's diminution in value claim based upon the failure to state a claim upon which relief may be granted, and respectfully request that the Court dismiss Count III of ConEd's complaint in its entirety for failure to state a claim upon which relief can be granted.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

---

To the extent that ConEd is attempting to assert an illegal exaction claim, such a claim should be dismissed. To assert an illegal exaction claim, a plaintiff must demonstrate that it "has paid money over to the Government, directly or in effect, and seeks return of all or part of that sum . . ." and "assert[s] that the value sued for was improperly paid, exacted, or taken from the claimant in contravention of the Constitution, a statute, or a regulation." See Consumers Energy, 57 Fed. Cl. at 280 (emphasis in original). The Court has have routinely dismissed illegal exaction claims in other SNF cases, recognizing that, absent the Standard Contract, the Government had no obligation to accept, store, and dispose of utilities' SNF. See id. at 282; Yankee Atomic Elec. Co. v. United States, 42 Fed. Cl. 223, 236-37 (1998). Similarly, as discussed above, absent the Standard Contract, ConEd had no obligation to pay monies to the Government.

s/ Harold D. Lester, Jr.
HAROLD D. LESTER, JR.
Assistant Director

s/ Joshua E. Gardner
JOSHUA E. GARDNER
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit, 8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Tele: (202) 305-7583
Fax: (202) 307-2503

OF COUNSEL:

JANE K. TAYLOR
Office of General Counsel
U.S. Department of Energy
1000 Independence Ave., S.W.
Washington, D.C. 20585

December 27, 2004

Attorneys for Defendant

CERTIFICATE OF FILING

I hereby certify that on this 27th day of December 2004, a copy of foregoing "DEFENDANT'S MOTION TO DISMISS CONSOLIDATED EDISON COMPANY OF NEW YORK, INC.'S COMPLAINT" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ Joshua E. Gardner