# UNITED STATES
# COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| DELMARVA POWER & LIGHT COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Docket No.: 0434C |
| | ) | |
| UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

Pages: 1 through 43

Place: Washington, D.C.

Date: December 3, 2004

**HERITAGE REPORTING CORPORATION**
*Official Reporters*
1220 L Street, N.W., Suite 600
Washington, D.C. 20005-4018
(202) 628-4888
hrc@concentric.net

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

DELMARVA POWER & LIGHT COMPANY, )
)
Plaintiff, )
)
v. ) Docket No.: 04-34C
)
UNITED STATES, )
)
Defendant. )

Courtroom 4
National Courts Building
717 Madison Place, N.W.
Washington, D.C.

Friday,
December 3, 2004

The parties met, pursuant to notice of the Court, at 3:00 p.m.

BEFORE: HONORABLE CHRISTINE O.C. MILLER
Judge

APPEARANCES:

For the Plaintiff:

RICHARD CONWAY, Esquire
JEFFREY P. BECHERER, Esquire
NICHOLAS MATTIA, Esquire
Dickstein, Shapiro, Morin & Oshinsky
2101 L Street, N.W.
Washington, D.C. 20037
(202) 828-2205

TODD GOODMAN, Esquire
Assistant General Counsel
Conectiv

APPEARANCES (continued):

For the Defendant:

HAROLD P. LESTER, Esquire
JOSHUA GARDNER, Esquire
JOHN ECKMAN, Esquire
U.S. Department of Justice
Civil Division
Commercial Litigation Branch
1100 L Street, N.W.
Washington, D.C. 20530

P R O C E E D I N G S

(3:00 p.m.)

THE CLERK: All rise. The United States Court of Federal Claims is now in session, the Honorable Christine Odell Cook Miller presiding. God bless this Honorable Court. Calling the case of Delmarva Power & Light Company v. United States, Case No. 04-34C, for Defendant's motion to dismiss.

THE COURT: Good afternoon, everybody. Please be seated.

ALL: Good afternoon, Your Honor.

THE COURT: Mr. Conway?

MR. CONWAY: Good afternoon, Your Honor. Richard Conway for Plaintiff Delmarva; Dickstein, Shapiro.

THE COURT: And whom do you have with you?

MR. CONWAY: I have with me Mr. Nicholas Mattia of Dickstein, Shapiro; Jeffrey Becherer, Dickstein, Shapiro; and Mr. Todd Goodman, assistant general counsel of Conectiv, which is the owner of Delmarva.

THE COURT: I'm sorry. What's his name again?

MR. CONWAY: Todd Goodman.

THE COURT: Thank you. I always appreciate

it when a representative of the client comes. That's very helpful to us.

Mr. Lester, how are you doing?

MR. LESTER: Yes, Your Honor. Harold Lester for the government, and with me is Joshua Gardner and John Eckman, both from the Department of Justice.

THE COURT: Glad to meet both of you.

Well, I heard you had a rehearsal.

MR. CONWAY: We did, Your Honor.

THE COURT: So you came in here to settle; you learned so much, huh?

I don't know, because no one told me about this until I saw the other Judge Miller in the hall, whether the cases are absolutely identical as pleaded. Mr. Conway, can you tell me about that?

MR. CONWAY: Yes, Your Honor. They are virtually identical.

THE COURT: Okay.

MR. CONWAY: The primary factual distinction is that in Atlantic City, besides selling Salem Units 1 and 2 Peach Bottom Units 2 and 3, they also sold Hope Creek as well to PSEG. So in Atlantic City, they sold Salem Units 1 and 2 to PSEG, Peach Bottom Units 2 and 3 to PSEG and PECO Energy, Your Honor, and Hope Creek to PSEG.

Now, in Delmarva, Delmarva sold Salem Units 1 and 2 to PSEG and Peach Bottom Units 2 and 3 to PSEG Power and PECO Energy in the exact same ownership percentages as before. The primary, of course, is the Hope Creek sale by Atlantic, not by Delmarva. I think that's the primary factual distinction. Otherwise, I view them to be virtually identical, Your Honor.

THE COURT: In terms of legal posture and so forth, they are identical.

MR. CONWAY: I think they are identical, Your Honor.

THE COURT: Thank you. Mr. Lester?

MR. LESTER: Yes, Your Honor.

THE COURT: It's your motion. One of the helpful documents that Plaintiff filed was the list of what I call possibly related cases, of which there appear to be 60, and I wanted to take this opportunity, since I know you're the head honcho on all of these cases, if you could explain to me their general status. I am aware that the government repeatedly has asked for consolidation and repeatedly has been refused, and if you can summarize -- you don't need to give specific names unless you want to -- what the status is. I would like to know what's on appeal; what, if anything, has been argued on appeal;

what's been tried, what's been tried and decided, what cases are going to trial, if you could help me with this.

MR. LESTER: Sure, I can. Let me start with just a brief response to the notice of related cases that was filed because I do want to tie it to this case just to make sure the Court is aware sort of the interrelationship of this case to a couple of the other cases.

On page 4 of our motion to dismiss, we identified the fact that this case actually involves claims relating to the same nuclear reactors and the same SNF that are at issue in the PSEG Nuclear case and that were at issue in the PECO case, which, I think, when it was filed, it was called Excelon because PECO had been bought out or taken over somehow. Since that time, the Excelon case has been settled, and only the PSEG Nuclear case remains, and that case is pending before Judge Sypolt.

We just sort of figured this out yesterday, a little late, that this case also involves the same contracts and SNF and the same reactors as the Atlantic City case that we just argued with the other Judge Miller at 1 o'clock today. So --

THE COURT: That surprised me, too.

MR. LESTER: Your Honor, I apologize. We just didn't notice that.

THE COURT: But I really wanted an overview of these cases.

MR. LESTER: Yes. Let me give you that, too. I just wanted to sort of put that in the context that three remaining cases in the Court -- PSEG, Atlantic City, and Delmarva -- all really relate to exactly the same reactor, same SNF, same contracts, and I'm not sure, with the amendment to the complaint that was filed last night, what the effect of that is going to be.

THE COURT: I don't have the amendment.

MR. LESTER: Last night, I think, about six-thirteen, I came in. There was an amended complaint that Delmarva filed, and it adds a breach-of-contract allegation in Count II of the complaint in this case.

So we have not really had an opportunity to really develop a response to that. We haven't had it very long, but --

THE COURT: Well, I haven't seen it.

MR. LESTER: I'm here today to talk about the takings claim, and I'm not really going to address that other than we can sort of --

THE COURT: Right.

MR. LESTER: -- tell the Court what it's about, but let me tell you about the other cases.

THE COURT: I know what it's about, if it's a contract claim, but go ahead.

MR. LESTER: Let me tell you about the other cases. I just had to write this up for somebody else within the department, so I'll try to remember. I wish I had brought it with me.

There is one case that has been tried and decided and is now on appeal to the federal circuit. That's the Indiana Michigan Power Company case that Judge Hodges decided. That trial was in March. I can't remember if the decision was in May or June, but it was around then. The plaintiff's brief was filed with a motion to exceed the word limit by about 5,000 words. The motion was denied, and so they are supposed to refile, I think, this week or next week, and then our brief will be due 40 days after that.

That case, I think, it appears, at least from the briefing, to involve just damages issues. At least the plaintiff's appellant's brief does not deal with rate issues, some of the other issues that we've sort of briefed in the other cases.

The second, third, and fourth cases to go to trial were all consolidated into a single trial before

Judge Merow, which began -- I think it was July 12th and ended August 31st, and that was Yankee Atomic, Connecticut Yankee, and Maine Yankee, all represented by the same firm, and we have just filed our simultaneous, initial, post-trial briefs. That was on November 18th. Simultaneous response briefs will be filed December 22nd. Closing argument is scheduled for January 14th, and then there will be simultaneous reply briefs, which will incorporate any questions the judge may have at closing arguments on January 28th.

Aside from that, then there are a few cases that have been scheduled for trial. The next case for trial is the Sacramento Municipal Utility District case before Judge Braden, which is scheduled for March 21st, I believe, and that, I believe, is scheduled for two weeks.

The next trial after that is the Tennessee Valley Authority case, -- let me step back. The Smud case before Judge Braden; the government filed dispositive motions in that case on the rate of acceptance. That's in --

THE COURT: I've read her decision.

MR. LESTER: She has not decided those. She has decided the takings claim, but that was it.

THE COURT: I'm sorry. That's what I was

referring to.

MR. LESTER: The others are pending, and so I'm not quite sure if those will be resolved before trial, or if they will be a part of the trial or not.

The next case scheduled for trial is the Tennessee Valley Authority case with Judge Lettow. That is scheduled for trial in June. I'm sorry. I don't remember the specific day that it's supposed to start. Judge Lettow decided the -- I'll call it the rate/schedule issue in TVA. In fact, TVA agreed with our position, at least up to the point of current damages, and so there was really not much of a dispute. What he is doing there is they are recovering damages up to, I believe, the end of their Fiscal Year 2004, and then any future damages, they will return to court in response to future partial breaches.

THE COURT: So he is trying damages?

MR. LESTER: He is trying damages, right, and so the rate will not be an issue there, I don't think.

After that, the next trial is Southern Nuclear Operating Company, to begin towards the end of August, again before Judge Merow, who also did the Yankee trials. I don't remember how long that trial

is supposed to be. And then after that, there are trials scheduled in South Carolina Gas & Electric with Judge Lettow in January of 2006. Wisconsin Electric is scheduled for trial in -- I believe it's June 2006. I don't think I'm leaving any out, but I might have missed one, but anyway --

THE COURT: You seem very familiar.

MR. LESTER: Oh, believe me, this is my life at this point.

THE COURT: This is your life.

MR. LESTER: Then, aside from that, there are several cases, most of them with one of the law firms, in particular, Shaw Pittman, LLP, --

THE COURT: Right.

MR. LESTER: -- where they have filed motions for summary judgment on liability, and so those have been briefed. Most of those are the Entergy cases. I think there are four or five of the Entergy cases where they have different contracts, and they have filed separate complaints, and Systems Fuels, Inc., which are related to the Entergy Company as well. It's not motions in all of the cases, but in most of those, and I don't know how Entergy got picked to file all of those motions.

THE COURT: Is that Entergy, I-N-T-E-R-G?

MR. LESTER: -- G-Y, yes. E-N-T-E-R-G-Y.

THE COURT: Somebody was very creative on that.

MR. LESTER: And in one of those cases, SFI/Entergy Arkansas, and in Consumers Energy, -- SFI is with Judge Lettow, and Consumers is with Chief Judge Damich -- we have a motion for summary judgment pending relating to a condition precedent that has not been satisfied to the government's obligation to accept fuel, and that is payment of certain fees, and we have sought summary judgment on that basis, that, in fact, because certain conditions precedent to the government's obligation to take fuel were never satisfied, the government's obligation to those two plaintiffs has not yet arisen; and, therefore, there is no basis for a liability ruling in those two cases.

THE COURT: Or you could just say there is no basis for a takings claim. You're preventing them from making one.

MR. LESTER: Well, those two cases are breach-of-contract cases.

THE COURT: I'm teasing you. Go ahead.

MR. LESTER: And then, as the Court is aware, although, obviously, this is not admissible evidence in any preceding, there has been a settlement

of the Excelon cases that were pending before Judge Hewitt at one point.

THE COURT: She had rendered some decisions on summary judgment.

MR. LESTER: She had issued one decision on summary judgment, yes, Your Honor, -- well, a single decision that disposed of the three motions the government had filed. She dismissed the takings claim. She found that a motion on GTCC waste was moot, and she denied the government's motion on the rate issues and had scheduled that for trial, but, obviously, the settlement has obviated the need for that. That was going to be tried last month, in November.

THE COURT: In terms of the cases you've just discussed, and I'm aware there are a number of pending motions that haven't been decided -- I'm aware of some other dockets, but just for my edification, are these cases all different, in your view? Would they have profited by coordinated discovery?

MR. LESTER: Oh, yes, definitely. Before I get to that, though, I did leave one set of cases out, and I apologize.

THE COURT: What was that?

MR. LESTER: There are four cases that are

pending before Judge Sypolt --

THE COURT: Those are the ones I was referring to.

MR. LESTER: -- where Judge Sypolt has issued a show cause order: Florida Power, Duke Power, PSEG Nuclear, which is related to this case; and Nebraska Public Power District, where she has issued a show cause order relating a jurisdictional issue, and the plaintiffs there have responded, and we will be responding in due course.

THE COURT: And this is on the same jurisdictional issue that was raised in the decision that she issued.

MR. LESTER: Yes. I'm viewing her -- it was a 30-page, show cause order.

THE COURT: Oh, I'm sorry.

MR. LESTER: I referred to the show cause order.

THE COURT: The show cause order, I referred to as an opinion.

MR. LESTER: Yes.

THE COURT: Sorry.

MR. LESTER: I think we're talking about the same thing.

THE COURT: And what was the government's

response?

MR. LESTER: The government has not filed its response yet, so --

THE COURT: You're considering it.

MR. LESTER: We are considering it, and we will be responding in the time --

THE COURT: Okay.

MR. LESTER: -- at an appropriate time.

THE COURT: Then let me begin again. In your view, and I'm just asking for your view, -- I referred to you as "head honcho" -- are these cases similar enough that they would have profited by coordinated discovery?

MR. LESTER: Well, I can tell you what we're finding in the discovery that we're having on damages now, and it is a problem for us, and I think it's going to become a bigger problem for us, particularly if we have multiple trials on these schedule issues. You know, from the government's standpoint, it is the same witnesses on the government side who were involved in the development of the contract and the program that it's developed, and unfortunately some of these folks are retired, and this is going to be an incredible burden on them to make them testify over and over again. Certainly, some of them are not very

happy about that, and I'm not quite sure how we'll resolve that.

THE COURT: In terms of discovery of classes of documents and so forth, would that have been helpful? I don't know if we're talking entirely past tense.

MR. LESTER: Well, I mean, in a large sense, to date, although it's starting to come apart a little bit, to date, for the most part, we have been able achieve that. The Court might recall there was, at one time, a coordinated discovery proceeding --

THE COURT: Correct.

MR. LESTER: -- that Judge Sypolt presided over. We were able to deal with depositions there in a coordinated manner. People were deposed once by the group of plaintiffs that existed at that time, and although some of those depositions were fairly lengthy, it did make it so that, you know, we weren't having to burden the same people over and over again, having the same questions asked over and over again. There was some coordination at that point, and that was very useful because it really did streamline a lot of what we had to do.

On the other side of it, obviously, the witnesses for each of the plaintiffs differs,

depending upon who in their organization was involved with the contract development, particularly with regard to their damages claims.

THE COURT: Are there any outstanding provisions that are requiring ongoing coordination as the cases that you've discussed are developing their way to trial?

MR. LESTER: I don't think so. The coordinated discovery proceedings were created for these schedule issues, and the plaintiffs' view has been that pretty much the coordination is done, and we've, you know, tried to broach the idea of coordination, but I don't think we've had a lot of success lately.

THE COURT: Well, let me tell you what my thought was, and it's a gratuitous thought, but I think it should be offered, and that is one of the successes with the Winstar experience was that the parties got together and essentially proposed a form of coordinated proceedings such that waves of cases proceeded that were similar at given times. And although a motion to consolidate would not be effective, and has not been effective, I noted, in going over some of the dockets, that the same firms, especially Shaw Pittman, seemed to dominated, it

seemed to me that it would be useful to enlist the plaintiffs' firms to come together and see if, among yourselves, you can devise a program to submit to the Court where you might be able to either have a test case approach and certain issues or scheduling the cases in a manner that is more conducive to having similar cases tried in order so that the issues go up that are somewhat similar to the federal circuit, if they must. Certainly, positioning cases in that manner helps settlement efforts.

I think it's something that it would be very worthwhile for the government and the law firms to get together on and formulate a plan.

The Court declined the motion to consolidate because, in the Winstar experience, only one opinion went on appeal, and it was felt by the Court that the jurisprudence would profit by having more than one judge decide the issues. I think we've gone to the other extreme in this case.

MR. LESTER: Well, you know, Your Honor, to be honest, I often here that we are sort of the anti-Winstar backlash cases. You know, Winstar went one way, and we are getting the entirely opposite reaction, and perhaps somewhere in the middle --

THE COURT: There is nothing wrong with your

making a proposal short of consolidation, and I think it would be very useful for all concerned, and I can't imagine that it wouldn't be beneficial.

I was the judge who was selected to decide the contract takings issues in Detroit Edison, and given that plaintiffs complaint at the time only pleaded a taking, Detroit Edison was not a case that, I think, provided a lot of guidance here.

So since the complexion has changed, let me summarize where I think you are, and we'll go from there. You filed a brief, a motion to dismiss based on Plaintiff's contract claim. The Plaintiff came back and said, no, we've got primarily a takings claim, and in your reply brief you attacked Plaintiff's claim to a cognizable property interest. And I was going to spend some time today, which I don't need to, going through the allegations of the complaint and indicating exactly what property interest had been pleaded but also asking why Plaintiff hadn't pled a breach of contract, and Mr. Conway can answer that later. There is no problem with doing that.

I went through the complaint and saw that, as pleaded, paragraph 56, the protected property interest was in the benefits of NWPA, and paragraph 60

claimed an intended beneficiary of the standard contract. Plaintiff possessed property rights to have DOE dispose of the SNF.

Then in Plaintiff's brief, at page 16, Plaintiff said that its property interests emanate from decades-long statutory framework. At pages 27 to 28, Plaintiff explained that the relevance of the express intended-beneficiary theory is that Plaintiff, as owner, had a responsibility for paying its share of the fees assessed. There is a dispute between the parties as to whether the Plaintiff, in fact, as owner, did have a responsibility for paying its share of the fees assessed and did pay them.

There are cases that have been decided that, I think, would reject Plaintiff's claim to a property interest, as described in the brief and in the complaint. The parties didn't address Allied General; Nuclear Services, which was decided by the federal circuit in 1988, 839 Federal Reporter 2nd Series at 1572; or the United Nuclear Corp., 912 F.2d 1432, decided in 1990, which my overzealous clerk, Mr. Saxon, found and we've been discussing.

I believe that what Plaintiff has pleaded is that it has a property interest in its plant that was sold at a depreciated value, according to Plaintiff's

complaint, as a result of actions of the government. Plaintiff is saying that it can prove that the value of its plant was diminished.

The significance of one of the cases I cited, United Nuclear, is a case that said in, I think, somewhat similar terms that a lease-hold interest in minerals constituted a property right, not any claim based on regulatory program and contracts executed pursuant to that program. I think United Nuclear is grounds to deny the motion based on the property interest as I've framed it.

But in any event, the important thing that we're accomplishing today, I hope, is to focus us because you made your central argument in your reply brief, and Plaintiff has not had an opportunity to respond, so I'm in no position to rule on the matter. What I would like to do is narrow the focus.

I think, with respect to Plaintiff's claim to a confiscatory fee having been paid, the federal circuit's case in Roedler, which both parties cite, would indicate that Plaintiff has made an allegation that goes beyond the discussion in Roedler and the Houck case, which is discussed there, because Plaintiff is alleging that the fees are being paid while the service is not being rendered, and that

distinguishes it from both of those cases. So I think that particular claim survives.

However, if we have a breach-of-contract claim, I would invoke my decision, which was supposed to govern these issues, in Detroit Edison and reserve the takings claim to proceed on the contracts claim, and on the contracts claim, you're going to take the view that Plaintiffs either don't have privity, or they are not an express intended beneficiary. In other words, we're back to your first brief. I think we need some discovery because Plaintiff has claimed, as an owner, that it really had responsibilities and that the operator of the facility was acting in its stead, but the Plaintiff had responsibilities, a lesson that I learned recently in the Hanson case, to my detriment, but, I think, a clarification of the issues. That was a Winstar case.

I can't resolve anything beyond what I discuss today in this case. I want to give Plaintiff the election to file a surreply, but I think that the addition of the new complaint that I haven't seen puts us in a position where we all need to step back and reassess the case. The contract allegations of a similar nature have not met with much favor, but I think that such allegations would be distinguishable

from the situation in Roedler, Roedler, of course, dealing with the takings issue but talking about the interest that is involved here.

I haven't seen the complaint, and my inclination would be to get a discovery schedule because no matter what you allege in what I refer to as your first brief, your brief on contract, I think Plaintiff would come back under Rule 56(f) and want some discovery to show what its ownership interest is and how the government related to that ownership interest unless Plaintiff has all of the papers it needs tissue.

So what is your view if the Court does one of the following: denies the motion with respect to the takings theory and defers proceeding on the takings theory until the contracts theory has been resolved one way or the other? That's one alternative. The other alternative is just to continue briefing. What's your preference?

MR. LESTER: Well, obviously, Your Honor, if you're going to deny our motion, then --

THE COURT: I said that's one alternative.

MR. LESTER: -- obviously that's not our favorite alternative.

THE COURT: No. What I'm saying is, based

on what I have now, the motion would be denied. Now, Plaintiff isn't stupid enough, represented by very competent counsel, to want to file much if the judge isn't going to go with -- but they have a right to file a surreply, and you have a right to amend -- if your motion fits the amended complaint, it can be reinstated, and Plaintiff can also respond at that time. But I see two alternatives: more anguished briefing, or can we, please, just go to the heart of it and see if we've got a contracts claim and go from there?

MR. LESTER: Well, I'm not sure which to respond to first, but let me give it a shot. With regard to the contract claim proceeding, obviously, the claim was just submitted last night, so that's not something there is any motion about here today. One thing, though, that --

THE COURT: I realize that, but you would be refiling much the same motion. I wouldn't be surprised.

MR. LESTER: Well, I think, actually, it might be a little bit different, though. The pleading that was filed yesterday, apparently, unbeknownst to the government, Delmarva alleges in that complaint that it actually had assigned its contract claims to

PSEG and to PECO and that the reason that it did not file a contract claim in its complaint originally was based upon that assignment.

Now, what it did, then, was file what we believe is a contract-based takings claim, presumably, then, to get around the assignment that they had made to the other two nuclear utilities. The government recently, in Rochester Gas & Electric, in September, and then in another brief in Entergy Nuclear Generation Company in early November, responded to some allegations regarding assignments in other cases, particularly in Rochester with regard to a request to substitute plaintiffs.

The assignor was the current plaintiff, and it has purported to assign all of its claims to the purchaser of its reactor and has sought permission to substitute the assignee for the assignor as the plaintiff in interest. The government has opposed that motion in light of its interpretation of the assignment provisions. Both the Assignment of Contracts Act, the Assignment of Claims Act, and there is a particular assignment provision in the Nuclear Waste Policy Act --

THE COURT: I don't want you to get that detailed.

MR. LESTER: Okay.

THE COURT: I'm just asking how you would like to proceed. I mean, just outline the motions practice.

MR. LESTER: Well, Your Honor, I think, if the contract claim is going to proceed, we have a bit of a dilemma at the government because this contract is the same contract that's at issue in PSEG. The contract claim is a request for the diminished value of the sale to PSEG and to PECO. The problem that we have is that if, in fact, the government is liable to Delmarva for the reduced price that it got -- if Delmarva received a reduced, diminished price in its sale of its interest to PSEG and PECO, that means that PSEG and PECO also paid less than they would have had there been no breach, and yet PSEG and PECO also filed suit for all of their damages that arose as a result of the government's breach. Supposedly, if they receive these damages, they will then be made whole as a result of the breach, assuming that monetary damages do, in fact, make you whole.

The problem that we have is that we are also liable to Delmarva or to Atlantic City or to other people who claim that they have sold interests at a diminished value. That means that PSEG and PECO

really ought to then somehow compensate, as part of their damages awards, for the reduced price that they paid on top of their --

THE COURT: This is one of the reasons that you might want to consider some sort of coordinated proceeding.

MR. LESTER: Well, in fact, Your Honor, under Rule 40.2, when this case was filed, it presumably should have included a notice of directly related cases that would have resolved the issue and allowed for consolidation of this case with other cases that involve the same contract. Now, I know that we had, in the past, asked for consolidation of all of the cases on the schedule --

THE COURT: But I'm asking you -- the whole dialogue is to focus.

MR. LESTER: Right. In this particular case, given that this case, PSEG, Atlantic City all involve exactly the same contract, and there are breach-of-contract claims now in all of these, breaches of the same contract, we presumably will be looking at a request to put all of those cases together before one judge and to consolidate them so these breach-of-contract issues on this same contract will be resolved together and to preclude any possible

that we are basically double-paying. We're paying PSEG the full price and paying somebody else the diminished value.

A bit of a problem that we also have, then, is that the PECO case is settled. That is something that obviously will be a part of our consideration of how the case develops, but given that it's out of the picture, really the only contracts --

THE COURT: You know, what you're telling me is that the government has the capability to get these cases together to see where they overlap and to sit down and discuss with the plaintiffs' law firms a method of resolving them by way of disposition, meaning settlement. This just seems ideal because you're talking about making adjustments, and any time you make adjustments, you can deal with factors by adding and deducting amounts of money, which would be involved in the analysis of this case and the others.

Now, is the same law firm representing plaintiffs in all the cases that you just mentioned?

MR. LESTER: No.

THE COURT: In two of them?

MR. LESTER: Yes. The PSEG is represented by --

THE COURT: Well, I think you ought to have

a tripartite meeting and see what can be resolved. I think that's number one. I think you should really make an effort to settle. There are interesting legal issues, but the government has settled other claims, and it's capable of doing so. I would be very glad to assist in any way I could in terms of reading any more law or even discussing monetary issues, whether or not I end up trying the case. I'm guaranteed to forget everything.

That's the first thing you ought to do. The second thing you ought to do is, failing settlement of this unique class of cases, which, I think, you should be able to do, is coming up with a method of disposing them, you know, sane, and the current method is not. Meeting a judge in the hall and finding out he has got the same argument is just really not the way to proceed.

So those are the steps the government should take in the short run. The amended complaint will be filed, and I would think that the best way to proceed is that the Detroit Edison decision would govern, and we would hold off dealing with takings, unless proceeding with a takings theory would give everybody information that you need to dispose of the case, and we would analyze, I suppose under a dispositive

motion, the assignment issues. I think you've got a lot better things to do than deal with assignment issues. You've got a readily identifiable class of case. There are only three of them, and I think every effort should be made to resolve them.

Mr. Conway knows that there are always risks on liability, and here, because of Plaintiff's particular status, those risks have to be taken very seriously, and adjustment of risks monetarily is what the parties do when they sit down. If you settle those other cases, -- I don't know who represented them, but I wouldn't be surprised if it wasn't Shaw Pittman, so they are willing to settle a case. So do that first. Failing that, as I say, get a program going for how you want to proceed with the contracts claim.

Now, you can either read the amended complaint and amend the motion or just file a renewed motion on the contracts claim. Plaintiff may well meet that motion with a request for discovery, and that's a matter that you could settle right now and sit down and talk and decide whether it's best just to go into a limited discovery. But I sincerely wish that you consider getting together on these three cases.

The body of jurisprudence is not going to benefit from sorting out that thorny issue, and I just tried one half of a damages case, and I'm going to try the other half. My law clerk saw the argument and said I'm going to be reversed, but I entered judgment after plaintiff had rested its case in a complex Winstar damages case where that same issue arose dealing with compensation coming from one source where there is a diminution in value from another source and an adjustment not having been made. It's a very difficult thing to do as a matter of proof with the best of experts.

So let me hear what Mr. Conway has to say.

MR. LESTER: Your Honor, could I address just one of the fee issues that you had referred to, the Houck case?

THE COURT: Right.

MR. LESTER: There is one part of our reply brief that I would ask the Court to just take a look at.

THE COURT: Well, I have looked at it.

MR. LESTER: I understand.

THE COURT: That's why I'm here today.

MR. LESTER: I understand. There is a jurisdictional issue, though, with regard to the

claims regarding basically about the fees, the nuclear waste fund fees. The complaint appears to be a complaint that the secretary of energy did not properly assess fees in his annual assessment, that he overcollected and that, in fact, as a result of that, that's a taking.

The Nuclear Waste Policy Act actually provides a specific review mechanism for that and requires challenges to that in the --

THE COURT: -- federal district court.

MR. LESTER: -- either D.C. Circuit or a federal --

THE COURT: I interpret the Plaintiff's claim slightly differently. I interpret Plaintiff's claim as saying not that there is a challenge to the amount of the fee, but there is a challenge to the fact that it has continued to be assessed after there essentially is no quid pro quo, and I think that is a different case than challenging a fee structure or imposition of the fee when it originated because those decisions had to be challenged years ago. Plaintiff didn't know what would happen.

I would like, of course, to resolve an issue of that nature with the benefit of Plaintiff's reply brief, but I had distinguished it myself, and

Plaintiff might be able to do a better job.

MR. LESTER: Actually, Your Honor, I think that the statute actually requires the secretary to review the fee assessment annually, and that the Nuclear Waste Policy Act permits, then, within 180 days of each annual review, a challenge to the assessment for that year. The secretary himself, though, even if he finds the fee assessment is inappropriate, does not have the authority to simply change the fee. All he does is submit a recommendation to Congress. It is that decision, anyway, that is the permissible subject of a petition for review to the appropriate regional or Washington, D.C. Circuit.

THE COURT: As I say, I construed the claim the way I did, but briefing isn't completed, so we're not arguing that. That's just the way, initially, I did, and Plaintiff may have some other thoughts. I think that unique events occurred in this case that were not contemplated by the original legislation. I'm not saying that the legislation created property rights, but it certainly created a scheme, a plan. The contract implemented and incorporated many of the statutory provisions, and the contract has had its performance frustrated by the inability of the

government to perform.

So, in these circumstances, I don't think that we are dealing necessarily with the necessity to raise a flag to the secretary about the imposition of the fee because the statutory program has been turned on its head, and we'll just see. We don't have full briefing on that issue. Okay?

MR. LESTER: All right. I just want to make clear, too, Your Honor, we'll go back and talk about how to proceed in the three cases: Atlantic, Delmarva, PSEG. I think it is probably likely that we will file some kind of a notice of directly related cases and probably a motion to transfer them all to a single judge, and we obviously have no preference which judge it is, but that's probably the most likely thing just to, from an organizational standpoint, to keep the cases sort of organized in a way where those directly related cases are sort of together where we're making decisions before one judge that are sort of all-encompassing of the cases that are directly related.

THE COURT: That's fine, with one exception. I also want you to spend your efforts considering with the firms whether disposition is appropriate and try to work out with them, are they going to oppose

this effort? If you can't dispose of them, try to determine if they agree that economies would be achieved proceeding before one judge.

The problem with doing this so late, and I'm really not aware of all of the other cases, -- that's why I asked you -- is because if Plaintiff knows that it has a favorable ruling in this case that it doesn't have in the other cases, this case isn't going to be transferred unless I'm the judge, and I don't know who the earliest-filed judge is.

MR. LESTER: Actually, I think, Your Honor, it will be Judge Sypolt. That case was filed in 2001. These were just filed.

THE COURT: It won't be transferred to her. That won't happen. Thank you very much.

MR. LESTER: Thank you, Your Honor.

THE COURT: Well, Mr. Goodman, excuse me. I did a lot of talking for you. Mainly, it was out of my own ignorance and trying to learn where these cases were, but tell me about your amended complaint.

MR. CONWAY: I will, Your Honor. Actually, it's Mr. Conway.

THE COURT: I'm sorry.

MR. CONWAY: That's quite all right.

THE COURT: I apologize.

MR. CONWAY: It's late in the day. That's quite all right, Your Honor.

We filed an amended complaint last night, Your Honor, in response to the pleadings that the government has been filing in the Rochester and the Entergy cases, which do make a breach-of-contract action, and we filed it because the government is trying to have it both ways in these cases, in our view, which is they are saying to people, the buyers that have these assigned cases, they are saying, Your Honor, that you don't have any right to bring these cases because it's an assigned case, and they are saying to the people that assigned them, you have no contract right because you've assigned your cases.

We became aware of these pleadings in mid-November, and we filed our amended complaint yesterday, and Judge Miller in the other courtroom asked why I waited a couple of weeks, and I said because I was at trial in front of Judge Allegra in the Boeing case, in fact, in this very courtroom. I was preparing for trial, and I try it starting the 15th of November. So once I've got out of that trial and got my head back together, I'll focus on this brief and file the amended complaint.

It is because of the government's action in

these other cases, and I am more than willing, Your Honor, to sit down with Mr. Lester and his colleagues and discuss all of the items that you are prepared to discuss. We do have somebody, I believe, today -- I think the gentleman in the back, I believe, is from Shaw Pittman. I spoke to Alex Tomasczuck of Shaw Pittman yesterday about the amended complaint to give him a heads-up so that he would know it's coming, and we talked about it, and I'm more than willing to sit down with the government, with Shaw Pittman, to try to work out whatever we can work out in whatever way we can work it out. That is our --

THE COURT: You're in a fix-it; you really are in this case, the tripartite case and the overlapping motions and overlapping interests, and this is the kind of thing that parties can settle. I just settled a case that looked intractable, and as I said, I would be willing to do what I can here to help you because sorting out these issues on a practical level looks much more feasible than on a legal level.

MR. CONWAY: We're prepared to do that, Your Honor, as soon as possible.

THE COURT: What's your preference with respect to Defendant's opposing brief, which essentially was its brief-in-chief to which you

haven't had an opportunity to respond?

MR. CONWAY: If the government is going to file more papers, I would rather wait and see what the papers are and then reply to them as opposed to what's happened here, which is their reply brief was longer than their main brief, and I basically responded to it on my feet. I would rather see their brief come in and give you paper on it. If we can't -- I would rather sit down with Mr. Lester if we can't resolve it.

THE COURT: I'm glad you have that attitude. You're really saying just what I was hoping to hear.

MR. CONWAY: My client is here, Your Honor, and they have no --

THE COURT: He took a break.

MR. CONWAY: There is one client back there. I have two clients here, and they have no interest in paying legal fees if we can resolve it, --

THE COURT: No.

MR. CONWAY: -- and they are more than willing to have it resolved. So if we can do that, I'm more than willing to stop any paper production and stop killing the trees and sit down with Mr. Lester and try to work something out. He and I have always gotten along very well. He is a fine lawyer, and I'm

glad to try and do that. If we can't, after some reasonable period of time, then if he wants to file more paper, let him file more paper, we'll respond, and once it's fully briefed, we'll argue it.

THE COURT: Now, would you like to reserve your opportunity to reply on the takings issue and the confiscatory fee issue at that time?

MR. CONWAY: I would, Your Honor. It makes no sense -- if we're going to see more paper, we might as well just do it at one point. In one sentence, I would state that you have essentially captured our issue on the fee. That was the one issue that counsel for the government talked to you on a jurisdictional basis. You've captured our view of that. That's what I tried to articulate to Judge Miller in the other courtroom.

Other than that, I'm willing to wait and sit down with Mr. Lester starting as soon as he wants to meet, and I know Alex Tomasczuck well, and I'm sure he'll have people at the same table, and we can do it either in person or by telephone, and then it that doesn't work out, we'll file paper. That's my plan.

THE COURT: Well, I really appreciate your willingness to be so flexible. I think, in the short run, I would ask the parties to advise me in 30 days

of what they intend to do. Defendant is required to answer the complaint at an earlier time, and I'll be glad to defer that if you're moving productively.

MR. CONWAY: That would be fine with us, Your Honor.

THE COURT: And if things aren't productive before 30 days, let me know. We can move ahead. Before the government files its notice of related cases, do what you can to resolve these three cases.

I see the government in this Court filing a lot of paper, and I see other interests that are being addressed out West, and if the government put all of the tremendous efforts it's putting into defending these cases to resolving the issue out West, I think we would have a solution at hand much faster.

So thank you very much, Mr. Conway.

MR. CONWAY: Thank you, Your Honor.

THE COURT: I'm sorry I used the wrong name.

MR. CONWAY: That's quite all right, Your Honor.

THE COURT: I have a lot of this in my head, and sometimes the personnel get mixed up when I haven't met them before.

We'll go off the record.

(Discussion off the record at 3:58 p.m.)

THE COURT: Is there anything the parties want to address today, Mr. Conway?

MR. CONWAY: Nothing further, Your Honor. Nothing from Plaintiff.

THE COURT: Mr. Lester?

MR. LESTER: I guess not, Your Honor. I guess the next thing for us would be, then, whatever our due date is for the response to the amended complaint, so --

THE COURT: I think it's 10 days of filing, but I'll certainly extend that if after you have an initial meeting, you decide that efforts were productive, to try to resolve these cases, and I would understand that you made a commitment to sit down and really try to do it and have the holiday season interrupt and not be able to get to these matters until January. But what I really want to know in December is if there is some hope because we can't single these cases out.

This is a dreadful issue that you're dealing with. You know, hard cases make bad law, and you've got to deal with it later. It can come up in another context you don't want it to. It's unpredictable. That's why I like to go back to the old Court of Claims cases and stay with simple contract concepts.

But as I say, you can call Mr. Saxon at any time, and I'll be very glad to help you, although I'm not particularly available the rest of this year. I start a trial in Tampa for two weeks, but if you need me, I can be on the phone.

Is that all from you, Mr. Lester?

MR. LESTER: Yes, Your Honor.

THE COURT: Well, thank you, everybody, for coming in. It really means a lot to me that Mr. Goodman came and that we do have an observer from another law firm because that may help coordinate these cases a little better, and I appreciate Mr. Lester's efforts to deal with all of these cases, an enormous assignment. The good news about it is I get to see you in a courtroom again, and the bad news about it is that I think that it's an enormous task that you have discharged superbly to date.

Thank you very much and have a happy holiday season.

ALL: Thank you, Your Honor.

(Whereupon, at 4:02 p.m., the hearing was adjourned.)

//

//

//

REPORTER'S CERTIFICATE

DOCKET NO.: 04-34C

CASE TITLE: Delmarva Power & Light v. U.S.

HEARING DATE: December 3, 2004

LOCATION: Washington, D.C.

I hereby certify that the proceedings and evidence are contained fully and accurately on the tapes and notes reported by me at the hearing in the above case before the United States Court of Federal Claims.

Date: 12/3/04

Charity Davis
Official Reporter
Heritage Reporting Corporation
Suite 600
1220 L Street, N.W.
Washington, D.C. 20005-4018