UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

CONSOLIDATED EDISON COMPANY OF NEW YORK, INC.
4 Irving Place
New York, NY 10003

CONSUMERS ENERGY COMPANY
f/k/a CONSUMERS POWER COMPANY
212 West Michigan Avenue
Jackson, MI 49201-2276

ILLINOIS POWER COMPANY
500 South 27th Street
Decatur, Illinois 62521

PACIFIC GAS AND ELECTRIC COMPANY
77 Beale Street
San Francisco, CA 94177

AND

ROCHESTER GAS AND ELECTRIC CORPORATION
89 East Avenue
Rochester, NY 14649

Petitioners,

v.

UNITED STATES DEPARTMENT OF ENERGY
1000 Independence Avenue, S.W.
Washington, DC 20585

THE HONORABLE ELIZABETH ANNE MOLER
ACTING SECRETARY OF ENERGY
1000 Independence Avenue, S.W.
Washington, DC 20585

AND

UNITED STATES OF AMERICA,

Respondents.

No.: 98-1358

CORRECTED COPY

**PETITION FOR REVIEW OF ACTIONS AND FAILURES TO ACT OF THE SECRETARY OF THE DEPARTMENT OF ENERGY, THE DEPARTMENT OF ENERGY AND THE UNITED STATES OF AMERICA**

**PETITION FOR REVIEW OF ACTIONS AND FAILURES TO ACT OF THE SECRETARY OF THE DEPARTMENT OF ENERGY, THE DEPARTMENT OF ENERGY AND THE UNITED STATES OF AMERICA**

Under 42 U.S.C. § 10139 and Fed. R. App. P. 15(a) and 21, petitioners respectfully submit this Petition for Review of Actions and Failures to Act of the Department of Energy, the Secretary of the Department of Energy and the United States of America under the Nuclear Waste Policy Act of 1982 ("NWPA" or "the Act."), and allege as follows:

**PARTIES**

1. Petitioners are public utility companies. Each company holds spent nuclear fuel as defined by the NWPA, 42 U.S.C. § 10101(23).

2. Petitioner Consolidated Edison Company of New York, Inc. ("Consolidated Edison") is the owner and operator of the Indian Point Unit Nos. 1 and 2 nuclear generating stations, located in Buchanan, New York. Indian Point Unit No. 1 commenced operation in 1962 and ceased operation in 1974. Indian Point Unit No. 2 received its operating license from the Atomic Energy Commission ("AEC") and commenced operation in 1973. Consolidated Edison's spent nuclear fuel inventory is currently stored at the Indian Point site in spent fuel pools. The current aggregate inventory is 1,077 fuel assemblies, or approximately 430 metric tons of uranium.

Consolidated Edison executed its statutory contract with DOE in June 1883 and has paid over $113,213,450 into the Nuclear Waste Fund.

3. Consumers Energy Company, d/b/a Consumers Power Company ("Consumers") is the owner and operator of the Big Rock Point Nuclear Plant, located in Charlevoix, Michigan, for which an operating license was issued by the AEC in 1962. Consumers is also the owner and operator of the Palisades Nuclear Plant, located near South Haven, Michigan, for which an operating license was issued by the AEC in 1971. Consumers' current aggregate inventory of spent nuclear fuel is approximately 1,400 fuel assemblies, or approximately 500 metric tons of uranium. Consumers executed its statutory contract with DOE in June 1983 and has paid approximately $57,000,000 into the Nuclear Waste Fund.

4. Illinois Power Company is the owner and operator of the Clinton Nuclear Power Plant, located near Clinton, Illinois, for which an operating license was issued in 1987. Illinois Power's current aggregate inventory of spent nuclear fuel is approximately 1,124 fuel assemblies, or approximately 201 metric tons of uranium. Illinois Power has paid almost $47,000,000 into the Nuclear Waste Fund.

5. Pacific Gas & Electric Company ("PG&E") is the owner and operator of the Diablo Canyon Nuclear Power Plant, located in Avila Beach, California, which has two operating

units, for which operating licenses were obtained from the Nuclear Regulatory Commission ("NRC") in 1981 and 1985 respectively. PG&E is also the owner and operator of the Humboldt Bay Power Plant, Unit 3, located in Humboldt County, California, for which an operating license was issued by the AEC in 1963. Unit 3 was retired from commercial operation in 1983, and received a possession-only license from the NRC in 1988. PG&E's current aggregate inventory of spent nuclear fuel is approximately 550 metric tons of uranium. PG&E executed its statutory contract with DOE in April 1983 and has paid over $180,000,000 into the Nuclear Waste Fund.

6. Rochester Gas and Electric Corp. ("RG&E") is the owner and operator of the R.P. Ginna Nuclear Power Plant, located in Wayne County, New York, for which an operating license was issued by the AEC in 1969. RG&E is also the owner of a 14% interest in the Nine Mile Point Unit 2 facility operated by NMPC. RG&E's current aggregate inventory of spent nuclear fuel is approximately 340 metric tons of uranium. RG&E executed its statutory contract with DOE in April 1983 and has paid over $50,000,000 into the Nuclear Waste Fund at a rate of approximately $3.4 million per year. RG&E also is obligated to pay into the fund approximately $83,000,000 for spent nuclear fuel generated prior to 1983.

7. Respondents are the Secretary of Energy, the United States Department of Energy, and the United States.

**JURISDICTION AND VENUE**

8. This court has jurisdiction under 42 U.S.C. § 10139(a)(1), which provides for original and exclusive jurisdiction over any civil action under the NWPA in the United States courts of appeals. This court also has authority to grant relief in this action under the All Writs Act (28 U.S.C. § 1651(a)) and the Declaratory Judgment Act (28 U.S.C. § 2201). The government has waived sovereign immunity pursuant to 42 U.S.C. § 10139(a)(1) and the Administrative Procedure Act (5 U.S.C. §§ 702-706).

9. Venue is proper in this court pursuant to 42 U.S.C. § 10139(a)(2), which provides for venue of any proceeding under section 10139 in the United States Court of Appeals for the District of Columbia Circuit.

10. Petitioners have standing to bring this action and are proper parties before this court because they have suffered redressable injury in fact as a result of the respondents' conduct.

**NATURE OF THE ACTION**

11. Petitioners seek review of respondents' actions and failures to act within the meaning of the Nuclear Waste Policy Act. In particular, petitioners seek review of respondents' failure to act under 42 U.S.C. § 10222(a)(4),

requiring the Secretary to evaluate and modify fees collected under the Act, and 42 U.S.C. § 10222(a)(6), requiring the Secretary to establish written terms and conditions under which DOE will provide spent nuclear fuel disposal services. Petitioners also seek declaratory, injunctive, and other affirmative relief to remedy DOE's failure to act in accordance with these sections, including a declaration that respondents' failure to reduce the fee petitioners are required to pay deprives petitioners of property interests protected by the substantive due process and taking clauses of the fifth amendment. Finally, petitioners seek declaratory and injunctive relief to remedy DOE's misuse of the Nuclear Waste Fund.

## REQUIREMENTS OF THE NUCLEAR WASTE POLICY ACT

12. In 1982, Congress enacted the Nuclear Waste Policy Act. The purpose of the NWPA was, among other things, to establish a schedule for the siting, construction and operation of repositories for spent nuclear fuel and high level radioactive waste, and to establish federal responsibility for the disposal of such waste and spent fuel beginning in January 1998. The NWPA established a Nuclear Waste Fund to ensure that the costs of timely disposing of waste and spent fuel in accordance with the NWPA's requirements would be borne by the persons responsible for generating such waste and spent fuel. 42 U.S.C. § 10131.

13. The NWPA required that DOE dispose of spent nuclear fuel beginning no later than January 31, 1998, and thereafter continue disposing of that fuel at levels consistent with the requirements of the Act and the terms and conditions for disposal that DOE was directed to publish. 42 U.S.C. §§ 10131(b)(1) and 10222(a)(6).

14. Section 302(a)(2) of the NWPA, 42 U.S.C. § 10222(a)(2), established a fee, initially set in the amount of 1 mil per kilowatt-hour, for disposal of spent nuclear fuel used to generate electricity sold on or after the date 90 days after January 7, 1983. 42 U.S.C. § 10222(a)(2). Section 302(a)(3) of the Act, 42 U.S.C. § 10222(a)(3), required that the Secretary establish a one-time per-kilogram fee for spent nuclear fuel used to generate electricity prior to the date on which the fee for prospective spent nuclear fuel became effective. 42 U.S.C. § 10222(a)(3).

15. Both the one-time fee and the continuing fees are paid into the "Nuclear Waste Fund" created by the NWPA, which is the source of funds to cover DOE's costs for disposing of the utilities' spent nuclear fuel. 42 U.S.C. §§ 10131(b)(4) and 10222.

16. The Secretary of DOE is allowed to make expenditures from the Nuclear Waste Fund only for purposes of radioactive waste disposal activities. 42 U.S.C. § 10222(d).

17. For purposes of this Petition, the NWPA mandates that DOE take three critical actions to fulfill its

obligations under the Act. First, 42 U.S.C. § 10222(a)(4) requires the Secretary to review annually the fees levied against the utilities and evaluate whether collection of those revenues will provide revenue sufficient to recover costs of radioactive waste disposal activities taken pursuant to the Act. In the event that the Secretary determines that either insufficient or excess revenues are being collected, the Secretary is required to propose an adjustment in the fee to Congress. Under this section, the Secretary's proposal automatically becomes effective if Congress does not reject the proposal within ninety (90) days.

18. Second, 42 U.S.C. § 10222(a)(5) requires the Secretary, acting through contracts, to begin disposing of spent nuclear fuel not later than January 31, 1998. Upon acceptance of the high-level radioactive waste or spent fuel, title to such waste or spent nuclear fuel shall transfer to the Secretary. 42 U.S.C. § 10143.

19. Third, 42 U.S.C. §§ 10131(b)(1) and 10222(a)(6) require the Secretary to establish a schedule for the siting, construction and operation of repositories accepting spent nuclear fuel for disposal, including the publication of written criteria setting forth the terms and conditions under which DOE will make disposal services available to the utilities.

IMPLEMENTATION OF THE STATUTORY FRAMEWORK

20. In 1983, DOE developed through rulemaking procedures a standard form of contract to administer the fee-collection and program-funding measures mandated by Congress (hereinafter "statutory contract")[1] and thereafter required execution of the contract by nuclear utilities. The statutory contract contained the fee provisions and the date by which DOE was to begin disposing of spent nuclear fuel required by the Act. See 10 C.F.R. Part 961.11.

21. Every one of the nation's utilities owning spent nuclear fuel, including each of the petitioners, executed an individual version of the statutory contract with DOE. See DOE Final Interpretation of Nuclear Waste Acceptance Issues ("Final Interpretation"), 60 Fed. Reg. 21793, 21794 (May 3, 1995).

22. Failure by a utility to execute the contract would subject the utility to denial of any subsequent request for issuance or renewal of a license to operate a nuclear power plant. 42 U.S.C. § 10222(b)(1)(A). Without an operating

---

[1] This court already has determined that the Standard Contract is to be treated as a regulation. Commonwealth Edison v. United States Dept. of Energy, 877 F.2d 1042, 1045 (D.C. Cir. 1989). Unlike many regulations, however, this regulation contains specific terms mandated by Congress as to which petitioners and DOE had no discretion.

license, no utility was or is permitted to operate a nuclear power plant in the United States.

**DOE FAILURE TO COMPLY WITH THE NWPA FUNDING REQUIREMENTS**

23. In 1987, Congress designated the Yucca Mountain site in Nevada as the only candidate site for a permanent repository designed to store high-level radioactive waste and spent nuclear fuel.

24. In 1993, various utilities and state agencies requested DOE to state how it intended to perform its obligation to dispose of spent nuclear fuel consistent with the statutory 1998 deadline. Respondents took the position that they had no legal obligation to dispose of the spent fuel absent an operational repository or other facility.

25. The utilities and states promptly filed petitions for review in this court. These petitions sought a declaration that the NWPA imposed an unconditional obligation on DOE to dispose of spent fuel beginning no later than January 31, 1998, a declaration that DOE's decision not to meet this obligation was contrary to the Act, and declaratory and injunctive relief. See, e.g., Petition of Indiana Michigan Power Company, dated May 30, 1995, at 5-6 (Case No. 95-1279).

26. The court agreed that the NWPA imposed an unconditional obligation on the Secretary to dispose of spent nuclear fuel beginning no later than January 31, 1998.

Indiana Michigan Power Co. v. Department of Energy, 88 F.3d. 1272, 2376-77 (D.C. Cir. 1996) The court further held that repudiation of this duty would destroy the "*quid pro quo*" for the utilities' payment of fees which Congress had created in the NWPA. DOE neither sought rehearing of that decision nor petitioned the Supreme Court for further review.

27. In response to a further utility petition, the court, in Northern States Power Co. v. Department of Energy, 128 F.3d 754 (D.C. Cir. 1997), again confirmed that the NWPA imposed an unconditional obligation to dispose of spent fuel beginning January 31, 1998, and issued a writ of mandamus precluding respondents from excusing their delay in disposing of this fuel on the ground that DOE had not yet constructed a permanent repository and had no authority to provide storage in the interim. 128 F.3d at 761.

28. On January 31, 1998, respondents failed to begin accepting spent nuclear fuel. Despite having conducted activities under the NWPA for more than 20 years, and consuming over $4.5 billion in expenditures from the Nuclear Waste Fund, respondents failed even to complete a determination of site adequacy, much less construct and make operational a repository at the Yucca Mountain location by January 31, 1998. Contrary to the requirements of the NWPA, respondents have neither established a schedule nor

determined a date certain by which a permanent repository will be operational.

29. Respondents also failed to propose a plan for storage of spent nuclear fuel pending completion of a permanent repository, and have established no date by which they will commit to begin disposing of that fuel. Letter from DOE General Counsel to Michigan Attorney General, dated January 13, 1997, at 1 (acknowledging uncertainty as to when DOE will begin disposing of spent fuel); 1996 Nuclear Waste Fund Fee Adequacy: an Assessment, at 6 (assuming waste disposal beginning in 2010).

30. Although DOE did not perform its obligations under the NWPA, its implementing regulations and the statutory contracts, petitioners have complied with their obligations. Since 1983, petitioners, and other nuclear utilities, have paid the fees mandated by the NWPA, its implementing regulations, and the statutory contract. Specifically, petitioners have been paying at a continuing rate of 1 mil per kilowatt-hour.

31. On average, the industry as a whole has paid approximately $550 million each year ($8.7 billion total) at the 1 mil fee. In addition, the cumulative interest generated by investment of unspent fee accumulations has in recent years contributed an average of another $219 million per year ($3.5 billion total) to the Nuclear Waste Fund.

32. In comparison, DOE's total incurred costs have averaged less than $350 million per year.

33. The present balance of the Nuclear Waste Fund is approximately $7.5 billion dollars.

34. The NWPA clearly contemplated that the Secretary annually would reassess the fee collected in connection with the spending plan required to site, construct and begin operating a repository by January, 31, 1998, and immediately would propose adjustments to the fee as necessary to fund timely accomplishment of DOE's NWPA obligations.

35. As noted in the House Report on the version of the bill passed into law, "[Section 302(a)(5)(B)] makes the Secretary responsible for disposing of high level waste or spent fuel as provided under this subtitle in permanent disposal facilities, beginning not later than January 1998, in return for the payment of fees established by this section." H.R. Rep. No. 97-491, at 59 (1982).

36. DOE was thus under an ongoing obligation to implement an on-time repository construction program, and to collect by January 31, 1998, all program funding necessary to have an operational repository by that date. In addressing the fee payment obligations the utilities were to assume under the NWPA, the Congressional Budget Office noted on April 26, 1982, when the bill was before Congress, that, in order to match program funding with the mandated January 31,

1998, repository operational date, "It is expected that the majority of the costs of this bill will be incurred by the year 2000 when repository construction is expected to be completed and the facility operational." 1982 U.S.C.C.A.N. at 3833, 97th Cong., 2nd Sess. Report of the Congressional Budget Office.

37. The annual Fee Adequacy Reports published by DOE never have proposed an adjustment in the fee. Each year Respondents have stated only that continuation of the 1 mil fee would produce revenues "adequate" to fund the program.

38. Notwithstanding the passage of the January 31, 1998 deadline, and thus the expiration of the time period over which the NWPA required that DOE collect fees sufficient to pay all siting and construction costs of the repository, DOE continues to collect the 1 mil fee (amounting to over $600 million per year) in accordance with the recommendation of the DOE's most recent Fee Adequacy Report. See 1996 Nuclear Waste Fund Fee Adequacy: An Assessment.

39. DOE proposes to continue collection of fees at this rate even though the Act required DOE to adjust the fees annually from 1982 until 1998 to assure that, within that period, sufficient funds would be collected for DOE to site, construct and initiate operation of a repository by January 31, 1998.

40. DOE proposes to continue to collect this amount despite the $7.5 billion existing balance in the Nuclear Waste Fund and an expenditure plan which shows it will spend only about one-half of future yearly receipts over the next twelve years. On May 18, 1998, Secretary Pena wrote to all petitioners identifying DOE's expenditure plan for the nuclear waste disposal program through the year 2010 - the date by which DOE currently estimates repository completion - and beyond. This plan indicates that DOE's expenditures through 2010 will average less than $340 million per year.

41. Moreover, Secretary Pena's May 18 letter demonstrates that the amount of money currently in the fund is, by itself, more than adequate to cover all of DOE's program costs through 2010.

42. DOE thus proposes current fee assessment practices that deviate from the mandatory requirements of the NWPA in at least two important respects: (a) fees would continue to be collected without recognition that DOE was required to collect, between 1982 and 1998, all fees necessary for the siting, construction and initial operation of a repository; and (b) continuation of the existing fee structure would perpetuate systematic and persistent overcollection under which annual fee collections would exceed annual NWPA-compliant waste program expenditures.

**DOE FAILURE TO COMPLY WITH NWPA PERFORMANCE REQUIREMENTS**

43. In addition to their obligation to accept spent nuclear fuel beginning January 31, 1998, under 42 U.S.C. § 10222(a)(5), and their obligation to adjust fees under 42 U.S.C. § 10222(a)(4), respondents are obligated to develop a schedule for the construction and operation of the repository and publish terms and conditions for acceptance of spent nuclear fuel that are in all respects compliant with the requirements of the NWPA. 42 U.S.C. § 10131(b)(1) and 10222(a)(6). Neither DOE nor the Secretary have published such schedule or criteria.

44. In 1995, DOE published the latest of its Annual Priority Ranking and Annual Capacity reports providing what is purported to be only an estimate of the rate of acceptance of spent nuclear fuel DOE intends to achieve for the ten years following first acceptance of that fuel. DOE intentionally failed to distinguish between fuel accepted for temporary storage and permanent emplacement in a repository as required by the NWPA, and also stated that the rates of acceptance identified in the report are not contractual terms and conditions and do not bind DOE.

**DOE'S REPUDIATION OF NWPA OBLIGATIONS**

45. Respondents' failures to meet their statutory obligations to modify the fee and publish terms and conditions for acceptance of spent nuclear fuel are critical

in light of DOE's failure: (a) to begin disposing of spent fuel on January 31, 1998, as required by the NWPA; and (b) to reduce or eliminate fees collected from petitioners while simultaneously refusing to establish a schedule for repository operation, a start date for acceptance of spent nuclear fuel, or a schedule or rate of spent fuel acceptance following commencement of repository operations.

46. Petitioners Consolidated Edison, RG&E, Consumers and Illinois Power separately wrote to the Secretary demanding that the Secretary comply with DOE's statutory obligations under 42 U.S.C. § 10222(a)(4) (fee adjustments) and 42 U.S.C. § 10222(a)(6) (establishment of terms and conditions). These letters highlighted the Secretary's "disregard for DOE's statutory obligations that exist independent of the contracts with the various utilities," and requested assurances of future compliance by July, 1998. See, e.g., Letter from Consolidated Edison to Secretary Pena, dated June 15, 1998, at 1 (Attachment 1).

47. On July 15, 1998, DOE responded to Consolidated Edison and Consumers,[2] asserting that it was not obligated by 42 U.S.C. § 10222(a)(6) to establish schedule for

---

[2] DOE did not respond to the letters from RG&E or Illinois Power.

acceptance of spent nuclear fuel due to delay in opening a disposal facility, and denying that under 42 U.S.C. § 10222(a)(4) it was obligated to collect by January 31, 1998, all funds necessary for the siting, construction and initial operation of a repository. Further, DOE denied that it was required prospectively to match further fee collections with its waste program expenditure plans pursuant to Section 10222(a)(4). See, e.g., Letter from DOE to Consolidated Edison, dated July 15, 1998 (Attachment 2).

48. To date, the Secretary has not fulfilled the obligation under 42 U.S.C. § 10222(a)(4) to propose to Congress the adjustment in fees necessary to bring fee collections into alignment with NWPA requirements or the program expenditures announced in the May 18, 1998 letter.

49. To date, the Secretary has not fulfilled the obligation under 42 U.S.C. §§ 10131(b)(1) and 10222(a)(6) to publish terms and conditions for the acceptance of spent nuclear fuel, because the Secretary has failed to promulgate the schedule for operation of a repository for the permanent emplacement of spent nuclear fuel, the schedule or rate of acceptance of this fuel, and other criteria, terms and conditions relating to the manner in which DOE will make disposal services available to the utilities.

**COUNT I (Violation Of Statutory Obligations To Reduce Or Eliminate Fees Collected Under The NWPA)**

50. Petitioners reallege and incorporate by reference paragraphs 1 through 49 of this Petition.

51. The Act permits DOE to collect, from petitioners, only those fees necessary to fund a nuclear waste disposal program which complies with the requirements of the Act.

52. Section 302(a)(4) of the NWPA, 42 U.S.C. § 10222(a)(4), explicitly requires that the Secretary review annually the fees levied against the utilities and determine whether collection of those revenues will provide revenue sufficient to recover costs of such a statutorily-compliant program.

53. In the event that the Secretary determines that the amount of fees collected either is in excess of or less than the amount necessary to cover legitimate costs incurred by DOE, the Secretary is required to propose to Congress an adjustment in the fee.

54. The Act required that DOE make adjustments necessary to ensure that DOE collected, by January 31, 1998, fees sufficient to fund the siting, construction, licensing, and initial operation of a repository for disposal of spent nuclear fuel by that date.

55. On information and belief, DOE did, by that date, collect all funds necessary to site, construct, license and initiate operation of the repository in a timely fashion.

56. DOE's failure now to reduce fees to an amount no greater than that which is reasonably necessary to fund the nuclear waste disposal program assuming the present existence of a fully functional repository is a violation of 42 U.S.C. § 10222(a)(4) and constitutes agency action unlawfully withheld.

57. On information and belief, respondents do not know with certainty, and did not know prior to January 31, 1998, either when DOE will construct a repository or the form this facility will take.

58. Respondents can make no rational evaluation of what are excess or inadequate fees as required by 42 U.S.C. § 10222(a)(4) without knowledge of the schedule under which the repository will be completed and the form and location of this repository.

59. Respondents' continued collection of fees under these circumstances is arbitrary and capricious and constitutes a violation of 42 U.S.C. § 10222(a)(4).

60. Respondents have collected more than $12 billion in fees and interest. Over the next ten years, DOE will collect twice the amount each year than it plans to spend. See Letter from Secretary Pena to Consolidated Edison, dated May 18, 1998 (identifying DOE projected Nuclear Waste Fund appropriations).

61. Respondents' continued collection of fees at a constant rate of 1 mil per kilowatt-hour, notwithstanding the

fact that respondents' program expenditure plan shifts a disproportionate quantity of incurred costs to a point fifteen years later than was contemplated in the initial establishment and assessment of the 1 mil fee, also is arbitrary and capricious and contrary to the Act and the statutory contract.

62. Given the existing fund balance, the uncertainty surrounding the form and cost of the required repository, and DOE's intent to incur costs at a slower rate than initially projected, DOE may not lawfully continue to collect the 1 mil fee consistent with the NWPA.

63. Respondents' most recent fee adequacy report fails to reconcile the uncertainty surrounding construction of a repository, the excess amounts currently in the Nuclear Waste Fund, the waste program expenditure plan set forth by the Secretary and the proposed continuation of the 1 mil per kilowatt-hour fee.

64. In light of the excess amounts currently in the Nuclear Waste Fund, the waste program expenditure plan announced by Secretary Pena on May 18, 1998, and DOE's inability to state with certainty when, and in what form, it will construct a repository, the Secretary's failure to propose a reduction in fee assessments to Congress is a violation of 42 U.S.C. § 10222(a)(4) of the NWPA and constitutes agency action unlawfully withheld. DOE already has substantial amounts in excess of what it will spend

through 2010 and should be precluded from any collection that further increases this excess.

65. As a direct and proximate result of the Secretary's failure to comply with the statutory obligation to adjust the fee, petitioners have been or will be required to pay fees in excess of what DOE lawfully may require payments into the Nuclear Waste Fund.

66. Accordingly, petitioners request that this court declare DOE in violation of 42 U.S.C. § 10222(a)(4).

67. Further, petitioners request that this court declare that under 42 U.S.C. §§ 10222(a)(4) and (5), the Secretary was obligated to seek any fee adjustments necessary to ensure collection, by January 31, 1998, of all funds required to site, construct, license and initiate operation of the repository by January 31, 1998.

68. Petitioners further request that this court declare that, under 42 U.S.C. §§ 10222(4) and (5), the Secretary currently is obligated to seek a fee reduction to an amount no more than necessary to fund a nuclear waste disposal program assuming existence of a fully operational repository from January 31, 1998, going forward.

69. Petitioners further request that the court declare DOE's most recent Fee Adequacy Report dated October 1996 contrary to 42 U.S.C. § 10222(a)(4) for failure to reconcile future proposed fees with the existing fund balance, the

expenditure plan through 2010, and respondents' uncertainty regarding when and in what form the repository will be built.

70. Finally, petitioners request that this court enter an order requiring the Secretary to propose to Congress, under 42 U.S.C. § 10222(a)(4) of the NWPA, a reduction in fees to a level not in excess of that which would be appropriate had DOE sited, constructed and initiated operation of fully functional repository for the permanent disposal of spent nuclear fuel by January 31, 1998, as required by the NWPA.

**COUNT II (Deprivation Of Substantive Due Process)**

71. Petitioners reallege and incorporate by reference paragraphs 1 through 70 of this Petition.

72. Petitioners' right, after January 31, 1998, to make payments into the Nuclear Waste Fund at a level no greater than would be necessary to fund the nuclear waste disposal program had DOE constructed an operational spent nuclear fuel repository by January 31, 1998, is a property interest protected by the substantive due process clause of the fifth amendment to the United States Constitution. See U.S. Const. Amend. V.

73. Petitioners' right to make payments into the NWF at a level no greater than would be required if the existing fund balance and DOE's May 18, 1998 expenditure plan were fully recognized is a property interest protected by the

substantive due process clause of the fifth amendment to the United States Constitution. See U.S. Const. Amend. V.

74. Respondents' refusal to adjust fees and its insistence that petitioners continue fee payments at existing levels results in a systematic and unreasonable overcollection of fees on the part of DOE and deprives petitioners of their protected property interests.

75. The actions of respondents are Executive actions not rationally related to the accomplishment of a legitimate government objective and, in fact, are contrary to the NWPA and its implementing regulations, and the statutory contracts.

76. Accordingly, respondents' conduct constitutes a denial of petitioners' substantive due process rights.

77. Petitioners respectfully request that this court enjoin DOE from further violation of petitioners' constitutional rights. Specifically, petitioners request a declaratory judgment that:

(a) DOE's continued collection of fees at levels in excess of those which would be required had DOE constructed an operational repository by January 31, 1998, constitutes a violation of petitioners' substantive due process rights; and

(b) DOE's continued collection of fees greater than those necessary to fund the program taking into account the existing fund balance and DOE's May 18,

1998 expenditure plan constitutes a violation of petitioners' substantive due process rights.

78. Petitioners further request that this court enter an order preventing DOE from further violating petitioners' constitutional rights and requiring the Secretary of Energy to propose to Congress a reduction in the fees petitioners are required to pay to zero until such time as the Secretary is able to establish to this court that additional payments into the Nuclear Waste Fund are appropriate.

**COUNT III (Taking)**

79. Petitioners reallege and incorporate by reference paragraphs 1 through 78 of this Petition.

80. Petitioners' right, after January 31, 1998, to make payments into the Nuclear Waste Fund at a level no greater than would be necessary to fund the nuclear waste disposal program had DOE constructed an operational spent nuclear fuel repository is a property interest within the meaning of the fifth amendment taking clause. See U.S. Const. Amend. V.

81. Petitioners' right to make payments at a level no greater than would be required if the existing fund balance and DOE's May 18, 1998 expenditure plan were fully recognized is a property interest within the meaning of the fifth amendment taking clause. See U.S. Const. Amend. V.

82. Respondents' refusal to adjust fees and requirement that petitioners continue payments at existing levels amount

to a systematic and unreasonable overcollection of fees on the part of DOE and a taking of petitioners' property.

83. DOE's taking of petitioners' property was unauthorized. No statute permits the Executive to deprive the petitioners of property beyond that which would be necessary to fund the nuclear waste disposal program assuming an operational repository consistent with the NWPA's statutory framework. DOE's failure was contrary to the NWPA, its implementing regulations and the statutory contract.

84. Petitioners respectfully request that this court enjoin DOE from further violation of petitioners' constitutional rights. Specifically, petitioners request a declaratory judgment that:

(a) DOE's continued collection of fees at levels in excess of those which would be required if DOE had constructed an operational repository by January 31, 1998, constitutes a violation of the taking clause of the United States Constitution; and

(b) DOE's continued collection of fees greater than those necessary to fund the program taking into account the existing fund balance and DOE's May 18, 1998 expenditure plan constitutes a violation of the taking clause of the United States Constitution.

85. Petitioners further request that the court enter an order preventing DOE from further violating petitioners'

constitutional rights and requiring the Secretary of Energy to propose to Congress a reduction in the fees petitioners are required to pay to zero until such time as the Secretary is able to establish to this court, on notice to petitioners, that additional contributions to the Nuclear Waste Fund are appropriate.

**COUNT IV (Declaratory Judgment Regarding Use of Nuclear Waste Fund)**

86. Petitioners reallege and incorporate by reference paragraphs 1 through 85 of this Petition.

87. Section 302(d) of the NWPA provides that the Secretary "may make expenditures from the Waste Fund . . . only for the purposes of radioactive waste disposal activities" under the Act. 42 U.S.C. § 10222(d).

88. Funds in this Nuclear Waste Fund are not general treasury funds, but rather are funds held in trust pursuant to the NWPA.

89. Use of these funds is limited not only by the language of the NWPA itself, but also by the prohibitions found in 31 U.S.C. 1321 and 1301, governing use of trust fund amounts.

90. Upon information and belief, funds paid into the Nuclear Waste Fund have been used as general treasury funds for purposes other than those authorized by Congress in 42 U.S.C. § 10222(d) of the NWPA.

91. Upon information and belief, the cost of the repository to petitioners will increase as a direct result of respondents' delay in the construction of the repository which is solely the responsibility of respondents.

92. Upon information and belief, DOE is now using, and intends to continue using, the Nuclear Waste Fund to pay costs other than those associated with an NWPA-compliant repository, e.g., a repository which has been sited, constructed and made operational prior to January 31, 1998. Further utilization of the Nuclear Waste Fund to defray these delay costs is in violation of the NWPA.

93. Accordingly, petitioners request that this court enter an order declaring that all monies paid into the Nuclear Waste Fund be maintained in a separate account and that the Secretary of Energy be required to provide an annual accounting of all amounts spent.

94. Further, petitioners request that this court enter an order declaring that any increased costs of disposal resulting from the delay in developing a permanent repository for spent nuclear fuel, including increased costs of construction and operation, be borne by DOE from sources other than the Nuclear Waste Fund and not be used directly or indirectly to justify an increase in payments to that fund.

95. Petitioners request that this court enter an order restraining respondents from:

(a) further misuse of the fund; and

(b) paying from the fund any increased costs that relate to delay in construction or operation of the repository.

**COUNT V (Failure To Establish Schedule, Terms And Conditions For Acceptance Of Spent Nuclear Fuel)**

96. Petitioners reallege and incorporate by reference paragraphs 1 through 95 of this Petition.

97. Sections 111(b)(1) and 302(a)(6) of the NWPA, 42 U.S.C. § 10131(b)(1)) and 42 U.S.C. § 10222(a)(6), require the Secretary to establish in writing a schedule for the construction and operation of a repository for the permanent disposal of spent nuclear fuel, and criteria setting forth the terms and conditions, including the schedule and rate of acceptance, under which DOE is obligated to make spent nuclear fuel disposal services available to the utilities.

98. Under the statutory contract, DOE was required to collect information from utilities regarding the age of the spent nuclear fuel and, using that data, establish a schedule by which DOE would accept spent nuclear fuel following the January 31, 1998 start date.

99. The Secretary delegated responsibility for establishing this schedule to DOE's Office of Civilian Radioactive Waste Management ("OCRWM"). That office published periodic reports setting forth a hypothetical rate of acceptance of spent nuclear fuel by DOE. The most recent

report published was the 1995 Acceptance Priority Ranking and Annual Capacity Report.

100. DOE has failed to establish either a schedule for operating a repository or terms and conditions governing DOE's rate of acceptance of spent nuclear fuel under the Act.

101. In July 1983, DOE published a Report on Financing the Disposal of Commercial Spent Nuclear Fuel and Processed High-Level Radioactive Waste. This Report comprises DOE's first pronouncement of the terms and conditions for acceptance of spent nuclear fuel made following enactment of the NWPA. It specified a design receipt rate of 6000 metric tons per year.

102. On information and belief this rate of acceptance took into account multiple factors including repository design, rate of production of spent nuclear fuel, and optimization of the transportation resources required for the program.

103. Subsequent reports have published projected rates of approximately 900 metric tons per year for the ten years following first acceptance of spent nuclear fuel. See 1995 Annual Priority Ranking and Annual Capacity Report, at 4.

104. These "projections" do not satisfy the Act's requirement for a "schedule" and "terms and conditions" for spent fuel acceptance because they neither bind nor condition DOE conduct under the statutory scheme Congress established through the NWPA. DOE expressly has disclaimed that its

projections amount to terms and conditions. In its 1995 Annual Priority Ranking and Annual Capacity Report, DOE states that this data "is for planning purposes only . . . ." Id. at 1.

105. DOE's projections subsequent to July 1983 are unreasonable. They attempt to accommodate DOE's unauthorized delay in fulfilling its statutory obligations, and thus violate the Act even if taken as terms and conditions for spent fuel acceptance or as a schedule for repository operation. These projections are based on highly restrictive assumptions applicable only if initial acceptance of spent nuclear fuel were to occur at Monitored Retrievable Storage ("MRS") facilities rather than the permanent repository required by the NWPA. Id. at 4. Moreover, DOE's "projections" bear no rational relationship to the technical capabilities of the permanent repository for which petitioners are paying. See, e.g., 1983 Report on Financing the Disposal of Commercial Spent Nuclear Fuel and Processed High-Level Radioactive Waste, at 11.

106. DOE also has failed to establish other essential terms and conditions required by 42 U.S.C. § 10222(a)(6).

107. The Secretary's failure to establish terms and conditions for the disposal of spent nuclear fuel required by 42 U.S.C. § 10222(a)(6) violates the Act.

108. Accordingly, petitioners request that this court declare DOE in violation of 42 U.S.C. §§ 10131(b)(1) and 10222(a)(6). Petitioners further request that this court require DOE and the Secretary to establish, no later than 60 days following entry of an order in this case, the schedule for repository operation and the terms and conditions, including the rate of acceptance, by which disposal services shall be made available in compliance with the NWPA. Finally, petitioners request that this court retain jurisdiction over this action for purposes of determining whether the terms and conditions established by DOE comply with the NWPA and otherwise enforcing the court's order.

**PRAYER FOR RELIEF**

WHEREFORE, petitioners respectfully request that the court enter judgment in favor of the companies, and grant the following relief:

(a) A declaration that respondents are in violation of Sections 111(b)(1), 302(a)(4), and 302(a)(6) of the NWPA. 42 U.S.C. §§ 10131(b)(1), 10222(a)(4) and 10222(a)(6).

(b) A declaration that respondents' decision to require petitioners to continue making payments into the Nuclear Waste Fund at current levels is a violation of the substantive due process and taking clauses

of the fifth amendment to the United States Constitution.

(c) A declaration that, under 42 U.S.C. § 10222(a)(4) and (5), the Secretary was obligated to seek all fee adjustments necessary to ensure collection, by January 31, 1998, of all funds required to site, construct, license and make operational the repository by that date.

(d) A declaration that DOE's most recent Fee Adequacy Report dated October 1996 is contrary to 42 U.S.C. § 10222(a)(4) for failure to reconcile future proposed fees with the existing fund balance and the announced expenditure plan through 2010.

(e) An order declaring that any increased costs of disposal resulting from the delay in developing a permanent repository for spent nuclear fuel, including increased costs of construction and operation, be borne by DOE and not be used to increase payments by petitioners to the Nuclear Waste Fund.

(f) An order requiring the Secretary of Energy to propose to Congress a fee reduction to an amount no more than necessary to fund the nuclear waste disposal program assuming the present existence of an operational repository consistent with the NWPA's statutory framework, or alternatively, a

reduction of the fee to zero until such time as the Secretary is able to establish, on notice to petitioners, that additional contributions to the Nuclear Waste Fund are appropriate.

(g) An order declaring that all monies paid into the Nuclear Waste Fund be maintained in a separate account and that the Secretary of Energy be required to provide an annual accounting of all amounts spent.

(h) An order prohibiting respondents from (a) further misuse of the fund; and (b) paying any increased costs that relate to delay in construction of the repository from the fund.

(i) An order requiring respondents to establish, no later than 60 days following entry of an order in this case, the schedule for repository operation and the terms and conditions, including rate of acceptance, under which disposal services shall be made available in compliance with the Act.

(j) A determination that the court will retain jurisdiction over this action for purposes of assessing whether DOE's prospective fee assessment practices, its schedule for repository operation, and its established terms and conditions for spent fuel acceptance for permanent disposal at a repository comply with the NWPA, and enforcing

DOE's compliance with such NWPA requirements as may be approved by the court.

(k) Such other and further relief as the court deems just.

Respectfully submitted,

Tami Lyn Azorsky*
David A. Churchill
Stephen E. Ruscus
MCKENNA & CUNEO, L.L.P.
1900 K Street, N.W.
Washington, DC 20006
202-496-7500

Attorneys for

Consolidated Edison Company of New York, Inc.

Consumers Energy f/k/a Consumers Power Company

Illinois Power Company

Pacific Gas and Electric Company

Rochester Gas and Electric Corporation

Dated: July 30, 1998

*Counsel of Record

Of Counsel:

C. Stanley Dees, Esq.
Herbert L. Fenster, Esq.
John Bonello, Esq.
Suzanne Karbarz, Esq.

MCKENNA & CUNEO, L.L.P.
1900 K Street, N.W.

Washington, DC 20006
202-496-7500