No. 98-384

# In the Supreme Court of the United States

OCTOBER TERM, 1997

---

UNITED STATES OF AMERICA, ET AL., PETITIONERS

*v.*

NORTHERN STATES POWER COMPANY, ET AL.

---

*ON PETITION FOR A WRIT OF CERTIORARI
TO THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT*

---

**PETITION FOR A WRIT OF CERTIORARI**

---

SETH P. WAXMAN
*Solicitor General*
*Counsel of Record*

LOIS J. SCHIFFER
*Assistant Attorney General*

LAWRENCE G. WALLACE
*Deputy Solicitor General*

MALCOLM L. STEWART
*Assistant to the Solicitor General*

JOHN A. BRYSON
*Attorney*

*Department of Justice*
*Washington, D.C. 20530-0001*
*(202) 514-2217*

## QUESTION PRESENTED

In *Indiana Michigan Power Co.* v. *Department of Energy*, 88 F.3d 1272 (D.C. Cir. 1996), the court of appeals held that the Department of Energy (DOE) has an unconditional obligation to begin, on January 31, 1998, disposal of spent nuclear fuel owned by utilities that are parties to the Department of Energy's Standard Contract for Disposal of Spent Nuclear Fuel and/or High Level Radioactive Waste (Standard Contract). DOE subsequently issued a preliminary determination that the expected delay in performance by DOE of that obligation was governed by the "unavoidable delays" provision of the Standard Contract. The court of appeals then held that its prior decision in *Indiana Michigan* precluded DOE from treating the delay as "unavoidable." The question presented is:

Whether the court of appeals' order prohibiting DOE from invoking the "unavoidable delays" provision of the Standard Contract intrudes impermissibly upon the jurisdiction of the Court of Federal Claims, which has exclusive authority under the Tucker Act, 28 U.S.C. 1491 (1994 & Supp. II 1996), to adjudicate actions founded on a contract with the United States.

## PARTIES TO THE PROCEEDINGS

Petitioners are the United States of America, the United States Department of Energy, and the Secretary of Energy.

Respondents are as follows: Alabama Public Service Commission, Arizona State Corporation Commission, State of Arkansas, Arkansas Public Service Commission, California Public Utilities Commission, State of Connecticut, Connecticut Department of Public Utility Control, State of Delaware, State of Florida, Florida Public Service Commission, State of Georgia, State of Indiana, State of Illinois, Illinois Commerce Commission, State of Iowa, Iowa Utilities Board, State of Kansas, Kansas Corporation Commission, Commonwealth of Kentucky, Louisiana Public Service Commission, State of Maine, State of Maryland, Maryland Public Service Commission, Commonwealth of Massachusetts, State of Michigan, Michigan Public Service Commission, State of Minnesota, Minnesota Department of Public Service, Minnesota Public Utilities Commission, State of Mississippi, Mississippi Public Service Commission, Missouri Public Service Commission, National Association of Regulatory Utility Commissioners, State of Nebraska, State of New Hampshire, New Hampshire Office of the Consumer Advocate, New Jersey Board of Public Utilities, New York State Public Service Commission, North Carolina Utilities Commission, North Dakota Public Service Commission, Public Utilities Commission of Ohio, Pennsylvania Public Utility Commission, Public Systems Group, State of Rhode Island and Providence Plantations, Public Service Commission of South Carolina, South Dakota Public Utilities Commission, State of Vermont, Vermont Public Service Board, Commonwealth of Virginia, Wiscon-

sin Public Service Commission, Northern States Power Company, Florida Power and Light Company, Duke Power Company, Vermont Yankee Nuclear Power Corporation, Niagara Mohawk Power Corporation, GPU Nuclear, Inc., Jersey Central Power & Light Company, Metropolitan Edison Company, Pennsylvania Electric Company, Wisconsin Public Service Corporation, Union Electric Company, Detroit Edison Company, Public Service Electric and Gas Company, Florida Power Corporation, Wolf Creek Nuclear Operating Corporation, Kansas Gas and Electric Company, Gas City Power & Light Company, Kansas Electric Power Cooperative, Inc., Indiana Michigan Power Company, PECO Energy Company, Virginia Electric and Power Company, Consumers Power Company, Baltimore Gas and Electric Company, Centerior Energy Corporation, Consolidated Edison Company of New York, Inc., Duquesne Light Company, Midamerican Energy Company, New York Power Authority, Pennsylvania Power & Light Company, Entergy Operations, Inc. (on its own behalf and as agent for Entergy Arkansas, Inc., System Energy Resources, Inc., South Mississippi Electric Power Association, Entergy Louisiana, Inc., Entergy Gulf States Utilities, and Cajun Electric Power Cooperative), Rochester Gas and Electric Corporation, Texas Utilities Electric Company, Carolina Power & Light Company, Pacific Gas and Electric Company, Commonwealth Edison Company, Boston Edison Company, IES Utilities, Inc., Central Iowa Power Cooperative, Corn Belt Power Cooperative, Northeast Utilities Service Company, Connecticut Yankee Atomic Power Company, North Atlantic Energy Service Corporation, American Public Power Association, Piedmont Municipal Power Agency, Connecticut Municipal Electric Energy Cooperative, Massachusetts Municipal Wholesale

Electric Company, Florida Municipal Power Agency, the New Hampshire Electric Cooperative, Inc., the Electric Department of the City of Burlington, Vermont, the Electric Department of Braintree, Massachusetts, City of Anaheim, California, City of Riverside, California, City of Banning, California, City of Azusa, California, Arizona Corporation Commission, National Associate of Regulatory Utility Commissioners, Virginia State Corporation Commission, Louisiana Public Service Commission, Illinois Power Company, Yankee Atomic Electric Company, Maine Yankee Atomic Power Company, Southern Nuclear Operating Company, Wisconsin Electric Power Company, Omaha Public Power District, Nebraska Public Power District, Southern California Edison Company, Washington Public Power Supply System, South Carolina Electric & Gas Company, Dairyland Power Cooperative.

The parties in the consolidated cases in the court of appeals were as follows:

No. 97-1064:

*Petitioners*: Northern States Power Company, Florida Power and Light Company, Duke Power Company, Vermont Yankee Nuclear Power Corporation, Niagara Mohawk Power Corporation, GPU Nuclear, Inc., Jersey Central Power & Light Company, Metropolitan Edison Company, Pennsylvania Electric Company, Wisconsin Public Service Corporation, Union Electric Company, Detroit Edison Company, Public Service Electric and Gas Company, Florida Power Corporation, Wolf Creek Nuclear Operating Corporation, Kansas Gas and Electric Company, Gas City Power & Light Company, Kansas Electric Power Cooperative, Inc., Indiana Michigan Power Company, PECO Energy Company, Virginia Electric and Power Company, Consumers Power Com-

pany, Baltimore Gas and Electric Company, Centerior Energy Corporation, Consolidated Edison Company of New York, Inc., Duquesne Light Company, Midamerican Energy Company, New York Power Authority, Pennsylvania Power & Light Company, Entergy Operations, Inc. (on its own behalf and as agent for Entergy Arkansas, Inc., System Energy Resources, Inc., South Mississippi Electric Power Association, Entergy Louisiana, Inc., Entergy Gulf States Utilities, and Cajun Electric Power Cooperative), Rochester Gas and Electric Corporation, Texas Utilities Electric Company, Carolina Power & Light Company, Pacific Gas and Electric Company, Commonwealth Edison Company, Boston Edison Company.

*Respondents*: United States Department of Energy, United States of America.

*Intervenors*: IES Utilities, Inc., Central Iowa Power Cooperative, Corn Belt Power Cooperative, Northeast Utilities Service Company, Connecticut Yankee Atomic Power Company, North Atlantic Energy Service Corporation, American Public Power Association, Piedmont Municipal Power Agency, Connecticut Municipal Electric Energy Cooperative, Massachusetts Municipal Wholesale Electric Company, Florida Municipal Power Agency, New Hampshire Electric Cooperative, Inc., the Electric Department of the City of Burlington, Vermont, the Electric Department of Braintree, Massachusetts, City of Anaheim, California, City of Riverside, California, City of Banning, California, City of Azusa, California, Arizona Corporation Commission, National Association of Regulatory Utility Commissioners, Virginia State Corporation Commission, Louisiana Public Service Commission.

No. 97-1065:

*Petitioners*: Alabama Public Service Commission, Arizona State Corporation Commission, State of Arkansas, Arkansas Public Service Commission, California Public Utilities Commission, State of Connecticut, Connecticut Department of Public Utility Control, State of Delaware, State of Florida, Florida Public Service Commission, State of Georgia, State of Indiana, State of Illinois, Illinois Commerce Commission, State of Iowa, Iowa Utilities Board, State of Kansas, Kansas Corporation Commission, Commonwealth of Kentucky, Louisiana Public Service Commission, State of Maine, State of Maryland, Maryland Public Service Commission, Commonwealth of Massachusetts, State of Michigan, Michigan Public Service Commission, State of Minnesota, Minnesota Department of Public Service, Minnesota Public Utilities Commission, State of Mississippi, Mississippi Public Service Commission, Missouri Public Service Commission, National Association of Regulatory Utility Commissioners, State of Nebraska, State of New Hampshire, New Hampshire Office of the Consumer Advocate, New Jersey Board of Public Utilities, New York State Public Service Commission, North Carolina Utilities Commission, North Dakota Public Service Commission, Public Utilities Commission of Ohio, Pennsylvania Public Utility Commission, Public Systems Group, State of Rhode Island and Providence Plantations, Public Service Commission of South Carolina, South Dakota Public Utilities Commission, State of Vermont, Vermont Public Service Board, Commonwealth of Virginia, Virginia State Corporation Commission, Wisconsin Public Service Commission.

*Respondents*: United States Department of Energy, Secretary of Energy, United States of America.

*Intervenors*: IES Utilities, Inc., Central Iowa Power Cooperative, Corn Belt Power Cooperative, Northeast Utilities Service Company, Connecticut Yankee Atomic Power Company, North Atlantic Energy Service Corporation, Public Systems Group (American Public Power Association, Piedmont Municipal Power Agency, Connecticut Municipal Electric Energy Cooperative, Massachusetts Municipal Wholesale Electric Company, Florida Municipal Power Agency, New Hampshire Electric Cooperative, Inc., Electric Department of the City of Burlington, Vermont, Electric Department of Braintree, Massachusetts, City of Anaheim, California, City of Riverside, California, City of Banning, California, City of Azusa, California).

No. 97-1370:

*Petitioner*: Illinois Power Company.

*Respondents*: United States Department of Energy, United States of America.

No. 97-1398:

*Petitioner*: Yankee Atomic Electric Company.

*Respondent*: United States Department of Energy.

No. 98-1069:

*Petitioner*: Maine Yankee Atomic Power Company.

*Respondent*: United States Department of Energy.

No. 98-1070:

*Petitioners*: Southern Nuclear Operating Company, Wisconsin Electric Power Company, Omaha Public Power District, Nebraska Public Power District.

*Respondent*: United States Department of Energy.

No. 98-1201:

*Petitioner*: Southern California Edison Company.

*Respondent*: United States Department of Energy.

No. 98-1213:

*Petitioners*: Washington Public Power Supply System, South Carolina Electric & Gas Company.

*Respondent*: United States Department of Energy.

No. 98-1284:

*Petitioner*: Dairyland Power Cooperative.

*Respondents*: United States Department of Energy, United States of America.

TABLE OF CONTENTS


| | Page |
|---|---|
| Opinions below | 1 |
| Jurisdiction | 2 |
| Statutory provisions involved | 2 |
| Statement | 2 |
| Reasons for granting the petition | 14 |
| Conclusion | 27 |
| Appendix A | 1a |
| Appendix B | 15a |
| Appendix C | 22a |
| Appendix D | 27a |
| Appendix E | 39a |


TABLE OF AUTHORITIES

Cases:


| | |
|---|---|
| *Commonwealth Edison Co.* v. *U.S. Dep't of Energy,* 877 F.2d 1042 (D.C. Cir. 1984) | 23 |
| *General Elec. Uranium Mangement Corp.* v. *United States Dep't of Energy,* 764 F.2d 896 (D.C. Cir. 1985) | 15, 23 |
| *Indiana Michigan Power Co.* v. *Dep't of Energy,* 88 F.2d 1272 (D.C. Cir. 1996) | 7, 9 |
| *Megapulse, Inc.* v. *Lewis,* 672 F.2d 959 (D.C. Cir. 1982) | 15 |
| *Ojeda Rios, In re,* 863 F.2d 202 (2d Cir. 1988) | 18 |
| *Roche* v. *Evaporated Milk Ass'n,* 319 U.S. 21 (1943) | 18 |
| *Sharp* v. *Weinberger,* 788 F.2d 1521 (D.C. Cir. 1986) | 15, 16 |
| *Sindram, In re,* 498 U.S. 177 (1991) | 18 |
| *Telecommunications Research and Action Ctr.* v. *FCC,* 750 F.2d 70 (D.C. Cir. 1984) | 18 |
| *Tennessee* v. *Herrington,* 806 F.2d 642 (6th Cir. 1986), cert. denied, 480 U.S. 946 (1987) | 3 |

Cases—Continued: Page

*Transohio Savings Bank* v. *Director, OTS,* 967 F.2d 598 (D.C. Cir. 1992) ........ 15, 16
*Wisconsin Elec. Power Co.* v. *Dep't of Energy,* 778 F.2d 1 (D.C. Cir. 1985) ........ 15

Statutes and regulations:

Administrative Procedure Act, 5 U.S.C. 702 ........ 16
All Writs Act, 28 U.S.C. 1651(a) ........ 18
Nuclear Waste Policy Act of 1982, 42 U.S.C. 10101 *et seq.* (1994 & Supp. II 1996) ........ 2
§ 111(a)(4), 42 U.S.C. 10131(a)(4) ........ 3, 4, 25, 26
§ 111(a)(5), 42 U.S.C. 10131(a)(5) ........ 4
§ 112, 42 U.S.C. 10132 (1982) ........ 3
§ 112(b), 42 U.S.C. 10132(b) (1982) ........ 2
§ 113(a), 42 U.S.C. 10133(a) ........ 3
§ 113-115, 42 U.S.C. 10133-10135 ........ 2
§ 114, 42 U.S.C. 10134 (1982) ........ 3
§ 114, 42 U.S.C. 10134 ........ 7
§ 116, 42 U.S.C. 10136 ........ 7
§ 119, 42 U.S.C. 10139 ........ 9, 17, 18
§ 119(a), 42 U.S.C. 10139(a) ........ 15
§ 119(a)(1), 42 U.S.C. 10139(a)(1) ........ 9
§ 119(a)(1)(A), 42 U.S.C. 10139(a)(1)(A) ........ 15, 18, 23
§ 119(c), 42 U.S.C. 10139(c) ........ 9, 24, 25
§ 121, 42 U.S.C. 10141 ........ 7
§ 141, 42 U.S.C. 10161 (1982) ........ 3
§ 142, 42 U.S.C. 10162 ........ 3
§ 145, 42 U.S.C. 10165 ........ 3
§ 145(b), 42 U.S.C. 10165(b) ........ 8
§ 161, 42 U.S.C. 10172a ........ 3
§ 302(a), 42 U.S.C. 10222(a) ........ 4
§ 302(a)(1), 42 U.S.C. 10222(a)(1) ........ 4, 13
§ 302(a)(2), 42 U.S.C. 10222(a)(2) ........ 4, 26
§ 302(a)(3), 42 U.S.C. 10222(a)(3) ........ 4
§ 302(a)(4), 42 U.S.C. 10222(a)(4) ........ 4, 5, 26
§ 302(a)(5), 42 U.S.C. 10222(a)(5) ........ 5, 24
§ 302(a)(6), 42 U.S.C. 10222(a)(6) ........ 5, 24

Statutes and regulations: Page

§ 302(b), 42 U.S.C. 10222(b) .......... 4
§ 302(c), 42 U.S.C. 10222(c) .......... 4
Act of Dec. 22, 1987, Pub. L. No. 100-302, 101 Stat. 1329 .......... 3
Omnibus Budget Reconciliation Act of 1987, Pub. L. No. 100-203, 101 Stat. 1330 .......... 3
Tucker Act, 28 U.S.C. 1491 (1994 & Supp. II 1996) .......... 12, 16
28 U.S.C. 1295(a)(3) .......... 19
10 C.F.R. 961.11 .......... *passim*
48 C.F.R. 52.249-8(c) .......... 21
48 C.F.R. 52.249-14 .......... 21

Miscellaneous:

48 Fed. Reg. (1983):
p. 5458 .......... 5
p. 16,590 .......... 5
59 Fed. Reg. (1994):
p. 27,007 .......... 8
p. 27,008 .......... 8
60 Fed. Reg. (1995):
p. 21,793 .......... 8
pp. 21,794-21,795 .......... 8
p. 21,797 .......... 8
16 C. Wright, et al., *Federal Practice and Procedure* (1996) .......... 18, 19

# In the Supreme Court of the United States

OCTOBER TERM, 1997

No. 98-384

UNITED STATES OF AMERICA, ET AL., PETITIONERS

*v.*

NORTHERN STATES POWER COMPANY, ET AL.

*ON PETITION FOR A WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT*

**PETITION FOR A WRIT OF CERTIORARI**

The Solicitor General, on behalf of the United States of America, the United States Department of Energy, and the Secretary of Energy, respectfully petitions for a writ of certiorari to review the judgment of the United States Court of Appeals for the District of Columbia Circuit in this case.

**OPINIONS BELOW**

The opinion of the court of appeals (App., *infra,* 1a-14a) is reported at 128 F.3d 754. The court of appeals' order denying rehearing and denying motions to enforce the mandate (App., *infra,* 15a-19a) is not reported. The court of appeals' prior opinion in *Indiana Michigan Power Co.* v. *Dep't of Energy* (App., *infra,* 27a-38a) is reported at 88 F.3d 1272.

## JURISDICTION

The judgment of the court of appeals was entered on November 17, 1997. Petitions for rehearing were denied on May 5, 1998. App., *infra*, 15a-19a. On July 27, 1998, the Chief Justice extended the time for filing a petition for a writ of certiorari to and including September 2, 1998. The jurisdiction of this Court is invoked under 28 U.S.C. 1254(1).

## STATUTORY PROVISIONS INVOLVED

Relevant portions of Sections 119 and 302(a) of the Nuclear Waste Policy Act of 1982, as amended, 42 U.S.C. 10139 and 10222(a), are set forth at App., *infra*, 39a-40a.

## STATEMENT

1. The Nuclear Waste Policy Act of 1982, as amended (NWPA or Act), 42 U.S.C. 10101 *et seq.* (1994 & Supp. II 1996), establishes a program for disposing of high-level radioactive waste and spent nuclear fuel (SNF). The major long-term objective of the Act is the siting, construction, and operation of a deep mined geologic repository that will safely isolate SNF from the human environment for at least 10,000 years. The Department of Energy (DOE) is charged with evaluating a site at Yucca Mountain in Nevada and, if the site is deemed suitable and is approved in accordance with the statutory procedures, obtaining a license from the Nuclear Regulatory Commission (NRC) and then constructing and operating the facility. 42 U.S.C. 10133-10135.[1]

---

[1] As originally enacted, the NWPA directed DOE to identify three potential sites for a first repository and to conduct a multi-year scientific and technical evaluation of them, a process known as site characterization. See 42 U.S.C. 10132(b) (1982). Following

In addition to providing for the development of a repository, the NWPA established the respective responsibilities of the federal government and of the owners and generators of SNF (primarily utilities that generate electricity through nuclear power). Congress determined that "while the Federal Government has the responsibility to provide for the permanent disposal of high-level radioactive waste and * * * spent nuclear fuel * * * , the costs of such disposal should be

---

site characterization, DOE was to recommend to the President one site for development as a repository; if that recommendation was approved by the President and otherwise became effective, DOE could then apply to the NRC for a license to construct and operate the repository. 42 U.S.C. 10134 (1982). The Act also authorized DOE to locate a second repository through a similar process. 42 U.S.C. 10132 (1982). In addition, the Act directed DOE to study the need for and feasibility of a monitored retrievable storage facility (MRS) for the purpose of storing SNF on an interim basis before permanent disposal in an underground repository, and to submit to Congress a site-specific proposal for such a storage facility. 42 U.S.C. 10161 (1982).

By 1986, DOE had completed the process of selecting three sites for site characterization—one in Texas, one in the State of Washington, and one at Yucca Mountain, Nevada—and had begun the process of identifying sites for a second repository. The agency had also recommended to Congress the construction of an interim storage facility at Oak Ridge, Tennessee. See *Tennessee* v. *Herrington*, 806 F.2d 642 (6th Cir. 1986), cert. denied, 480 U.S. 46 (1987). In 1987, however, Congress amended the NWPA in several significant respects. See Pub. L. No. 100-202, 101 Stat. 1329; Pub. L. No. 100-203, 101 Stat. 1330. Congress directed DOE to characterize only the Yucca Mountain site for a potential first repository, 42 U.S.C. 10133(a), and eliminated DOE's authority to identify and characterize a site for a second repository, 42 U.S.C. 10172a. The 1987 amendments also nullified the Oak Ridge interim storage facility recommendation and prohibited DOE from selecting a site for an interim storage facility until a repository site is recommended to the President. 42 U.S.C. 10162, 10165.

the responsibility of the generators and owners of such waste and spent fuel." 42 U.S.C. 10131(a)(4). Under Section 302 of the NWPA, those parties were assessed a "one-time" fee based on the amount of electricity they generated in a nuclear power reactor prior to the effective date of the NWPA, and are assessed an on-going fee based on the amount of such power generated thereafter. 42 U.S.C. 10222(a)(2) and (3). That money is deposited into a Treasury account called the Nuclear Waste Fund, from which Congress makes annual appropriations to fund the program. 42 U.S.C. 10222(c).[2] Congress also concluded that the "generators and owners of [SNF] have the primary responsibility to provide for, and the responsibility to pay the costs of, the interim storage of such waste and spent fuel until such waste and spent fuel is accepted by the Secretary of Energy in accordance with the provisions of this chapter." 42 U.S.C. 10131(a)(5).

2. A. The NWPA provides for each generator owning spent fuel to have a contract with DOE for the disposal of the fuel. 42 U.S.C. 10222(a) and (b). The Act requires that "[s]uch contracts shall provide for payment * * * of fees [to DOE] sufficient to offset [its] expenditures." 42 U.S.C. 10222(a)(1); see also 42 U.S.C. 10222(a)(4) (fees are subject to annual adjust-

---

[2] The Department of Energy informs us that over the past 15 years, utilities have paid approximately $9 billion into the fund. Congress has appropriated, and DOE has spent, some $4.8 billion. Utilities are currently paying into the Fund at an annual rate of approximately $600 million. Once a utility ceases generating nuclear power, however, it is no longer required to pay the ongoing fee. And once the full amount due has been paid, the utility has no further financial obligation to the federal government for the disposal of its spent fuel. 42 U.S.C. 10222(a)(3).

ment in order to ensure "full cost recovery"). Section 302(a)(5) of the Act sets forth certain terms that such contracts are required to contain. That Section states:

> (5) Contracts entered into under this section shall provide that—
>
> > (A) following commencement of operation of a repository, the Secretary shall take title to the high-level radioactive waste or spent nuclear fuel involved as expeditiously as practicable upon the request of the generator or owner of such waste or spent fuel; and
> >
> > (B) in return for the payment of fees established by this section, the Secretary, beginning not later than January 31, 1998, will dispose of the high-level radioactive waste or spent nuclear fuel involved as provided in this subchapter.

42 U.S.C. 10222(a)(5). In addition to the contractual terms specifically required by the statute, DOE was directed to "establish in writing criteria setting forth the terms and conditions under which such disposal services shall be made available." 42 U.S.C. 10222(a)(6).

B. DOE established the terms of the Standard Contract for Disposal of Spent Nuclear Fuel and/or High Level Radioactive Waste (Standard Contract) by rulemaking. See 48 Fed. Reg. 5458 (1983) (proposed Standard Contract); 48 Fed. Reg. 16,590 (1983) (final Standard Contract). The Standard Contract is published at 10 C.F.R. 961.11. Each of the respondent utilities has signed an individual contract containing all the terms and conditions of the Standard Contract.

In accordance with 42 U.S.C. 10222(a)(5), Article II of the Standard Contract states that "[t]he services to

be provided by DOE under this contract shall begin, after commencement of facility operations, not later than January 31, 1998 and shall continue until such time as all SNF * * * has been disposed of." 10 C.F.R. 961.11. The Standard Contract also specifies in Articles IV.B, V, and VI criteria and procedures for scheduling DOE's receipt of spent nuclear fuel, based on the anticipated annual capacity of a disposal facility and giving priority to the oldest discharged spent fuel. See 10 C.F.R. 961.11.

Article IX of the Standard Contract addresses potential delays in contract performance. Article IX states:

> A. *Unavoidable Delays by Purchaser or DOE*
>
> Neither the Government nor the Purchaser shall be liable under this contract for damages caused by failure to perform its obligations hereunder, if such failure arises out of causes beyond the control and without the fault or negligence of the party failing to perform. In the event circumstances beyond the reasonable control of the Purchaser or DOE—such as acts of God, or of the public enemy, acts of Government in either its sovereign or contractual capacity, fires, floods, epidemics, quarantine restrictions, strikes, freight embargoes and unusually severe weather—cause delay in scheduled delivery, acceptance or transport of [spent nuclear fuel], the party experiencing the delay will notify the other party as soon as possible after such delay is ascertained and the parties will adjust their schedules, as appropriate, to accommodate such delay.

B. *Avoidable Delays by Purchaser or DOE*

> In the event of any delay in the delivery, acceptance or transport of SNF * * * to or by DOE caused by circumstances within the reasonable control of either the Purchaser or DOE or their respective contractors or suppliers, the charges and schedules specified by this contract will be equitably adjusted to reflect any estimated additional costs incurred by the party not responsible for or contributing to the delay.

10 C.F.R. 961.11.

Article XVI of the Standard Contract establishes a mechanism for resolving "Disputes" as to contract administration. Article XVI provides for initial resolution of a dispute by DOE's designated Contracting Officer. The Contracting Officer's decision is appealable to the DOE Board of Contract Appeals. See 10 C.F.R. 961.11.

3. When the NWPA was enacted, "Congress anticipated the existence of a repository by 1998." *Indiana Michigan Power Co.* v. *Dep't Of Energy*, 88 F.3d 1272, 1277 (D.C. Cir. 1996) (App., *infra*, 37a). By 1993, however, it had become apparent both that DOE could not have a repository in operation by 1998, and that an above-ground interim storage facility could not be available by that time.[3] In response to inquiries about

---

[3] DOE currently projects that Yucca Mountain site characterization will be completed in 2001. If Yucca Mountain is found suitable for development of a repository, DOE expects to recommend approval of the site to the President in 2001. DOE further expects to be able to begin receipt of SNF at the Yucca Mountain site in 2010 if the approval is sustained (see 42 U.S.C. 10134, 10136) and if required NRC licenses are issued (see 42 U.S.C. 10134, 10141). Under the NWPA amendments of 1987, a site for an MRS cannot

DOE's plans and its view of the government's obligations under the NWPA, DOE published in the Federal Register a request for comment on a preliminary interpretation of Section 302(a)(5) of the Act. 59 Fed. Reg. 27,007 (1994). DOE's preliminary view was that the January 31, 1998, deadline specified in Section 302(a)(5) was implicitly conditioned on the availability of a repository or other licensed facility. *Ibid.*; see *id.* at 27,008.

After consideration of comments from the public, DOE concluded, in accordance with the preliminary views expressed in the earlier Federal Register notice, that the NWPA "does not impose a statutory obligation on DOE to begin nuclear waste disposal in 1998 in the absence of a disposal or interim storage facility constructed under the Act." 60 Fed. Reg. 21,793, 21,794-21,795 (1995) ("Department of Energy final interpretation of nuclear waste acceptance issues"). DOE likewise construed the Standard Contract to "predicate[] DOE's obligation [to dispose of nuclear waste] on the development of a facility under the Act." *Id.* at 21,797. DOE also stated that if the obligation to accept SNF no later than January 31, 1998, was determined to be unconditional, as the utilities contended, the Delays Clause (Art. IX, 10 C.F.R. 961.11; see pp. 6-7, *supra*) of the contract would supply the appropriate remedy. *Ibid.* DOE observed that "[w]ere the Delays Clause to be invoked, Article XVI of the Standard Contract establishes the process for resolving disputed questions of fact (e.g., whether a delay has occurred and, if so, whether it was avoidable or unavoidable)." *Ibid.*

---

be selected until a repository site is recommended to the President. See 42 U.S.C. 10165(b).

4. Pursuant to Section 119 of the NWPA, 42 U.S.C. 10139, a group of utilities, States, and state regulatory agencies filed petitions for review in the United States Court of Appeals for the District of Columbia Circuit, challenging DOE's view of its statutory and contractual obligations as reflected in the "final interpretation."[4] They asked the court to set aside DOE's interpretation; to permit the utilities to escrow their fee payments after January 31, 1998; and to order DOE to develop a plan for beginning disposal services as soon as possible after that date. The court of appeals vacated DOE's interpretation. *Indiana Michigan, supra* (App., *infra,* 27a-38a).

The court of appeals "agree[d] with DOE that Congress contemplated a facility would be available by 1998." App., *infra,* 37a. The court determined, however, that Congress's expectation that a repository would exist "does not mean that Congress conditioned DOE's obligation to begin acceptance of SNF on the availability of a facility." *Ibid.* The court held that the NWPA "creates an obligation in DOE, reciprocal to the utilities' obligation to pay, to start disposing of the SNF no later than January 31, 1998." *Id.* at 38a. It stated that the absence of any suitable facility for the disposal of nuclear waste "simply affects the remedy we can provide." *Id.* at 37a. The court concluded, however, that it was "premature to determine the appropriate

---

[4] Section 119 states that "the United States courts of appeals shall have original and exclusive jurisdiction over any civil action * * * for review of any final decision or action of the Secretary." 42 U.S.C. 10139(a)(1). Section 119 further provides that "[a] civil action for judicial review described under subsection (a)(1) of this section may be brought not later than the 180th day after the date of the decision or action or failure to act involved." 42 U.S.C. 10139(c).

remedy, * * * as DOE has not yet defaulted upon either its statutory or contractual obligation." *Ibid.* It therefore remanded the matter for further proceedings consistent with its opinion. *Id.* at 38a.

5. After the court of appeals issued its decision in *Indiana Michigan*, DOE issued the required notice of a delay under Article IX of the Standard Contract and gave the contract holders an opportunity to submit their views on how that delay should be addressed. App., *infra*, 5a-6a. After reviewing the comments, DOE concluded that the Disputes Clause (Art. XVI, 10 C.F.R. 961.11) of the Standard Contract governed resolution of whether the delay was "[u]navoidable" or "[a]voidable." App., *infra*, 6a. DOE also made a preliminary determination that the delay was unavoidable, and it provided 60 days for the contract holders to make submissions supporting their contrary view.[5] App., *infra*, 6a.

Many of the utilities, as well as States and state regulatory commissions, had in the meantime filed petitions for a writ of mandamus alleging that DOE had failed to comply with the court of appeals' mandate in *Indiana Michigan*. App., *infra*, 6a. Those parties renewed their request for an order requiring DOE to begin disposal services on January 31, 1998, and for a declaration that

---

[5] DOE's preliminary determination concluded that the delay was unavoidable because the unprecedented process of siting and developing a repository had been beset by technical problems, delays necessary to satisfy a broad range of regulatory requirements, legislative amendments that effectively blocked early establishment of an interim storage facility, budgetary restrictions, litigation delays, and the legal obigation to consult a broad range of interested parties, including States, Indian tribes, and private interest groups. See Exh. 6, Exhibits to Respondents' Response to Petitions for a Writ of Mandamus.

the utilities could escrow the payment of their fees if DOE failed to perform its obligation by that date. *Ibid.*

6. The court of appeals granted limited mandamus relief. *Northern States Power Co.* v. *United States Dep't of Energy,* 128 F.3d 764 (D.C. Cir. 1997) (App., *infra,* 1a-14a). The court declined to issue a writ of mandamus directing DOE to begin accepting SNF by January 31, 1998. *Id.* at 9a. It explained that such relief was unwarranted because the utilities "are presented with another potentially adequate remedy" under the Delays Clause of the Standard Contract, which "outlines how the parties are to proceed if one party is unable to fulfill its obligations in a timely manner." *Ibid.* The court therefore "conclude[d] that [the utilities] must pursue the remedies provided in the Standard Contract in the event that DOE does not perform its duty to dispose of the SNF by January 31, 1998." *Id.* at 10a.

The court of appeals determined, however, that "[a] writ of mandamus is required * * * to compel DOE to comply with [the] mandate in *Indiana Michigan.*" App., *infra,* 11a. The court stated that it had "held in *Indiana Michigan* that the NWPA imposes an unconditional obligation, memorialized in the Standard Contract, to begin disposing of the [nuclear waste] materials by January 31, 1998." *Ibid.* The court concluded that "DOE's current approach toward contractual remedies"—*i.e.*, the Department's preliminary determination that the expected delay in its acceptance of SNF would be "[u]navoidable" within the meaning of Article IX—was inconsistent with the *Indiana Michigan* mandate. *Ibid.* The court of appeals "order[ed] DOE to proceed with contractual remedies in a manner consistent with NWPA's command that it undertake an unconditional obligation to begin disposal of the SNF by

January 31, 1998," and it specifically "preclude[d] DOE from concluding that its delay is unavoidable on the ground that it has not yet prepared a permanent repository or that it has no authority to provide storage in the interim." *Id.* at 13a.[6]

6. DOE filed a petition for rehearing, arguing that the court of appeals lacked jurisdiction to determine the applicability of the "unavoidable delays" provision of the Standard Contract to disputes between DOE and the utilities. App., *infra,* 18a-19a. DOE's rehearing petition explained that questions concerning the construction and administration of the Standard Contract are entrusted to the Court of Federal Claims, which exercises exclusive jurisdiction under the Tucker Act, 28 U.S.C. 1491 (1994 & Supp. II 1996), over any damage action founded on a contract with the United States. One of the utilities, Yankee Atomic Company (Yankee), also filed a rehearing petition; the remaining utilities and the States that were parties to the case filed motions to enforce or expand the mandate.[7] App., *infra,* 15a-19a.

---

[6] The court further stated: "This necessarily means, of course, that DOE not implement any interpretation of the Standard Contract that excuses its failure to perform on the grounds of 'acts of Government in either its sovereign or contractual capacity'." Pet. App. 13a (quoting Article IX.A of the Standard Contract, 10 C.F.R. 961.11). It held on that basis that "this provision in the Standard Contract, insofar as it is applied to DOE's failure to perform by 1998, is inconsistent with DOE's statutory obligation to assume an unconditional duty." *Id.* at 14a.

[7] Yankee argued that the remedy of adjustment of fees under the "[a]voidable delays" provision was inadequate as applied to Yankee because that utility had ceased nuclear power generation and was no longer paying the fee. Yankee requested the court to order DOE to begin moving Yankee's spent fuel off its site. The States and remaining utilities contended that the equitable

On May 5, 1998, the court of appeals denied the petitions for rehearing and the motions to enforce the mandate. App., *infra,* 15a-19a. In rejecting Yankee's request for a move-fuel order (*i.e.*, an order requiring DOE to accept SNF for disposal), the court explained that

> enforcement of our mandate does not extend to requiring the DOE to perform under the Standard Contract. While the statute requires the DOE to include an unconditional obligation in the Standard Contract, it does not itself require performance. Breach by the DOE does not violate a statutory duty; thus, our jurisdiction to hear allegations of failure to take an action required under the NWPA, see 42 U.S.C. § 10139(a)(1)(B), does not provide a basis for a move-fuel order.

*Id.* at 18a.

The court also rejected DOE's contention that the court's grant of mandamus relief impermissibly intruded on the jurisdiction of the Court of Federal Claims, stating:

> The DOE * * * suggest[s] that this Court has erroneously designated itself as the proper forum for adjudication of disputes arising under the Standard Contract. As the above should make clear, we did

---

adjustment of fees was not an appropriate remedy since under the statutory requirement of full cost recovery, DOE would be required simply to redistribute the burden of the program's costs from some utilities to other utilities. See 42 U.S.C. 10222(a)(1) (contracts shall provide for payment of fees sufficient to offset the costs of the program). They requested an order barring DOE from using fee collections to pay any costs or damages due to the delay, and renewed their request for specific relief that would order DOE to develop a plan for disposing of their spent fuel.

> not; we merely prohibited the DOE from implementing an interpretation that would place it in violation of its duty under the NWPA to assume an unconditional obligation to begin disposal by January 31, 1998. The statutory duty to include an unconditional obligation in the contract is independent of any rights under the contract. The Tucker Act does not prevent us from exercising jurisdiction over an action to enforce compliance with the NWPA.

App., *infra*, 18a-19a.

To date, only one party to the Standard Contract (the Wisconsin Electric Power Company) has filed with DOE a request for equitable adjustment of the fees under the avoidable delays provision. Eleven utilities have filed suits in the Court of Federal Claims, seeking damages ranging from $70 million to $1.5 billion. Other utilities have again sought relief in the D.C. Circuit. In addition, the States and state regulatory commissions that are parties to this case have filed a petition for a writ of certiorari from the judgment and orders below. See *State of Michigan* v. *Dep't of Energy*, No. 98-225.

**REASONS FOR GRANTING THE PETITION**

The court of appeals has issued a writ of mandamus prohibiting the DOE from treating its delay in accepting SNF as "[u]navoidable" within the meaning of the *force majeure* clause of the Standard Contract (10 C.F.R. 961.11) between the Department of Energy and utilities that own and generate such fuel. The court's decision intrudes upon the jurisdiction of the Court of Federal Claims—the tribunal vested with exclusive authority to adjudicate contract claims against the United States. Moreover, in dictating the appropriate resolution of an issue that is reserved for administra-

tive processes prescribed by the contract, and that is ultimately entrusted to another court, the court of appeals has pretermitted the orderly disposition of a contractual dispute that has potentially great consequences both for the liability of the United States and for the continued economic viability of nuclear generating facilities. Review by this Court is warranted both to restore the proper division of jurisdiction in contract cases between the regional courts of appeals and the Court of Federal Claims, and to prevent disruption of an important national program.

1. It is well established that "[t]he sole remedy for an alleged breach of contract by the federal government is a claim for money damages, either in the United States Claims Court under the Tucker Act, 28 U.S.C. § 1491(a)(1) (1982), or, if damages of no more than $10,000 are sought, in district court under the Little Tucker Act, 28 U.S.C. § 1346(a)(2) (1982)." *Sharp* v. *Weinberger*, 798 F.2d 1521, 1523 (D.C. Cir. 1986) (Scalia, J.). Accord, *e.g.*, *Transohio Savings Bank* v. *Director, OTS*, 967 F.2d 598, 609-610 (D.C. Cir. 1992); *Megapulse, Inc.* v. *Lewis*, 672 F.2d 959, 967 (D.C. Cir. 1982). The court of appeals' authority to review "any final decision or action of the Secretary" of Energy *under the NWPA*, 42 U.S.C. 10139(a)(1)(A), does not extend to a contracting party's claim that the Secretary has violated its rights *under the contract*.[8]

---

[8] Section 119(a), 5 U.S.C. 10139(a), is a grant of subject matter jurisdiction, and litigants invoking that provision must also identify an appropriate waiver of sovereign immunity. See *General Elec. Uranium Management Corp.* v. *U.S. Dep't of Energy*, 764 F.2d 896, 900-904 (D.C. Cir. 1985) (characterizing Section 119 as addressing subject matter jurisdiction); *Wisconsin Elec. Power Co. v. Department of Energy*, 778 F.2d 1, 2-3 (D.C. Cir. 1985) (applying *General Electric Uranium*). The only waiver of sovereign

The court of appeals purported to accept that restriction on its authority, stating (in its order on denial of rehearing) that its grant of mandamus relief in *Northern States* "does not place the question of contract remedies in this court." App., *infra*, 18a. Its decision in this case, however, cannot be reconciled with that jurisdictional limit. The court expressly "preclude[d] DOE from concluding that its delay is unavoidable on the ground that it has not yet prepared a permanent repository or that it has no authority to provide storage in the interim." App., *infra*, 13a. The words "avoidable" and "unavoidable," however, do not appear in the NWPA itself, but only in the Standard Contract. The court of appeals' determination that DOE's delay must be treated as "avoidable" thus goes directly, and exclusively, to the manner in which the Standard Contract is construed and its remedial provisions implemented. Indeed, the writ of mandamus issued by the court in *Northern States* is on its face a directive to DOE regarding the interpretation and administration of the

---

immunity potentially applicable here is that found in the Administrative Procedure Act (APA), 5 U.S.C. 702. However, parties may not obtain judicial review under the APA "if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought." 5 U.S.C. 702. The Tucker Act, 28 U.S.C. 1491 (1994 & Supp. II 1996), provides a damages remedy for actions founded on a contract with the United States and impliedly forbids any other type of relief on the contract in any other court. See *Sharp*, 798 F.2d at 1523 ("The waiver of sovereign immunity in the Administrative Procedure Act does not run to actions seeking declaratory relief or specific performance in contract cases, because that waiver is by its terms inapplicable if 'any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought,' 5 U.S.C. § 702, and the Tucker Act and Little Tucker Act impliedly forbid such relief."); *Transohio*, 967 F.2d at 609.

Standard Contract. See, *e.g.*, App., *infra*, 11a ("DOE's current approach toward contractual remedies violates our directives in *Indiana Michigan*"). The court of appeals erred in resolving an issue of contract interpretation that is reserved, following administrative consideration of the claims by DOE, for the exclusive jurisdiction of the Court of Federal Claims.

2. The court of appeals concluded that mandamus relief was appropriate "because DOE has not abided by our prior conclusion that the NWPA imposes an unconditional obligation on the Department to begin disposal of the SNF by January 31, 1998." App., *infra*, 14a; see also *id.* at 19a (order on denial of rehearing) (characterizing prior opinion as "prohibit[ing] the DOE from implementing an interpretation that would place it in violation of its duty under the NWPA to assume an unconditional obligation to begin disposal by January 31, 1998."). The court thus treated the writ of mandamus as a means of "compel[ling] DOE to comply with our prior mandate in *Indiana Michigan*." *Id.* at 11a. That conclusion is flawed in two distinct respects.[9]

---

[9] The analysis that follows assumes that the court of appeals in *Indiana Michigan* properly exercised jurisdiction, pursuant to 42 U.S.C. 10139, when it held that DOE's obligation to accept SNF in January 1998 was not contingent on the existence of a suitable disposal facility. In light of the court of appeals' subsequent opinions, however, that premise is open to substantial doubt. The court in *Indiana Michigan* held that "section 302(a)(5)(B) [42 U.S.C. 10222(a)(5)(B)] creates an obligation in DOE, reciprocal to the utilities' obligation to pay, to start disposing of the SNF no later than January 31, 1998." App., *infra*, 38a. The court has since recognized, however, that its initial formulation was not accurate. In its order on denial of rehearing, the court acknowledged that "[w]hile the [NWPA] requires the DOE to include an unconditional obligation in the Standard Contract, it does not itself require performance. Breach by the DOE does not violate a statutory duty." *Id.* at

A. Except in extraordinary circumstances not applicable here, mandamus is unavailable "as a mode of review where a statutory method of appeal has been prescribed." *Roche* v. *Evaporated Milk Ass'n*, 319 U.S. 21, 27-28 (1943); see also *In re Sindram*, 498 U.S. 177, 179 (1991) (per curiam); *In re Ojeda Rios*, 863 F.2d 202 (2d Cir. 1988). Moreover, a mandamus order is appropriately issued under the All Writs Act, 28 U.S.C. 1651(a), only when the case that it affects is "one that may lie within the prospective future jurisdiction of the court of appeals, or that has in fact come within its jurisdiction in the past." 16 C. Wright et al., *Federal Practice and Procedure* § 3932, at 471 (1996); see also *id.* at 477 ("a court of appeals could not issue a writ to a district court sitting in another circuit, nor to any other tribunal properly reviewable only in another circuit"); *Ojeda Rios*, 863 F.2d at 204-205; *Telecommunications Research and Action Ctr.* v. *FCC*, 750 F.2d 70, 77-78 (D.C. Cir. 1984).

As we explain above, following administrative consideration by DOE, adjudication of claims arising under

---

18a. Because DOE's obligation to accept SNF by January 31, 1998, is contractual rather than statutory, the nature (conditional or unconditional) of that obligation is at bottom a question of contract interpretation—a matter that lies outside the jurisdiction of the court of appeals.

If the court of appeals had not previously issued its decision in *Indiana Michigan*, it is altogether clear that the Contracting Officer's preliminary determination regarding the "unavoidable" character of DOE's delay in performance would not have been subject to review under 42 U.S.C. 10139. That is so not only because the Contracting Officer's determination was one of contract construction, but also because her preliminary determination was subject to further review within the agency and therefore was not a "final decision or action of the Secretary." 42 U.S.C. 10139(a)(1)(A).

the Standard Contract is solely entrusted to the Court of Federal Claims, and thus is subject to appellate review in the Federal Circuit. See 28 U.S.C. 1295(a)(3) (Federal Circuit has exclusive jurisdiction over "an appeal from a final decision of the United States Court of Federal Claims"). There is consequently no prospect that the D.C. Circuit will be called upon to resolve any future dispute that may arise concerning the proper interpretation of the Delays Clause (Art. IX, 10 C.F.R. 961.11) of the Standard Contract. Because any suit arising under the Standard Contract will be "properly reviewable only in another circuit," Wright, *supra*, at 477, the court of appeals exceeded its authority in directing DOE not to treat the delay as "unavoidable" in implementing the contract's remedial provisions.[10]

---

[10] The government's petition for a writ of certiorari in *FCC* v. *Iowa Utilities Board, et al.*, No. 97-1519, raises a similar issue. In that case, the court of appeals for the Eighth Circuit issued a writ of mandamus declaring invalid a Federal Communications Commission (FCC) order. The Eighth Circuit acknowledged that direct review of the FCC order in question fell within the exclusive jurisdiction of the D.C. Circuit, but concluded that mandamus relief was justified as a means of enforcing its mandate entered in a prior review proceeding concerning a separate agency order. The government's petition for certiorari argues, *inter alia*, that the Eighth Circuit exceeded its authority by issuing a writ of mandamus, and that the mandamus order subverts Congress's decision to consolidate judicial review of a defined class of FCC actions in the D.C. Circuit. See 97-1519 Pet. 24-27; 97-1519 Reply Br. 7-9. The government's petition in No. 97-1519 is currently pending before this Court.

The fact that the D.C. Circuit exceeded its authority in issuing a writ of mandamus does not mean that its decision in *Indiana Michigan* would be without force in appropriate litigation under the contract in the Court of Federal Claims. In any such litigation, the utilities would be free to argue that the D.C. Circuit's decision in *Indiana Michigan* (1) is entitled to preclusive effect and (2)

B. There is, in any event, no merit to the court of appeals' conclusion that DOE's reliance on the "[u]navoidable delays" provision of Article IX is logically irreconcilable with the *Indiana Michigan* holding. Observing that treatment of the agency's delay as "unavoidable" would "let DOE off the hook for monetary damages," the court concluded that "DOE cannot now render its obligation contingent, and free itself of the costs caused by its delay." App., *infra*, 12a, 13a. The court of appeals' apparent premise was that DOE's failure to fulfill a contractual obligation *necessarily* requires the payment of damages for any losses incurred as a result of the breach—*i.e.*, that a denial of monetary relief should be regarded as the practical and legal equivalent of a determination that no contractual obligation exists.

That premise has no basis in the law of contracts and would, if pursued to its logical conclusion, render the doctrine of *force majeure* a nullity. The Standard Contract's "[u]navoidable delays" provision presupposes a "failure" by one of the contracting parties "to perform its obligations" under the contract. Art. IX.A, 10 C.F.R. 961.11. The provision is included in the Standard Contract precisely to ensure that a failure of performance will *not* give rise to monetary liability "if such

---

logically forecloses DOE from treating its delay in performance as "unavoidable" within the meaning of Article IX. It is therefore possible that the D.C. Circuit's decision in *Indiana Michigan* could ultimately affect the outcome of litigation regarding claims under the Standard Contract. The Court of Federal Claims, however, is fully capable of resolving any preclusion issues that may arise in suits falling within its jurisdiction. The D.C. Circuit's authority to enforce its mandate in *Indiana Michigan* does not extend to defining the scope of that decision's preclusive effect in suits coming within the exclusive jurisdiction of another federal court.

failure arises out of causes beyond the control and without the fault or negligence of the party failing to perform." *Ibid.*[11] Article IX.A thus reflects an unambiguous determination (and agreement) that a contracting party's failure to perform its obligations in a timely manner does not logically compel the provision of a monetary remedy.[12]

Moreover, quite apart from the court of appeals' failure to distinguish between contractual rights and remedies, the court erred in equating DOE's argument (in *Indiana Michigan*) that its obligation to accept SNF

---

[11] A *force majeure* clause excusing failures of performance caused by events beyond the control of the contracting party is a standard feature of government procurement contracts. Compare 48 C.F.R. 52.249-8(c); 48 C.F.R. 52.249-14.

[12] The court of appeals did not squarely hold that the "[u]navoidable delays" provision was contrary in its entirety to the holding in *Indiana Michigan*. The court did not, for example, expressly foreclose application of that provision to delays caused by "fires, floods, epidemics, quarantine restrictions, strikes, freight embargoes and unusually severe weather." Art. IX.A, 10 C.F.R. 961.11. Rather, the court "preclude[d] DOE from concluding that its delay is unavoidable on the ground that it has not yet prepared a permanent repository or that it has no authority to provide storage in the interim," and it stated that "DOE [may] not implement any interpretation of the Standard Contract that excuses its failure to perform on the grounds of 'acts of Government in either its sovereign or contractual capacity.'" App., *infra*, 13a (quoting Art. IX.A, 10 C.F.R. 961.11). The court's decision to grant mandamus relief, however, was based on (1) its conclusion, drawn from the *Indiana Michigan* opinion, that DOE's obligation to accept SNF is "[u]nconditional," *id.* at 11a; and (2) its apparent belief that the existence of an "unconditional" contract obligation necessarily implies a duty to pay money damages if any breach occurs. The logic of the court's analysis would therefore appear to extend to delays caused by natural disasters or other occurrences wholly outside the control of any arm of the federal government.

was contingent on the existence of a suitable facility with its subsequent preliminary determination that its delay in performance was "unavoidable." See App., *infra*, 12a (stating that in characterizing its delay in performance as "unavoidable," "DOE is simply recycling the arguments rejected by this court in *Indiana Michigan*."). In reaching her preliminary determination that DOE's delay in accepting SNF was "unavoidable" within the meaning of Article IX, the Contracting Officer did not rely solely on the fact that no repository or other facility was available. Instead, she examined the reasons for that state of affairs. For example, she analyzed at length the many technical difficulties that had been encountered in the course of an unprecedented scientific and engineering project—a project that has as its goal the safe isolation of highly radioactive waste from the human environment "for at least 10,000 years." Resp. Exh. 6 (Contracting Officer's Preliminary Determination), *supra* note 5, at 4. She also considered the numerous regulatory hurdles that have impeded the project, the legislative actions that have constrained alternative approaches, and the effects of third-party legal challenges to and oversight of project activities. *Id.* at 6-16. Her preliminary determination regarding the proper application of the Delays Clause was based not simply on the fact that no repository or other suitable facility existed, but on her finding that the absence of such a facility was the result of factors beyond DOE's control.

For the foregoing reasons, the court of appeals lacked authority to direct DOE in its construction and implementation of the existing Standard Contract, since questions of contract interpretation are reserved for the Court of Federal Claims.

3. The court of appeals' disposition is perhaps subject to an alternative explanation—that the unavoidable delays provision is, on its face, inconsistent with the NWPA. Thus, the court stated that "DOE has no authority to adopt a contract that violates the directives of Congress"; it held that the "[u]navoidable delays" provision, "insofar as it is applied to DOE's failure to perform by 1998, is inconsistent with DOE's statutory obligation" to begin accepting SNF for disposal no later than January 31, 1998. App., *infra*, 14a; see also *id.* at 19a ("The statutory duty to include an unconditional obligation in the contract is independent of any rights under the contract. The Tucker Act does not prevent us from exercising jurisdiction over an action to enforce compliance with the NWPA.").

We agree that DOE's promulgation of the Standard Contract was a "final decision or action of the Secretary" subject to review in the court of appeals pursuant to 42 U.S.C. 10139(a)(1)(A). See, *e.g.*, *General Electric Uranium*, 764 F.2d at 900-904.[13] At the time the Standard Contract was promulgated, a utility that believed the "[u]navoidable delays" provision to be inconsistent

[13] In *Commonwealth Edison Co.* v. *U.S. Dep't of Energy*, 877 F.2d 1042, 1044-1045 (D.C. Cir. 1989), the court of appeals relied in part on *General Electric Uranium* in holding that it could entertain a petition for review challenging the DOE Board of Contract Appeals' interpretation of a provision of the Standard Contract. Although the government in *Commonwealth Edison* took the position that the D.C. Circuit was authorized to hear the case, we now believe that result to have been erroneous. In our view, the court in *Commonwealth Edison* failed to recognize the fundamental distinction between a challenge to the *validity* of some provision of the Standard Contract—a challenge that we agree arises under the NWPA and is properly brought in the D.C. Circuit—and a challenge to DOE's *interpretation* of existing contractual provisions.

(in whole or in part) with the NWPA's requirements could have obtained court of appeals review of that contention. The time for filing such a petition for review, however, has long since passed. The NWPA provides that a petition for review pursuant to Section 119 must be brought "not later than the 180th day after the date of the decision or action or failure to act involved." 42 U.S.C. 10139(c). The "[a]voidable delays" provision was adopted in 1983; neither the "final interpretation" issued by DOE in 1995 (see p. 8, *supra*), nor the Contracting Officer's preliminary determination that DOE's anticipated delay in contract performance should be regarded as "unavoidable" (see p. 10, *supra*), altered the text of the relevant contractual provision. The proper *interpretation* of that provision of course remains subject to adjudication in the Court of Federal Claims. But any challenge to the *terms* of the Delays Clause would have been barred by the statute of limitations at the time the petition for review in *Indiana Michigan* was filed.

4. The court of appeals' disposition of this case substantially disrupts the scheme established by Congress for resolution of disputes pertaining to the disposal of SNF. In enacting the NWPA, Congress chose not to impose upon DOE a freestanding statutory obligation to accept SNF by a particular date. Rather, Congress directed DOE to enter into contracts containing specified provisions, see 42 U.S.C. 10222(a)(5), and expressly authorized DOE to establish additional contractual terms, 42 U.S.C. 10222(a)(6). In choosing that means of achieving the statutory objectives, Congress must be presumed to have intended that disputes regarding the precise nature of the parties' obligations, and the remedies for any breach thereof, would be resolved in the manner (and in the court) appropriate for contract

claims. The court of appeals, however, has pretermitted the process of contract implementation by purporting to issue a definitive ruling as to the proper application of the Standard Contract's remedial provisions.[14]

The disposition of the utilities' contractual claims is of paramount importance both to DOE and to the utilities themselves. DOE has estimated that over the next ten years, the utilities' storage costs associated with the delay in acceptance of SNF will be between $500 million and $1 billion. The utilities, by contrast, estimate that the costs will run to the tens of billions of dollars. If the remedy specified in the "[a]voidable delays" provision is implemented as the court of appeals contemplated, DOE will be required to undertake equitable adjustments in the fees charged to individual contract holders, based on the storage costs incurred by each utility as a result of DOE's delay in performance. The likely result, paradoxically, is that DOE will be required to increase its basic fee, since the NWPA requires DOE "annually * * * to evaluate whether collection of the fee will provide sufficient revenues to offset the [program] costs" and to adjust the basic fee

---

[14] Insofar as the D.C. Circuit's ruling may rest on a determination that the terms of the Standard Contract are invalid because inconsistent with the NWPA (see pp. 23-24, *supra*), its decision disrupts the statutory scheme in a different but no less troubling way. The 180-day limitations period specified in 42 U.S.C. 10139(c) serves to ensure that both DOE and the utilities that generate SNF may assume the validity of the Secretary's actions implementing the NWPA as soon as that limitations period expires. Orderly implementation of the Standard Contract would be wholly undermined if the terms of the contract could be challenged as inconsistent with the Act more than a decade after the contract was promulgated.

so as "to [e]nsure full cost recovery" if "insufficient * * * revenues are being collected." 42 U.S.C. 10222(a)(4); see also 42 U.S.C. 10131(a)(4). Because contract holders with the lowest incremental storage costs will receive the lowest equitable adjustments, they will ultimately be forced to subsidize utilities with higher incremental costs. That remedy has the potential to make nuclear power production uneconomic, since the only way for a contract holder to end its liability to pay fees is to cease nuclear generation of electricity. See 42 U.S.C. 10222(a)(2).

In considering the propriety of the decision below, it bears noting that only one party to the instant proceedings (the Wisconsin Electric Power Company) has sought relief under the "[a]voidable delays" provision of Article IX, 10 C.F.R. 961.11, and none urged that result in the court of appeals. Instead, since the court of appeals entered its decision in this case, eleven utilities have filed breach of contract suits in the Court of Federal Claims seeking, in the aggregate, more than $4 billion in damages. The utilities have argued in those suits both that the Delays Clause is altogether inapplicable, and that the government is precluded by the D.C. Circuit's rulings from asserting *force majeure* as a defense to claims for breach of the Standard Contract.

The fact that the utility respondents themselves do not generally regard the "[a]voidable delays" provision as the proper mechanism for addressing DOE's current inability to accept SNF does not *necessarily* mean that the court of appeals' interpretation of the contract is incorrect. It does, however, reinforce the impropriety of the court's decision to issue a writ of mandamus directing DOE to administer the contract in accordance with the D.C. Circuit's reading. Review by this Court is needed to ensure that disputes regarding the imple-

mentation of the Standard Contract, in which vast sums are at stake for both the government and its contract holders, can be resolved in an orderly manner by the Court of Federal Claims—and, more broadly, to rectify the unwarranted disruptive effect of the decision below on efforts to achieve safe and equitable resolution of the difficult nationwide problem of nuclear waste disposal.

**CONCLUSION**

The petition for a writ of certiorari should be granted.

Respectfully submitted.

SETH P. WAXMAN
*Solicitor General*
LOIS J. SCHIFFER
*Assistant Attorney General*
LAWRENCE G. WALLACE
*Deputy Solicitor General*
MALCOLM L. STEWART
*Assistant to the Solicitor General*
JOHN A. BRYSON
*Attorney*

SEPTEMBER 1998

**APPENDIX A**

UNITED STATES COURT OF APPEALS
DISTRICT OF COLUMBIA CIRCUIT

---

Nos. 97-1064, 97-1065, 97-1370 and 97-1398

NORTHERN STATES POWER COMPANY, ET AL., PETITIONERS

*v.*

UNITED STATES DEPARTMENT OF ENERGY AND UNITED STATES OF AMERICA, RESPONDENTS

IES UTILITIES, INC., ET AL., INTERVENORS

---

[Argued: Sept. 25, 1997
Decided Nov. 14, 1997]

---

Before: WILLIAMS, GINSBURG and SENTELLE, Circuit Judges.

Opinion for the Court filed by Circuit Judge SENTELLE.

SENTELLE, Circuit Judge:

In *Indiana Michigan Power Co. v. Department of Energy*, 88 F.3d 1272 (D.C. Cir. 1996), we held that the Nuclear Waste Policy Act ("NWPA") imposes on the Department of Energy ("DOE") an unconditional obligation to begin disposing of high-level radioactive waste and spent nuclear fuel (collectively, "SNF") by January 31, 1998. After we issued our decision, DOE nonetheless informed various utilities and state commissions ("petitioners") that it would not accept the SNF for disposal by the 1998 deadline. Petitioners now

seek a writ of mandamus requiring DOE to comply with *Indiana Michigan* and begin disposing of the SNF by the statutory deadline. We hold that the Standard Contract between DOE and the utilities provides a potentially adequate remedy if DOE fails to fulfill its obligations by the deadline, and thus do not grant in full the writ requested by petitioners. We do agree, however, that DOE's current approach toward contractual remedies is inconsistent with the NWPA and with our prior decision in *Indiana Michigan.* We thus grant the petition in part, and issue a writ of mandamus precluding DOE from advancing any construction of the Standard Contract that would excuse its delinquency on the ground that it has not yet established a permanent repository or an interim storage program.

I. Background

In the NWPA, Congress, confronting the "national problem" posed by the accumulation of spent nuclear fuel and radioactive waste produced by various domestic sources, 42 U.S.C. § 10131(a)(2), created a scheme whereby the federal government would have the responsibility to provide for the permanent disposal of the SNF, and the costs of such disposal would be borne by the owners and generators of the waste and spent fuel. 42 U.S.C. § 10131(a)(4). The plan provided that the owners and generators of the SNF would have the primary responsibility to provide and pay for its interim storage until the Secretary of Energy accepts the material "in accordance with the provisions of this chapter." 42 U.S.C. § 10131(a)(5).

As part of this regulatory program, Congress authorized the Secretary to enter into contracts with the owners and generators for the acceptance, transportation, and ultimate disposal of the SNF. 42 U.S.C.

§ 10222(a)(1). Congress left open many of the terms of the contracts, but specifically dictated, *inter alia*, the deadline by which DOE must begin disposing of the SNF. In the language of the statute, the "[c]ontracts entered into under this section shall provide that . . . in return for the payment of fees established by this section, the Secretary, beginning not later than January 31, 1998, will dispose of the high-level radioactive waste or spent nuclear fuel involved as provided in this subchapter." 42 U.S.C. § 10222(a)(5)(B). "Payment of fees" referred to hefty contributions into a so-called Nuclear Waste Fund by owners and generators of the SNF.

In accordance with the NWPA, DOE adopted the final Standard Contract after notice and comment. The language of the Standard Contract is slightly different than that of the statute, but does include the requirement that disposal begin by January 31, 1998: "[t]he services to be provided by DOE under this contract shall begin, after commencement of facility operations, not later than January 31, 1998 and shall continue until such time as all SNF and/or HLW [high-level radioactive waste] from the civilian nuclear power reactors . . . has been disposed of." 10 C.F.R. § 961.11, Art. II (1996).

In 1993, various utilities and state agencies became concerned about DOE's ability to meet the 1998 deadline, and thus asked the Department to address how it would go about performing its responsibilities. The Department, apparently anticipating that it would not be ready to take the SNF by the deadline, took the position that it did not have a clear legal obligation to accept the SNF absent an operational repository or other facility. In its Final Interpretation of Nuclear

Waste Acceptance Issues, issued in 1995, DOE announced that it "does not have an unconditional statutory or contractual obligation to accept high level waste and spent nuclear fuel beginning January 31, 1998 in the absence of a repository or interim storage facility constructed under the [NWPA]." 60 Fed. Reg. 21,793-94. The Department also took the position that "it lacks statutory authority under the Act to provide interim storage." 60 Fed. Reg. at 21,794.

The utilities and the states promptly filed petitions for review. The question before us in *Indiana Michigan* was whether the legal obligation of DOE to accept SNF by January 31, 1998, was conditioned on the presence of an operational repository or interim storage facility. Reviewing DOE's construction of the NWPA under the two-step analysis of *Chevron U.S.A. Inc. v. Natural Resources Defense Council*, 467 U.S. 837, 104 S. Ct. 2778, 81 L.Ed.2d 694 (1984), we concluded that DOE's interpretation was contrary to the unambiguously expressed intent of Congress. We reached this conclusion after analyzing the plain language of the statute, which mandates that DOE assume a contractual obligation to start disposing of the SNF by January 31, 1998. We took special care to emphasize the reciprocal nature of the obligations. DOE's duty to dispose of the SNF in a timely manner is "in return for" the payment of fees into the Nuclear Waste Fund. 42 U.S.C. § 10222(a)(5)(B). We held that DOE's obligation to meet the 1998 deadline is "without qualification or condition," and identified DOE's duty to "perform its part of the contractual bargain." 88 F.3d at 1273. We therefore remanded the matter to DOE for "further proceedings consistent with" our opinion. *Id.* at 1277.

DOE neither sought rehearing of that decision nor petitioned the Supreme Court for further review.

After issuing our decision in *Indiana Michigan*, we would have expected that the Department would proceed as if it had just been told that it had an unconditional obligation to take the nuclear materials by the January 31, 1998, deadline. Not so. Quite to the contrary, the Department informed the utilities and the states that it would be unable to comply with the statutory deadline that this court had just reaffirmed. In late 1996, the utilities and the states initiated discussions with DOE and asked about the procedure and schedule that the Department would follow to comply with the court's decision. DOE responded to the utilities by announcing that it "will be unable to begin acceptance of spent nuclear fuel for disposal in a repository or interim storage facility by January 31, 1998." Utility Petitioners' Pet. at Tab 1; *see also* Tab 2. The Department recognized that the delay would affect "large number[s]" of contract holders, but nonetheless expressed "uncertainty as to when DOE will be able to begin spent fuel acceptance." *Id.* The letter ended by cordially inviting "the views of all contract holders on how the delay can best be accommodated." *Id.*

In a similar letter to the states, DOE wrote that it "understands that states are concerned about the Department's delay," and expressed an interest in talking with the states about how to mitigate the harm caused by the delay. State Petitioners' Pet., Att. D. DOE's letter also revealed one of its asserted reasons for the delay: "The Administration continues to believe that interim storage siting should not proceed until the Department has the benefit of the information resulting from the Yucca Mountain Project Viability Assess-

ment." *Id.* By the Department's own estimates, this Yucca Mountain facility will not be operational until the year 2010. Exhibits to Resp. Response, Tab 6, at 8.

On January 31, 1997, the utilities and state agencies separately petitioned for a writ of mandamus, seeking to compel DOE to comply with *Indiana Michigan* and begin disposal of the nuclear materials by January 31, 1998. Petitioners also requested that their payments to the Nuclear Waste Fund be placed in escrow unless and until DOE meets its obligations to dispose of SNF, and asked that the court prohibit DOE from taking any punitive action toward those who suspend payments to the Fund.

On June 3, 1997, DOE responded to comments submitted by contract holders regarding the anticipated delay. The Department began by recognizing that "Section 302 [of the NWPA] specifies that the contracts shall provide for the Department to begin to dispose of spent fuel not later than January 31, 1998." Exhibits to Resp. Response, Tab 6, at 4. DOE then expressed its belief that "the Standard Contract adopted by the Department pursuant to Section 302 and entered into by the contract holders specifies the available remedies in the event the Department is unable to meet the January 31, 1998 date." *Id.* Under Article IX of the contract, the Department asserted, the Department was "not obligated to provide a financial remedy for the delay," because the delay, in the Department's estimation, was "unavoidable." *Id.* at 2. After conceding that the delay may result in "hardship" to contract holders, DOE expressed its willingness "to consider amendments to individual contracts that would mitigate the impacts of the delay particular contract holders will experience in the acceptance of their spent fuel." *Id.*

II. Discussion

Petitioners assert that a writ of mandamus is necessary to force DOE to comply with *Indiana Michigan* and begin acceptance of the SNF by the 1998 deadline. Their argument rests on our prior conclusion that "section 302(a)(5)(B) [of the NWPA] creates an obligation in DOE, reciprocal to the utilities' obligation to pay, to start disposing of the SNF no later than January 31, 1998." 88 F.3d at 1277. DOE has not only failed to undertake "further proceedings consistent with" the court's opinion, petitioners argue, but has informed them of its plans to default on its obligations. Petitioners draw special attention to the fact that the Department currently accepts SNF from 41 foreign countries, from which they conclude that DOE is not unable but is simply unwilling to meet the 1998 deadline. They submit that a writ of mandamus is an appropriate remedy for the Department's refusal to comply with *Indiana Michigan* and perform its duties by the deadline set by Congress.[1]

We start our consideration of the petition with the observation that "[t]he remedy of mandamus is a drastic one, to be invoked only in extraordinary situations." *Allied Chemical Corp. v. Daiflon, Inc.*, 449 U.S. 33, 34, 101 S. Ct. 188, 190, 66 L.Ed.2d 193 (1980). Mandamus is proper only if "(1) the plaintiff has a clear

---

[1] The state petitioners also contend that a writ of mandamus is warranted, wholly apart from our decision in *Indiana Michigan*, under *Telecommunications Research & Action Center v. F.C.C.*, 750 F.2d 70 (D.C. Cir. 1984) ("*TRAC*"). State Petitioners' Pet. at 9-12. Because we issue a writ of mandamus to effectuate our decision in *Indiana Michigan*, we decline to reach the additional question of whether issuance of the writ would have been proper under *TRAC*.

right to relief; (2) the defendant has a clear duty to act; and (3) there is no other adequate remedy available to plaintiff." *Council of and for the Blind of Delaware County Valley v. Regan*, 709 F.2d 1521, 1533 (D.C. Cir. 1983) (en banc). The party seeking mandamus has the burden of showing that "its right to issuance of the writ is clear and indisputable." *Gulfstream Aerospace Corp. v. Mayacamas Corp.*, 485 U.S. 271, 289, 108 S. Ct. 1133, 1143, 99 L.Ed.2d 296 (1988) (internal quotations and citations omitted).

Petitioners have established that they have a clear right to relief, and thus have satisfied the first requirement for a writ of mandamus. As we explained in *Indiana Michigan*, the NWPA requires DOE, "in return for the payment of fees," to begin disposing of the materials "not later than January 31, 1998." 42 U.S.C. § 10222(a)(5)(B). We specifically noted that the payment of fees into the Nuclear Waste Fund is the "only limitation placed on the Secretary's duties" found in the text of the statute. 88 F.3d at 1276. The owners and generators have dutifully complied with the NWPA, pouring billions of dollars of payments into the Fund with the expectation that DOE would live up to its end of the bargain. The Department, on the other hand, has tersely informed the parties that it "will be unable to begin acceptance of spent nuclear fuel for disposal in a repository or interim storage facility by January 31, 1998." Utility Petitioners' Pet. at Tab 1. Petitioners' full compliance with the requirements of the NWPA, taken in conjunction with DOE's refusal to perform its reciprocal duties, compels the conclusion that petitioners have established a clear right to relief in this case.

The second requirement is also satisfied. DOE's duty to act could hardly be more clear. DOE argued in *Indiana Michigan* that its obligations under the NWPA were contingent on the existence of a repository or interim storage facility. We held that DOE's interpretation was inconsistent with the text of the NWPA, which clearly demonstrates a congressional intent that the Department assume a contractual obligation to perform by the 1998 deadline, "without qualification or condition." 88 F.3d at 1276. DOE's duty to take the materials by the 1998 deadline is also an integral part of the Standard Contract, which provides that the Department "shall begin" disposing of the SNF by January 31, 1998. 10 C.F.R. § 961.11, Art. II. The contractual obligations created consistently with the statutory contemplation leave no room for DOE to argue that it does not have a clear duty to take the SNF from the owners and generators by the deadline imposed by Congress.

Although petitioners have a clear right to relief, and the Department has a clear duty to act, we decline to issue the broad writ of mandamus sought by petitioners because they are presented with another potentially adequate remedy. Although the statute does not prescribe a particular remedy in the event that the Department fails to perform on time, the Standard Contract does provide a scheme for dealing with delayed performance. 10 C.F.R. § 961.11, Art. IX. Specifically, Article IX of the Standard Contract outlines how the parties are to proceed if one party is unable to fulfill its obligations in a timely manner. Under Article IX, unavoidable delays are to be treated differently than avoidable delays. A failure to perform is considered "unavoidable" only if such failure "arises

out of causes beyond the control and without the fault or negligence of the party failing to perform." *Id.* at Art. IX.A. If a party's delay is determined to be unavoidable, that party is not liable for damages caused by the failure to perform in a timely manner. *Id.* An avoidable delay, in contrast, is caused by "circumstances within the reasonable control" of the delinquent party. *Id.* at Art. IX. B. If a party's delay is avoidable, the charges and schedules in the contract must be equitably adjusted to reflect additional costs incurred by the other party. *Id.* The contract also provides a mechanism for resolving disputes of fact that the parties may encounter along the way. *See id.* at Art. XVI.

Petitioners have not convinced us that this contractual scheme is inadequate to deal with DOE's anticipated delay in accepting the SNF. Petitioners have suggested that the contractual processes are inadequate, claiming that they will "suffer additional billions of dollars in additional costs if DOE fails to meet its January 1998 obligation," Utility Petitioners' Pet. at 4, and that they will not be able to recover these costs in the contract proceedings because the Department is excusing its own default. *See* Utility Petitioners' Reply at 2. Such costs may in fact ensue if DOE fails to perform on time, but there is no reason to believe that these additional expenses will not be taken into account if the contractual processes operate as Congress intended. *See infra* at 11-13. Accordingly, we conclude that petitioners must pursue the remedies provided in the Standard Contract in the event that DOE does not perform its duty to dispose of the SNF by January 31, 1998. This conclusion, we should note, comports with our decision in *Indiana Michigan*. Even though we did

not enter a remedy at that time, we suggested that the provisions of the Standard Contract would determine the appropriate remedy for the Department's failure to perform its obligations. 88 F.3d at 1277.

A writ of mandamus is required, however, to compel DOE to comply with our prior mandate in *Indiana Michigan*. *See Office of Consumers' Counsel v. FERC*, 826 F.2d 1136, 1140 ("A federal appellate court has the authority, through the process of mandamus, to correct any misconception of its mandate by a lower court or administrative agency subject to its authority."); *see also Potomac Electric Power Co. v. Interstate Commerce Comm.*, 702 F.2d 1026, 1032 (D.C. Cir. 1983). We held in *Indiana Michigan* that the NWPA imposes an unconditional obligation, memorialized in the Standard Contract, to begin disposing of the materials by January 31, 1998. We rejected the Department's attempt to water-down its obligations, finding that DOE's interpretation would "destroy[ ] the *quid pro quo* created by Congress" and would mean that the payment of fees into the Nuclear Waste Fund "was for nothing." 88 F.3d at 1276. To effectuate DOE's duty, as we recognized in *Indiana Michigan*, petitioners must be able to enforce the terms of the contract in a meaningful way. Petitioners' ability to enforce the contract would be frustrated if DOE were allowed to operate under a construction of the contract inconsistent with our prior conclusion that the NWPA imposes an obligation on DOE "without qualification or condition." *Id.*

Viewed in this light, DOE's current approach toward contractual remedies violates our directives in *Indiana Michigan*. As explained above, the Department has endeavored to proceed according to Article IX of the Standard Contract, by first informing the parties of its

anticipated delay, and then evaluating whether its own delay is "unavoidable." Article IX describes an unavoidable delay as a party's " failure to perform its obligations . . . aris[ing] out of causes beyond the control and without the fault or negligence of the party failing to perform." 10 C.F.R. § 961.11, Art. IX.A. The contract goes on to list a few examples of circumstances "beyond the reasonable control" of the delayed party: "acts of God, or of the public enemy, acts of Government in either its sovereign or contractual capacity, fires, floods, epidemics, quarantine restrictions, strikes, freight embargoes and unusually severe weather." *Id.* The Contracting Officer isolated six factors that, taken together, supposedly support the conclusion that DOE experienced an unavoidable delay in this case: technical problems; regulatory delays; roadblocks to implementation of interim or monitored retrievable storage; funding restrictions; litigation delays; and consultation requirements. Exhibits to Resp. Response, Tab 6. Reaching the preliminary conclusion that the delay was unavoidable, the Department's Contracting Officer let DOE off the hook for monetary damages.

The most glaring problem with DOE's position is that it is answering the wrong question: it is attempting to explain why it will not have a "state-of- the-art, deep geologic facility for the permanent disposal of the Nation's spent nuclear fuel and high- level waste" ready by 1998. *Id.* Put another way, DOE's position is that its delayed performance is unavoidable because it does not have an operational repository, and does not have the authority to provide storage in the interim. DOE is simply recycling the arguments rejected by this court in *Indiana Michigan.* DOE unsuccessfully argued in that case that it does not have an obligation to take the

SNF in the absence of an operational repository or other facility; here, DOE recycles that same argument in the slightly different form that it does not have responsibility for the costs resulting from its failure to perform that duty because it does not have an operational repository or other facility. As we pointed out in *Indiana Michigan*, the NWPA directs DOE to undertake the duty to begin taking the SNF by January 31, 1998, whether or not it has a repository or interim storage facility. DOE cannot now render its obligation contingent, and free itself of the costs caused by its delay, by advancing the same failed position that we rejected before.

Given DOE's repeated attempts to excuse its delay on the ground that it lacks an operational repository or interim storage facility, we find it appropriate to issue a writ of mandamus to correct the Department's misapprehension of our prior ruling. Accordingly, we order DOE to proceed with contractual remedies in a manner consistent with NWPA's command that it undertake an unconditional obligation to begin disposal of the SNF by January 31, 1998. More specifically, we preclude DOE from concluding that its delay is unavoidable on the ground that it has not yet prepared a permanent repository or that it has no authority to provide storage in the interim.

This necessarily means, of course, that DOE not implement any interpretation of the Standard Contract that excuses its failure to perform on the grounds of "acts of Government in either its sovereign or contractual capacity." 10 C.F.R. § 961.11, Art. IX.A. We held in *Indiana Michigan* that the NWPA imposes an unconditional duty on DOE to take the materials by 1998. Congress, in other words, directed DOE to

assume an unqualified obligation to take the materials by the statutory deadline. Under the Department's interpretation of the governing contractual provisions, however, the government can always absolve itself from bearing the costs of its delay if the delay is caused by the government's own acts. This cannot be a valid interpretation, as it would allow the Executive Branch to void an unequivocal obligation imposed by Congress. DOE has no authority to adopt a contract that violates the directives of Congress, just as it cannot implement interpretations of the contract that contravene this court's prior ruling. We hold that this provision in the Standard Contract, insofar as it is applied to DOE's failure to perform by 1998, is inconsistent with DOE's statutory obligation to assume an unconditional duty.

## III. Conclusion

In conclusion, we do not grant petitioners' broad request for a writ of mandamus because we conclude that the remedial scheme of the Standard Contract offers a potentially adequate remedy. We do, however, grant the petition in part because DOE has not abided by our prior conclusion that the NWPA imposes an unconditional obligation on the Department to begin disposal of the SNF by January 31, 1998. We therefore issue a writ of mandamus precluding DOE from excusing its own delay on the grounds that it has not yet prepared a permanent repository or interim storage facility. We retain jurisdiction over this case pending compliance with the mandate issued herewith.

**APPENDIX B**

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

September Term, 1997

---

No. 97-1064

NORTHERN STATES POWER COMPANY, ET AL.,
PETITIONERS

*v.*

UNITED STATES DEPARTMENT OF ENERGY
AND UNITED STATES OF AMERICA, RESPONDENTS

IES UTILITIES, INC., ET AL., INTERVENORS

---

Consolidated with Nos. 97-1065, 97-1370 and 97-1398

No. 98-1069

IN RE: MAINE YANKEE ATOMIC POWER CO.,
PETITIONER

No. 98-1070

IN RE: SOUTHERN NUCLEAR OPERATING CO., ET AL.,
PETITIONERS

---

[Filed: May 5, 1998]

---

ORDER

Before: WILLIAMS, GINSBURG and SENTELLE, *Circuit Judges.*

Upon consideration of the Motions to Consolidate from Maine Yankee and Southern Nuclear; the Motions

from the Department of Energy to Dismiss the suits of Maine Yankee and Southern Nuclear; the Motions for Enforcement of the Mandate from the State Petitioners, the Utility Petioners [*sic*], and Connecticut Yankee; and the Petitions for Rehearing from Yankee Atomic and the Department of Energy, and the responses thereto and the replies, it is hereby

ORDERED that the Motions to Consolidate are granted. The Petitions and Motions are otherwise denied.

I. Maine Yankee and Southern Nuclear Operating Company are parties to the Department of Energy's ("DOE") Standard Contract for Disposal of Spent Nuclear Fuel ("SNF"). Their suits against the DOE present issues identical to those raised by the Utility Petitioners in *Northern States Power Co. v. DOE*, 128 F.3d 754 (D.C. Cir. 1997). To make clear that they are entitled to identical relief, we grant the motion to consolidate. Our disposition of the motions for enforcement and petitions for rehearing, discussed below, applies in full measure to Maine Yankee and Southern Nuclear.

II. The DOE moves for dismissal of the actions of Maine Yankee and Southern Nuclear. Those utilities are entitled to the same relief as the other Utility Petitioners; consequently, we do not dismiss their suits but instead consolidate them with *Northern States*. The relief awarded in that decision extends to them. To the extent that they join in the Utility Petitioners' motions, the following dispositions also apply to them. The DOE's motion is denied.

III. The State Petitioners request an order that (1) bars the DOE from using utility and ratepayer-

supplied monies from the Nuclear Waste Fund ("NWF") or fee collections to pay any costs or damages awarded to utilities under the Standard Contract; (2) authorizes the payment of NWF fees into an interest-bearing escrow account; and (3) requires the DOE to file a plan for disposing of SNF before receiving any more shipments of foreign or domestic SNF at its existing facilities.

We express no opinion on the legality of the DOE's using utility or ratepayer-supplied monies to pay costs or damages, nor on the adequacy of any particular type of equitable adjustment of fees that might be awarded to utilities under the Delays Clause of the Standard Contract. Our decision in *Northern States* barred the DOE from interpreting the Contract as imposing only a contingent disposal obligation; such an interpretation, we ruled, would place the DOE in violation of its statutory duties under the Nuclear Waste Policy Act ("NWPA"), which required it to undertake an unconditional obligation. Beyond that clarification of the statute's requirements, we remitted the utilities to their remedies under the Standard Contract. Suits based on the Contract may present issues of the permissible forms of equitable adjustment, and possibly the award of some forms of equitable adjustment would place the DOE in violation of the NWPA and again properly trigger our jurisdiction (as opposed to that of the Court of Federal Claims) under either the NWPA or the APA. But as the DOE has not yet taken any of these actions, the issues are not ripe for review as presented to us in these petitions.

The second and third elements of the State Petitioners' requested order constitute equitable contract remedies against the DOE and fall outside the scope of

the *Northern States* mandate. *Northern States* describes the nature of the DOE's obligation, which was created by the NWPA and undertaken by the DOE under the Standard Contract. It does not place the question of contract remedies in this court, nor set up this court as a source of remedies outside the Standard Contract.

IV. The Utility Petitioners request essentially the same relief as the State Petitioners. For the same reasons, their request is denied.

V. Yankee Atomic requests an order requiring the DOE to begin to dispose of its SNF, asserting that monetary damages are inadequate. We do not address the question of the adequacy of damages or of any contract remedy. The order cannot issue because enforcement of our mandate does not extend to requiring the DOE to perform under the Standard Contract. While the statute requires the DOE to include an unconditional obligation in the Standard Contract, it does not itself require performance. Breach by the DOE does not violate a statutory duty; thus, our jurisdiction to hear allegations of failure to take an action required under the NWPA, see 42 U.S.C. § 10139(a)(1)(B), does not provide a basis for a move-fuel order.

VI. Connecticut Yankee requests an order prohibiting the DOE from using NWF monies to compensate utilities for delay, and requiring the DOE to move Connecticut Yankee's spent fuel. This request is covered by the discussion above: the issue of recycling NWF monies is not ripe, and the move-fuel order is beyond our mandate.

VII. The DOE petitions for rehearing, suggesting that this Court has erroneously designated itself as the

proper forum for adjudication of disputes arising under the Standard Contract. As the above should make clear, we did not; we merely prohibited the DOE from implementing an interpretation that would place it in violation of its duty under the NWPA to assume an unconditional obligation to begin disposal by January 31, 1998. The statutory duty to include an unconditional obligation in the contract is independent of any rights under the contract. The Tucker Act does not prevent us from exercising jurisdiction over an action to enforce compliance with the NWPA. The DOE's petition is denied.

FOR THE COURT:

Mark J. Langer, Clerk

BY: /s/ MICHAEL C. MCGRAIL
MICHAEL C. MCGRAIL
Deputy Clerk

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

September Term, 1997

No. 97-1064

NORTHERN STATES POWER COMPANY (MINNESOTA), ET AL., PETITIONERS

*v.*

DEPARTMENT OF ENERGY AND UNITED STATES OF AMERICA, RESPONDENTS

IES UTILITIES, INC., ET AL., INTERVENORS

Consolidated with Nos. 97-1065, 97-1370, 97-1398

[Filed: May 5, 1998]

Before: EDWARDS, Chief Judge; WALD, SILBERMAN, WILLIAMS, GINSBURG, SENTELLE, HENDERSON, RANDOLPH, ROGERS, TATEL and GARLAND, Circuit Judges.

ORDER

Upon consideration of respondents' Suggestion for Rehearing *In Banc*, and the absence of a request by any member of the court for a vote, it is

ORDERED that the suggestion be denied.

Per Curiam

FOR THE COURT:
Mark J. Langer, Clerk

BY: /s/ ROBERT A. BONNER
ROBERT A. BONNER
Deputy Clerk

Circuit Judges Silberman and Garland did not participate in this matter.

**APPENDIX C**

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT
SEPTEMBER TERM, 1997

---

No. 97-1064

NORTHERN STATES POWER COMPANY (MINNESOTA), ET AL., PETITIONERS

*v.*

DEPARTMENT OF ENERGY AND UNITED STATES OF AMERICA, RESPONDENTS

---

IES UTILITIES, INC., ET AL., INTERVENORS

---

Consolidated with Nos. 97-1065, 97-1370, 97-1398, 98-1069, 98-1070

---

No. 98-1201

SOUTHERN CALIFORNIA EDISON COMPANY, PETITIONER

*v.*

DEPARTMENT OF ENERGY, RESPONDENT

---

No. 97-1213

WASHINGTON PUBLIC POWER SUPPLY SYSTEM AND SOUTH CAROLINA ELECTRIC & GAS COMPANY, PETITIONERS

*v.*

DEPARTMENT OF ENERGY, RESPONDENT

---

[Filed: July 2, 1998]

---

## ORDER

Before: WILLIAMS, GINSBURG, AND SENTELLE, Circuit Judges.

Upon consideration of the petitions for review and for a writ of mandamus, the motion to consolidate, the motion to dismiss, the joint motion to withdraw, and the stipulation regarding the response to the petition for review in 98-1213, it is

ORDERED that the motions to consolidate be granted. It is

FURTHER ORDERED that the petitions be denied. Because the holding of *Northern States v. Department of Energy*, 128 F.3d 754 (D.C. Cir. 1997), bars the Department of Energy from utilizing its previous interpretation of the Nuclear Waste Policy Act in dealings with any entity, and because Standard Contract holders must seek remedies available under the contract in other fora, these cases and No. 97-1067 are concluded and no further relief can be sought therein. *See Northern States v. Department of Energy*, No. 97-1064 (D.C. Cir. May 5, 1998) (order explaining reasons for refusal to grant relief on post-judgment petitions for review and for mandamus).

The Clerk is directed to withhold issuance of the mandate herein until seven days after the disposition of any timely petition for rehearing. *See* D.C. Cir. Rule 41.

Per Curiam

FOR THE COURT:
Mark J. Langer, Clerk

BY: /s/ MICHAEL C. MCGRAIL
MICHAEL C. MCGRAIL
Deputy Clerk/LD

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT
SEPTEMBER TERM, 1997

---

No. 97-1064

NORTHERN STATES POWER COMPANY (MINNESOTA), ET AL., PETITIONERS

*v.*

DEPARTMENT OF ENERGY AND UNITED STATES OF AMERICA, RESPONDENTS

---

IES UTILITIES, INC., ET AL., INTERVENORS

---

Consolidated with Nos. 97-1065, 97-1370, 97-1398, 98-1069, 98-1070

---

No. 98-1284

DAIRYLAND POWER COOPERATIVE, PETITIONER

*v.*

DEPARTMENT OF ENERGY AND UNITED STATES OF AMERICA, RESPONDENTS

---

[Filed: July 2, 1998]

---

ORDER

Before: WILLIAMS, GINSBURG, AND SENTELLE, Circuit Judges.

Upon consideration of the petition for review and the motion for consolidation with No. 97-1064, it is

ORDERED that the petition be denied, for the reasons stated in the court's order filed May 5, 1998, in

*Northern States v. Department of Energy*, No. 97-1064. It is

FURTHER ORDERED that the motion to consolidate be dismissed as moot.

The Clerk is directed to withhold issuance of the mandate herein until seven days after disposition of any timely petition for rehearing. *See* D.C. Cir. Rule 41.

Per Curiam

FOR THE COURT:
Mark J. Langer, Clerk

BY: /s/ MICHAEL C. MCGRAIL
MICHAEL C. MCGRAIL
Deputy Clerk/LD

**APPENDIX D**

UNITED STATES COURT OF APPEALS,
DISTRICT OF COLUMBIA CIRCUIT

Nos. 95-1279, 95-1321 AND 95-1463

INDIANA MICHIGAN POWER COMPANY, ET AL.,
PETITIONERS

*v.*

DEPARTMENT OF ENERGY AND UNITED STATES OF AMERICA, RESPONDENTS, NORTHERN STATES POWER COMPANY (MINNESOTA), ET AL., INTERVENORS

[Argued: Jan. 17, 1996
Decided: July 23, 1996]

Before: WILLIAMS, GINSBURG, AND SENTELLE, Circuit Judges.

Opinion for the Court filed by Circuit Judge SENTELLE.

SENTELLE, Circuit Judge:

The Nuclear Waste Policy Act ("NWPA") of 1982 authorized the Secretary of Energy ("Secretary") to enter contracts with owners and generators of high-level radioactive waste and spent nuclear fuel ("SNF") under which the private parties were to pay the Secretary statutorily imposed fees in return for which the Secretary, "beginning not later than January 31, 1998, will dispose of the high-level radioactive waste or [SNF] involved." 42 U.S.C. § 10222(a)(5)(B) (1994). Petitioners are utilities and state commissions who paid

fees to the Secretary under the statute. They seek review of the Department of Energy's ("DOE") final interpretation declaring that the Department has no obligation to perform its part of the contractual bargain. We conclude that the Department's interpretation is not valid and we therefore allow the petition for review.

Background

In the NWPA, Congress created a comprehensive scheme for the interim storage and permanent disposal of high-level radioactive waste generated by civilian nuclear power plants. NWPA establishes that, in return for a payment of fees by the utilities, DOE will construct repositories for SNF, with the utilities generating the waste bearing the primary responsibility for interim storage of SNF until DOE accepts the SNF "in accordance with the provisions of this chapter." 42 U.S.C. § 10131(a)(5).

The NWPA requires the utilities to enter into standard contracts with DOE for the disposal of the waste. According to the statute, the contracts shall provide that:

> (A) following commencement of operation of a repository, the Secretary shall take title to the high-level radioactive waste or spent nuclear fuel as expeditiously as practicable upon the request of the generator or owner of such waste or spent fuel; and
>
> (B) in return for the payment of fees established by this section, the Secretary, beginning not later than January 31, 1998, will dispose of the high-level radioactive waste or spent nuclear fuel as provided in this subchapter.

42 U.S.C. § 10222(a)(5). The final standard contract adopted by DOE, following notice and comment, states that "[t]he services to be provided by DOE under this contract shall begin, after commencement of facility operations, not later than January 31, 1998 and shall continue until such time as all SNF . . . from the civilian nuclear power reactors specified . . . has been disposed of." 10 C.F.R. § 961.11, Art. II (1996).

In 1993, several states and utilities became concerned about DOE's ability to meet its obligations under the NWPA. Therefore, they requested DOE to address its responsibilities under the NWPA, particularly section 302(a)(5), 42 U.S.C. § 10222(a)(5), and the January 31, 1998 deadline. Daniel Dreyfuss, Director of DOE's Office of Civilian Radioactive Waste Management, responded in a letter that DOE "does not have a clear legal obligation under the [NWPA] to accept [SNF] absent an operational repository or other facility." In February 1994, DOE's Secretary, Hazel O'Leary, indicated that, while at the time NWPA was enacted DOE "envisioned that it would have a waste management facility in operation and prepared to begin acceptance of [SNF] in 1998," DOE subsequently concluded it did not have "a clear legal obligation under the [NWPA] to accept [SNF] absent an operational repository or other facility constructed under the [NWPA]."

To address this issue, on May 25, 1994, DOE published a Notice of Inquiry on Waste Acceptance Issues ("NOI"), requesting the views of affected parties on matters relating to the continued storage of SNF at reactor sites beyond 1998. 59 Fed. Reg. 27,007 (1994). DOE presented its preliminary finding that it had "no statutory obligation to accept [SNF] beginning in 1998

in the absence of an operational repository or other facility constructed under the [NWPA]." *Id.* at 27,008. DOE did note, however, that the terms of the Standard Contract may have created such an expectation. *Id.*

On June 20, 1994, utility petitioners ("utilities") and state petitioners ("states") filed petitions for review against DOE. This Court dismissed the petitions, finding that the NOI did not constitute final agency action. *Northern States Power Co. v. DOE*, Nos. 94-1457, 94-1458, 94-1574, 1995 WL 479714 (D.C. Cir. July 28, 1995) (order granting motion to dismiss case).

On April 28, 1995, DOE issued its Final Interpretation. *Final Interpretation of Nuclear Waste Acceptance Issues*, 60 Fed. Reg. 21,793 (1995). In the Final Interpretation, DOE stated that it would not be able to begin taking SNF by January 31, 1998, the date established by the NWPA. *Id.* at 21,793-94. DOE concluded that it did not have an unconditional statutory or contractual obligation to accept high-level waste and spent fuel beginning January 31, 1998 in the absence of a repository or interim storage facility constructed under the NWPA. *Id.* The agency also determined that it had no authority under the NWPA to provide interim storage in the absence of a facility that has been authorized, constructed and licensed in accordance with the NWPA. *Id.* at 21,797. Finally, DOE declared that, even if it did have an unconditional obligation under the statute, the Delays Clause of the Standard Contract would provide an administrative remedy for DOE's failure to satisfy an obligation under the statute. *Id.*

Petitioners and intervenors then filed their petitions for review of the Final Interpretation.

**Analysis**

In reviewing an agency's construction of a statute entrusted to its administration, we follow the two-step statutory analysis established in *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842-43, 104 S. Ct. 2778, 81 L.Ed.2d 694 (1984). First, we ask whether Congress has spoken unambiguously to the question at hand. If it has, then our duty is clear: "We must follow that language and give it effect." *Wisconsin Elec. Power Co. v. DOE*, 778 F.2d 1, 4 (D.C.Cir.1985). If not, we consider the agency's action under the second step of Chevron, deferring to the agency's interpretation if it is "reasonable and consistent with the statute's purpose." *Nuclear Info. Resource Serv. v. NRC*, 969 F.2d 1169, 1173 (D.C. Cir. 1992) (quoting *Chemical Mfrs. Ass'n v. EPA*, 919 F.2d 158, 162-63 (D.C. Cir. 1990)). We now apply that review to the Department's interpretation of section 302(a)(5)(B).

Section 302(a)(5)(B) states that "in return for the payment of fees . . . [DOE], beginning not later than January 31, 1998, will dispose of the [SNF]. . . ." The states and utilities contend that this provision means what it says: in return for the payment of fees to the utilities, DOE will begin accepting SNF not later than January 31, 1998. DOE argues that this language does not in fact require it to begin to dispose of SNF by January 31, 1998; rather, the agency contends that this obligation is further conditioned on the availability of a repository or other facility authorized, constructed, and licensed in accordance with the NWPA. DOE contends that this is the only interpretation possible when one examines the statute as a whole.

To support this interpretation, the Department first argues that Congress's use of the term "dispose" in section 302(a)(5)(B), which provides that DOE "will dispose of the high-level radioactive waste or spent nuclear fuel involved as provided in this subchapter," presupposes the availability of a repository. Although conceding that the statute does not define "dispose," DOE notes that the statute does define "disposal" as "the emplacement in a repository of . . . spent nuclear fuel . . . with no foreseeable intent of recovery." 42 U.S.C. § 10101(9). DOE contends that "dispose" is simply a different grammatical form of "disposal," and that Congress must have intended the two terms be interpreted consistently. Thus, it argues, section 302 must require a repository be operational before DOE may begin accepting SNF.

We disagree. The phrase "dispose of " is a common term. It has a common meaning. For example, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY UNABRIDGED 654 (1961) defines it as meaning, among other things, "to get rid of; throw away; discard." Admittedly, that and other dictionaries list other definitions. Each of those definitions, however, is consistent with the one set forth and not consistent with a limitation for placing the object of the phrase "in the disposal." There is no indication in the statute that Congress intended the words to be used in any but their common sense. *See McNally v. United States*, 483 U.S. 350, 358-59, 107 S. Ct. 2875, 2880-81, 97 L.Ed.2d 292 (1987) (interpreting commonly used phrase according to "common understanding" where Congress had "not indicat[ed]" an intent to depart from it). Indeed, the very fact that Congress defined "disposal" restrictively and did not define "dispose" bears mute testi-

mony to the strong possibility that Congress intended the former as a term of art, the latter as common English. Indeed, DOE itself has previously concluded that the statutory definition of "disposal" was not intended to define "dispose of." In an April 1, 1987 letter, DOE's general counsel, although responding to a different issue, wrote "we doubt that the[se] terms were intended to have identical meanings." Furthermore, if DOE's obligation to dispose of waste was linked exclusively to the Act's definition of "disposal" then that obligation would be conditioned only upon the availability of a *repository*. However, Article II of the Standard Contract provides that DOE will provide its services after commencement of "facility" operations, 10 C.F.R. 961.11, with "facility" being defined as including both a repository and "such other facilit[ies] to which spent nuclear fuel and/or high-level radioactive waste may be shipped by DOE prior to its transportation to a disposal facility." *Id.* at Article I. It is difficult to see how that paragraph and the Department's interpretation of the statutory section can sensibly coexist.

Perhaps more importantly, we must interpret the section in light of the whole statutory scheme. *See Bailey v. United States*, —— U.S. ——, ——, 116 S. Ct. 501, 506, 133 L.Ed.2d 472 (1995) (observing that a court must "consider not only the bare meaning of the word but also its placement and purpose in the statutory scheme.") In the scheme before us, indeed in another subsection of the very section under review, Congress used even the elsewhere narrowly defined "disposal" to encompass more than "emplacement in a repository of . . . spent nuclear fuel . . . with no foreseeable intent of recovery." That is, in section 302(d), 42 U.S.C.

§ 10222(d), Congress authorizes the Secretary to make expenditures "for purposes of radioactive waste disposal activities," and expressly includes within the ambit of authorized "disposal" activities those conducted not only in connection with repositories, but also with "any . . . monitored retrievable storage facility or test and evaluation facility constructed under this chapter." 42 U.S.C. § 10222(d)(1). Therefore, even if we look to Congress's use of "disposal" to enlighten our interpretation of "dispose of," we still find that Congress has not evidenced limited usage for which the Department argues.

DOE next argues that subsections (A) and (B) of 302(a)(5) are not independent provisions, but rather must be read together because taking title to the waste cannot be separated from the disposal activities. To support this proposition, DOE cites section 302(a)(1), which describes the Standard Contract as "for the acceptance of title, subsequent transportation, and disposal of such waste or spent fuel" and section 123, which provides that "[d]elivery and acceptance by the Secretary, of any high-level radioactive waste or spent nuclear fuel for a repository constructed under this part shall constitute a transfer to the Secretary of title to such waste and spent fuel." 42 U.S.C. § 10143. Respondent contends that these provisions evince Congress's intent that DOE take title to the waste before proceeding with disposal. According to DOE, any other interpretation of these sections would result in an anomaly in which one party would have ownership of the SNF while another party would have physical control of it.

We do not find this argument persuasive. Sections 302(a)(5)(A) and (B) clearly set forth two independent

requirements. These separate obligations are independent of whether DOE holds title to SNF when it begins to dispose of the material. The duties imposed on DOE under subsections (A) and (B) are linked to different events and are triggered at different times. DOE's duty under subsection (A) to take title to the SNF is linked to the commencement of repository operations and is triggered when a generator or owner of SNF makes a request to DOE. DOE's duty under subsection (B) to dispose of the SNF is conditioned on the payment of fees by the owner and is triggered, at the latest, by the arrival of January 31, 1998. Nowhere, however, does the statute indicate that the obligation established in subsection (B) is somehow tied to the commencement of repository operations referred to in subsection (A).

This conclusion is reinforced by the placement of the two requirements in the Standard Contract. DOE's obligation *to dispose* of SNF under section 302(a)(5)(B) is set forth in Article II-Scope, 10 C.F.R. § 961.11, whereas DOE's obligation to take title to SNF under section 302(a)(5)(A) is set forth in Article VII-Title. *Id.* In addition, contrary to DOE's assertions, it is not illogical for DOE to begin to dispose of SNF by the 1998 deadline and yet not take title to the SNF until a later date. As the utilities point out, it is not unusual, particularly in the nuclear area, to recognize a division between ownership of materials and other obligations relating to such materials. For example, the Nuclear Regulatory Commission recognizes a distinction between the ownership of nuclear materials and the right to possess or use such materials. *See also* 10 C.F.R. § 70.20; 10 C.F.R. § 40.21.

In fact, a comparison of paragraphs (A) and (B) argues against the Department's position. In (A), Con-

gress expressly conditioned the obligation of the Secretary on the commencement of the operation of a repository. In (B), Congress imposed no such condition, but rather directed the beginning of the Secretary's duty as "not later than January 31, 1998," without qualification or condition. The only limitation placed on the Secretary's duties under (B) is that that duty is "in return for the payment of fees established by this section." The Department's treatment of this statute is not an interpretation but a rewrite. It not only blue-pencils out the phrase "not later than January 31, 1998," but destroys the *quid pro quo* created by Congress. It does not survive the first step of the *Chevron* analysis. 467 U.S. at 842-43, 104 S. Ct. at 2781-82. Under the plain language of the statute, the utilities anticipated paying fees "in return for [which] the Secretary" had a commensurate duty. She was to begin disposing of the high-level radioactive waste or SNF by a day certain. The Secretary now contends that the payment of fees was for nothing. At oral argument, one of the panel compared the government's position to a Yiddish saying: "Here is air; give me money," and asked counsel for the Department to distinguish the Secretary's position. He found no way to do so, nor have we.

Finally, respondent asserts that reading subsection (B) as creating an unconditional obligation cannot be reconciled with other requirements of the statute, noting that the NWPA provides a complex scheme for the authorization, construction and licensing of a repository or monitored retrieval storage facility. DOE contends that "many contingencies facing the commencement of repository operations strongly undercut the assumption that Congress intended to require disposal by 1998 no matter what the outcome."

Although Congress anticipated the existence of a repository by 1998, the fact that such a repository does not exist does not make subsection (B) illogical; it simply affects the remedy we can provide. We agree with DOE that Congress contemplated a facility would be available by 1998; however, that Congress contemplated such a facility would be available does not mean that Congress conditioned DOE's obligation to begin acceptance of SNF on the availability of a facility. It does not make sense to assert that Congress would express an intent to exempt DOE from the January 31, 1998 deadline by including specific statutory procedures regarding the siting and development of a repository in the NWPA. Rather, these prerequisites evince a strong congressional intent that DOE's various obligations be performed in a timely manner. *See, e.g., Tennessee v. Herrington*, 806 F.2d 642, 648 (6th Cir. 1986) ("[T]he overall structure of the Act does reveal a consistent concern for timely implementation of the disposal provisions."), *cert. denied*, 480 U.S. 946, 107 S. Ct. 1604, 94 L.Ed.2d 790 (1987). DOE's interpretation of the provisions does not harmonize them. Instead, its interpretation reads into section 302(a)(5)(B) language that appears only in section 302(a)(5)(A) and reads out of section 302(a)(5)(B) language that actually appears in that provision.

It is premature to determine the appropriate remedy, particularly as to the interaction between Article XI and Article XVI of the Standard Contracts, as DOE has not yet defaulted upon either its statutory or contractual obligation. We therefore will remand this matter for further proceedings consistent with this opinion.

**Conclusion**

In conclusion, we hold that the petitioners' reading of the statute comports with the plain language of the measure. In contrast, the agency's interpretation renders the phrase "not later than January 31, 1998" superfluous. Thus, we hold that section 302(a)(5)(B) creates an obligation in DOE, reciprocal to the utilities' obligation to pay, to start disposing of the SNF no later than January 31, 1998. The decision of the Secretary is vacated, and the case is remanded for further proceedings consistent with this opinion.

**APPENDIX E**

1. Section 119 of the Nuclear Waste Policy Act of 1982 (NWPA), as amended, 42 U.S.C. 10139, provides in pertinent part:

**(a) Jurisdiction of the court of appeals**

(1) * * * the United States courts of appeals shall have original and exclusive jurisdiction over any civil action–

> (A) for review of any final decision or action of the Secretary * * * under this part;
>
> (B) alleging the failure of the Secretary * * * to make any decision, or take any action, required under this part;

* * * * *

**(c) Deadline for commencing action**

A civil action for judicial review described under subsection (a)(1) of this section may be brought not later than the 180th day after the date of the decision or action or failure to act involved, as the case may be, except that if a party shows that he did not know of the decision or action complained of (or of the failure to act), and that a reasonable person acting under the circumstances would not have known, such party may bring a civil action not later than the 180th day after the date such party acquired actual or constructive knowledge of such decision, action, or failure to act.

2. Section 302(a) of the NWPA, as amended, 42 U.S.C. 10222(a), provides in relevant part:

**(a) Contracts**

(1) In the performance of his functions under this chapter, the Secretary [of Energy] is authorized to enter into contracts with any person who generates or holds title to high-level radioactive waste, or spent nuclear fuel, of domestic origin for the acceptance of title, subsequent transportation, and disposal of such waste or spent fuel. Such contracts shall provide for payment to the Secretary of fees pursuant to paragraphs (2) and (3) sufficient to offset expenditures described in subsection (d) of this section.

* * * * *

(5) Contracts entered into under this section shall provide that—

> (A) following commencement of operation of a repository, the Secretary shall take title to the high-level radioactive waste or spent nuclear fuel involved as expeditiously as practicable upon the request of the generator or owner of such waste or spent fuel; and
>
> (B) in return for the payment of fees established by this section, the Secretary, beginning not later than January 31, 1998, will dispose of the high-level radioactive waste or spent nuclear fuel involved as provided in this subchapter.

(6) The Secretary shall establish in writing criteria setting forth the terms and conditions under which such disposal services shall be made available.