IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| CONSOLIDATED EDISON COMPANY OF NEW YORK, INC. Plaintiff, | ) | |
| v. | ) | No. 04-0033C (Judge Lettow) |
| UNITED STATES OF AMERICA, Defendant. | ) | |

DEFENDANT'S REPLY TO CONSOLIDATED EDISON COMPANY OF NEW YORK, INC.'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

Defendant, the United States, respectfully submits this reply to the opposition to defendant's motion to dismiss filed by plaintiff, Consolidated Edison Company of New York, Inc. ("ConEd").[1]

SUMMARY OF ARGUMENT

As we explained in our motion, and which ConEd does not refute in its opposition brief, the Nuclear Waste Policy Act ("NWPA") establishes that the sole purpose of the Standard Contract is to create a commitment on the part of the Federal Government to accept and dispose of commercial utilities' SNF, with a corresponding obligation on the part of commercial utilities

[1] As an initial matter, the Court should disregard ConEd's attempts to amend its complaint through its brief in opposition to the Government's motion to dismiss. Specifically, ConEd asserts, for the first time in this litigation, that the "Government's breach of its contractual obligation to commence disposal of SNF significantly diminished the value of Con Edison's Standard Contract." Pl. Opp. at 7, 11, 13. ConEd also now contends that it was "stripped of its ability to trade its SNF disposal queue position, an asset that was uniquely provided under the Standard Contract." Pl. Opp. at 7-8, 11, n.3. Because neither of these contentions are contained in ConEd's complaint or are otherwise supported by affidavits or other documents, we request that the Court disregard them.

to pay for the cost of such acceptance and disposal. Simply stated, the sale by a utility of its nuclear power plant to a third party is not directly related to the purpose of the Standard Contract. Although ConEd appears to devote its entire argument with respect to the Government's motion to dismiss Count I to establishing that such a sale was foreseeable, foreseeability is <u>not</u> the appropriate standard for establishing whether a type of damage is consequential. Indeed, foreseeability is a prerequisite for establishing entitlement to <u>any</u> type of damages. Rather, in addition to establishing foreseeability, which ConEd has not even alleged in its complaint, ConEd must establish that the type of damages it seeks directly flow from the Standard Contract. Because ConEd cannot make such a showing, ConEd's claim for the alleged diminution in value of its nuclear facilities upon sale to a third party constitutes a consequential damage that may not be recovered against the Government.

Further, ConEd's assertion that its takings claim rests upon rights arising separate and apart from the Standard Contract is incorrect both as a matter of law and as a matter of fact. As discussed in our motion, a plaintiff may not claim a property interest in the rule of law. Yet, that is exactly what ConEd is attempting to do in this case by claiming that it somehow has a property interest in the NWPA. Moreover, even if ConEd could somehow claim a property interest in the rule of law, as a matter of fact, any interest that ConEd may have in this case derives solely from the Standard Contract, which provides the specific obligation on the part of DOE to accept a specific utility's fuel, at a specific time, and in specific amounts. Therefore, because any property interest that ConEd may posses is derived exclusively from the Standard Contract, and its claimed "taking" was the Government's breach of the Standard Contract, ConEd's sole remedy under the circumstances is for breach of the Standard Contract.

Finally, this Court does not possess jurisdiction to adjudicate ConEd's challenge to the Secretary of Energy's collection of fees under the Nuclear Waste Fund. ConEd has brought a challenge to the Secretary of Energy's fee collection practices, and the United States courts of appeals have original and exclusive jurisdiction to adjudicate such challenges. Indeed, the courts of appeals repeatedly have recognized that challenges to the Secretary of Energy's fee collection practices properly belong in the courts of appeals.

## DISCUSSION

### I. CONSOLIDATED EDISON'S CLAIM FOR THE DIMINISHED SALES PRICE OF ITS REACTORS IS A CLAIM FOR UNRECOVERABLE CONSEQUENTIAL DAMAGES AS A MATTER OF LAW

#### A. ConEd Does Not Dispute That The Sale Of Its Nuclear Power Plant Constitutes A Collateral Undertaking Unrelated To The Purpose Of The Standard Contract

Under the appropriate circumstances, recovery of lost profits may be a proper measure of damages in a breach of contract action against the Government. However, there can be little disagreement with the proposition that remote and consequential damages are not recoverable against the Government for breach of contract. Therefore, the issue before the Court is whether ConEd's claim for the diminution in value of its nuclear facilities when it was sold its facilities to a third party is a type of damage directly related to the Standard Contract or, instead, constitutes a remote and collateral undertaking. As we explained in our motion, and as we discuss below, ConEd's claim that the value of its nuclear utility decreased as a result of the Government's breach of the Standard Contract constitutes a consequential and, hence, unrecoverable form of damages as a matter of law.

The main focus of ConEd's opposition is that the determination of its damages claim is an

issue of fact that is not appropriate for resolution on a motion to dismiss. Pl. Opp. at 21. Specifically, ConEd argues that, because foreseeability is a question of fact, this Court may not dismiss its complaint with respect to ConEd's claim for diminution in value. Id. However, in determining whether claimed damages are consequential as a matter of law, rather than focus solely on foreseeability, as ConEd urges, the predecessor to the Federal Circuit has articulated the following analysis:

> [T]here is a distinction by which all questions of this sort can easily be tested. If the profits are such as would have accrued and grown out of the contract itself, as the direct and immediate results of its fulfillment, then they would form a just and proper item of damages, to be recovered against the delinquent party upon a breach of the agreement. These are part and parcel of the contract itself, and must have been in the contemplation of the parties when the agreement was entered into. But if they are such as would have been realized by the party from other independent and collateral undertakings, although entered into in consequence and on the faith of the principal contract, then they are too uncertain and too remote to be taken into consideration as part of the damages occasioned by the breach of the contract in suit.

Ramsey v. United States, 101 F. Supp. 353, 357-58 (Cl. Ct. 1951) (quoted in Morris v. United States, 39 Fed. Cl. 7, 24 (1997)).

This Court has recognized that, under the appropriate circumstances, claimed damages may be so remote or unrelated to the purpose of the contract as to be deemed consequential as a matter of law. As this Court explained in Smokey Bear, Inc. v. United States, 31 Fed. Cl. 805 (1994):

> [T]here are certain kinds of damages which have long been determined to be consequential and unrecoverable as a matter of law. Thus, the court and its predecessor has previously held that damages for the loss of future profits and lost profitable business opportunities arising from potential contracts with others are per

> se unrecoverable. Olin Jones Sand Co. v. United States, 225 Ct. Cl. 741, 742, 1980 WL 13211 (1980); Ramsey v. United States, 121 Ct. Cl. 426, 433-34, 101 F. Supp. 353, 357 (1951) cert. denied, 343 U.S. 977, 72 S. Ct. 1072, 96 L. Ed. 1369 (1952); Lucas v. United States, 25 Cl. Ct. 298, 310-11 (1992); Solar Turbines, Inc. v. United States, 23 Cl. Ct. 142, 159-60 (1991).

Id. at 808 (emphasis added); see Southern California Edison v. United States, 58 Fed. Cl. 313, 323 (2003) (explaining that, as a matter of law, certain consequential damages may be too remote to be recoverable).

Indeed, application of this well-established principle illustrates the inapplicability of the cases cited by ConEd in support of its claim that its diminution in value claim does not constitute a consequential damage. For example, ConEd relies heavily upon the Court of Claims' decision in Neely v. United States, 285 F.2d 438 (Ct. Cl. 1961), as support for its position that it is entitled to seek damages for the alleged diminution in value of its former nuclear facilities upon sale to a third party. In Neely, the plaintiff had entered into a lease with the Government to mine coal. Id. at 439. The plaintiff had intended to mine coal through stip mining. Id. However, the Government refused to allow the plaintiff to engage in strip mining and the plaintiff sued the Government for breach of the lease agreement. Id. at 440. The plaintiff sought loss of anticipated profits as damages. Id. at 443. The Court of Claims allowed for the recovery of lost anticipated profits, but remanded the case to allow the plaintiff to present evidence of its alleged losses. Id. at 443-44. In Neely, the alleged damages – lost profits as a result of an inability to engage in strip mining – were a direct and natural outgrowth of the subject of the lease agreement, which was to mine coal.[2]

---

[2] ConEd relies upon the Court of Federal Claim's decision in Southern National Corporation v. United States, 57 Fed. Cl. 294 (2003), for the proposition that the Court "should determine at

Similarly, the Court's decision in Suess v. United States, 52 Fed. Cl. 221 (2002), is yet another example of a circumstance where the claimed damages directly flow from the subject matter of the contract. In Suess, the plaintiffs, former shareholders of a failed savings and loan, sought to recover the lost franchise value of the thrift as a result of the passage of the Financial Institutions Reform, Recovery, and Enforcement Act ("FIRREA"), which the plaintiffs alleged was a breach of their contract with the Government regarding the regulatory treatment of goodwill. Id. at 223. Plaintiffs contended that, as a result of the passage of FIRREA, the thrift fell out of compliance and was seized by the Government. Id. The Court interpreted the purpose of the contract governing the treatment of goodwill as:

> part of a promise by regulators to protect the institution from regulatory insolvency for an extended period. While the transactions clearly were designed to buy time for interest rates to go down, they were also designed to protect the viability of the acquiring thrift so that it would not be pulled under water by the net worth deficits of the acquired firms.

Id. at 230. Consequently, the Court concluded that, because it was "both foreseeable and actually foreseen that breach of the contractual promise regarding the regulatory treatment of goodwill would push the thrift into insolvency and subject it to seizure," the plaintiffs were entitled to the lost equity value of the thrift. Id. at 231. Thus, Seuss is simply an example of a circumstance in

---

trial whether plaintiff could prove the diminished value of its business opportunity." Pl. Op. at 12. In Southern National, the Government moved for summary judgment on damages based upon the lost profits model utilized by the plaintiffs' expert. Southern National, 57 Fed. Cl. at 306-07. The Court denied the Government's motion for summary judgment because there was a "material dispute regarding the viability" of the expert's model. Id. at 308. The Court did not address in its decision whether the alleged lost profits were directly related to the subject of the contract allowing for the use of goodwill. Therefore, Southern National does not support ConEd's claim that the Court in this case should deny the Government's motion to dismiss.

which the Court determined that, in the Winstar context, the loss in value of the thrift was not a consequential damage resulting from the passage of FIRREA.

In this case, no factual development is necessary to resolve whether ConEd's diminution of value claim flows directly from the subject matter of the Standard Contract or, instead, constitutes a collateral undertaking. As we discussed in our motion, and as ConEd does not dispute, the sole purpose of the Standard Contract is to create a commitment on the part of the Department of Energy to accept and dispose of commercial utilities' SNF, with a corresponding obligation on the part of commercial utilities to pay for the cost of such acceptance and disposal. See 10 C.F.R. § 961.11; 42 U.S.C. § 10131(b)(1)-(4) (2004). Consequently, this Court should determine, as a matter of law, that ConEd's claimed damages for diminution in value are impermissibly consequential because the sale of a nuclear power plant to a third party does not directly flow from the subject matter of the Standard Contract.

B. ConEd's Complaint Fails To Allege That The Sale Of Its Nuclear Facility To A Third Party Was Foreseeable

Even if foreseeability were the sole determinant of whether a claimed damage was consequential as a matter of law, ConEd has failed to allege any facts in its complaint in support of its assertion that the claimed diminution in value of its nuclear power plant upon sale to a third party was reasonably foreseeable. Although ConEd purports to cite to various places in its complaint in support of its contention that the sale was foreseeable (Pl. Opp. at 17), ConEd's citation to the complaint does not comport with its assertions.

For example, ConEd makes the following claims in its opposition:

- The Government knew that nuclear plants had finite storage capacity on-site and would be required to cease operations when that capacity was exhausted (Citing Compl. ¶ 49);

- The Government knew that expanding that storage capacity was not as-of-right, but depended on uncertain regulatory approval (Citing Compl. ¶ 71);

- The Government knew that only it was practically and legally able to offer SNF disposal services, and that the purchasers of those services could not obtain "cover" from any other source when the Government failed to provide these critical services (Citing Compl. ¶ 31);

- The Government knew that NWPA placed obligations on DOE as to the amount of fees it was to collect from 1982 until 1998, and that its fee collection authority was constrained both by NWPA and rulings of the D.C. Circuit (Citing Compl. ¶ 37).

Pl. Opp. at 17 (emphasis added).[3] Despite its references to the complaint, nowhere in ConEd's complaint does it reference the Government's awareness or knowledge of any events, or that such events were somehow foreseeable. Consequently, ConEd has failed to put forth a cognizable cause of action.

Finally, ConEd relies upon the assignment provision contained in the Standard Contract and the NWPA in claiming that the "Government knew that nuclear plants could and likely

---

[3] ConEd also makes reference to the Government's purported awareness that "the Federal Energy Regulatory Commission ["FERC"] was in the late 1990s strongly urging competitive markets in electric energy sales and the separation of ownership of electric generating facilities from traditional utilities." Pl. Opp. at 17 (citing Compl. ¶ 50) (emphasis supplied). The Federal Circuit has unequivocally held that foreseeability must be measured at the time of contract formation, rather than at the time of breach or some other date. See Prudential Ins. Co. of Am. v. United States, 801 F.2d 1295, 1300 (Fed. Cir. 1986). Therefore, ConEd's reference to FERC's actions in the late 1990s has absolutely no relevance to whether ConEd's claim for diminution in value based upon the sale of its nuclear facility to a third party naturally and directly flows from the Standard Contract.

would be sold." Pl. Opp. at 17.[4] Again, ConEd misses the point. As we explained in our motion, although the NWPA and the Standard Contract clearly contemplate that a party to the Standard Contract could assign its rights and interests in the contract with transfer of title of the SNF, 10 C.F.R. § 961.11, Art. XIV, the Standard Contract is not concerned with assisting in sales

---

[4] ConEd also claims that it "provided the Government with the requisite notice of its intended sale and assignment of the Standard Contract to Entergy." Pl. Opp. at 18. There appears to be an issue as to whether such notice was valid. As the Government explained in the recent hearing in Entergy Nuclear Indian Point 2, No. 03-2622C (Feb. 9, 2004) (Lettow, J) ("ENIP"), the notice of the assignment provided to DOE by ConEd on September 6, 2001 appears inconsistent with the actual assignment language contained in the asset and purchase agreement between ConEd and ENIP.

The notice of assignment from ConEd to DOE states that "Con Edison has, effective September 6, 2001, assigned Con Edison's rights and obligations under the Contract to Entergy, with the exception of all claims and causes of action in respect of damages to property or economic loss related to or pertaining to the Department of Energy's breaches or defaults under the Contract accrued as of September 6, 2001, whether relating to periods prior to or following September 6, 2001." See attachment 3 to Defendant's Notice Of Directly-Related Cases, Defendant's Motion To Reassign Consolidated Edison And Entergy Nuclear To A Single Judge, And Defendant's Motion To Consolidated (Aug. 5, 2004). However, the actual language of the asset and purchase agreement states that ENIP, as the purchaser of Indian Point, would be entitled to: "all claims or causes of action for the refund or return of any payments made or to be made (including any Spent Nuclear Fuel Fees paid or payable) pursuant to the DOE Standard Contract with regard to electricity generated at the Generating Plants and sold on or prior to Closing, but specifically excluding any claims or causes of action in respect of damages to property or economic loss related or pertaining to the Department of Energy's breach or default under the DOE Standard Contract accrued prior to Closing . . ." See ENIP Appendix To Reply In Support Of Its Motion For Summary Judgment On Liability And Response In Opposition To Defendant's Cross-Motion For Summary Judgment On Liability, at 152.

Although the notice that ConEd provided to DOE could suggest that ConEd retained all claims accruing prior to sale, the asset and purchase agreement suggests that ConEd conveyed to ENIP causes of action for the return of payments made to the Nuclear Waste Fund ("NWF"), which is one of the primary claims that ConEd raises in this litigation. Because the notice provided by ConEd to DOE appears inconsistent with the actual language of the asset and purchase agreement, there is a substantial question as to the legal sufficiency of the notice of assignment. Further, the issue of the meaning of the NWPA's assignment provision, 42 U.S.C. § 10222(b)(3), and the scope of appropriate assignments has been briefed in Rochester Gas & Electric Co. v. United States, No. 04-118C (Fed. Cl.).

transactions or with the value or price of any sale. Indeed, the potential sale of a nuclear utility from one private entity to another is a transaction wholly separate and distinct from the Standard Contract. Consequently, the fact that the Standard Contract provides a mechanism for the assignment of a contract holder's interest to a third party does not support the conclusion that the alleged diminution in value as a result of such a sale is directly related to the purposes of the Standard Contract.[5]

## II. PLAINTIFF'S ASSERTIONS THAT ITS TAKINGS CLAIM IS BASED UPON RIGHTS PRE-EXISTING THE STANDARD CONTRACT OR ARISING OUTSIDE OF THE STANDARD CONTRACT ARE UNSUPPORTABLE

### A. Plaintiff Has No Cognizable Property Interest In The NWPA

ConEd next contends that its "takings claim is not predicated on rights emanating from the Standard Contract, but rather is based upon legal and property rights emanating from the NWPA." Pl. Opp. at 23. This claim is incorrect both as a matter of law and as a matter of fact.[6]

---

[5] Recently, this Court in Boston Edison Company v. United States, No. 99-447C, 2005 WL 375603 (Fed. Cl. Feb. 15, 2005), held that, based upon the existence of the assignment provision contained in the Standard Contract, "[i]t is a fair inference that failure to implement the Standard Contract might engender a diminution in the value obtained from a sale" and, therefore, that such a diminution in value constitutes a foreseeable damage. Id. at *15. As discussed above, the fact that such damages were foreseeable at the time that the Standard Contract was signed in 1983 – a conclusion with which the Government respectfully disagrees – does not, by itself, mean that the consequential damages directly resulted from the Government's breach. Rather, the Court must decide whether ConEd's claimed damages flow directly from the subject matter of the Standard Contract. As we discuss above, ConEd has not even attempted to argue that its alleged damages flow directly from the subject matter of the Standard Contract.

[6] To the extent that ConEd is asserting that it somehow has a property interest in the Atomic Energy Act ("AEA"), Pl. Opp. at 23 n.9, such a contention lacks merit. The AEA authorized private ownership of nuclear reactors to promote the development of atomic energy. See Commonwealth Edison Co. v. United States, 271 F.3d 1327, 1330 (Fed. Cir. 2001) (stating that the AEA "for the first time authorized private ownership of nuclear power reactors"); United States v. Commonwealth of Kentucky, 252 F.3d 816, 821 (6th Cir. 2001) ("Congress enacted the [AEA] in 1954 to promote the development of atomic energy for peaceful purposes under a

As discussed in our motion to dismiss, ConEd cannot have a protected property right in the NWPA because a plaintiff may not claim an interest in the rule of law. ConEd attempts to circumvent the well-established principle that a rule of law may not serve as the basis for a property interest by drawing a distinction between property interests in changes in the law versus a property interest in the rule of law itself. Pl. Opp. at 26. ConEd's alleged distinction is simply one without a meaningful difference.

The United States Supreme Court has unequivocally stated that, for purposes of a takings under the Fifth Amendment, a plaintiff may not have a protected property interest in the rule of law:

> [A] person has no property, no vested interest, in any rule of common law. Rights of property which have been created [by common law] may not be taken away without due process; but the law itself as a rule of conduct, may be changed at the will or even at the whim, of the legislature, unless prevented by constitutional limitations.

Munn v. Illinois, 94 U.S. 112, 134 (1876) (emphasis added) (cited in Fern v. United States, 908 F. 2d 955, 959 (Fed. Cir. 1990)). The reason for this rule is simple:

> To treat every statutory change in the rules of liability as a taking would cripple the ability of federal and state legislatures to adjust the benefits and burdens of economic life. In the words of Professor Fuller, cited approvingly by the Supreme Court, "If every time a man relied on existing law in arranging his affairs, he were made secure against any changes in legal rules, the whole body of our law would remain ossified forever.

---

program of federal regulation and licensing."). The AEA did not, in and of itself, obligate the Federal Government to accept commercial utilities' SNF, to accept that SNF by any particular date, or to accept that SNF without compensation. Accordingly, ConEd cannot establish any obligation arising out of the AEA that could form the basis of a takings claim.

Branch v. United States, 69 F.3d 1571 (Fed. Cir. 1995) (citing Lon Fuller, The Morality of Law 60 (1964), quoted in Landgraf v. USI Film Prods., 511 U.S. 244, n. 24 (1994)); Members of the Peanut Quota Holders Assoc., Inc. v. United States, 60 Fed. Cl. 524, 529 (2004) (holding that "[b]ecause Congress has the right to modify or terminate a federal program, the benefits of such a program do not constitute a property interest protected by the Fifth Amendment"). ConEd's claimed distinction between the rule of law versus changes in the rule of law is without merit.

ConEd further contends that the Federal Circuit has "recognized that a nuclear utility's legal and property rights existed prior to and, are thus, independent from the Standard Contract," citing Yankee Atomic Electric Co. v. United States, 42 Fed. Cl. 223 (1998), and the decision issued by the Federal Circuit upon review of the Yankee decision, Maine Yankee Atomic Power Co. v. United States, 225 F.3d 1336, 1342 (Fed. Cir. 2000). Pl. Opp. at 24. ConEd's interpretation of these decision is highly misleading. In Maine Yankee, the Government filed a motion to dismiss the plaintiff's complaint for lack of jurisdiction, arguing that the plaintiff was required to exhaust its administrative remedies before it could proceed with either its breach of contract or takings claim in this Court. However, the Court concluded that, with regard to the plaintiff's breach of contract claim, the "Avoidable Delays" and "Disputes" clauses contained in the Standard Contract did not encompass the delay at issue in this case and that, therefore, no administrative exhaustion was required before the plaintiff could pursue its contract claim. See Maine Yankee, 225 F.3d at 1342. The Court stated that the Mainee Yankee plaintiff "was not required to invoke the contract's disputes clause before bringing suit" and that its takings count "cannot be viewed as constituting avoidable delays under that clause." Id. at 1342-43.

Therefore, the Federal Circuit has never addressed, much less decided, whether a utility has a property interest in the NWPA or another statute.

Further, contrary to ConEd's assertions, the Court in Sacramento Municipal Utility District v. United States, 61 Fed. Cl. 438 (2004) ("SMUD I") did not "recognize[] that DOE obligated itself to remove SNF prior to the execution of the Standard Contract." Pl. Opp. at 24. Indeed, in SMUD I, the plaintiff alleged that its "vested contract rights" were "taken" when the Government failed to begin acceptance of SNF by January 31, 1998, the date specified in the Standard Contract. Id. at 441. In addition to alleging a taking of its "vested property rights," SMUD also alleged a physical taking because the Government's failure to dispose of SMUD's SNF "forced SMUD to store it at Rancho Seco." Id. at 442. However, this property interest was not predicated upon the NWPA, but rather was based upon property interests that SMUD allegedly had in its land prior to the signing of the Standard Contract. Therefore, the Court in SMUD I clearly did not recognize any rights emanating from the NWPA.[7]

In Boston Edison, No. 99-447C, 2005 WL 375603, at *18, this Court recently denied the Government's motion for summary judgment with respect to the plaintiff's takings claim because

---

[7] Any doubts about the basis for the Court's decision in SMUD are dispelled by the Court's more recent decision in Sacramento Municipal Utility District v. United States, No. 98-488C, 2005 WL 242130 (Fed. Cl. Jan. 19, 2005) ("SMUD II"). In SMUD II, the Court addressed the date upon which liability should be entered against the Government. The Court concluded that "the Government's contractual obligation to begin disposing of SNF and/or HLW from utilities no later than January 31, 1998 is established in the DOE Standard Contract." Id. at *11. Therefore, the Court in SMUD clearly views a plaintiff's protected property interests as arising from the Standard Contract, rather than from the NWPA or from some other source.

Further, ConEd claims, without any analysis or citation, that the D.C. Circuit's decisions in Indiana Michigan and Northern States "demonstrate that the Government is wrong when it states that a property interest cannot be claimed in the rule of law." Pl. Opp. at 25. Nothing in either of these decisions recognize a property interest in the rule of law.

"[s]everal genuine issues of material fact have emerged." Specifically, the Court concluded that four factual disputes existed, including the origin of plaintiff's rights, whether the rights allegedly taken were property rights or contract rights, the voluntariness of entering into the Standard Contract, and the reasonableness of the parties' expectations with respect to whether a regulatory taking has occurred. Id. To the extent that the Court concluded that a factual dispute exists with respect to the origin of plaintiff's property interest, for the reasons explained above, we respectfully disagree that, as a matter of law, a plaintiff may have an interest in the rule of law, such as the NWPA or the AEA. Simply stated, a plaintiff cannot have an interest in the rule of law. Therefore, even if the Court were to accept plaintiff's allegations as true, as it must in response to a motion to dismiss, plaintiff cannot assert a cognizable property interest in the rule of law. Indeed, plaintiff has provided no legal authority for such a proposition.

B. Any Alleged Protected Interest That ConEd May Have Derives Exclusively From The Standard Contract

Even if ConEd could somehow circumvent the well-established prohibition against the establishment of a protected property interest based upon the rule of law, ConEd cannot demonstrate any protected property interest arising from any source other than the Standard Contract.[8] ConEd's attempt to bypass the requirement that an executed Standard Contract exist before the Government would be obligated to accept a particular nuclear utility's SNF directly conflicts with the language of the NWPA. Contrary to ConEd's assertions, the NWPA did not create any self-executing obligation upon DOE to accept a particular utility's SNF. Instead, section 302(a) of the NWPA, 42 U.S.C. § 10222(a), authorized the Secretary of Energy "to enter

[8] Notably, ConEd does not even attempt to identify any specific statutory provision of the NWPA that confers upon it a protected property interest.

into contracts with any person who generates or holds title to [SNF] of domestic origin for the acceptance of title, subsequent transportation, and disposal of such [SNF]." 42 U.S.C. § 10222(a)(1) (emphasis added). More significantly, the Secretary of Energy was – and is – expressly barred from disposing of any SNF under the NWPA, "unless the generator or owner of such [SNF] has entered into a contract with the Secretary under this section by not later than . . . June 30, 1983; or . . . the date on which such generator or owner commences generation of, or takes title to, such [SNF]; whichever occurs later." Id. § 10222(b)(2) (emphasis added). Therefore, DOE's obligation to dispose of any particular generator's SNF is expressly conditioned upon the existence of a contract between the generator and DOE.

The Court has reached an identical conclusion in other SNF cases. For example, in Consumers Energy Company v. United States, 57 Fed. Cl. 278 (2003), the Court rejected plaintiff's illegal exaction claim, explaining that the Government's obligations were dependent upon execution of a contract:

> While this Court is obligated to acknowledge the Federal Circuit's recognition of the mandatory nature of the Standard Contract, nonetheless, absent the execution of the Standard Contract, there is no provision of the NWPA establishing January 31, 1998, as the deadline for the Government's assumption of the obligation to accept, store and dispose of SNF. Under the NWPA, the Government did not gratuitously take over the burden of storage and disposal of SNF, but rather assumed the responsibility for that looming national problem contractually in return for payment of fees by the nuclear utilities into the NWF sufficient to cover the Government's costs. 42 U.S.C. § 10131(4).

Id. at 282 (emphasis in original).

Similarly, the Court rejected a plaintiff's illegal exaction claim in Yankee Atomic Electric Co. v. United States, 42 Fed. Cl. 223 (1998), because its rights are based upon the Standard Contract, not a statute:

> Yankee's illegal exaction claim fails because the duty on which the claim is based is contractual, not statutory. Section 302(a)(5)(B) of the NWPA directed DOE to assume a contractual obligation to begin disposing of SNF by January 31, 1998. 42 U.S.C. § 10222(a)(5). As discussed above, DOE has done so through Article II of the Standard Contract. Therefore, while DOE's failure to begin disposing of Yankee's SNF breaches Article II, it does not violate any statutory duty.

Id. at 237 (emphasis in original).

As in Consumers Energy and Yankee Atomic, ConEd's contention that it somehow has a statutory right to DOE acceptance of its SNF, outside the context of the Standard Contract, is unsupported by precedent and contrary to the express language of the NWPA.[9] Accordingly, it is clear that ConEd's takings claim in this case is based solely upon the Government's contractual obligation to accept SNF and/or HLW from the Indian Point nuclear reactors.

C. Plaintiff's Takings Claim Fails Because It Is Predicated Upon A Breach Of A Contract With The Government

As we demonstrated in our motion to dismiss, it is well-established that, where a party's rights are created by contract, that party cannot state a takings claim founded upon a breach of that contract. See Def. Br. 10-15. Although we cited to an extensive number of cases that

[9] Because the NWPA does not create a "property right" requiring DOE to accept and dispose of ConEd's SNF, an alleged violation of the NWPA cannot constitute a taking of ConEd's property right. See, e.g., Commonwealth Edison, 271 F.3d at 1340 (provision of Energy Policy Act requiring domestic utilities that had entered into contracts with the Government for processing uranium to pay for costs of cleanup of environmentally contaminated uranium processing facilities was not a Fifth Amendment taking).

support that rule of law, ConEd has attempted to distinguish only two of them: Commonwealth Edison Co. v. United States, 56 Fed. Cl. 652 (2003), and Castle v. United States, 48 Fed. Cl. 187 (2000), aff'd in relevant part, 301 F.3d 1328 (Fed. Cir. 2002). Pl. Opp. 28, 31 n.15. In attempting to distinguish the Commonwealth Edison holding, ConEd claims that the Court "addressed different issues at a different procedural posture than Con Edison." Pl. Opp. 31 n.15. Of course, ConEd does not, and cannot, explain what "different issues" the Court in Commonwealth Edison addressed. In fact, as explained above, the Court in Commonwealth Edison addressed the identical issue that is presented in this case: namely, whether plaintiff has any real property interests that are separate from its interests under the Standard Contract. 56 Fed. Cl. at 656. Further, ConEd is simply wrong in its assertion that the Commonwealth Edison case was in a different procedural posture than this case. Although the Government in Commonwealth Edison moved for partial summary judgment with respect to the issues of its obligation to dispose of Greater Than Class C radioactive waste and the rate and schedule of SNF acceptance, the Government moved to dismiss the plaintiff's takings claim pursuant to Rule 12(b)(6). Id. at 654. ConEd has provided no persuasive reason why the Court should not follow the analysis set forth in Commonwealth Edison.

ConEd also attempts to distinguish the Court's decision in Castle by claiming that Castle recognized that, where a plaintiff has rights in property that are separate and distinct from rights conferred upon it by contract, then a plaintiff may bring a takings claim in addition to a breach of contract claim. Pl. Opp. at 28 (citing Castle, 48 Fed. Cl. at 218-19). However, as discussed below, ConEd cannot assert that the Government's failure to accept ConEd's SNF constituted a

physical taking. Therefore, ConEd's distinction is irrelevant, and the Court's decision in Castle is directly applicable to this case.[10]

ConEd also relies upon the Court's decision in SMUD I for the proposition that, "where the Government has forced storage on another's private property the Just Compensation Clause is implicated." Pl. Opp. at 25 (citing SMUD I, 61 Fed. Cl. at 442). With all due respect, we disagree with the Court's decision to the extent that it applies to rights created by a contract with the Government. The fact that the plaintiff's rights to removal of the SNF by a date certain were created solely by contract requires that any damages claim focus upon the contract, not upon recovery for a Fifth Amendment taking.[11] Furthermore, the Court's decision in SMUD I appears to be in conflict with the Court's earlier decisions in Commonwealth Edison Co., 56 Fed. Cl. at 652, and Southern Nuclear Operating Co. v. United States, No. 98-614C, slip op. at 5 (Fed. Cl. Apr. 7, 2004) (unpublished opinion), which rejected identical takings theories in SNF cases.[12]

---

[10] ConEd also claims that it lacked the same contractual remedies that were available to the plaintiffs in Castle. Pl. Opp. at 28, n.14. To the extent that ConEd is asserting that it lacks contractual remedies because it voluntarily sold its nuclear facility to a third party, such voluntary actions do not deprive ConEd of its contractual remedies for purposes of the Fifth Amendment. See Admiral Fin. Corp. v. United States, 378 F.3d 1336, 1340 (Fed. Cir. 2004) (holding that it is irrelevant whether the plaintiff actually has any rights under the contract that it could pursue, as the only relevant issue is whether those contractual remedies that the plaintiff had, if any, were "taken" from him).

[11] Indeed, the Court in SMUD I appears implicitly to agree with the Government on this point. The Court has decided to hold a trial related only to plaintiff's alleged breach of contract. Only if SMUD is unsuccessful in establishing damages for a breach of contract will the Court hold a second trial related to the alleged taking.

[12] Notably, the Government presented substantially similar briefing in this case, SMUD, Commonwealth Edison, and Southern Nuclear.

D. ConEd Cannot Establish A Physical Taking Under These Circumstances

In a last-ditch effort to cabin its contract claims as a taking, ConEd asserts that "[t]he Government's actions and inactions . . . deprived Con Edison of the use of its real property in violation of the Takings Clause . . ." Pl. Opp. at 29. Specifically, relying upon the Court of Claims decision in Benenson v. United States, 548 F.2d 939, 949 (Ct. Cl. 1977), ConEd claims that it was "forced into an untenable situation where it was unable to have the SNF removed from Indian Point yet Con Edison was unable to do anything else with the SNF." Pl. Opp. at 29. However, the only basis that ConEd has identified for demanding that the Government remove its SNF derives squarely from DOE's contractual obligations under the Standard Contract. Simply put, the alleged relief that ConEd seeks lies in contract, not the Constitution, and ConEd's reliance upon Benenson is misplaced.

The Federal Circuit recently explained that "[a] physical taking occurs 'when the government itself occupies the property or 'requires' the landowner to submit to physical occupation of its land.'" Stearns Co. v. United States, No. 04-5031, 2005 WL 181712 (Fed. Cir. Jan. 28, 2005) (emphasis in original) (citing Forest Props., Inc. v. United States, 177 F.3d 1360, 1364 (Fed. Cir. 1999)). In Stearns Co., the Federal Circuit rejected a takings claims, noting that "the government has not occupied Appellee's mineral property or the accompanying implied appurtenant easement. Also, the government has not required Appellee to accept the physical presence of a third party on any of the property." Id.

Similarly, in this case, ConEd cannot establish a physical invasion of its property by the Government. Indeed, until the date of sale, ConEd had exclusive possession of its SNF and the property upon which the SNF rested. Further, ConEd has not alleged, nor can it allege, that the

Government required ConEd to accept the physical presence of a third party on its property. Simply put, ConEd's physical takings theory fails as a matter of law.[13]

E. Because ConEd's Takings Claim Is Impermissibly Predicated Upon A Breach Of The Standard Contract, No Discovery Is Required To Dismiss Its Claim As A Matter Of Law

Finally, ConEd asserts that takings claims are necessarily fact-intensive, and "[a]mong the takings claim issues that would benefit form factual development here as discussed below is the extent of the Government's taking and the nature of Con Edison's expectations regarding the use of its property . . ." Pl. Opp. at 34-35. However, none of these suggested factual issues overcome the plain legal deficiency contained in ConEd's complaint. "The purpose of the rule [Rule 12(b)(6)] is to allow the court to eliminate actions that are fatally flawed in their legal premises and destined to fail, and thus spare the litigants the burdens of unnecessary pretrial and trial activity." Advanced Cardiovascular Sys., Inc. v. Scimed Life Sys., 988 F.2d 1157, 1160 (Fed. Cir. 1993). Moreover, contrary to plaintiff's suggestion, this Court has disposed of numerous takings claims on dispositive motion. See, e.g., Consolidated Edison, 56 Fed. Cl. at 656; Granite Mgt. Corp. v. United States, 55 Fed. Cl. 164, 168 (2003) (dismissing takings claim

[13] ConEd cites to the Federal Circuit's decisions in Chancellor Manor v. United States, 331 F.3d 891 (Fed. Cir. 2003), and Del-Rio Drilling Programs, Inc. v. United States, 146 F.3d 1358 (Fed. Cir. 1998), to support the view that contract and takings claims can co-exist. Pl. Opp. at 21-22. However, neither of those decisions supports the view that contract rights arising from a contract with the Government which the Government breaches constitute a "taking." To the contrary, and as previously explained, to establish a "taking" outside the context of the contract, the plaintiff must identify a property right unrelated to the rights created by contract that has been taken. Here, no utility's "right" to have DOE begin accepting its SNF by January 31, 1998, exists outside the context of a contract. See 42 U.S.C. § 10222. Further, the issue of whether the plaintiff's takings claim in Del-Rio was based solely upon rights arising from a contract with the Government was neither raised nor addressed in that case. Accordingly, ConEd's reliance on Chancellor Manor and Del-Rio is misplaced.

for failure to state a claim (following court's show cause notice)); Westfed Holdings, Inc. v. United States, 52 Fed. Cl. 135, 152 (2002) (dismissing takings claim prior to trial for damages on breach of contract); Home Sav. of America v. United States, 51 Fed. Cl. 487, 494-96 (2002) (same); Croman Corp. v. United States, 49 Fed. Cl. 776, 788-89 (2001) (same); Centex Corp. v. United States, 49 Fed. Cl. 691, 712 (2001) (same); Franklin Sav. Corp. v. United States, 46 Fed. Cl. 533, 537-38 (2000) (same). In light of the facially deficient nature of ConEd's takings claim, dismissal under the circumstances is appropriate.

## III. THIS COURT LACKS JURISDICTION TO ADJUDICATE PLAINTIFF'S CHALLENGE TO THE SECRETARY OF ENERGY'S FEE COLLECTION PRACTICE

### A. This Court Has Not Addressed Whether It Possesses Jurisdiction To Adjudicate Challenges To The Secretary Of Energy's Fee Collection Practices

In the Court's recent decision in Boston Edison, No. 99-447C, 2005 WL 375603, at *10, it appears the Court held that section 119 of the NWPA, 42 U.S.C. § 10139, does not provide the United States courts of appeals with original and exclusive jurisdiction to entertain challenges to DOE's actions arising under Title III of the NWPA. Specifically, the Court held that it possesses jurisdiction to adjudicate claims for breach of the Standard Contract, finding that, although section 302(a) of the NWPA provides for DOE's entry into contracts with the owners and generators of SNF, this Court, pursuant to the Tucker Act, had jurisdiction to entertain disputes regarding activities under the executed contracts. Id. The Court recognized that the United States Court of Appeals for the District of Columbia Circuit has held that the courts of appeals have original and exclusive jurisdiction to "review DOE's rules regarding fee rates under the NWPA," id. at 12 n.13 (citing General Elec. Uranium Mgmt. Corp. v. Dep't of Energy, 764 F.2d

896 (D.C. Cir. 1985)), issues that arise under section 302 of Title III to the NWPA. ConEd has made precisely this type of challenge here.

Although the Government does not dispute this Court possesses jurisdiction to adjudicate ConEd's breach of contract and takings claims, this Court lacks jurisdiction to adjudicate ConEd's challenge to the Secretary of Energy's fee collection practices. As we discussed in our motion, ConEd has asserted a direct challenge to the Secretary of Energy's collection of fees under the NWPA. ConEd made the following assertion in its complaint:

> Con Edison possessed a protected property interest in the benefits of NWPA, including paying into the Nuclear Waste Fund only what the statute authorizes. DOE's disregard of this interest and its continued collection after January 31, 1998 of amounts in excess of those authorized by NWPA resulted in a systematic and unreasonable over-collection of those fees and a taking of Con Edison's property in violation of the Due Process and Takings Clauses of the Fifth Amendment. NWPA did not authorize DOE: a) to collect amounts to support DOE's breach of its obligations well into the 21st Century; b) to anticipate its damage liability as would ultimately be determined by the COFC and to embark upon a program of pre-collecting such amounts from Standard Contract holders; c) to pre-collect funds to repay or support operations damaged by DOE's failure to remove SNF; or d) to collect from and assign to Standard Contract holders cost responsibility for DOE's cost overruns associated with a noncompliant and significantly delayed waste disposal program. Notwithstanding this lack of authorization, DOE has engaged in just such activities, depriving Con Edison of the value of its assets and property interest and improperly requiring Con Edison to suffer the financial consequences of DOE's unauthorized actions.

Pl. Compl. ¶ 90.[14]

---

[14] In support of its assertion that this Court possesses jurisdiction to adjudicate ConEd's challenge to the Secretary of Energy's fee collection practices, ConEd relies upon the transcript of a hearing before Judge Christine Miller in Delmarva Power & Light Co. v. United States, No. 04-034C, and her understanding of another plaintiff's complaint. Pl. Opp. at 43. As noted by ConEd, Judge Miller interpreted Delmarva's complaint as challenging the fact that DOE has

As we explained in our motion to dismiss, section 119 of the NWPA, 42 U.S.C. § 10139, provides that the United States Courts of Appeals for the D.C. Circuit and the various regional circuits shall have original and exclusive jurisdiction over, among other things, any of the following civil actions: (1) review of any final decision or action of the Secretary of Energy; (2) allegations concerning the failure of the Secretary of Energy in making any decisions or taking any actions under this section; and (3) challenges to the constitutionality of any decision made, or action taken under this section. 42 U.S.C. § 10139(a)(1)(A), (B), & (C).

As is clear from ConEd's complaint, ConEd's challenge falls under each of these three categories. First, ConEd is challenging DOE's final decision to continue the collection of fees after January 31, 1998, a challenge falling within the United States courts of appeals' original and exclusive jurisdiction under 42 U.S.C. § 10139(a)(1)(A). Second, this same challenge is in effect challenging the Secretary's inaction in failing to eliminate the collection of fees into the NWF after January 31, 1998, a challenge that falls under 42 U.S.C. § 10139(a)(1)(B). Finally, ConEd

---

continued to assess fees upon Delmarva despite DOE's inability to begin acceptance of SNF by January 31, 1998. Pl. Op. at 43.

However, even if the Court were inclined to construe ConEd's complaint in the same manner as Judge Miller, such a construction does not save ConEd's claim. Indeed, as we explained in our motion to dismiss, even if this Court possesses jurisdiction to adjudicate ConEd's challenge to the Secretary's collection of fees under the NWF, ConEd has failed to explain how its complaint states a cognizable takings claim. As we explained in our motion, "[w]hile a taking may occur when a specific fund of money [in a private party's possession] is involved, the mere imposition of an obligation to pay money . . . does not give rise to a claim under the Takings Clause of the Fifth Amendment." Commonwealth Edison Co. v. United States, 271 F.3d 1327, 1340 (Fed. Cir. 2001); see United States Shoe Corp. v. United States, 296 F.3d 1378, 1383 (Fed. Cir. 2002). Yet, even under Judge Miller's alleged interpretation, that is precisely what ConEd asserts it is alleging in this case. ConEd has failed to explain how its challenge to the Secretary of Energy's fee collection practices states a cognizable cause of action.

has raised Due Process and Takings claims to DOE's decision to continue collecting fees after January 31, 1998, therefore falling squarely within the United States courts of appeals' original and exclusive jurisdiction under 42 U.S.C. § 10139(a)(1)(C). Therefore, regardless of this Court's jurisdiction to adjudicate ConEd's breach of contract and takings claims, ConEd's complaint, which must be accepted as true for purposes of the Government's motion to dismiss, firmly establishes that ConEd is asserting a claim that this Court does not possess jurisdiction to adjudicate.

Indeed, this conclusion is entirely supported by decisions for the D.C. Circuit holding that the courts of appeals posses original and exclusive jurisdiction to adjudicate disputes concerning the Secretary's collection of fees pursuant to the NWF. See, e.g., General Elec. Uranium Mgt. Corp. v. United States Dep't of Energy, 764 F.2d 896, 907 (D.C. Cir. 1985); see Natural Res. Def. Council, Inc. v. Abraham, 244 F.3d 742, 743 (D.C. Cir. 2001) (acknowledging original and exclusive jurisdiction of United States Courts of Appeal to entertain challenges relating to NWF); National Ass'n of Regulatory Util. Comm'n v. United States Dep't of Energy, 851 F.2d 1424, 1426, 1429-30 (D.C. Cir. 1988) (suggesting that D.C. Circuit is proper forum for challenges to DOE's proposed methodology for allocating the cost of nuclear waste repositories between waste resulting from defense activities and that generated by civilian commercial reactors, although ultimately finding that the issue was not ripe for review).

Virtually every single decision from the D.C. Circuit and other circuits upon which the various SNF plaintiffs have relied as precedent is dependent upon the United States courts of appeals' original and exclusive jurisdiction under section 119 to entertain challenges to actions and decisions arising under Title III of the NWPA. See, e.g., Indiana Michigan Power Co. v.

Department of Energy, 88 F.3d 1272 (D.C. Cir. 1996); Northern States Power Co. v. United States Department of Energy, 128 F.3d 754 (D.C. Cir. 1997); Wisconsin Elec. Power Co. v. Department of Energy, 211 F.3d 646 (D.C. Cir. 2000); Alabama Power Co. v. Department of Energy, 307 F.3d 1300 (11th Cir. 2002). To the extent that the Court finds that the D.C. Circuit and other circuits did not possess original and exclusive jurisdiction to decide the cases that they decided, it would undercut the precedential value of those decisions.

Further, even if, as the Court appears to have held in Boston Edison, the United States courts of appeals do not have original and exclusive jurisdiction to entertain NWF fee issues under the provisions of section 119, ConEd has identified no reason that this Court, rather than the United States district courts, would possess jurisdiction to entertain NWF challenges. The NWPA creates the obligation for nuclear utilities that enter into contracts with DOE to pay fees into the NWF. If the NWPA does not require petitioners to challenge those fees and the bases of those fees before the United States courts of appeals, it appears that such challenges would properly be presented to the United States district courts. See General Elec. Uranium Mgt. Corp. v. United States Dep't of Energy, 584 F. Supp. 234, 236-37 (D.D.C. 1984) (finding that district courts possess jurisdiction to entertain NWF challenges), rev'd, 764 F.2d 896 (D.C. Cir. 1985). Accordingly, regardless of its view of the application of section 119 to Title III of the NWPA, the Court should dismiss ConEd's challenge to the NWF fees.

### B. The Courts Of Appeals Have Never Found That This Court Possesses Jurisdiction To Adjudicate Challenges To The Collection Of Fees Under The NWPA

ConEd contends that the Government is barred by the doctrine of res judicata from asserting that this Court lacks jurisdiction to adjudicate ConEd's challenge to the Secretary of

Energy's fee collection practices. Pl. Opp. at 35. In support of its argument, ConEd refers to selective court filings and claims that the Government previously has successfully challenged the D.C. Circuit's jurisdiction to adjudicate SNF claims, including claims related to the Secretary of Energy's fee collection practices. Id. at 35-36. However, a careful review of the past litigation in the D.C. Circuit demonstrates the fallacy of this argument. Indeed, rather than argue that all claims involving SNF issues belong in this Court, as ConEd asserts, or that all cases belong in the courts of appeals, as the Court recently concluded in Florida Power & Light Co. v. United States, Nos. 98-483C, 98-485C, 01-116C, 01-551C, 2005 WL 318678 (Fed. Cl. Jan. 31, 2005), as explained below, the Government has consistently taken the position that this Court has exclusive jurisdiction to adjudicate contract claims, but that the courts of appeals have original and exclusive jurisdiction to adjudicate challenges to the Secretary's fee collection practices under Section 119 of the NWPA.

As an initial matter, ConEd's suggestion that the D.C. Circuit has concluded that fee challenges belong in this Court is directly contrary to the D.C. Circuit's decision in Commonwealth Edison Co. v. United States Department of Energy, 877 F.2d 1042 (D.C. Cir. 1989), in which the D.C. Circuit expressly held that it possesses original and exclusive jurisdiction to entertain challenges to the assessment of NWF fees:

> The fee paid by utilities into the Fund resembles an assessment or tax more than it does a freely negotiated price. The size of the fee, moreover, is fixed by statute at the equivalent of 1 mill per kilowatt-hour of electricity generated, see 42 U.S.C. § 10222(a)(3). Because we interpret Commonwealth Edison's challenge as seeking review of a "final decision or action of the Secretary" in the form of a regulation promulgated under the Act, there is no question that we have jurisdiction to hear the petition, see 42 U.S.C. § 10139(a)(1); Consolidated Edison Co. v. U.S. Department

> of Energy, 870 F.2d 694, 695-96 (D.C. Cir. 1989); Wisconsin Electric Power Co. v. U.S. Department of Energy, 778 F.2d 1, 2-3 (D.C. Cir. 1985); General Electric Uranium Management Corp. v. U.S. Department of Energy, 764 F.2d 896, 900-04 (D.C. Cir. 1985).

Id. at 1045. In fact, the D.C. Circuit expressly assumed jurisdiction over a NWF fee challenge by ConEd in Consolidated Edison Co. v. United States Department of Energy, 870 F.2d 694 (D.C. Cir. 1989). Contrary to ConEd's position that res judicata requires that the Court assume jurisdiction over ConEd's current fee challenges, res judicata appears to require the opposite.

The SNF cases to which ConEd now cites to support its claim that the Government is bound by res judicata provide no support for its proposition. In Indiana Michigan Power Co. v. United States, 88 F.3d 1272, 1274 (D.C. Cir. 1996), ConEd, as well as other utilities, filed petitions for review in the D.C. Circuit under section 119 of the NWPA, challenging DOE's view that it had no obligation under section 302 to begin acceptance of SNF by January 31, 1998 in the absence of an available Federal repository or interim storage facility. The petitions for review requested that the court set aside DOE's interpretation of its obligations, escrow petitioners' fee payments after January 31, 1998, and order DOE to develop a plan for beginning disposal services as soon as possible after this date. The D.C. Circuit vacated DOE's interpretation of its obligations under the NWPA. Importantly, however, the D.C. Circuit also concluded that it was

> premature to determine the appropriate remedy, particularly as to the intersection between Article XI and Article XVI of the Standard Contracts, as DOE has not yet defaulted upon either its statutory or contractual obligations. We will therefore remand this matter for further proceedings consistent with this opinion.

Id. at 1277. Clearly, the D.C. Circuit in Indiana Michigan did not decide that a court other than the United States courts of appeals possesses original and exclusive jurisdiction to adjudicate challenges to the Secretary of Energy's fee collection practices.

After the D.C. Circuit's decision in Indiana Michigan, DOE announced that it would be "unable to begin acceptance of spent nuclear fuel for disposal in a federal repository or interim storage facility by January 31, 1998." Northern States Power Co. v. United States Dep't of Energy, 128 F.3d 754, 757 (D.C. Cir. 1997) ("Northern States I"). Consequently, on January 31, 1997, various utilities, including ConEd, sought a petition for a writ of mandamus in the D.C. Circuit seeking to compel DOE to comply with the D.C. Circuit's earlier decision in Indiana Michigan and begin disposal of SNF by January 31, 1998. See id. Petitioners also requested that their payments into the Nuclear Waste Fund ("NWF") be placed in escrow until DOE began the acceptance of SNF. Id. After the petition was filed in the D.C. Circuit, but before the court ruled upon the petition, DOE determined, in response to comments received by contract holders regarding the anticipated delay in building a permanent geological repository or interim storage facility, that, pursuant to Article IX of the Standard Contract, DOE was "not obligated to provide a financial remedy for the delay" because the delay was unavoidable. Id.

On November 14, 1997, the D.C. Circuit denied the writ in part, concluding that the Standard Contract provides a "potentially adequate remedy if DOE fails to fulfill its obligations" by January 31, 1998. Id. at 756. However, the D.C. Circuit granted petitioners' writ in part, precluding DOE from relying upon the "unavoidable delays" provision of the Standard Contract to excuse its delay on the grounds that DOE had not yet built a federal repository or interim storage facility. Id. Again, the D.C. Circuit in Northern States I was neither confronted with, nor

addressed, whether a court other than the United States courts of appeals possesses original and exclusive jurisdiction pursuant to Section 119 to adjudicate challenges to the Secretary of Energy's fee collection practices.

After the D.C. Circuit's decision in Northern States I, various utilities, including ConEd, filed a motion in the D.C. Circuit for enforcement of the court's previous mandate and requested an order authorizing, among other things, the payment of NWF fees into an interest-bearing escrow account. DOE also filed a petition for rehearing in the D.C. Circuit, contending that the court lacked jurisdiction to determine the applicability of the "unavoidable delays" provision of the Standard Contract. DOE explained in the rehearing petition that questions concerning the construction and administration of the Standard Contract are entrusted to the Court of Federal Claims. The D.C. Circuit denied the utilities' requested order, explaining:

> We express no opinion on . . . the adequacy of any particular type of equitable adjustment of fees that might be awarded to utilities under the Delays Clause of the Standard Contract. Our decision in Northern States barred the DOE from interpreting the Contract as imposing only a contingent disposal obligation; such an interpretation, we ruled, would place the DOE in violation of its statutory duties under the Nuclear Waste Policy Act ("NWPA"), which required it to undertake an unconditional obligation. Beyond that clarification of the statute's requirements, we remitted the utilities to their remedies under the Standard Contract. Suits based on the Contract may present issues of the permissible forms of equitable adjustment, and possibly the award of some forms of equitable adjustment would place the DOE in violation of the NWPA and again properly trigger our jurisdiction (as opposed to that of the Court of Federal Claims) under either the NWPA or the APA. But as the DOE has not yet taken any of these actions, the issues are not ripe for review as presented to us in these petitions.

Northern States Power Co. v. United States Dep't of Energy, No. 97-1064, 98-1069, 98-1070, 97-1065, 97-1370, 97-1398, 1998 WL 276581, *1 (D.C. Cir. May 5, 1998) ("Northern States II") (emphasis added).

The D.C. Circuit also denied DOE's motion for rehearing, concluding that:

> The DOE . . . suggest[s] that this Court has erroneously designated itself as the proper forum for adjudication of disputes arising under the Standard Contract. As the above should make clear, we did not; we merely prohibited the DOE from implementing an interpretation that would place it in violation of its duty under the NWPA to assume an unconditional obligation to begin disposal by January 31, 1998. The statutory duty to include an unconditional obligation in the contract is independent of any rights under the contract. The Tucker Act does not prevent us from exercising jurisdiction over an action to enforce compliance with the NWPA.

Northern States II, 1998 WL 276581, at *2 (emphasis added).

DOE filed a petition for certiorari to the United States Supreme Court, contending that the D.C. Circuit's decision "intrudes upon the jurisdiction of the Court of Federal Claims – the tribunal vested with exclusive authority to adjudicate contract claims against the United States." Pl. Ex. 7, at p. 14 (emphasis added). DOE contended in the petition for writ of certiorari that by determining that DOE could not invoke the "unavoidable delays" provision of the Standard Contract, the D.C. Circuit had pretermitted the orderly disposition of a contract dispute that could have potentially great consequences both the for the liability of the United States and for the continued economic viability of nuclear generating facilities. Id. at 14-15. The Government asserted that "[t]he court of appeals' authority to review 'any final decision or action of the Secretary' of Energy under the NWPA, 42 U.S.C. 10139(a)(1)(A), does not extend to a contacting party's claim that the Secretary has violated its rights under the contract." Id. at 15 (emphasis

added). The Supreme Court denied DOE's certiorari petition. Department of Energy v. Northern States Power Co., 525 U.S. 1016 (1998).

In July 1998, various utilities, including ConEd, filed another petition for review and a motion for leave to file a complaint in the D.C. Circuit pursuant to section 119 of the NWPA. Pl. Ex.2, 3. The petitioners asserted claims based on section 302(a)(5)(B) of the NWPA, 42 U.S.C. § 10222(a)(5)(B); Article II of the Standard Contract, which implements Section 302(a)(5)(B); and the Takings Clause of the Fifth Amendment. Pl. Ex. 2, pp. 15-23. Notably, petitioners claimed that the D.C. Circuit had "original and exclusive" jurisdiction over all claims related to the administration of the Standard Contract, including claims for breach of contract. Id. at 9.

With respect to relief, petitioners sought, among other things, the following:

- a declaration that DOE had acted unlawfully in failing to accept SNF by January 31, 1998;
- a declaration that DOE's decision to require petitioners to continue making payments into the NWF at current levels violates the utilities' due process rights and constituted a taking;
- a declaration that the Secretary of Energy was obligated to seek all fee adjustments necessary to ensure collection, by January 31, 1998, of all funds required to site, construct, license and make operational the repository by that date;
- a declaration that DOE's October 1996 Fee Adequacy Report violates 42 U.S.C. § 10222(a)(4) because it failed to reconcile future proposed feeds with the existing fund balance and the then-announced expenditure plan through 2010;
- an order declaring that any increased costs of disposal resulting from DOE's delay in accepting SNF be borne by DOE and not be used to increase payments by petitioners to the NWF;

- an order requiring the Secretary of Energy to propose to Congress a fee reduction to an amount no more than necessary to fund the nuclear waste disposal program or, alternatively, a reduction of the fee to zero until the Secretary is able to establish that additional contributions to the NWF are appropriate;

- an order prohibiting DOE from "further misuse of the fund;" and paying increased costs related to the delay in construction from the NWF.

Pl. Ex. 2 at 22-23.

DOE moved to dismiss the petition for review and opposed petitioners' motion for leave to file the complaint. The Government's primary argument was that the petitioners, "having failed three times [in prior petitions] to obtain leave from [the D.C. Circuit] to escrow their fee payments because of DOE's failure to meet the January 31, 1998, deadline," were barred through claim and issue preclusion from raising new alternative theories based upon the same operative facts to achieve the same relief. See Def. Att. 1 (Respondents' D.C. Circuit Mtn., at 5, 6-8). Specifically, the Government argued that, even though the petitioners now claimed "the right to have the fee payment reduced or eliminated because of DOE's alleged violation" of the requirement to begin SNF acceptance by January 31, 1998 at a repository, the D.C. Circuit had "already ruled that Section 302(a)(5)(B) [of the NWPA] itself [did] not require DOE to perform the obligation to begin disposal by January 31, 1998," in its decision in Northern States. Id. at 6-7. The Government further argued that "[p]etitioners could have contended in Northern States that other provisions of the NWPA, such as Section 302(a)(4), or the due process or taking clause of the Fifth Amendment, support the claim that petitioners could enforce Section 302(a)(5)(B) through suspension or withholding of their fee payments," but that "[t]heir failure to do so bars

litigation of Counts I through III of this petition" under principles of claim and issue preclusion. Id. at 8 (citing Yamaha Corp. of Am. v. United States, 961 F.2d 245, 254 (D.C. Cir. 1992)) (emphasis added).[15]

In a brief per curiam decision, the D.C. Circuit granted DOE's motion to dismiss the petition for review, stating that "[p]etitioners' arguments are precluded by the court's holding in [Northern States I], and the unpublished order issued May 5, 1998, denying rehearing in that case." Consolidated Edison Co. of New York v. Department of Energy, No. 98-1358, 1999 WL 325517, *1 (D.C. Cir. Apr. 16, 1999). Petitioners subsequently filed a petition for writ of certiorari with the Supreme Court.

In its brief opposing the grant of certiorari, the Government contended that petitioners' statutory claims were precluded by the D.C. Circuit's rulings in Northern States I and Northern

[15] The Government alternatively argued that, to the extent that the fee challenge was not barred by the D.C. Circuit's prior judgment, "the challenge does not meet the 180-day statute of limitations in Section 119(c)" of the Nuclear Waste Policy Act, 42 U.S.C. § 10139, relating to judicial review of decisions of the Secretary of Energy. Respondents' D.C. Circuit Mtn., at 5, 8-13. Under section 119(c) of the NWPA, a challenge to any final decision or action of the Secretary of Energy under the NWPA, any failure of the Secretary to make any decision or take any action required by the NWPA, or to the constitutionality of any decision made or action taken under the NWPA must be filed in one of the United States Courts of Appeals (for the regional circuits or the D.C. Circuit) "not later than the 180th day after the date of the decision or action or failure to act involved, as the case may be," unless the petitioner shows that he did not know of the decision, action, or failure to act and that a "reasonable person" would not have known of it. 42 U.S.C. § 10139(a)(1) & (c). The last DOE fee adequacy assessment had been taken in October 1996, more than 180 days before the filing of the Consolidated Edison petition. Respondents' D.C. Circuit Mtn., at 13. Further, the next fee assessment was not scheduled to be completed until the end of 1998. Id. Accordingly, as the Government informed the D.C. Circuit, "petitioners' attempt to seek review of DOE's implementation of Section 302(a)(4) was filed both too late and too soon." Id.; see Respondents' D.C. Circuit Reply, at 7-10 (discussing 180-day limitation period). Again, the Government's argument assumed that, absent the prior challenges to the fee assessment by the petitioners, the D.C. Circuit would possess jurisdiction to entertain a fee challenge in the appropriate circumstances.

States II, because although those specific statutory claims may not have been raised in the previous litigation, "they rest on a legal premise that the Northern States court unequivocally rejected." See Pl. Ex. 5, at pp. 12-13. As the Government explained in its opposition brief:

> Thus, the basis for the court of appeals' preclusion holding was not that the precise statutory claims raised in the petition for review had previously been litigated. Rather, petitioners' claims were precluded because they rest on a legal premise that the court of appeals had squarely rejected in Northern States and particularly in its order denying rehearing in that case. . . . The court of appeals made clear in that order that DOE's failure to accept SNF for disposal by January 31, 1998, may place it in breach of the Standard Contract but did *not* constitute a violation of the NWPA. . . . Because the petition for review filed in this case was premised on a contrary view of the law, the court of appeals correctly held that its prior judgment – which rested on the contrary premise as the foundation for its holding – barred petitioners' claims.

Id. at pp. 14-15. Further, the Government maintained:

> Petitioners also contend . . . that the court of appeals erred in declining to exercise jurisdiction over the contract claims asserted in their complaint. They argue . . . that "[w]hen Congress granted 'original and exclusive' jurisdiction to the court of appeals [in 42 U.S.C. 10139(a)(1)], it divested any other court, including the United States Court of Federal Claims, of jurisdiction over any action under the NWPA, including actions for breach of the statutory contract alleged in the complaint." That argument is without merit.
>
> In its order denying rehearing in Northern States, the court of appeals recognized that its jurisdiction under 42 U.S.C. 10139 does not extend to claims for breach of the Standard Contract. . . . The court explained that while the NWPA requires the inclusion of certain terms within the Standard Contract, the Act "does not itself require performance. Breach by the DOE does not violate a statutory duty; thus, our jurisdiction to hear allegations of failure to take an action required under the NWPA . . . does not provide a basis for a move-fuel order."

> The NWPA's judicial review provisions vests the courts of appeal with "original and exclusive" jurisdiction over specified categories of suits (see 42 U.S.C. 10139(a)(1)(A)-(F)), not over every challenge to DOE's implementation of the nuclear waste program. Nothing in Section 10139 suggests that the courts of appeals are authorized to entertain contractual claims. . . .

Id. at 15-16 (emphasis added).[16] The Supreme Court denied the certiorari petition. Consolidated Edison Co. of New York v. Department of Energy, 529 U.S. 1003 (2000).

As is obvious from the previous recitation, contrary to ConEd's contention, the Government has not alleged in previous litigation that complaints about the Secretary of Energy's collection of fees pursuant to the NWF should be presented to this Court. Rather, consistent with the statutory and contractual framework, the Government has maintained that contract claims belong in this Court, while challenges brought under section 119 belong in the courts of appeals. It is ConEd that has successfully argued to the D.C. Circuit that challenges arising under the fee provisions of the NWPA belong under the original and exclusive jurisdiction of the D.C. Circuit. Not only is ConEd's assertion that the Government is precluded from raising this issue in this litigation misplaced, but ConEd should be itself barred under the doctrine of res judicata from arguing that fee issues belong in this Court.

---

[16] ConEd conveniently has omitted these underlined portions of the Government's opposition briefing. Pl. Opp. at 37-38. Further, even if the D.C. Circuit in Northern States had determined that it did not possess jurisdiction, although the D.C. Circuit certainly can decide whether it possesses jurisdiction to entertain a claim, it cannot conclusively decide that this Court possesses such jurisdiction. See United States v. Cook County, 170 F.3d 1084, 1091-92 (Fed. Cir. 1999); see also Christianson v. Colt Industries, 486 U.S. 800, 815-818 (1988); Amen v. City of Dearborn, 718 F.2d 789, 793-94 (6th Cir. 1983), *cert. denied*, 465 U.S. 1101 (1984). Accordingly, ConEd's assertion that the Court is barred by res judicata from considering its own jurisdiction is incorrect.

## CONCLUSION

For the foregoing reasons, and those set forth in our motion to dismiss, the Government respectfully requests that the Court dismiss Counts I and II of ConEd's complaint with respect to ConEd's diminution in value claim based upon ConEd's failure to state a claim upon which relief may be granted. We further respectfully request that the Court dismiss Count III of ConEd's complaint in its entirety for failure to state a claim upon which relief can be granted.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

s/ Harold D. Lester, Jr.
HAROLD D. LESTER, JR.
Assistant Director

s/ Joshua E. Gardner
JOSHUA E. GARDNER
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit, 8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Tele: (202) 305-7583
Fax: (202) 307-2503

Attorneys for Defendant

OF COUNSEL:

JANE K. TAYLOR
Office of General Counsel
U.S. Department of Energy
1000 Independence Ave., S.W.
Washington, D.C. 20585

March 7, 2005

CERTIFICATE OF FILING

I hereby certify that on this 7th day of March 2005, a copy of foregoing "DEFENDANT'S REPLY TO MOTION TO CONSOLIDATED EDISON COMPANY OF NEW YORK, INC.'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ Joshua E. Gardner