# In the United States Court of Federal Claims

No. 04-0033C

(Filed: August 24, 2005)

| | |
|---|---|
| CONSOLIDATED EDISON COMPANY OF NEW YORK, INC., Plaintiff, v. UNITED STATES, Defendant. | Spent nuclear fuel cases; subject matter jurisdiction; motion to dismiss; Nuclear Waste Policy Act of 1982; damages for alleged partial breach of contract; *Restatement (Second) Contracts* § 348(2)(a); takings |

Richard J. Conway, Dickstein Shapiro Morin & Oshinsky LLP, Washington, D.C., for plaintiff. With him were David M. Nadler, Nicholas W. Mattia, Jr., Bradley D. Wine, and Jeffrey P. Becherer, Dickstein Shapiro Morin & Oshinsky LLP, Washington, D.C., and Brent L. Brandenburg, Assistant General Counsel, Consolidated Edison Company of New York, Inc., New York, NY.

Joshua E. Gardner, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for defendant. With him on the briefs were Peter D. Keisler, Assistant Attorney General, Civil Division, David M. Cohen, Director, Commercial Litigation Branch, and Harold D. Lester, Jr., Assistant Director. Of counsel was Jane K. Taylor, Office of General Counsel, United States Department of Energy, Washington, D.C.

## OPINION AND ORDER

LETTOW, Judge.

Plaintiff ("Consolidated Edison") entered a contract with the Department of Energy ("DOE") under the Nuclear Waste Policy Act of 1982 ("NWPA"), Pub.L. No. 97-425, 96 Stat. 2201 (Jan. 7, 1983) (codified as amended at 42 U.S.C. §§ 10101-10270), for the disposal of spent nuclear fuel ("SNF") and high-level radioactive waste ("HLW"). The contract obligated DOE to

dispose of the SNF and HLW generated at Consolidated Edison's Indian Point and Indian Point 2 power plants (collectively, "Indian Point facilities") on or before January 31, 1998. To this date, DOE has not commenced disposal of any SNF from the Indian Point facilities or any other nuclear power plant. DOE projects that, at the earliest, it could begin disposal by 2012.

Consolidated Edison sold the Indian Point facilities to Entergy Nuclear Indian Point 2, LLC ("ENIP") on September 6, 2001. *See Entergy Nuclear Indian Point 2, LLC v. United States*, 64 Fed. Cl. 515, 520 (2005). The contract for sale contained an assignment by Consolidated Edison of its rights under the Standard Contract to ENIP, with Consolidated Edison reserving all claims arising under that contract against DOE up to the date of the closing. *Id*. Under this and similar assignment agreements, the seller retains "claims for damages accrued as of the closing date," with the buyer "acquiring later accruing claims." *Boston Edison Co. v. United States*, 64 Fed. Cl. 167, 170 (2005). Thus, Consolidated Edison retains the right to bring suit against the United States for claims arising before the sale of the Indian Point facilities. Both Consolidated Edison and ENIP have filed claims against the United States in this court.[1]

Consolidated Edison filed its complaint against the United States on January 13, 2004, alleging that the government partially breached the Standard Contract, violated the implied covenant of good faith and fair dealing, and took its property without just compensation. The government filed a motion to dismiss the contractual claims pursuant to Rule 12(b)(6) of the Rules of the Court of Federal Claims ("RCFC") insofar as the remedy for those alleged breaches might be measured by the diminution in value of the Indian Point facilities at the time of sale. The government also moved to dismiss the takings claim under the same rule. For the reasons discussed below, the government's motion to dismiss is denied.

## BACKGROUND[2]

The terms of the Standard Contract at issue in this case reflect to a considerable degree the provisions of the NWPA applicable to disposal of SNF and HLW. Because the text of the statute and the terms of the Standard Contract have been addressed by numerous other decisions, only the provisions relevant to the pending motions are recounted below.

---

[1]ENIP's claim has been docketed as *Entergy Nuclear Indian Point 2, LLC v. United States*, No. 03-2622C (filed Nov. 5, 2003). This court previously denied a motion filed by the government to consolidate Consolidated Edison's claims with those of ENIP. *See Entergy Nuclear Indian Point 2, LLC v. United States*, 62 Fed. Cl. 798 (2004).

[2]The recitations that follow do not constitute findings of fact by the court. Rather, the factual elements are taken from the parties' filings and are either undisputed or are alleged and assumed to be true for the purposes of the following analysis.

A. *The NWPA*

Congress enacted the NWPA on January 7, 1983, establishing a Federal responsibility and policy for the disposal of SNF and HLW. 42 U.S.C. § 10131(b)(2). In doing so, Congress provided "that the costs of carrying out activities relating to the disposal of such waste and spent fuel will be borne by the persons responsible for generating such waste and spent fuel." *Id.* § 10131(b)(4). In short, utilities with nuclear power plants would pay fees to the government that would cover the government's costs of collecting, transporting, and storing SNF and HLW.

To carry out its goals, the NWPA authorized the Secretary of DOE to "enter into contracts with any person who generates or holds title to high-level radioactive waste, or spent nuclear fuel, of domestic origin for the acceptance of title, subsequent transportation, and disposal of such waste or spent fuel." 42 U.S.C. § 10222(a)(1). The NWPA conditioned the renewal of the facilities' licences on their entering or negotiating in good faith to enter such contracts with the DOE. *Id.* § 10222(b)(1)(A). Utilities entering contracts with DOE were required to pay or become liable for a one-time fee for the electricity generated before April 7, 1983, and to pay a continuing fee based on electricity generated and sold after that date. *Id.* § 10222(a)(2)-(3). Money from these fees was (and is) deposited into the Nuclear Waste Fund. In exchange, DOE agreed to begin SNF and HLW disposal no later than January 31, 1998. *Id.* § 10222(a)(5)(B) ("[I]n return for the payment of fees established by this section, the Secretary, beginning not later than January 31, 1998, will dispose of the high-level radioactive waste or spent nuclear fuel involved as provided in this subchapter.").

B. *The Standard Contract*

After notice and receipt of comments, DOE established the Standard Contract for Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste ("Standard Contract") to govern the arrangements for the collection of SNF from utilities. *See* 48 Fed. Reg. 5,458 (Feb. 4, 1983). The Standard Contract is codified at 10 C.F.R. § 961.11. Rather than providing a specific schedule for disposal of the contracting utility's SNF and HLW, the Standard Contract provided for a process by which the priority for collection would be determined, employing the general principle that the oldest SNF and HLW would be collected first. Standard Contract, art. VI.B.1(a). DOE was to issue an annual capacity report ("ACR") for planning purposes each year beginning on July 1, 1987, setting forth "the projected annual receiving capacity for the DOE's [facility or facilities] and the annual acceptance ranking relating to DOE contracts for the disposal of SNF and/or HLW." *Id.*, art. IV.B.5(b). Acceptance priority rankings ("APRs") were to be issued by DOE commencing on April 1, 1991. *Id.*, art. IV.B.5(a). Based on the APRs, utilities could submit delivery commitment schedules ("DCSs") that listed all SNF and HLW the utility desired DOE to collect starting sixty-three (63) months later. *Id.*, art. V.B.1. DOE was to act on the DCSs within three months of receipt. *Id.* If DOE disapproved a DCS, it was to advise the utility of the reasons for disapproval in writing and request that the utility submit a revised schedule within thirty days. *Id.* DOE was required to take action on the revised DCS within sixty days. *Id.*, art. V.B.2. No later than one year prior to the scheduled delivery, utilities were

scheduled to submit a final delivery schedule ("FDS"). *Id*., art. V.C. Utilities had the right to adjust the quantities of SNF and/or HLW "plus or minus (+-) twenty percent (20%) and the delivery schedule up to two (2) months, until the submission of the final delivery schedule." *Id*., art. V.B.2. Utilities also possessed the right under the contract to engage in SNF "put-option" trading. *See id*., art. V.E. (granting utilities "the right to exchange approved delivery commitment schedules with parties to other contracts with DOE for disposal of SNF and/or HLW" provided that DOE receive notice no later than six months before the delivery date and approve the exchange). This provision enabled the market to adjust the order of SNF disposal.

DOE halted the approval of DCSs at some time during 1997, prior to the January 31, 1998 deadline. It announced that no DCSs would be approved, reflecting that it did not have facilities ready for disposal of SNF and HLW by the 1998 statutory deadline. *Entergy Nuclear Indian Point 2*, 64 Fed. Cl. at 519. After a pause lasting seven years, DOE restarted the DCS process in July 2004, only to suspend the process again on December 1, 2004, advising that its resumption was "'premature'" and that it would again start the DCS process "'[a]fter the Department has determined a revised date for the initial operation of the Yucca Mountain repository.'" *Id*. at 519-20 (quoting Letter from David Zabransky, Contracting Officer, DOE, to Frank Rives, Entergy Operations, Inc. (Dec. 1, 2004)). *See also Entergy Nuclear Generation Co. v. United States*, 64 Fed. Cl. 336, 339-40 (2005).

Consolidated Edison executed a Standard Contract with DOE on June 17, 1983. Compl. ¶ 32. Upon entry into the contract, Consolidated Edison paid its one-time fee and began paying the continuing fees at the rate set by the contract. Consolidated Edison paid in excess of $115 million into the Nuclear Waste Fund. *Id.*

C. *The Sale of the Indian Point Facilities*

In 1999, after DOE's failure to begin its disposal services by January 31, 1998, Consolidated Edison offered the Indian Point facilities for sale through a competitive auction process. Compl. ¶ 56. Potential bidders, selected by Consolidated Edison, were notified of the sale of the Indian Point facilities and invited to engage in initial due diligence. *Id*. ¶¶ 57-58. At the end of this first phase, Consolidated Edison invited potential bidders to submit a non-binding indicative bid for Indian Point. *Id*. ¶ 59. Only half of the potential bidders did so. Those who submitted non-binding indicative bids received additional detailed information about the Indian Point facility and submitted final, binding bids. *Id*. ¶ 60. ENIP emerged as the highest bidder, and on November 9, 2000, ENIP entered into a purchase and sale agreement with Consolidated Edison for the sale of the Indian Point facilities.

To effectuate the transfer of the facilities, the parties had to receive approval by the Nuclear Regulatory Commission ("NRC"). Compl. ¶ 62. The NRC sought to ensure that ENIP was financially able to assume any future liability and obligations with respect to decommissioning the plant at the end of its useful life as well as to storing and disposing SNF and making future payments to the Nuclear Waste Fund. *Id*. ¶¶ 62-63. Upon receiving such

assurances from ENIP, the NRC granted licence approval on August 27, 2001. *Id.* ¶ 63. As noted previously, the sale actually occurred on September 6, 2001. *Id.* ¶ 4.

The contract for the sale of the Indian Point facilities assigned Consolidated Edison's rights under the Standard Contract to ENIP, reserving for Consolidated Edison certain rights and claims against DOE which arose before the sale of the Indian Point facilities. Compl. ¶ 4. The reserved claims are the subject of this case.

D. *This Lawsuit*

Consolidated Edison filed its complaint on January 13, 2004, alleging that the government had partially breached the Standard Contract and breached the implied covenant of good faith and fair dealing, and that DOE's failure to collect and dispose of Consolidated Edison's SNF and its fee assessment practices deprived the plaintiff of the full use and value of its facilities, amounting to a taking without just compensation under the Fifth Amendment of the Constitution.

The government's motion to dismiss is premised on two arguments. First, it claims that Consolidated Edison cannot recoup the diminution in value of the Indian Point facilities on its claims for partial breach and breach of good faith and fair dealing because any diminution would constitute unrecoverable consequential damages which were independent of and collateral to the Standard Contract. Defendant's Motion to Dismiss Consolidated Edison Company of New York, Inc.'s Complaint ("Def.'s Mot.") at 9-16. Second, it argues that the takings claim should be dismissed because Consolidated Edison's alleged "property right" derives solely from the Standard Contract. *Id.* at 16-29.

**STANDARD FOR DECISION**

In determining whether a claim should be dismissed under Rule 12(b)(6), the issue for the court is "not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511 (2002) (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)). The motion to dismiss should not be granted unless "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957).

**ANALYSIS**

This court has subject matter jurisdiction over Consolidated Edison's claims under the Tucker Act, 28 U.S.C. § 1491. *See Boston Edison Co.*, 64 Fed. Cl. at 174-79.[3]

---

[3]The government avers that this court lacks jurisdiction to entertain Consolidated Edison's claim that DOE collected fees in excess of those authorized by the NWPA, citing a provision of the NWPA that grants "original and exclusive jurisdiction" to the United States

*A. Alleged Partial Breach of the Standard Contract and Breach of the Implied Covenant of Good Faith and Fair Dealing Claims*

Consolidated Edison avers that DOE's failure to collect and dispose of the Indian Point facilities' SNF by the contracted deadline constituted a partial breach of the Standard Contract and a breach of the implied covenant of good faith and fair dealing. These breaches, Consolidated Edison alleges, harmed it in two ways. First, the market value of the Indian Point facilities was "significantly diminished," by the partial breach, causing Consolidated Edison to realize less value in the sale of Indian Point to ENIP. Compl. ¶¶ 66-67. Second, Consolidated Edison incurred increased costs and expenditures up to the closing date of sale to store and maintain the uncollected SNF. *Id*. ¶ 67. Consolidated Edison posits that the government's failure to commence SNF collection under the terms of the Standard Contract resulted in the diminished value of its plant because it forced potential bidders to account for the "increased risk and anticipated expense associated with storing SNF on-site indefinitely." *Id*. ¶ 68. The increased risk and expenses allegedly resulted in fewer bidders, and caused those who did bid to take account of the uncertainty of the remaining useful economic life of the facilities, as well as the obligation of making continuing fee payments to DOE through at least 2020. *Id*. ¶¶ 68-74; *see also Boston Edison*, 64 Fed. Cl. at 182. To support its argument, Consolidated Edison cites the projections ENIP made to the NRC in obtaining approval of the license transfer for the Indian Point facilities. Compl. ¶¶ 72-73. Plaintiff argues that evidence of the plant's diminished value is found in ENIP's assurance to the NRC that, as part of the sales transaction, ENIP took into account "all future costs it would be required to bear as part of the decommissioning of Indian Point," including the installation of an on-site dry cask storage facility and other costs related to the long-term on-site maintenance of SNF. *Id*.

Damages for diminished value may be awarded by this court as incidental or consequential damages where such damages are not unforeseeable or too remote. *See Boston Edison*, 64 Fed. Cl. at 182. In *Boston Edison*, this court relied in part on an analogy to construction contracts where a party may recover damages based on the diminution in the market price of the property caused by the breach if the breach occurred due to defective or unfinished construction and the loss in value to the injured party could not be proven with sufficient certainty. 64 Fed. Cl. at 182-83 (quoting *Restatement (Second) Contracts* § 348(2) (1981)).

---

Court of Appeals for the D.C. Circuit and the various regional circuits for review of "any final decision or action of the Secretary [of Energy] . . . under this part [Subtitle A of Title I of the NWPA]," as well as any "failure of the Secretary . . . to make any decision, or take any action, required under this part [Subtitle A of Title I of the NWPA]," and "the constitutionality of any decision made, or action taken, under any provision of this part [Subtitle A of Title I of the NWPA]." 42 U.S.C. § 10139(a)(1)(A), (B), (C). This court acknowledges and accepts the rulings of the D.C. Circuit that that court has original and exclusive jurisdiction to review DOE's actions in setting the fees due under the NWPA and the Standard Contract. *See Boston Edison Co.*, 64 Fed. Cl. at 174-79 & n.13 (citing, among other decisions, *General Electric Uranium Mgmt. Corp. v. Dep't of Energy*, 764 F.2d 896 (D.C. Cir. 1985)).

Diminution in value is typically used as a measure of damages when the cost of repairing or replacing the defect far exceeds the loss in value. *See* 64 Fed. Cl. at 183 (citing *Restatement (Second) Contracts* § 348 cmt. c). In the case at hand, the government's failure to collect SNF has allegedly resulted in a diminished value of the Indian Point facilities, and "[t]he option of getting another contractor to repair the damage is unavailable . . . because there is no other approved provider of disposal services in this highly regulated industry." *Boston Edison*, 64 Fed. Cl. at 183. Thus, diminution in value can be an appropriate damage assessment in SNF-related cases.

The government argues that, in this case, damages for diminution in value are unrecoverable because the sale to ENIP occurred independently of and collaterally to the Standard Contract. Def.'s Mot. at 9-16. The government advances the rule that consequential damages may only be collected where they are the "proximate result" of a defendant's breach of contract and are not too remote. *Id.* at 9-10 (quoting *Olin Jones Sand Co. v. United States*, 225 Ct. Cl. 741, 742-43 (1980)). Only if the damages naturally flow from the breach and are not realized from "independent and collateral undertakings," are they recoverable. *Id*. at 11. To assess whether the diminution in value of the plant is the "proximate result" of the breach, the government would have this court look to the purpose of the breached contract. The government avers that the purpose behind the Standard Contract was to "create a commitment on the part of the Federal Government to accept and dispose of commercial utilities' SNF" and that "it is not concerned with assisting in sales transactions or with the value or price of any sale." *Id.* at 16. Thus, it argues, the reduction in the value of the Indian Point facilities reflected in the sale to ENIP does not flow from the Standard Contract and is unrecoverable.

The government is undoubtedly correct regarding the overarching purpose of the Standard Contract. However, both the NWPA and the Standard Contract contain an assignment provision that demonstrates that Congress and DOE were fully cognizant that utilities might desire to sell their nuclear power plants and transfer the rights and obligations regarding SNF and HLW that appertained to the plants. *See* 42 U.S.C. § 10222(b)(3) ("The rights and duties of a party to a contract entered into under this section may be assignable with transfer of title to the spent nuclear fuel or high-level radioactive waste involved."); Standard Contract, art. XIV ("The rights and duties of the Purchaser may be assignable with transfer of title to the SNF and/or HLW involved; provided, however, that notice of any such transfer shall be made to DOE within ninety (90) days of transfer."). *See also Boston Edison*, 64 Fed. Cl. at 183. Because DOE had to have contemplated that some facilities would be sold, it is also fair to infer that failure to adhere to the Standard Contract might result in the diminution of the value obtained from a sale. If the facts exist as plaintiff alleges, such diminution was not only foreseeable but also appears to be the proximate result of the government's breach of contract. In short, Consolidated Edison's diminution-in-value claim is one upon which relief could be granted and dismissal for failure to state a claim is not appropriate.[4]

[4]In its Opposition to the Defendant's Motion to Dismiss ("Pl.'s Opp'n"), Consolidated Edison also asserts that this court may award damages for breach of contract based upon a "lost

Accordingly, the court denies the government's motion to dismiss Consolidated Edison's claims of partial breach and breach of the implied covenant of good faith and fair dealing insofar as a remedy for those claims might be premised on the diminution in value of the Indian Point facilities at the time of the sale to ENIP.

*B. Takings Claim*

Consolidated Edison also asserts that DOE's failure to remove and store its SNF after January 31, 1998, and the collection of fees by DOE beyond those required by the NWPA, constituted a taking without just compensation in contravention of the Fifth Amendment of the Constitution. Compl. ¶¶ 87-93. The government argues that Consolidated Edison "cannot state a takings claim founded upon a breach of [the Standard] [C]ontract." Def.'s Mot. at 21 (citing *Castle v. United States*, 301 F.3d 1328, 1342 (Fed. Cir. 2002)). Other than the right arising from the Standard Contract, Consolidated Edison avers that the rights taken stemmed from, among other things, the NWPA and the Atomic Energy Act of 1954, 42 U.S.C. §§ 2011– 2297g-4. Pl.'s Opp'n at 23-24.

The source and nature of Consolidated Edison's property rights, if any, is a disputed matter to be decided after trial.[5] At this point, however, Consolidated Edison may proceed with both its takings and breach-of-contract claims concurrently. "If the party asserting the taking has contracted with the federal government, the contract itself may be a cognizable property interest that, if abrogated by legislation or regulatory action, may form the basis of a takings claim." *Lion Raisins, Inc. v. United States*, 416 F.3d 1356, 2005 WL 1705511, at *11 (Fed. Cir. 2005) (citing *Chancellor Manor v. United States*, 331 F.3d 891, 903 (Fed. Cir. 2003); *Cienega Gardens v. United States*, 331 F.3d 1319, 1330 (Fed. Cir. 2003)); *see also Lynch v. United States*, 292 U.S. 571, 579 (1934) ("Valid contracts are property, whether the obligor be a private individual, a municipality, a state, or the United States. Rights against the United States arising out of a

---

asset" analysis. *See* Pl.'s Opp'n at 14-16 (citing *Schonfeld v. Hilliard*, 218 F.3d 164, 178 (2d Cir. 2000); *Indu Craft, Inc. v. Bank of Baroda*, 47 F.3d 490, 495-96 (2d Cir. 1995); *Sharma v. Skaarup Ship Mgmt. Corp.*, 916 F.2d 820, 825 (2d Cir. 1990)). Because of the court's disposition of Consolidated Edison's primary claim for damages for partial breach of contract, it is not necessary at this juncture to examine this secondary route for an award of damages.

[5]In contrast to the takings claims presented in other spent nuclear fuel cases, Consolidated Edison does not allege that the government physically took any portion of the Indian Point facilities. Consolidated Edison had sold its interest in the Indian Point real property to ENIP several years before it filed its complaint, and only the owner of property may sue for a taking of that property. Consolidated Edison's claim differs in this respect from the similar claim put forward by Boston Edison because Boston Edison filed its complaint prior to the sale of its nuclear power plant and thus was able also to state a takings claim based on an alleged physical taking as well as the taking of a contract. *See Boston Edison*, 64 Fed. Cl. at 187. *See also Sacramento Mun. Util. Dist. v. United States*, 63 Fed. Cl. 495, 500-01 (2005).

contract with it are protected by the Fifth Amendment."). Eventually, if both claims remain viable, recovery of damages under the contract would take precedence. *See Cienega Gardens*, 331 F.3d at 1334 ("[T]he abrogation by legislation of clear, unqualified contract rights requires a remedy, even in a highly regulated industry, [such as banking], because the contracts embodied the commitments of the contracting parties."); *Prudential Ins. Co. of Am. v. United States*, 801 F.2d 1295, 1300 n.13 (Fed. Cir. 1986) (suggesting a takings claim as an alternative to a suit for damages for the government's failure to vacate at the end of a lease); *System Fuels, Inc. v. United States*, 65 Fed. Cl. 163, 172-73 (2005) (holding that a plaintiff may bring contract and takings claims concurrently); *Boston Edison*, 64 Fed. Cl. at 187-88 (holding that a plaintiff may bring both contract and takings claims, but if both claims remain viable, "recovery under the contract damages theory is appropriate"); *Integrated Logistics Support Sys. Int'l, Inc. v. United States*, 42 Fed. Cl. 30, 34-35 (1998) ("[D]efendant's motion does not preclude plaintiff from pleading a takings claim and breach of contract claim in the alternative.").

Both the contractual claims and the takings claim are currently viable grounds upon which relief can be granted, assuming Consolidated Edison proves the circumstances being alleged. To do so, a more complete record is necessary. "Given that the standard for determining whether a regulatory taking has occurred is both fact-intensive and case-specific, developing a more comprehensive record is appropriate." *System Fuels*, 65 Fed. Cl. at 172; *see also Tahoe-Sierra Preservation Council, Inc. v. Tahoe Reg'l Planning Agency*, 535 U.S. 302, 336-37 (2002). The court has denied motions to dismiss in this context to allow for the development of a more complete record. *See Detroit Edison Co. v. United States*, 56 Fed. Cl. 299, 302-03 (2003); *Yankee Atomic Elec. Co. v. United States*, 42 Fed. Cl. 223, 236 (1998). Once the breach-of-contract claim has been fully litigated, it will become possible to determine its viability. "Some decisions of the court have dismissed takings claims once the government has been held liable for breach of contract prior to addressing damages under a contractual theory, while others preserve both claims until final judgment is rendered." *System Fuels*, 65 Fed. Cl. at 172 (*comparing Allegre Villa v. United States*, 60 Fed. Cl. 11, 19 (2004) (dismissing takings claims in the housing context on the grounds that plaintiffs were in privity of contract, in contrast to *Cienega Gardens* where they were not, so contract claims were viable), *and Commonwealth Edison Co. v. United States*, 56 Fed. Cl. 652, 656 n.8 (2003) (dismissing a takings claim in a SNF-related case after granting plaintiff's motion for partial summary judgment that the government was liable for partial breach of contract), *with Sacramento Mun. Util. Dist.*, 63 Fed. Cl. at 501 (holding that a plaintiff had standing to pursue a takings claim while granting plaintiff's motion for partial summary judgment on liability for breach of contract)). *See also Canal Elec. Co. v. United States*, 65 Fed. Cl. 650, 655-56 (2005) (dismissing takings claim brought concurrently with claim of breach of contract). Nonetheless, both approaches demonstrate the principle that claims of a breach of contract and a taking may be brought concurrently and may proceed at least until the contract claim becomes viable and trumps the takings claim. The government's motion to dismiss Consolidated Edison's takings claim is accordingly denied.

## CONCLUSION

For the reasons stated, the government's motion to dismiss Consolidated Edison's contractual claims insofar as they seek a remedy based upon diminution in value of the Indian Point facilities is DENIED, as is the government's motion to dismiss Consolidated Edison's takings claim. The government shall file its answer to the complaint on or before the time specified in RCFC 12(a)(2)(A).

It is so ORDERED.

s/ Charles F. Lettow
Charles F. Lettow
Judge