# Exhibit A

**No. 04-0033C**
**(Judge Lettow)**

---

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

**CONSOLIDATED EDISON COMPANY OF NEW YORK, INC.,**
**Plaintiff,**

**v.**

**THE UNITED STATES,**
**Defendant.**

---

# CONSOLIDATED EDISON COMPANY OF NEW YORK, INC.'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

---

Richard J. Conway
DICKSTEIN SHAPIRO MORIN
& OSHINSKY LLP
2101 L Street, NW
Washington, DC 20037
Tel: (202) 785-9700
Fax: (202) 887-0689

*Counsel of Record for Consolidated Edison Company of New York Inc.*

January 27, 2005

# TABLE OF CONTENTS


TABLE OF AUTHORITIES ..... iii

INTRODUCTION ..... 1

STATEMENT OF THE ISSUE ..... 5

STATEMENT OF FACTS ..... 5

ARGUMENT ..... 10

I. STANDARD OF REVIEW ..... 10

II. CON EDISON HAS PROPERLY ALLEGED THAT IT HAS INCURRED DIRECT AND FORESEEABLE DAMAGES AS A RESULT OF THE GOVERNMENT'S BREACH OF THE STANDARD CONTRACT ..... 11

- A. Con Edison's Claim For Diminished Value Is A "Classic Contract Damage" And Thus Is Recoverable ..... 11
- B. The Court May Also Award Damages For Breach Of Contract Based Upon A "Lost Asset" Analysis ..... 14
- C. The Sale of Indian Point Was Reasonably Foreseeable by the Government at the Time the Standard Contract Was Executed ..... 16
- D. The Cases Relied Upon By The Government Do Not Adversely Affect Con Edison's Entitlement To A Recovery ..... 18
- E. Determination Of Con Edison's Damages Is An Issue Of Fact To Be Made Upon The Evidence Submitted ..... 21

III. CON EDISON HAS A COGNIZABLE TAKINGS CLAIM UNDER THE FIFTH AMENDMENT TO THE CONSTITUTION ..... 22

- A. The Government's Continued Assessment Of The 1 Mil Per kWh Fee ..... 22
- B. Con Edison's Takings Claim Arises Out Of Legal And Property Rights Separate From The Standard Contract ..... 23
- C. The Federal Circuit And Court Of Federal Claims Have Previously Affirmed That The Basis Of The Nuclear Utilities' Property Rights Was In NWPA ..... 24
- D. The Government Is Wrong To Assume That Con Edison's Takings Claim Is Founded Upon A Breach Of Contract ..... 27
- E. The Government Unlawfully Commandeered Con Edison's Real Estate For Public Use Without Compensation ..... 29
  - 1. Con Edison's Claim for Diminished Value Is the Proper Measure of Damages In Light of the Government's Unlawful Taking ..... 32
- F. Determination Of Con Edison's Takings Claim Is An Issue Of Fact ..... 34

IV. CON EDISON'S TAKINGS CLAIM BASED UPON THE GOVERNMENT'S WRONGFUL COLLECTION OF FEES IS PROPERLY BEFORE THE COURT OF FEDERAL CLAIMS ..... 35

A. The D.C. Circuit Has Referred All Claims Regarding Fee Assessments To The Court Of Federal Claims ........ 35

B. Recent Rulings From The Court OF Federal Claims Affirm Con Edison's Interpretation Of The Proper Jurisdiction Of Its Claim ........ 42

CONCLUSION ........ 44

## TABLE OF AUTHORITIES

Page

Cases:

*Adams v. United States*, 391 F.3d 1212 (Fed. Cir. 2004) ........ 26

*Ala. Power Co. v. United States Dep't of Energy*, 307 F.3d 1300 (11th Cir. 2002) ........ 31

*Almota Farmers Elevator & Warehouse Co. v. United States*, 409 U.S. 470 (1973) ........ 32, 34

*Aerolineas Argentinas v. United States*, 77 F.3d 1564 (1996) ........ 22, 23, 27

*Ariz. Pub. Serv. Co. v. Dep't of Energy*, No. 98-1346, 1999 U.S. App. LEXIS 11035 (D. C. Cir. Apr. 16, 1999) ........ 41

*Benenson v. United States*, 548 F.2d 939 (Ct. Cl. 1977) ........ 29

*Branch v. United States*, 69 F.3d 1571 (Fed. Cir. 1995) ........ 26

*Castle v. United States*, 48 Fed. Cl. 187 (2000), *aff'd in part, rev'd in part*, 301 F.3d 1328 (Fed. Cir. 2002) ........ 28

*Chancellor Manor v. United States*, 331 F.3d 891 (Fed. Cir. 2003) ........ 27, 28

*Cienega Gardens v. United States*, 331 F.3d 1319 (Fed. Cir. 2003) ........ 27

*City of Monterey v. Del Monte Dunes at Monterey, Ltd.*, 526 U.S. 687 (1999) ........ 30

*Clapp v. United States*, 127 Ct. Cl. 505 (1954) ........ 22

*Commercial Fed. Bank, F.S.B. v. United States*, 59 Fed. Cl. 338 (2004) ........ 16

*Commonwealth Edison Co. v. United States*, 46 Fed. Cl. 29 (2000), *aff'd*, 271 F.3d 1327 (Fed. Cir. 2001) ........ 10-11

*Commonwealth Edison v. United States*, 56 Fed. Cl. 652 (2003) ........ 31

*Consolidated Edison Co. of New York, Inc. v. Department of Energy*, No. 98-1358, 1999 U.S. App. LEXIS 11040 (D.C. Cir. Apr. 16, 1999) ........ *passim*

*Del Monte Dunes at Monterey, Ltd. v. City of Monterey*, 920 F.2d 1496 (1990), *aff'd*, 526 U.S. 687 (1999) ........ 34, 35

*Del-Rio Drilling Programs Inc. v. United States*, 146 F.3d 1358 (Fed. Cir. 1998) ........ 27

*Detroit Edison v. United States*, 56 Fed. Cl. 299 (2004) ........ 31

*E. Enters. v. Apfel*, 524 U.S. 498 (1998) ........ 35

*Energy Capital Corp. v. United States*, 302 F.3d 1314 (Fed. Cir. 2002) ........ 12, 13

*Fern v. United States*, 908 F.2d 955 (Fed. Cir. 1990) ........ 26

*First Heights Bank, FSB v. United States*, 57 Fed. Cl. 162 (2003) ........ 19

*Goolsby v. United States*, 21 Cl. Ct. 88 (1990) ........ 21

*Huntleigh USA Corp. v. United States*, No. 03-2670C, 2005 WL 44439 (Fed. Cl. Jan. 7, 2005) ........ 27, 33

*Hughes Communications Galaxy, Inc. v. United States*, 271 F.3d 1060 (Fed. Cir. 2001) ........ 28

Page

*Indiana Michigan Power Co. v. Department of Energy*, 88 F.3d 1272 (D.C. Cir. 1996) .......... 22, 24, 25, 31

*Indu Craft, Inc. v. Bank of Baroda*, 47 F.3d 490 (2d. Cir. 1995) .......... 15

*Ins. Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694 (1982) .......... 36

*Kaiser Aetna v. United States*, 444 U.S. 164 (1979) .......... 30, 32, 33

*Kimball Laundry Co. v. United States*, 338 U.S. 1 (1949) .......... 34

*Klein v. United States*, 375 F.2d 825 (Ct. Cl. 1967) .......... 34

*Koby v. United States*, 53 Fed. Cl. 493 (2002) .......... 16

*Landmark Land Co. v. United States*, 256 F.3d 1365 (Fed. Cir. 2001) .......... 21

*La Van v. United States*, 56 Fed. Cl. 580 (2003), *aff'd in part, vacated in part*, 382 F.3d 1340 (Fed. Cir. 2004) .......... 28

*Long Island Sav. Bank, FSB, v. United States*, 60 Fed. Cl. 80 (2004) .......... 16

*Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419 (1982) .......... 29

*Maine Yankee Atomic Power Co. v. United States*, 225 F.3d 1336 (Fed. Cir. 2000) .......... 24, 25

*Members of the Peanut Quote Holders Ass'n, Inc. v. United States*, 60 Fed. Cl. 524 (2004) .......... 26

*Mitchell v. United States*, 267 U.S. 341 (1925) .......... 34

*N. States Power Co. v. Dep't of Energy*, Nos. 97-1064 et al., 1998 U.S. App. LEXIS 20702 (D.C. Cir. July 2, 1998) .......... 41

*N. States Power Co. v. United States Dep't of Energy*, 128 F.3d 754 (D.C. Cir. 1997) .......... *passim*

*National Ass'n of Regulatory Utility Commissioners v. U.S. Department of Energy*, 851 F.2d 1424 (D.C. Cir. 1988) .......... 41

*Neely v. United States*, 285 F.2d 438 (Ct. Cl. 1961) .......... 13

*Northern States Power Co. v. United States Department of Energy*, No. 98-1070, 1998 U.S. App. LEXIS 12919 (D.C. Cir. May 5, 1998) .......... 38, 39, 40, 41, 42

*Northwest Airlines, Inc. v. United States Dep't of Transp.*, 15 F.3d 1112 (D.C. Cir. 1994) .......... 28

*Office of Consumers' Counsel v. FERC*, 826 F.2d 1136 (D.C. Cir. 1987) .......... 39

*Olin Jones Sand Co. v. United States*, 225 Ct. Cl. 741 (1980) .......... 20

*Pittman v. Chi. Bd. of Educ.*, 64 F.3d 1098 (7th Cir. 1995) .......... 26

*Plaintiffs in Winstar-Related Cases v. United States*, 37 Fed. Cl. 174 (1997), *aff'd*, 133 F.3d 874 (Fed. Cir. 1998) .......... 28

*Protectors Ins. Serv., Inc. v. United States Fid. & Guar. Co.*, 132 F.3d 612 (10th Cir. 1998) .......... 16

*Prudential Ins. Co. of Am. v. United States*, 801 F.2d 1295 (Fed. Cir. 1986) .......... 21

Page

*Ramsey v. United States*, 101 F. Supp. 353 (Cl. Ct. 1951) .......... 20

*Rushton v. Nebraska Public Power District*, 844 F.2d 562 (8th Cir. 1988) .......... 27

*S. Nat'l Corp. v. United States*, 57 Fed. Cl. 294 (2003) .......... 12

*Sacramento Mun. Util. Dist. v. United States*, 61 Fed. Cl. 438 (2004) .......... 24, 25, 31

*Sacramento Municipal Utility District v. United States*, No 98-488C (Fed. Cl. filed Jan. 19, 2005) .......... 2

*Scheuer v. Rhodes*, 416 U.S. 232 (1974), *abrogated on other grounds by Harlow v. Fitzgerald*, 453 U.S. 800 (1982) .......... 11

*Schonfeld v. Hilliard*, 218 F.3d 164 (2d. Cir. 2000) .......... 14, 15

*Scott Timber Co. v. United States*, 333 F.3d 1358 (Fed. Cir. 2003) .......... 19

*Sharma v. Skaarup Ship Mgmt. Corp.*, 916 F.2d 820 (2d Cir. 1990) .......... 15

*Smith v. United States*, 58 Fed. Cl. 374 (2003), *aff'd*, No. 04-5046, 2004 WL 2370589 (Fed. Cir. Oct. 6, 2004) .......... 28

*Sommers Oil Co. v. United States*, 241 F.3d 1375 (Fed. Cir. 2001) .......... 11

*Suess v. United States*, 52 Fed. Cl. 221 (2002) .......... 11, 12, 13

*Tyler House Apartments, Ltd. v. United States*, 38 Fed. Cl. 1 (1997) .......... 28

*United States v. General Motors Corp.*, 323 U.S. 373 (1945) .......... 34

*United States v. Pewee Coal Co.*, 341 U.S. 114 (1951) .......... 30

*United States v. Winstar Corp.*, 518 U.S. 839 (1996) .......... 28

*Webb's Fabulous Pharmacies, Inc. v. Beckwith*, 449 U.S. 155 (1980) .......... 30

*Wells Fargo Bank, N.A. v. United States*, 88 F.3d 1012 (Fed. Cir. 1996) .......... 18, 19, 20

*Whitney Benefits, Inc. v. United States*, 752 F.2d 1554 (Fed. Cir. 1985) .......... 35

*Wis. Elec. Power Co. v. United States Dep't of Energy*, 211 F.3d 646 (D.C. Cir. 2000) .......... 41, 42

*Yancey v. United States*, 915 F.2d 1534 (Fed. Cir. 1990) .......... 32

*Yankee Atomic Elec. Co. v. United States*, No. 98-126C (Fed. Cl. filed Feb. 18, 1998) .......... 8

*Yankee Atomic Elec. Co. v. United States*, No. 98-126C (Fed. Cl. filed June 28, 2004) .......... 13

*Yankee Atomic Elec. Co. v. United States*, 42 Fed. Cl. 223 (1998), *aff'd sub nom. Maine Yankee Atomic Power Co. v. United States*, 225 F.3d 1336 (Fed. Cir. 2000) .......... 24, 25, 28

*Yuba Natural Resources, Inc. v. United States*, 904 F.2d 1577 (Fed. Cir. 1990) .......... 34

Statutes:

31 U.S.C. § 3727 .......... 18

42 U.S.C. § 10101 et seq. .......... *passim*

42 U.S.C. § 10122(b)(3) .......... 17

Page

42 U.S.C. § 10139(a)(1) ........................................ 37

Rules of the U.S. Court of Federal Claims:

Rule 7.2(c) ........................................ 1

Rule 12(b) ........................................ 1

Other Authorities:

H.R. Rep. No. 97-491, pt. 1 (1982), *reprinted in* 1982 U.S.C.C.A.N. 3792 ........................................ 6, 7

Restatement (Second) of Contracts § 350 (1981) ........................................ 16

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| CONSOLIDATED EDISON COMPANY OF NEW YORK, INC., Plaintiff, | ) | |
| v. | ) | No. 04-0033C (Judge Lettow) |
| UNITED STATES OF AMERICA, Defendant. | ) | |

CONSOLIDATED EDISON COMPANY OF NEW YORK, INC.'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

## INTRODUCTION

Pursuant to Rules 7.2(c) and 12(b) of the Rules of the U.S. Court of Federal Claims, Plaintiff Consolidated Edison Company of New York, Inc. ("Con Edison"), through its undersigned counsel, hereby submits its brief in opposition to the Motion to Dismiss Con Edison's Complaint ("Motion") filed by Defendant, the United States of America ("Government"), acting through and on behalf of the Department of Energy ("DOE").

Con Edison was the owner of the Indian Point 1 and 2 nuclear generating facilities (collectively, "Indian Point") at the time that the Government failed to begin removal of spent nuclear fuel ("SNF") from nuclear facilities, on January 31, 1998. As properly alleged in the Complaint, the Government's failure to perform resulted in a breach of Con Edison's Standard Contract rights, and the Government's complete disregard of its obligations under the Nuclear Waste Policy Act of 1982, 42 U.S.C. 10101 et seq. ("NWPA"), constituted an unlawful taking of Con Edison's property rights. As a result, Con Edison has properly asserted a claim for breach of the Standard Contract, a

related claim for breach of the duty of good faith and fair dealing, and a claim for an unlawful taking of property rights without just compensation.

The Government's Motion is based upon a complete mischaracterization of Con Edison's Complaint and fundamental misapplications of the law. In reading the Government's Motion, one is prompted to wonder (as have other Judges of this Court) whether its representatives have studied this and similarly framed complaints at all, or are instead merely recycling arguments that have been unsuccessful in other SNF litigations.

First, the Government argues that Con Edison's damages are consequential, and are thus unrecoverable as a matter of law. Con Edison's claim for the diminished value of both Indian Point and its Standard Contract rights is a direct and foreseeable result of the Government's breach of the Standard Contract. Con Edison has alleged that the Government's admitted failure to remove SNF from Indian Point on January 31, 1998[1] left Con Edison with a severely damaged asset, a Standard Contract of dubious value (the principal purpose of which had been thwarted), and literally tons of SNF that could not be disposed of by any other means. Con Edison was also forced to retain and continue to store the SNF indefinitely (since the Government was then and is still unable to say when disposal will begin) within the heavily regulated confines established by the Government.

The extent of this damage was actually determined, Con Edison asserts, by an arms-length market value transaction when Con Edison liquidated Indian Point at auction in 2001. Purchasers, in full recognition that they were being forced to

---

[1] Judge Braden of this Court ruled in *Sacramento Municipal Utility District v. United States*, No 98-488C (Fed. Cl. filed Jan. 19, 2005), that the date of the breach was not determined by Delivery Commitment Schedules, or upon "Oldest Fuel First" principles, but by the fact that the Government breached the Standard Contract on January 31, 1998.

immediately incur substantial additional costs and grave going forward risks as a direct consequence of the Government's breach of contract, decreased their bid offerings to levels that were significantly below the fair market value that the Standard Contract and associated nuclear assets would otherwise have obtained in the absence of the Government's breach. Con Edison's damages are therefore completely actionable and entirely consistent with assertions of damage that have repeatedly been accepted by this Court and other courts, and Con Edison should now be allowed to conduct discovery and offer proof of its damages. This is particularly so since determination of damages is predominantly an issue of fact, to be made at trial following adequate opportunity for discovery and presentation of the evidence.

The Government's failure to remove SNF also resulted in an unlawful taking of Con Edison's property rights as established by NWPA. The history of the nuclear power industry leading up to the passage of NWPA in 1982, as well as the language of NWPA itself, indicates that the Government fully committed itself to establish immutable statutory obligations that the safe and orderly removal of SNF from nuclear power plant sites would commence by a date-certain expressly set forth in NWPA itself. When, on January 31, 1998, the Government failed to abide by NWPA's mandates, and forced Con Edison to retain ownership and responsibility for all of its SNF indefinitely, it seized Con Edison's property and failed to justly compensate Con Edison for doing so.

In addition, even after the Government failed to abide by NWPA's mandates, it compelled Con Edison under threat of loss of Nuclear Regulatory Commission ("NRC") licensing status to continue making uninterrupted payments into the Nuclear Waste Fund ("NWF"), notwithstanding lack of a *quid pro quo*, loss of its fee-collection

authority under NWPA, and a definitive ruling by the D.C. Circuit that the obligation to pay the fees had not continued. By unlawfully continuing to levy these fees, after the Government's justification for doing so was lost, DOE effected a classic taking in violation of the Fifth Amendment's Takings Clause, and, as such, Con Edison is entitled to just compensation. Con Edison alleges that the damages resulting from the Government's taking were liquidated upon the sale of Indian Point, and the dollar amount of the taking can be determined by reference to what Con Edison would have received for Indian Point and its Standard Contract had DOE abided by its statutory obligations, ceased its fee collections, and commenced SNF disposal by NWPA's deadline for doing so, viz. a "but-for" test.

Finally, it was conclusively established more than five years ago that the Court of Federal Claims has proper jurisdiction to rule upon all of Con Edison's claims, specifically including that DOE's continuing NWF fee assessments comprise an unlawful taking. The D.C. Circuit held in 1999 that the Court of Federal Claims is the proper court to hear such disputes. The Government is as bound by the doctrine of *res judicata* as is Con Edison from now contending otherwise. Indeed, the Government's position here is particularly remarkable since the Government previously argued that the very claims brought by Con Edison here should not be brought before the D.C. Circuit, but rather before the U.S. Court of Federal Claims. Consistent with and fully recognizing the D.C. Circuit's ruling, another Court of Federal Claims ruling has recently confirmed that claims for unlawful assessment of fees such as alleged by Con Edison in this case are properly before the Court of Federal Claims. *See* Dec. 3, 2004 hearing tr. at 21-22, *Delmarva Power & Light Co. v. United States*, No. 04-0034C, attached hereto as Exhibit 1.

## STATEMENT OF THE ISSUE

1. Whether, in a breach of contract action, Con Edison has properly alleged damages directly and proximately caused by the Government's breach, to be measured by the difference between the value of the breached contract and Con Edison's related nuclear assets after the breach occurred and the value of the contract and related nuclear assets if the Government had performed, and whether such a determination can or should be made prior to the initiation of discovery.

2. Whether Con Edison has properly alleged a breach of DOE's covenant of good faith and fair dealing by DOE's failure to commence disposal of SNF, refusing to state when such disposal would commence, and, after the breach, announcing its intention to continue fee collections for decades in disregard of the requirements of the contract and court rulings, and whether such a determination can or should be made prior to the initiation of discovery.

3. Whether Con Edison has properly alleged a takings claim by the Government for the unlawful demand of payments of fees in disregard of court rulings and after its authority to collect such fees had lapsed, in linking such demands to the license status of Con Edison's nuclear facilities, and also effecting the constructive occupation of Con Edison's property for storage of SNF in violation of federal law, and whether such a determination can or should be made prior to the initiation of discovery.

## STATEMENT OF FACTS

For more than fifty years, the federal government has systematically acted to induce electric utilities, including Con Edison, to invest in nuclear technology on the promise, both implicit and explicit, that key issues affecting utilities' utilization of the

technology would be resolved in a timely and economic manner. *See* Compl. ¶¶ 14-21. Recognizing that the original plan for reprocessing nuclear fuel was no longer a viable means to dispose of SNF, Congress enacted NWPA "to establish programs for the development of repositories for the safe permanent disposal of high level nuclear waste and spent fuel." *Id.* ¶ 22 (citing H.R. Rep. No. 97-491, pt. 1, at 26 (1982), *reprinted in* 1982 U.S.C.C.A.N. 3792, 3792).

NWPA invested DOE with the sole authority to accept title to, transport, and dispose of SNF. Compl. ¶ 26. The Act authorized DOE to enter into a Standard Contract with utilities to collect and take custody of SNF. *Id.* NWPA made execution of the Standard Contract mandatory for generators of high-level nuclear waste, because it prohibited the NRC from issuing or renewing an operating license to owners or operators without their having signed a Standard Contact. *Id.* ¶ 31. Two months later, on June 17, 1983, Con Edison entered into a Standard Contract with DOE for the disposal of SNF and high-level waste generated by Indian Point. *Id.* ¶ 32.

Consistent with NWPA, the Standard Contract provided that DOE would begin acceptance of SNF no later than January 31, 1998 in return for a one-time fee for pre-1983-generated nuclear waste, as well as for an ongoing fee assessed by DOE against SNF generators. Compl. ¶ 27 (citing 10 C.F.R. § 961.11, Arts. II, VIII.A). DOE was authorized under the Standard Contract to collect only those fees which were sufficient to achieve full cost recovery for a nuclear waste disposal program that was in compliance with the requirements of NWPA. *Id.* To this end, the Congressional Budget Office noted that "[i]t is expected that the majority of the costs of this bill will be incurred by the year 2000 when repository construction is expected to be completed and the facility operation." *Id.* ¶ 29 (citing H.R. Rep. No. 97-491, pt. 1, at 67, 1982

U.S.C.C.A.N. at 3833). DOE did not begin accepting SNF by January 31, 1998. DOE had not begun accepting SNF by the closing date of Con Edison's sale of Indian Point, and in fact DOE still has not begun accepting any nuclear utilities' SNF. *Id.* ¶ 5.

The Government's breach of its contractual obligation to commence disposal of SNF significantly diminished the value of Con Edison's Standard Contract and Indian Point itself. Compl. ¶ 66. Upon Indian Point's divestiture, this diminished value was reflected in the terms and conditions of the sale. *Id.* DOE's failure to timely and completely fulfill its mandates under NWPA and the Standard Contract directly resulted in prospective purchasers being forced in their respective valuations of the asset to account for increased costs, risks, and uncertainties brought about by DOE. *Id.* Due to the increased risk and anticipated expenses associated with storing SNF on-site indefinitely, potential buyers elected not to participate in the sales process for Indian Point, thereby shifting market power to a limited universe of some potential buyers who were prepared to entertain assumption of SNF risks in the face of DOE's defaults. *Id.* ¶ 68.

Absent a place to store the SNF or the confidence that DOE would fulfill its statutory and contractual obligations at any particular time, if ever, the continued operation of the plant for any significant period would not be possible. Compl. ¶ 69. As a result, the value of the plant was substantially depleted, since the future prospects of electric sales revenue were uncertain. *Id.* The value of the plant was also diminished because the re-use value of the site will be deferred indefinitely until decommissioning and SNF removal are complete. *Id.*

Furthermore, Con Edison was stripped of its ability to trade its SNF disposal queue position, an asset that was uniquely provided under the Standard Contract.

Under the process established by NWPA and the Standard Contract, nuclear utilities had the option of "trading" with another nuclear utility the date upon which the Government would have taken some or all of their SNF. The payment received for such a trade was significant, depending upon the date the SNF was to be taken and the need of a particular utility. This ability to trade positions was a unique asset that accompanied the Standard Contract, and the Government was clearly aware of such trades at the time the Standard Contract was executed. When the Government failed to begin disposal of SNF on January 31, 1998, it stripped Con Edison of its ability to trade its queue positions, and of the many millions of dollars that were associated with this asset.

On May 18, 1998, after DOE had repudiated its obligations under NWPA and after at least one SNF lawsuit had been filed in this Court,[2] DOE announced a fee collection and expenditure plan for the nuclear waste disposal program through year 2020 (the "1998 DOE Plan"). Compl. ¶ 42. The 1998 DOE Plan asserted that DOE would be unable to meet its statutory and contractual obligations to begin removal and disposal of SNF until 2020, at the earliest. *Id.* As of May 1998, the unspent balance in the NWF was approximately $8 billion. *Id.* The NWF balance as of May 1998, not including the interest to be accumulated thereon through 2020, was *twice* the amount necessary to fully fund the entire nuclear waste program spending plan as announced by DOE in May 1998. *Id.* Nonetheless, the 1998 DOE Plan projected that DOE would continue to collect fees from Standard Contract holders at the existing 1 mil per kWh fee rate through at least 2020, which would perpetuate aggregate collections into the NWF in excess of $600 million annually. *Id.* The 1998 DOE Plan expressly acknowledged that

---

[2] *Yankee Atomic Power Co. v. United States*, No 98-126C (Fed. Cl. filed Feb. 18, 1998) (Merrow, J.).

DOE was embarking on a program of overcollecting fees, a significant portion of which would be siphoned off from expenditures made to fulfill DOE's SNF disposal obligations and instead used for purposes of reducing DOE's delay costs for its SNF repository program, and also reducing Standard Contract holders' breach damages. *Id.* Through 2001, Con Edison had paid an excess of $115 million into the NWF. *Id.* ¶ 4.

On September 6, 2001, two and a half years after DOE's breach, Con Edison sold Indian Point to Entergy Nuclear Indian Point 2, LLC ("Entergy"). Compl. ¶ 4. As part of the sales transaction, Con Edison assigned its DOE Standard Contract (which was then in breach) to Entergy, subject to an explicit reservation of certain rights and claims. *Id.* As a direct and proximate result of DOE's failure to meet its statutory and contractual obligations to remove SNF, the value of the Indian Point Standard Contract and Indian Point itself was substantially reduced due to the failure of DOE to properly fulfill its contractual and statutory obligations. *Id.* ¶ 6. After the publication of the 1998 DOE Plan, it was clear to prospective buyers of nuclear electric generating facilities, which were themselves Standard Contract holders for plants that they already owned, that they should factor SNF disposal program status and prognosis, as well as the continuing fee payments announced in the 1998 DOE Plan into their valuation models and reduce their Standard Contract valuation and nuclear asset purchase prices accordingly. *Id.* ¶ 45.

The value of the Standard Contract was reduced in two ways. First, the promised and paid-for service – disposal of SNF by a date certain – was indefinitely delayed. Second, the payments claimed to be due and owing under the Standard Contract, which were themselves linked to the continuing validity of each nuclear unit's

NRC Operating License, were to continue at the same rate for an indefinite period extending to at least the year 2020.

DOE's failure to fulfill its statutory and contractual obligations caused the diminution in value of Indian Point itself. First, DOE's failure to meet its obligations resulted in considerable increased risk for Con Edison. Compl. ¶ 6. Second, DOE's failure created uncertainty in the operating life expectancy of Indian Point as a viable nuclear electric generating facility. *Id.* Third, DOE's failure created additional capital expenses and other costs associated with storing SNF at Indian Point indefinitely. *Id.* All of these factors caused potential buyers to either elect not to participate in the sales process for the nuclear facilities, or to drastically reduce the price they were otherwise prepared to pay. *Id.*

Additionally, DOE's failure to fulfill its obligations under NWPA and the Standard Contract negatively affected the Indian Point sales process, and the net value realized in the sales process, by increasing the amount of the decommissioning funds required by the NRC as part of the transfer of Indian Point. Compl. ¶ 7.

Con Edison suffered the loss of value of Indian Point caused by DOE's failure to perform its obligations, in addition to significant costs for interim storage incurred by Con Edison up to the date of Indian Point's sale. Compl. ¶ 8. These interim storage costs would not have been incurred had DOE performed its statutory and contractual obligations pertaining to SNF disposal by January 31, 1998, as required. *Id.*

## ARGUMENT

### I. STANDARD OF REVIEW

"When a federal court reviews the sufficiency of the complaint pursuant to a motion to dismiss, 'its task is necessarily a limited one.'" *Commonwealth Edison Co. v.*

*United States*, 46 Fed. Cl. 29, 35 (2000) (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974), *abrogated on other grounds by Harlow v. Fitzgerald*, 453 U.S. 800 (1982)), *aff'd*, 271 F.3d 1327 (Fed. Cir. 2001). "'The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support [its] claims.'" *Id.* Toward this end, the court must presume that the "factual allegations included in the complaint by a plaintiff are true." *Id.* Given this standard, the court should not dismiss a complaint for failure to state a claim "unless it is beyond doubt that the plaintiff can prove no set of facts which would entitle [it] to relief." *Sommers Oil Co. v. United States*, 241 F.3d 1375, 1378 (Fed. Cir. 2001). As discussed in greater detail below, the Government's Motion fails to demonstrate that Con Edison can prove no set of facts that would entitle it to relief.

## II. CON EDISON HAS PROPERLY ALLEGED THAT IT HAS INCURRED DIRECT AND FORESEEABLE DAMAGES AS A RESULT OF THE GOVERNMENT'S BREACH OF THE STANDARD CONTRACT

### A. Con Edison's Claim For Diminished Value Is A "Classic Contract Damage" And Thus Is Recoverable

Con Edison's claim for diminished value of the Standard Contract as well as Indian Point is, as a matter of law, entirely consistent with prior decisions of the court that have found such damages to be recoverable.[3] For example, in *Suess v. United States*, 52 Fed. Cl. 221 (2002), the court awarded damages for the diminished value of the plaintiffs banking franchise. *Suess*, a *Winstar* case, was brought derivatively on behalf of Franklin Federal Savings and Loan Association ("Franklin"). As a direct result of the Government's breach of contractual promises regarding the treatment of "goodwill"

[3] In addition to these diminished value arguments, Con Edison will also demonstrate that it sustained damages associated with re-racking as well as damages associated with Con Edison's inability to buy, sell, and trade SNF disposal allotments, as the Government had earlier encouraged.

due to the passage of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA"), Suess alleged that Franklin suffered damages, including the diminished value of the bank. The court found that the passage of FIRREA was the "substantial factor" leading to the demise of Franklin, and was sufficient to establish the causation element of damages based on the bank's diminished value. *Id.* at 231. In its holding, the court described the plaintiff's diminished value theory in the following manner:

> These are *classic contract damages*, because it was both foreseeable and actually foreseen that breach of the contractual promise regarding the regulatory treatment of goodwill would push the thrift into insolvency and subject it to seizure. Further, the breach was the substantial factor in the seizure of Franklin. In short, but for the breach, Franklin would have been a going concern with a market value of $35 million.[4]

*Id.* (emphasis added); *see also S. Nat'l Corp. v. United States*, 57 Fed. Cl. 294, 310 (2003) (court should determine at trial whether plaintiff could prove the diminished value of its business opportunity).

Like *Suess* and *Southern National*, the Federal Circuit's ruling in *Energy Capital Corp. v. United States*, 302 F.3d 1314 (Fed. Cir. 2002), supports Con Edison's damages theory as an appropriate measure of damages. In *Energy Capital*, the Federal Circuit held that lost profits are recoverable when they are benefits that were anticipated from the contract and are necessary for the plaintiff's ongoing operation. *Id.* at 1324-25. The Government's breach of the Affordable Housing Energy Loan Program ("AHELP") agreement precluded Energy Capital from issuing the loans AHELP was designed to permit. *Id.* at 1328-29. Just as there was no intervening cause in *Energy Capital*, there is no intervening cause in Con Edison's present claims against the Government. As the

[4] In making its award, the court determined that the clearest indicator of Franklin's value prior to the breach was the market value of its stock on the day prior to the breach.

AHELP agreement was intended to permit lenders to offer certain loans, the Standard Contract was designed to ensure Con Edison's operational viability by shifting to the Government (for a fee) the burden posed by SNF. Compl. ¶ 27. The Government's failure to perform its obligations pursuant to the Standard Contract here, much like its failure to abide by the AHELP agreement in *Energy Capital*, directly and severely impacted Con Edison's operation of Indian Point. Moreover, the diminished value that Con Edison suffered is equivalent to and consistent with the lost profit damages awarded in *Energy Capital*.

Finally, in *Neely v. United States*, 285 F.2d 438 (Ct. Cl. 1961), the Court of Claims awarded lost profits to a plaintiff to appropriately compensate him for the diminished value of a lease that had been breached by the Government. The plaintiff in *Neely*, a coal miner, had leased land from the Government with the intent of conducting mining upon the land. When the Government prohibited such mining, the plaintiff brought suit for breach of the lease. The predecessor to the Court of Federal Claims awarded the plaintiff damages in the amount of the value of the lease after the Government's breach. The Court of Claims rejected this award and permitted the plaintiff to seek lost profits. The court based its reasoning on the fact that the "plaintiff might have been able to secure a higher price for [the lease] if the prohibition against strip-mining had not been imposed." *Id.* at 443.

Much like the plaintiffs in *Energy Capital*, *Suess*, *Southern National*, and *Neely*, Con Edison seeks to recover the diminished value of the Standard Contract as well as that of Indian Point as a direct consequence of the Government's breach. By executing the Standard Contract, the Government promised decades ago to remove SNF from Indian Point on or before January 31, 1998. Compl. ¶ 27. When it executed the Standard

Contract, the Government knew that the failure to fulfill its contractual obligations would have a significant impact on the nuclear power industry, including Con Edison. *See Yankee Atomic Elec. Co. v. United States*, No. 98-126C (Fed. Cl. filed June 28, 2004) (Merrow, J.). Given the Government's prohibition of nuclear fuel reprocessing, the Standard Contract and NWPA were implemented to ensure the viability of the nuclear industry. Compl. ¶ 22. The Government should not be permitted to shirk these obligations and avoid fully compensating Con Edison for the resultant injuries, merely because Con Edison sold its facility in the wake of the Government's breach.[5]

**B. The Court May Also Award Damages For Breach Of Contract Based Upon A "Lost Asset" Analysis**

Con Edison is also entitled to seek damages for diminished value on the basis of a "lost asset" model. When a defendant's breach of contract leads to the reduction of the price a willing buyer would otherwise pay a willing seller for the right to a particular income stream, that plaintiff is eligible to recover for the lost asset. An award for lost assets provides a plaintiff with damages for the market value of a lost income-producing asset.

Various circuit courts have affirmed lost asset damages as a valid method of recovery when the plaintiff seeks to reclaim the diminished value of its asset. For instance, in *Schonfeld v. Hilliard*, 218 F.3d 164 (2d. Cir. 2000), the Second Circuit awarded

[5] It is noteworthy that the Government, acting through the Federal Energy Regulatory Commission in 1996, adopted Orders 888 and 889. The express intent of these Orders was to mandate the restructuring of the country's utility industry in order to provide an openly competitive market for electric generation. The essence of the restructuring was the separation of electric generation from traditional utility transmission and distribution functions. The Government essentially mandated these changes for interstate electric sales, and also encouraged states to follow suit. The Government should therefore not be heard to complain that it could not have foreseen that the physical and economic separation of nuclear electric generating plants was strongly encouraged at the same time the Government was severely compromising the economic viability of these nuclear plants by disavowing its obligations under NWPA.

lost asset damages to a plaintiff on a breach of contract claim. The plaintiff, a former partner with the defendants, brought suit on behalf of himself, as well as derivatively on behalf of the former company run by the plaintiff and the defendants. In the complaint, the plaintiff alleged that the defendants' breach of an oral agreement with the plaintiff lead directly to the company's breach of an agreement with a third party as well as to the subsequent loss of a different agreement with that same third party. The plaintiff sought damages for the diminished value of the lost agreement. *Id.* at 170-71.

The court awarded "lost asset" damages to the plaintiff, based upon the value of the asset the plaintiff lost as a result of the defendants' breach. "When a defendant's breach of contract deprives a plaintiff of an asset, the courts look to compensate the plaintiff for the 'market value' of the asset . . . ." *Id.* at 178. In determining the market value of the agreement, the court based its decision on "'future profits as estimated by potential buyers who form the "market"' and 'reflect the buyer's discount for the fact that the profits would be postponed and . . . uncertain.'" *Id.* at 176 (citation omitted). Further, the court found that it favored awarding lost asset damages over lost profits because "[t]he market value of an income-producing asset is inherently less speculative than lost profits because it is determined at a single point in time." *Id.* at 177; *see also Indu Craft, Inc. v. Bank of Baroda*, 47 F.3d 490, 495-96 (2d. Cir. 1995) (holding that plaintiff's damages for market value of business were recoverable even though plaintiff's lost profits claim was too speculative); *see also Sharma v. Skaarup Ship Mgmt. Corp.*, 916 F.2d 820, 825 (2d Cir. 1990) (measuring contract damages by the value of the item at the time of breach is a valid measure and actually takes expected future lost profits into account).

The decisions described above provide further credence to Con Edison's allegations that it is entitled to seek damages for the diminished value of the Standard Contract and its related nuclear assets which were incurred as a result of the Government's breach.[6] The value of both the Indian Point nuclear power plant and the value of the Standard Contract were severely diminished as a result of the Government's breach, specifically the failure to commence removal of SNF on January 31, 1998. Compl. ¶¶ 66-67. Potential buyers discounted from their purchase price all of the additional costs that they would incur as a result of having to continue storing the SNF and continue making payments to the NWF. *Id.* ¶¶ 69-72. Under a lost asset theory, Con Edison would be entitled to recover the difference between the value of Indian Point at the time of the breach and the price at which the plant was ultimately sold. *See Protectors Ins. Serv., Inc. v. United States Fid. & Guar. Co.*, 132 F.3d 612, 617 (10th Cir. 1998) (awarding lost asset damages based upon the difference between the going concern value and the price actually received by the plaintiff upon the sale of the business).

### C. The Sale of Indian Point Was Reasonably Foreseeable by the Government at the Time the Standard Contract Was Executed

Given the Government's knowledge of the limitations imposed upon nuclear utilities by NWPA and the Standard Contract, it is disingenuous for the Government to

---

[6] Far from being an unrelated, intervening event, the sale of Indian Point also had the effect of mitigating the precipitous drop in value of the Standard Contract and related nuclear assets after the Government's breach. Under generally accepted principles of contract law, Con Edison should be entitled to have contract liquidation recognized as the equivalent of taking reasonable steps to mitigate its losses. *Koby v. United States*, 53 Fed. Cl. 493, 496-97 (2002) (citing Restatement (Second) of Contracts § 350 (1981)); *see also Commercial Fed. Bank, F.S.B. v. United States*, 59 Fed. Cl. 338, 355 (2004). In the *Winstar* cases, this Court has recognized the sale, merger, or liquidation of banks that had been harmed by the Government's breach as sentinel events for purpose of damage measurement. *See, e.g., Long Island Sav. Bank, FSB, v. United States*, 60 Fed. Cl. 80, 89-90 (2004).

argue that the damages incurred by Con Edison were not foreseeable. For instance, the Government knew that nuclear plants had finite storage capacity on-site and would be required to cease operations when that capacity was exhausted. Compl. ¶ 49. It knew that expanding that storage capacity was not as-of-right, but depended on uncertain regulatory approvals. *Id.* ¶ 71. The Government knew that only it was practically and legally able to offer SNF disposal services, and that the purchasers of those services could not obtain "cover" from any other source when the Government failed to provide these critical services. *Id.* ¶ 31. It knew that NWPA placed obligations on DOE as to the amount of fees it was to collect from 1982 until 1998, and that its fee collection authority was constrained both by NWPA and rulings of the D.C. Circuit. *Id.* ¶ 37.

The Government was also aware that related statutes and agency orders further limited Con Edison, as a Standard Contract holder. For instance, the Government also knew that the NRC's regulations directly linked the approved status of the nuclear plant's operating license with DOE's determination as to whether a Standard Contract holder was current in satisfying DOE's demands for the payment of fees. Compl. ¶ 31. It also was aware that the Federal Energy Regulatory Commission was in the late 1990s strongly urging competitive markets in electric energy sales and the separation of ownership of electric generating facilities from traditional utilities. *Id.* ¶ 50.

Lastly, the Government knew that nuclear plants could and likely would be sold, and expressly included very detailed provisions as to how such sales would occur in the both NWPA and the Standard Contract. The assignment of a Standard Contract was authorized by a provision in NWPA. 42 U.S.C. 10122(b)(3). In addition, Article XIV of the Standard Contract explicitly allowed Con Edison to assign its rights to the

Standard Contract to a subsequent purchaser.[7] In order to effectuate an assignment, Con Edison was required to provide the Government with ninety days notice. *Id.* Further Government-imposed requirements on the sale included the fact that Standard Contract holder status and SNF ownership could not under any circumstances become separate from the nuclear generating facility with which they were inextricably linked. *Id.*

Con Edison provided the Government with the requisite notice of its intended sale and assignment of the Standard Contract to Entergy. The Government *never* objected to the assignment. At the time of contract formation, the Government therefore recognized that nuclear facilities were bought and sold regularly, and that they would continue to be bought and sold after the execution of the Standard Contract. As such, it is disingenuous at best for the Government to now argue that a sale of the Indian Point facility was unforeseeable.

Given all of the above-described circumstances, it is quite simply unfathomable that the Government could not have foreseen the consequences of its failure to commence SNF disposal to its trading partners, while continuing to exact millions of dollars in fees indefinitely.

### D. The Cases Relied Upon By The Government Do Not Adversely Affect Con Edison's Entitlement To A Recovery

In its Motion, the Government misappropriates numerous cases for the principle that Con Edison may not recover the damages asserted by Con Edison for breach of contract. For instance, the Government relies upon *Wells Fargo Bank, N.A. v. United States*, 88 F.3d 1012 (Fed. Cir. 1996). However, *Wells Fargo* actually supports Con

[7] This assignment clause within the Standard Contract is significant because it is an exception to the general rule that government contracts are non-assignable. *See* 31 U.S.C. § 3727.

Edison's opposition. In *Wells Fargo*, the court only rejected Wells Fargo's claim for lost profits on loans that were unrelated to the subject of the contract, loans that Wells Fargo had hoped to make by leveraging additional capital it may have received had the Government honored its guarantee commitment. However, the court did allow Wells Fargo's other claim for lost profits where Wells Fargo was able to prove that the profits were directly related to the breached contract. As in *Wells Fargo*, Con Edison has alleged here that as a direct result of the Government's breach of the Standard Contract, Con Edison suffered direct and immediate damages to Indian Point in the form of a severely diminished plant value.

Contrary to the Government's assertion, the diminished value alleged here is not a result of the sale of Indian Point. Rather, the sale confirms that the value of Indian Point was severely diminished by the Government's breach.[8] A situation comparable to *Wells Fargo* would be one under which Con Edison was seeking damages under a theory that the Government's breach thwarted its ability to build and operate, for example, a coal-fired power plant or some other distinct enterprise. To the contrary, all of Con Edison's claimed damages were the natural, foreseeable, and as best as can be determined prior to discovery, *actually foreseen* consequences of the Government's breach, stemming directly from DOE's failure to commence SNF disposal by the 1998 deadline.

[8] The Government also cites *Scott Timber Co. v. United States*, 333 F.3d 1358 (Fed. Cir. 2003), and *First Heights Bank, FSB v. United States*, 57 Fed. Cl. 162 (2003). Both of these cases, like *Wells Fargo*, were decided upon a motion for summary judgment, and in fact *First Heights* was decided after a finding of liability and upon a motion for summary judgment on damages. Given this, the decisions are confined to their facts, and certainly cannot be extended to preclude Con Edison's opportunity to obtain discovery and offer proof for the damages it has properly alleged.