Like the court in *Wells Fargo*, the court in *Ramsey v. United States*, 101 F. Supp. 353 (Cl. Ct. 1951), affirmed the validity generally of lost profit damage awards. As discussed above, when accompanied by appropriate showings as to amount, the award of lost profits associated with the breach of government contract is exceedingly well established in the Court of Federal Claims. While the *Ramsey* court denied an award of damages in the circumstances of that case, it also recognized that there are cases that appropriately have awarded lost profit damages. *Id.* at 357 n.1. The *Ramsey* court denied lost profits because the breached contract did not affect the remainder of the plaintiff's business. *Id.* at 357. Unlike in *Ramsey*, however, the Government's breach has affected all aspects of operations at Indian Point. Compl. ¶ 69.

*Olin Jones Sand Co. v. United States*, 225 Ct. Cl. 741 (1980), is also not applicable to the situation presented in Con Edison. The court in *Olin Jones* denied the damage request because its claim was predicated upon damages due to the plaintiff's lost reputation. The plaintiff claimed that the Government's breach hurt its reputation, and prevented it from obtaining further projects. *Id.* at 744. That is not the allegation here. Con Edison is not alleging that the Government's breach lead to a change in perception about Con Edison, as a company, and its ability to perform additional work. Rather, Con Edison alleges that the Government's breach improperly burdened Con Edison with SNF, and that the costs associated with SNF storage for indefinite periods were accounted for in the value of the Standard Contract and other interrelated assets, when asset valuations considered the costs to be incurred, the additional risks to be assumed, and the amount of the checks to be written, all as a direct consequence of DOE's conduct. Compl. ¶¶ 68-78.

### E. Determination Of Con Edison's Damages Is An Issue Of Fact To Be Made Upon The Evidence Submitted

Prior to a ruling upon damages, Con Edison should be afforded the opportunity to obtain discovery as well as to offer proof of the properly asserted allegations it has made in the Complaint. The U.S. Court of Claims previously had held that a determination of damages is an issue of fact, and is to be made upon the evidence submitted. In *Goolsby v. United States*, 21 Cl. Ct. 88 (1990), the court was presented with a motion to dismiss alleging that the plaintiff's lost profit damages were too consequential, and hence, not recoverable. The court denied the motion, holding that "[a]llegations of profits loss foreseeability entail a factual, not a legal, inquiry . . . and a [motion to dismiss] mandates acceptance of the nonmovant's factual allegations, along with all reasonable inferences arising therefrom." *Id.* at 91 (citing *Prudential Ins. Co. of Am. v. United States*, 801 F.2d 1295, 1300 (Fed. Cir. 1986)). Although the defendant claimed that the plaintiff's damages were too large and too speculative, the court found that "however fortuitous . . ., plaintiff's averments must be accepted pending trial." *Id.* In that same vein, the court wrote: "These claims may be suspect, . . . but they cannot be rejected as a matter of law." *Id.; see also Landmark Land Co. v. United States*, 256 F.3d 1365, 1379 (Fed. Cir. 2001) (holding that whether damages are foreseeable is a question of fact to be determined upon the evidence).

Similarly, this Court should deny the Government's Motion, especially as it pertains to Con Edison's breach of contract damages, because Con Edison has properly alleged a breach of contract and has not yet had an opportunity to obtain discovery and offer proof of its damage allegations. Con Edison has met its burden to survive a motion to dismiss, i.e., it has made sufficient allegations that the Government's breach of the Standard Contract caused direct and foreseeable injury to Con Edison.

## III. CON EDISON HAS A COGNIZABLE TAKINGS CLAIM UNDER THE FIFTH AMENDMENT TO THE CONSTITUTION

Con Edison asserts two independent bases of unjustified taking: (i) DOE's systematic collection of unauthorized fees after January 31, 1998 constituted a taking of Con Edison's property; and (ii) DOE's failure to dispose of Con Edison's SNF by January 31, 1998 deprived Con Edison of the use and value of its facility. Compl. ¶¶ 89-92. These takings theories' assertions are entirely consistent with the decisions in *SMUD, Yankee Atomic,* and *Maine Yankee,* discussed below, and, therefore, represent cognizable takings claims which are not susceptible to dismissal at the very outset of a proceeding.

### A. The Government's Continued Assessment Of The 1 Mil Per kWh Fee

The Government was obligated to stop collecting fees from Con Edison for two independent but complementary reasons: (1) its statutory authority to collect fees for its SNF repository program expired under NWPA when the repository was obligated to be operational in 1998; and (2) the Court of appeals ruled in *Indiana Michigan Power Co. v. Department of Energy*, 88 F.3d 1272, 1276 (D.C. Cir. 1996), that its ability to collect fees was "reciprocal" to its obligation to commence disposal activities by the statutory deadline. Nonetheless, DOE continued to collect fees, and in fact announced in the 1998 DOE Plan that it would do so for decades through 2020. This represents a classic unlawful takings claim under *Aerolineas Argentinas v. United States*, 77 F.3d 1564 (Fed. Cir. 1996), and its progeny. *Aerolineas Argentinas* confirms that these types of allegations are properly lodged in the Court of Federal Claims under the Tucker Act "when the exaction is based on an asserted statutory power." *Id.* at 1573 (citations omitted). *Aerolineas Argentinas* cites with approval to *Clapp v. United States*, 127 Ct. Cl. 505, 512 (1954), for its characterization that "an illegal exaction has occurred

when 'the Government has the citizen's money in its pocket.'" *Id.* *Aerolineas Argentinas* also establishes that "[a contract] does not provide the authorization for requiring the airlines to incur the obligations imposed on [the Government] by the enactment of [a statute]." *Id.* at 1576. All of these principles are fully applicable here, and confirm the sufficiency of the 1 mil per kWh fee portion of Con Edison's takings claim, which is not vitiated in any way by the Government's defenses based upon its interpretation of the Standard Contract.

### B. Con Edison's Takings Claim Arises Out Of Legal And Property Rights Separate From The Standard Contract

Con Edison's takings claim is not predicated on rights emanating from the Standard Contract, but rather is based upon legal and property rights emanating from NWPA. NWPA represents the Government's continued acceptance of responsibility for the disposal of SNF.[9] Compl. ¶ 22. Congress passed NWPA to address and ameliorate the accumulation of SNF from nuclear reactors, and to fulfill the federal government's long-standing policy of assuming responsibility for the disposal of SNF. *Id.* One of the purposes of NWPA was to establish a schedule for the location, construction, and operation of repositories for the disposal of SNF, and to initiate ownership and custody

[9] Since the enactment of the Atomic Energy Act in 1954, the federal government has recognized its sovereign obligation to provide for the lawful and permanent disposal of the wastes of nuclear power generation. Compl. ¶¶ 14-26. Throughout the late 1950s and early 1960s, the federal government represented that it would provide mechanisms for SNF storage and disposal, among which would be the continued utilization of nuclear fuel reprocessing. *Id.* ¶ 19. Consequently, electric utilities, including Con Edison, designed, and the Atomic Energy Commission (and subsequently the NRC) licensed, and approved for operation, nuclear power facilities with SNF pools intended only for temporary storage and for only a fraction of a nuclear plant's forty-year license life. *Id.* In 1976, consistent with new arms control initiatives, a moratorium on reprocessing SNF was put in place. *Id.* ¶ 20. In 1977, President Jimmy Carter announced that SNF would be transferred to a federally approved "away from reactor" facility for storage until a federal government repository became available. *Id.* ¶ 21. All of these past endeavors culminated with the enactment of the NWPA.

of SNF by the federal government at a permanent disposal facility beginning in January 1998. *Id.* ¶ 24. The Government's obligation to the utilities, including Con Edison, was "'without qualification or condition,'" *N. States Power Co. v. United States Dep't of Energy*, 128 F.3d 754, 757 (D.C. Cir. 1997) (quoting *Indiana Michigan*, 88 F.3d at 1273), and, thus, essential to Con Edison's obligation to pay the fees into the NWF, *see Indiana Michigan*, 88 F.3d at 1276-77.[10] Thus, NWPA established the federal government's exclusive responsibility for the disposal of SNF beginning in January 1998. *Id.*

### C. The Federal Circuit And Court Of Federal Claims Have Previously Affirmed That The Basis Of The Nuclear Utilities' Property Rights Was In NWPA

This Court has affirmed and recognized that a nuclear utility's legal and property rights existed prior to and, are thus, independent from the Standard Contract. *See Yankee Atomic Elec. Co. v. United States*, 42 Fed. Cl. 223, 225-29 (1998), *aff'd sub nom. Maine Yankee Atomic Power Co. v. United States*, 225 F.3d 1336 (Fed. Cir. 2000). Indeed, this Court has denied similar dispositive motions by the Government, and has instead recognized that DOE obligated itself to remove SNF prior to the execution of the Standard Contract. *See Sacramento Mun. Util. Dist. v. United States*, 61 Fed. Cl. 438 (2004) ("*SMUD*").

For example, in *Yankee Atomic*, the court noted that "Yankee asserts that DOE's failure to dispose of its SNF amounts to a taking of the real property on which its

[10] Moreover, DOE continued (and continues to this date) to disregard limitations imposed by NWPA on its authority to assess NWF fees, which has resulted in the collection of at least $15 billion more than DOE spent on activities to fulfill its disposal obligations prior to the January 31, 1998 deadline. This fund surplus is significant, particularly when one considers that NWPA requires the Secretary of Energy to annually submit to Congress a report on the status of the NWF balance and recommendations on whether to raise or lower the fee to ensure that the fund is neither under- nor over-collected. Despite the fund's massive surplus, the Secretary of Energy has never proposed an adjustment to the fee.

inoperative facility is located." 42 Fed. Cl. at 236. Assessing the basis for Yankee's takings claim, the court rejected the Government's motion to dismiss, concluding that "no contract clause purports to cover or redress an alleged taking of real property. Therefore, plaintiff's taking claim is not converted into a claim arising under the contract . . . ." *Id.* Thereafter, the Federal Circuit affirmed the *Yankee Atomic* decision in *Maine Yankee Atomic Power Co. v. United States*, 225 F.3d 1336, 1340, 1342-43 (Fed. Cir. 2000), when it affirmed the lower court's denial of the Government's motion to dismiss plaintiff's takings claim as one not arising under the Standard Contract. In doing so, the Federal Circuit found that while the Standard Contract provided details to the execution of the SNF removal,

> [t]he Act effectively made entry into such contracts mandatory for the utilities by prohibiting the Nuclear Regulatory Commission from issuing licenses to any operator who has not "entered into a contract with the Secretary" or who "is [not] actively and in good faith negotiating with the Secretary for a contract."

*Id.* at 1337 (citation omitted) (alteration in original).

Most recently, in *SMUD*, the court denied the Government's motion to dismiss a takings claim analogous to those asserted in Con Edison's Complaint. SMUD had brought a takings claim alleging that the Government had invaded SMUD's private property through its failure to remove SNF. The court allowed SMUD to continue pursuing its takings claim. In allowing SMUD's claim for taking of real property, the court held that "where the Government has forced storage on another's private property the Just Compensation Clause is implicated." *SMUD*, 61 Fed. Cl. at 442.

The cases cited above, namely *Indiana Michigan*, *Northern States*, *SMUD*, and *Maine Yankee*, demonstrate that the Government is wrong when it states that a property interest cannot be claimed in the rule of law. In addition, while the Government cites a

variety of cases allegedly supporting its argument,[11] these cases are inapplicable to Con Edison's claims. In each of the Government's cases, the plaintiff(s) allege that a change in the law, depriving the plaintiff(s) of a benefit enjoyed under some preceding statute, was also a taking of a property right arising out of that preceding statute. Each time, the court in these Government cases held that the plaintiff(s) did not have a property right insofar as the legislature is free to alter existing laws and statutes. Con Edison, however, is not asserting that a change in the law caused the taking. Rather, Con Edison maintains that DOE failed to live up to its existing and continuing statutory obligation, and its failure to do so invades Con Edison's property rights. Compl. 88-89. Con Edison had a right to expect that, absent a change in the law, the Government would live up to the mandates of NWPA (which it has not done).

The Government also mis-applies the holding in *Adams v. United States*, 391 F.3d 1212 (Fed. Cir. 2004). While the court ultimately finds that Adams was not entitled to bring a takings claim for underpaid overtime compensation under the Fair Labor Standards Act, the court did not hold that a statute cannot form the basis for a property right. In fact, the holding is quite the opposite. The court specifically found that since no property rights were delineated in the Constitution, "'existing rules or understandings that stem from an independent source,' such as state, federal, or common law, create and define the dimensions of property interests for purposes of establishing a cognizable right and hence a potential taking." *Id.* at 1219 (citation omitted). As such, *Adams* affirms the assertions made in the Con Edison Complaint that the Government's failure to remove SNF from Indian Point forced Con Edison to retain

[11] *Branch v. United States*, 69 F.3d 1571 (Fed. Cir. 1995); *Pittman v. Chi. Bd. of Educ.*, 64 F.3d 1098 (7th Cir. 1995); *Fern v. United States*, 908 F.2d 955 (Fed. Cir. 1990); *Members of the Peanut Quote Holders Ass'n v. United States*, 60 Fed. Cl. 524 (2004).

ownership and responsibility for SNF after January 31, 1998, depriving Con Edison of the property rights that had been established under NWPA.

### D. The Government Is Wrong To Assume That Con Edison's Takings Claim Is Founded Upon A Breach Of Contract

*Aerolineas Argentinas*, 77 F.3d 1564, establishes that the fact that a takings may have occurred under color of a contractual obligation neither deprives a claimant of its standing to assert a takings claim nor supplies the Government with a defense to the takings itself, yet that is precisely what the Government asserts here. In fact, a takings claim may properly lie even when congressional mandates are accompanied by contractual arrangements. *See, e.g., Chancellor Manor v. United States*, 331 F.3d 891 (Fed. Cir. 2003) (where takings claim arose separately from breach of contract action under single statute).[12] Rights to be vindicated through a takings claim can be separate and apart from those granted by contract, and the existence of a contract need not diminish a party's takings claim. *See, e.g., Del-Rio Drilling Programs Inc. v. United States*, 146 F.3d 1358 (Fed. Cir. 1998) (where takings and breach of contract claims were found to co-exist). The contractual relationships may even be viewed as supplementing and reinforcing the takings rights without supplanting them, and each right may be

---

[12] The Government wrongly asserts that DOE's actions were justified in the heavily regulated nuclear power industry. To this end, the Government cites *Rushton v. Nebraska Public Power District*, 844 F.2d 562 (8th Cir. 1988). According to *Rushton*, however, the Government's argument would only become relevant if DOE's actions were in furtherance of a new or existing statute. In fact, DOE's failure to remove SNF was in *violation* of existing law. DOE's actions actually frustrated the Atomic Energy Act's objectives of ensuring public health and safety (through removal and storage of SNF), and thwarted the mandates of NWPA. Furthermore, this court has recently rejected this same argument. *See Huntleigh USA Corp. v. United States*, No. 03-2670C, 2005 WL 44439, at *7 (Fed. Cl. Jan. 7, 2005) (quoting *Cienega Gardens v. United States*, 331 F.3d 1319, 1330 (Fed. Cir. 2003), in rejecting the government's assertion that "the plaintiff could not demonstrate a protective property right 'in an area voluntarily entered into and one which, from the start, is subject to pervasive Government control'").

individually enforced through separate litigation relief paths. *Id.* at 1367-68; *Chancellor Manor*, 331 F.3d at 903 (where the court held that the lack of contractual privity did not inhibit the plaintiff's takings claim); *Yankee Atomic*, 42 Fed. Cl. at 236 (permitting takings and contract claims to be pursued concurrently).

Con Edison does not base its takings claim upon a breach of the Standard Contract; rather, Con Edison's claim is based upon the Government's failure to fulfill its obligations in accordance with NWPA. Although the Standard Contract provides for certain contractual arrangements, it does not supplant NWPA's mandates. As such, the cases cited by the Government, arguing that a party cannot state a takings claim founded upon a breach of contract,[13] are inapplicable.

Contrary to the Government's assertion, *Castle v. United States*, 48 Fed. Cl. 187 (2000), *aff'd in part, rev'd in part*, 301 F.3d 1328 (Fed. Cir. 2002), does not preclude Con Edison's takings claim as a matter of law. In fact, *Castle* affirms the allegations made by Con Edison, namely, that a takings claim is warranted when the landowner has "rights in the property separate and distinct from any rights conferred by contract." *Id.* at 218-19. As such, *Castle* does not warrant the dismissal of Con Edison's takings claim.[14]

[13] *United States v. Winstar Corp.*, 518 U.S. 839 (1996); *Hughes Communications Galaxy, Inc. v. United States*, 271 F.3d 1060 (Fed. Cir. 2001); *Northwest Airlines, Inc. v. United States Dep't of Transp.*, 15 F.3d 1112 (D.C. Cir. 1994); *Smith v. United States*, 58 Fed. Cl. 374 (2003), *aff'd*, No. 04-5046, 2004 WL 2370589 (Fed. Cir. Oct. 6, 2004); *La Van v. United States*, 56 Fed. Cl. 580 (2003), *aff'd in part, vacated in part*, 382 F.3d 1340 (Fed. Cir. 2004); *Tyler House Apartments, Ltd. v. United States*, 38 Fed. Cl. 1 (1997); *Plaintiffs in Winstar-Related Cases v. United States*, 37 Fed. Cl. 174 (1997), *aff'd*, 133 F.3d 874 (Fed. Cir. 1998).

[14] In addition to its holding in favor of Con Edison's non-contract-based takings claim, there are factual distinctions in *Castle* that would prevent it from being applied to the situation presented in Con Edison. First, Con Edison does not have the same contractual remedies that were available to the plaintiffs in *Castle*. Moreover, Con Edison could not have sought specific performance from the Government as a vehicle for solving SNF problems. *Northern States*, 128 F.3d 754.

**E. The Government Unlawfully Commandeered Con Edison's Real Estate For Public Use Without Compensation**

The Government's actions and inactions, as detailed in the Complaint, deprived Con Edison of the use of its real property in violation of the Takings Clause of the Fifth Amendment to the U.S. Constitution. A Government-caused occupation of real property for public use constitutes a *per se* Fifth Amendment taking. *See Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 433 (1982) (law allowing cable companies to attach equipment to apartment buildings requires just compensation).

Government action that requires use of private property for a public purpose also is a taking. *See, e.g., Benenson v. United States*, 548 F.2d 939, 949 (Ct. Cl. 1977) (Government's actions barring owners from demolishing Willard Hotel and enjoining them from removing building's facade to determine whether structure could be used for profitable purposes other than operation of a hotel constituted a taking of owners' fee interest). Con Edison is no less of a party whose property has been taken, inasmuch as it was compelled to set aside and dedicate its property to activities and purposes that were specifically assigned to the Government by NWPA. In fact, as the Claims Court explained in finding a taking in *Benenson*:

> The net effect of the acts of the Government is that plaintiffs cannot use their property for any income-producing purpose . . . . Consequently, plaintiffs are forced to preserve the structure for the benefit of the Government, which bears no part of the financial responsibility.

*Id.* at 947. Similar to the situation in *Benenson*, where the Government refused to allow landowners to remove a building from their property, while simultaneously refusing to condemn the property, Con Edison was forced into an untenable situation where it was unable to have the SNF removed from Indian Point yet Con Edison was unable to do anything else with the SNF. Compl. ¶ 31.

A taking also occurs when the Government forces a business to dedicate its own resources for the benefit of the public, or to perform activities and provide services that should be undertaken by the Government. *See, e.g., Kaiser Aetna v. United States,* 444 U.S. 164, 180 (1979) (taking occurred where Government imposed navigational servitude on landowner's "private pond"); *United States v. Pewee Coal Co.*, 341 U.S. 114 (1951) (taking occurred where Government federalized coal mine); *Kimball Laundry Co. v. United States,* 338 U.S. 1, 6 (1949) (taking occurred where Government federalized laundry service and retained management and employees to operate plant).

Furthermore, when the Government has forced storage on another's private property, an illegal taking has occurred and the property owner must be justly compensated for its loss. *See Webb's Fabulous Pharmacies, Inc. v. Beckwith,* 449 U.S. 155, 160 (1980) (a state may not transform private property into public property without just compensation); *see also City of Monterey v. Del Monte Dunes at Monterey, Ltd.*, 526 U.S. 687 (1999) (Government's refusal to allow private party to develop its land for use benefiting the public is an unlawful taking).

The Government's actions in this case are functionally indistinguishable from those in the cases cited above. The Government prohibited Con Edison from reprocessing its SNF, charged Con Edison millions of dollars for removal of the SNF, and then failed to provide for the permanent removal of SNF from Indian Point when it was congressionally mandated to do so. Compl. ¶¶ 20, 25, 5. The Government's inaction forced Con Edison to store the SNF at its own cost, compromised the economic viability of Con Edison's nuclear assets, increased mandated future plant retirement costs, and encumbered the future ability to utilize the property for other uses. Compl. ¶¶ 67, 69. Indeed, the Government failed to act even though Con Edison, along with

other nuclear utilities, had paid billions of dollars into the NWF, the express purpose of which was to ensure timely execution of the Government's responsibilities. *Ala. Power Co. v. United States Dep't of Energy*, 307 F.3d 1300, 1303 (11th Cir. 2002); *see also SMUD*, 61 Fed. Cl. 438. A further taking occurred when the majority of these monies were diverted for uses unrelated to the intended purpose of SNF disposal.

The Government's failure to comply with its statutory duty to remove Con Edison's SNF and its fee collection practices forced Con Edison to suffer direct and substantial economic consequences and, therefore, constitutes a taking of Con Edison's property without just compensation. NWPA imposed an unconditional obligation on the Government to begin to remove and dispose of Con Edison's SNF by January 31, 1998. *Indiana Michigan*, 88 F.3d at 1276. The Government's failure to remove and dispose of SNF in express disregard of NWPA, and the Government's imposition on Con Edison of requirements that it instead provide its own property and facilities to store SNF beyond the date when the Government was required to assume such obligations, while it continued to collect fees without authorization, all constitute a taking of Con Edison's property without just compensation.[15]

---

[15] Contrary to the Government's assertion, Motion at 19-20, *Commonwealth Edison v. United States*, 56 Fed. Cl. 652 (2003), is inapplicable to Con Edison's case. While *Commonwealth Edison* was an SNF-related case, the opinion rendered by the Court of Federal Claims addressed different issues at a different procedural posture than Con Edison. Most significantly, the court was deciding a motion for summary judgment, not a motion to dismiss, which requires a plaintiff to meet an entirely different, and more stringent standard of proof. The more applicable ruling, given Con Edison's procedural posture, is the Court of Federal Claims' decision in *Detroit Edison v. United States*, 56 Fed. Cl. 299 (2004), where the court rejected the Government's attempts to dismiss Detroit Edison's takings claim upon a motion to dismiss. The court made it clear that, even if the plaintiff ultimately could not recover damages under both a breach and takings theory, a more fully developed record would allow it "to assess whether the property right implicated in the plaintiff's takings claim falls outside the rights granted under the Standard Contract." *Id.* at 302.

### 1. Con Edison's Claim for Diminished Value Is the Proper Measure of Damages In Light of the Government's Unlawful Taking

Con Edison has properly alleged that it is entitled to receive the diminished value of its property as just compensation for an unlawful taking. Once a taking has been established, the courts have interpreted just compensation as the fair market value of the affected property as of the date of the taking. *Almota Farmers Elevator & Warehouse Co. v. United States*, 409 U.S. 470, 474 (1973). The Federal Circuit, in *Yancey v. United States*, 915 F.2d 1534 (Fed. Cir. 1990), has concurred in this finding, and has held that when a property interest has not been completely destroyed, takings damages are awarded by accounting for the percentage diminution of the value of the property. *Id.* at 1541. In *Yancey*, the Government forced a quarantine of the plaintiffs' turkey farm, preventing the interstate sale of the stock. As a result of the quarantine, the plaintiffs sold their stock for slaughter at a significantly reduced value, and brought a claim for a regulatory taking against the Government. The court upheld the Yanceys' takings claim, and affirmed the Claims Court's damage award in the amount of the market value of the stock, minus the amount received from the sale for slaughter. *Id.* at 1542.

The Supreme Court has expressly affirmed the use of diminished value as a proper measure for a takings action. In *Kimball Laundry*, the plaintiff brought suit for unlawful taking when the Government seized the plaintiff's laundry plant. The plaintiff asserted that it was entitled to compensation for the diminution in the value of its business due to the seizure of its various assets. The Court found the impact of the Government's actions on the value of Kimball Laundry's business to be a compensable taking because the Government's actions diminished the going-concern value of the plaintiff's business. *Kimball Laundry*, 338 U.S. at 14. The Court found that the going-

concern of a business has a "value to a potential purchaser no different from the value of the business's physical property." *Id.* at 11.

Takings damages based on the *Kimball* diminished value rationale were recently addressed by the Court of Federal Claims, in *Huntleigh USA Corp. v. United States*, No. 03-2670C, 2005 WL 44439, at *4-*5 (Fed. Cl. Jan. 7, 2005). Huntleigh was also a victim of a taking by the Government. In denying the Government's motion to dismiss Huntleigh's damage claims for the diminished value of its assets, the Court wrote: "Huntleigh's going-concern value allegedly has been severely diminished by the Act. . . . Like the Plaintiff in *Kimball Laundry*, 'the owner retains nothing of the going-concern value that it formerly possessed . . . .'" *Id.* at *4. Similar to the plaintiffs in *Kimball Laundry* and *Huntleigh*, the Government's failure to remove SNF from Indian Point resulted in a diminished value the purchaser was willing to pay for Con Edison's tangible assets. This failure forced Con Edison to maintain financial responsibility for SNF, encumbering Con Edison's property with SNF, and created limitations on the operating life of the plant; all of which significantly impacted the value of Indian Point. Compl. ¶¶ 68-69.

The Government's arguments do not preclude an award of damages as a matter of law. Con Edison has properly alleged that the diminished value was suffered as a direct result of the Government's unlawful taking. Given the rationale of the above-cited decisions, along with the cases previously discussed in the context of Con Edison's breach of contract claim, Con Edison has adequately proven that a claim for diminished value is not a prohibited consequential damage of the Government's inactions. Furthermore, as has been the case throughout its Motion, the Government once again cites cases that have been decided upon motions for summary judgment or,

in some instances, after trial – all decided after the court has been able to consider all the evidence provided by the parties.

In addition, the cases that the Government cites regarding proper damages for takings actions are factually distinguishable from Con Edison's claim. For instance, both *Yuba Natural Resources, Inc. v. United States*, 904 F.2d 1577, 1580-81 (Fed. Cir. 1990), and *United States v. General Motors Corp.*, 323 U.S. 373, 381-82 (1945), assume a temporary taking. In fact, the *Yuba* court affirms that diminished value is the proper measure of damages for a permanent taking, citing *Almota Farmers*, 904 F.2d at 1580.

The Government also cites *Klein v. United States*, 375 F.2d 825 (Ct. Cl. 1967), and *Mitchell v. United States*, 267 U.S. 341 (1925), but neither of those cases deals with the situation presented in this case. In both *Klein* and *Mitchell*, the Claims Court and the Supreme Court, respectively, deny damages to third-party beneficiaries of a contract to use land. Both find that since the landowner at the time of the taking has already been compensated, a third-party interest need not be compensated at the same rate as the landowner. Con Edison, on the other hand, owned Indian Point at the time of the taking, and as such has the right to be compensated for an unlawful taking.

### F. Determination Of Con Edison's Takings Claim Is An Issue Of Fact

Takings claims are extremely fact-intensive, and thus it is inappropriate for the court to decide a takings claim on a dispositive motion. As the Ninth Circuit observed in *Del Monte Dunes at Monterey, Ltd. v. City of Monterey*, 920 F.2d 1496 (1990), *aff'd*, 526 U.S. 687 (1999), where a plaintiff claims that governmental action effects a taking, dispositive motions "must be viewed with particular skepticism. . . . The importance of the specific facts . . . and circumstances relating to the governmental action militate against summary resolution in most cases. . . . This issue must await

determination after trial on the merits." *Id.* at 1508 (citations omitted); *see also E. Enters. v. Apfel*, 524 U.S. 498, 523 (1998) (analysis of a takings claim "is essentially ad hoc and fact intensive"). Applying the same principle, the Federal Circuit in *Whitney Benefits, Inc. v. United States*, 752 F.2d 1554 (Fed. Cir. 1985), reversed the dismissal of a takings claim because it was "not a legal impossibility" that the claimant "might establish facts constituting a taking" given the allegations of the complaint; the court emphasized that "whether or not there has been a taking . . . is normally a fact issue that cannot be resolved except on a 'complete record,' or a trial." *Id.* at 1555, 1558-60. Among the takings claim issues that would benefit from factual development here as discussed below is the extent of the Government's taking and the nature of Con Edison's expectations regarding the use of its property, particularly given the long history of federal responsibility for SNF disposal.

## IV. CON EDISON'S TAKINGS CLAIM BASED UPON THE GOVERNMENT'S WRONGFUL COLLECTION OF FEES IS PROPERLY BEFORE THE COURT OF FEDERAL CLAIMS

### A. The D.C. Circuit Has Referred All Claims Regarding Fee Assessments To The Court Of Federal Claims

Having successfully argued in the Court of Appeals for the D.C. Circuit that claims for the unlawful collection of Nuclear Waste Fund fees are to be raised in the Court of Federal Claims, the government is now barred by the doctrine of *res judicata* from claiming the exact opposite here. In *Consolidated Edison Co. of New York, Inc. v. Department of Energy*, No. 98-1358, 1999 U.S. App. LEXIS 11040 (D.C. Cir. Apr. 16, 1999), conducted in the D.C. Circuit, the Government successfully contended that the D.C. Circuit lacked jurisdiction to adjudicate SNF claims, including claims as to DOE's NWF

fee collection practices.[16] As such, it is inappropriate for the Government to now argue, once the NWF claims have in fact been brought in the Court of Federal Claims, that these claims may only be brought before the D.C. Circuit, when it previously argued that such claims could not be raised there either. In fact, the Government is bound by the ruling in *Consolidated Edison* and cannot now argue otherwise. *See Ins. Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 702 n.9 (1982).

The July 30, 1998 *Consolidated Edison* petition – the petition that was dismissed by the D.C. Circuit in its April 16, 1999 Order in deference to Court of Federal Claims jurisdiction [17] - set forth NWF claims that track the claims asserted by Con Edison here. Paragraph 39 of the petition asserted:

> DOE proposes to continue collection of fees at [the 1 mil rate] even though the Act required DOE to adjust the fees annually from 1982 until 1998 to assure that, within that period, sufficient funds would be collected for DOE to site, construct and initiate operation of a repository by January 31, 1998.

Paragraph 42 of the petition alleged:

> DOE thus proposes current fee assessment practices that deviate from the mandatory requirements of the NWPA in at least two important respects: (a) fees would continue to be collected without recognition that DOE was required to collect, between 1982 and 1998, all fees necessary for the siting, construction and initial operation of a repository; and (b) continuation of the existing fee structure would perpetuate systematic and persistent overcollection under which annual fee collections would exceed annual NWPA-complaint waste program expenditures.

---

[16] The proposed complaint which Con Edison and several other utilities sought to file in the D. C. Circuit in the prior Con Edison litigation, a copy of which is attached hereto as Exhibit 2, clearly tracked the claims Con Edison asserts here. The proposed complaint asserted that the Government's conduct constituted a continuing violation of NWPA, a breach of the statutory contract, and a violation of the takings and due process clauses of the Fifth Amendment. The proposed complaint also asserted that DOE's failure to dispose of SNF caused reductions in the value of the petitioners' property and assets.

[17] A copy of the petition is attached hereto as Exhibit 3.

All such claims were dismissed by the D.C. Circuit as not cognizable by it under Section 119 of NWPA,[18] and utility claimants were instead directed to pursue their jurisdictional remedies in the Court of Federal Claims, which Con Edison is now doing.

When the *Consolidated Edison* utilities sought certiorari[19] from the D.C. Circuit's restrictive ruling relegating the utilities to such remedies as it could obtain from the Court of Federal Claims, the Government opposed certiorari. In its February 2000 brief in opposition before the Supreme Court, a copy of which is attached hereto as Exhibit 5, the Government asserted (at 16-17):

> The NWPA's judicial review provision vests the courts of appeals with "original and exclusive" jurisdiction over specified categories of suits (see 43 U.S.C. 10139(a)(1)(A)-(F)), not over every challenge to DOE's implementation of the nuclear waste program. . . . Any ambiguity in Section 10139(a)(1) should be resolved, moreover, in

[18] Section 119(a)(1) of NWPA, 42 U.S.C. § 10139(a)(1), states that:

> Except for review in the Supreme Court of the United States, the United States courts of appeals shall have original and exclusive jurisdiction of any civil action --
> (A) for review of any final decision or action of the Secretary, the President, or the Commission under this part;
> (B) alleging the failure of the Secretary, the President, or the Commission to make any decision, or take any action, required under this part;
> (C) challenging the constitutionality of any decision made, or action taken, under any provision of this part;
> (D) for review of any environmental impact statement prepared pursuant to the National Environmental Policy Act of 1969 (42 U.S.C. 4321 et seq.) with respect to any action under this part, or as required under section 10155(c)(1) of this title, or alleging a failure to prepare such statement with respect to any such action; (E) for review of any environmental assessment prepared under section 10132(b)(1) or 10155(c)(2) of this title; or
> (F) for review of any research and development activity under subchapter II of this chapter.

[19] A copy of the petition for certiorari is attached hereto as Exhibit 4.

> light of the settled background rule that "[t]he sole remedy for an alleged breach of contract by the federal government is a claim for money damages, . . . in the United States Claims Court [now the Court of Federal Claims] under the Tucker Act . . . . In choosing that means of achieving the statutory objectives, Congress must be presumed to have intended that disputes regarding the precise nature of the parties" obligations, and the remedies for any breach thereof, would be resolved in the manner appropriate for contract claims.

The claims lodged here are essentially the same as the claims Con Edison raised – unsuccessfully from a jurisdictional perspective – in the *Consolidated Edison* proceeding before the D.C. Circuit. These claims simply have been updated to reflect the passage of time and Con Edison's exit from the nuclear generation business following DOE's failure to commence SNF disposal, under circumstances substantially compromised by DOE's disregard of NWPA's requirements. The Government should certainly not be permitted to espouse positions here that are unmistakably at odds with the positions it took when analogous claims were pending before the D.C. Circuit.

*Consolidated Edison* demonstrates two things: (1) claims closely tracking those brought by Con Edison here were brought before the D.C. Circuit in 1998 and rejected by that court for lack of jurisdiction; and (2) the rationale of the D.C. Circuit's decision in that case (and others like it) is that the U.S. Court of Federal Claims is the appropriate forum for adjudication of such claims. *Consolidated Edison* is just one example of the D.C. Circuit's denial of jurisdiction, in favor of the Court of Federal Claims' jurisdiction, over claims involving DOE's failure to abide by the terms of NWPA and the Standard Contract. In its one-page opinion, the D.C. Circuit dismisses the Consolidated Edison petition based on the court's holding in *Northern States*, 128 F.3d 754 ("*Northern I*"), and the unpublished order issued on May 5, 1998, *Northern States Power Co. v. United States Department of Energy*, No. 98-1070, 1998 U.S. App. LEXIS 12919 (D.C. Cir. May 5, 1998) ("*Northern II*"), attached hereto as Exhibit 6, denying rehearing in that case (collectively,

"*Northern I & II*"). A fair reading of *Northern I & II*, along with other D.C. Circuit decisions that also cite *Northern I & II* as a basis for dismissal, clearly establishes that SNF claims implicating DOE's fee assessment practices are to be brought in the Court of Federal Claims.

In *Northern I*, the D.C. Circuit clearly held that SNF plaintiffs must pursue other remedies outside the D.C. Circuit. The court asserted limited jurisdiction in that case under the rubric that a "'federal appellate court has the authority, through the process of mandamus, to correct any misconception of its mandate by a lower court or administrative agency subject to its authority.'" *Northern I*, 128 F.3d at 759 (citing *Office of Consumers' Counsel v. FERC*, 826 F.2d 1136, 1140 (D.C. Cir. 1987)). On this ground, the court issued a narrow writ of mandamus precluding DOE from excusing its delay under the Standard Contract. *Id.* at 760. Aside from this limited ruling, the D.C. Circuit stated repeatedly in its decision that it would not grant petitioners' broad request for a writ of mandamus because an adequate remedy at law was available to the plaintiffs. *Id.* at 756, 759, 761. *Northern I* sets forth the D.C. Circuit's decision to require SNF plaintiffs to pursue these remedies, including suits for breach of contract, before the Court of Federal Claims.

It bears emphasis that in the *Northern I* proceeding which led to the D.C. Circuit's ruling reported at 128 F.3d 754, the petitioners specifically sought relief pertaining to DOE's NWF fee collection practices. Because breach had not yet occurred (until January 31, 1998), and because the court there found that as of 1997 "the Standard Contract between DOE and the utilities provides a potentially adequate remedy," the D.C. Circuit did not issue the writ of mandamus as requested, but did preclude the Government from contending that its failure to commence SNF disposal by NWPA's

1998 deadline was an "unavoidable delay" under the terminology of the Standard Contract. *Id.* at 756.

When the Government protested that the D.C. Circuit's exercise of Section 119 authority under NWPA was intruding upon the jurisdiction of the Court of Federal Claims, the D.C. Circuit disagreed. In *Northern II*, the D.C. Circuit explained that it was not itself directly or indirectly asserting Tucker Act jurisdiction:

> The DOE petitions for rehearing, suggesting that this Court has erroneously designated itself as the proper forum for adjudication of disputes arising under the Standard Contract. . . . [W]e did not; we merely prohibited the DOE from implementing an interpretation that would place it in violation of its duty under the NWPA to assume an unconditional obligation to begin disposal by January 31, 1998.

1998 U.S. App. LEXIS 12919, at *5.

Unwilling to accept the D.C. Circuit's limited characterization of Section 119 jurisdiction in deference to the Tucker Act jurisdiction of the Court of Federal Claims, the Government sought certiorari in the U.S. Supreme Court. *See* Sept. 1998 Government's Petition for a writ of Certiorari, *United States v. N. States Power Co.*, No. 98-384, attached hereto as Exhibit 7. In its petition (at 14), the Government asserted:

> The court's [*Northern I*] decision intrudes upon the jurisdiction of the Court of Federal Claims – the tribunal vested with exclusive authority to adjudicate contract claims against the United States.

With this understanding of *Northern I & II*, when the D.C. Circuit cited *Northern I & II* as a basis for denying the petition in *Consolidated Edison*, there can be no doubt that the court intended petitioners to exhaust their remedies for all SNF-related claims before the Court of Federal Claims.[20] The D.C. Circuit's holding in *Consolidated Edison* is

[20] Given the Government's certiorari petition, there can be no doubt whatsoever that the Government knew that the D.C. Circuit's reliance on the holdings in *Northern I & II* was based on deference to contract and related remedies, not on preclusion doctrines or statute of limitations as is currently argued in the Government's Motion.

further supported by subsequent cases citing *Northern I & II* as a basis for denying jurisdiction. *See N. States Power Co. v. Dep't of Energy*, Nos. 97-1064 et al., 1998 U.S. App. LEXIS 20702, at *1 (D.C. Cir. July 2, 1998) (petitions denied on holding of *Northern I* "because Standard Contract holders must seek remedies available under the contract in other fora"); *Ariz. Pub. Serv. Co. v. Dep't of Energy*, No. 98-1346, 1999 U.S. App. LEXIS 11035, at *1 (D. C. Cir. Apr. 16, 1999) (petitions for review dismissed as "[p]etitioners have conceded that they have potentially adequate remedies available in other fora, and are bound by the holding of the court in [*Northern I*]"); *Wis. Elec. Power Co. v. United States Dep't of Energy*, 211 F.3d 646, 648 (D.C. Cir. 2000) ("The Court of Federal Claims, not this court, is the proper forum for adjudicating contract disputes." (citing *Northern II*, 1998 U.S. App. LEXIS 12919, at *4)). Accordingly, jurisdiction in this Court over Con Edison's Complaint is proper.

In addition to contesting the D.C. Circuit's refusal of jurisdiction in these cases, the Government raises *National Ass'n of Regulatory Utility Commissioners v. U.S. Department of Energy*, 851 F.2d 1424 (D.C. Cir. 1988) ("*NARUC*"), to support its incredulous conclusion that Con Edison's challenge to fee assessments are untimely and in the wrong forum. Motion at 30-32. The Government's *NARUC* arguments merely represent an attempt to show some instance where the D.C. Circuit heard a case remotely involving NWF fees. However, *NARUC* is based on an entirely different set of facts from the case at bar. *NARUC* did not involve assertions that DOE's fee assessment authority has expired, that DOE is attempting to shift SNF disposal delay costs to claimants, or that DOE is improperly attempting to pre-collect its damage liability in

---

based on deference to contract and related remedies, not on preclusion doctrines or statute of limitations as is currently argued in the Government's Motion.

these SNF cases via fee assessments intended to continue indefinitely. *See* Compl. ¶¶ 42-43.

Indeed, when another utility sought to raise SNF fee claims in the D.C. Circuit in a recent case similar to Con Edison's, that claim was flatly rejected. *See Wisconsin Electric*, 211 F.3d at 648 ("Nor do we have jurisdiction to consider Wisconsin Electric's petition pursuant to the NWPA, 42 U.S.C. § 10139(a)(1)."). The plaintiffs in *Wisconsin Electric* were seeking: (1) a declaration that DOE must provide both monetary and non-monetary relief for failing to meet the January 31, 1998 deadline; and (2) an order directing DOE to comply with the court's mandates in *Northern I & II*.

Based on the holding in *Northern I & II*, and the cases applying and relying upon that decision, the Court of Federal Claims has been conclusively determined to be the only proper forum to adjudicate Con Edison's claims. The Government should not be able to escape liability for want of jurisdiction in both the D.C. Circuit and this Court. That the Government would now attempt to achieve such a result by artfully mischaracterizing prior final and binding court rulings as to where SNF litigation should be brought is most regrettable indeed.

### B. Recent Rulings From The Court OF Federal Claims Affirm Con Edison's Interpretation Of The Proper Jurisdiction Of Its Claim

Recently, the Court of Federal Claims denied a Government motion to dismiss[21] a takings claim that is analogous to the claim brought by Con Edison. In a matter brought by Delmarva Power & Light Company ("Delmarva") against the U.S.

[21] In that case, Judge Christine Miller "tentatively" denied the Government's motion to dismiss to only allow the Government to respond to new breach of contract allegations made in Delmarva's amended complaint, filed (as a protective measure) on December 2, 2004. Based upon Judge Christine Miller's statements during the hearing, along with the language in her Order, dated December 3, 2004, in *Delmarva* attached hereto as Exhibit 8, it is clear that Judge Christine Miller denied the Government's motion as it pertains to claims analogous to Con Edison's takings claim here.

Government, Delmarva has alleged that the Government's continued collection of the 1 mil per kWh fee after its failure to begin removing SNF by January 31, 1998 was an unlawful taking. The Government filed a motion to dismiss, in which it sought to dismiss Delmarva's takings claim, in part, on the basis of the same jurisdictional argument as it has made to Con Edison's takings claim.

In a hearing on the motion to dismiss before Judge Christine Miller, the Government sought to highlight its jurisdiction argument (as made initially in its papers). *See* Dec. 3, 2004 hearing tr. at 31-32, *Delmarva,* No. 04-034C. Upon hearing the Government's explanation, Judge Christine Miller disagreed with the Government's interpretation of Delmarva's claim, and found that the claim did not pose a challenge to the authority of the Secretary of Energy to assess or alter fees.

> I interpret Plaintiff's claim as saying not that there is a challenge to the amount of the fee, but there is a challenge to the fact that it has continued to be assessed after there essentially is no quid pro quo, and I think that is a different case than challenging the fee structure or imposition of the fee when it originated because those decisions had to be challenged years ago.

*Id*. at 32. Judge Christine Miller's comments in *Delmarva* accurately characterize Con Edison's 1 mil per kWh fee argument as well. Con Edison has alleged that the Government has wrongfully collected fees from nuclear waste plant owners, even after the Government has failed to provide the disposal services as it was obligated to provide under NWPA, and after statutory authority in NWPA to continue fee collections for its repository had expired. As described in detail above, the continued collection of this fee represents a violation of the Standard Contract, a breach of the Government's obligation of good faith and fair dealing, and an unlawful taking.

## CONCLUSION

For the foregoing reasons, Con Edison respectfully requests that the Court deny the Government's Motion to Dismiss in all respects.

Date: January 27, 2005

Respectfully submitted,

By: /s/

Richard J. Conway
DICKSTEIN SHAPIRO MORIN
& OSHINSKY LLP
2101 L Street, NW
Washington, DC 20037-1526
(202) 785-9700

*Counsel of Record for*
*Consolidated Edison Company of New York, Inc.*

Of Counsel:

David M. Nadler
Nicholas W. Mattia, Jr.
Bradley D. Wine
Jeffery P. Becherer
DICKSTEIN SHAPIRO MORIN
& OSHINSKY LLP
2101 L Street, NW
Washington, DC 20037
(202) 785-9700

Brent L. Brandenburg, Esq.
Assistant General Counsel
Consolidated Edison Company
of New York, Inc.
4 Irving Place – 1830
New York, NY 10003
(212) 460-4333

## CERTIFICATE OF ELECTRONIC FILING

I hereby certify that on January 27, 2005 a copy of the foregoing Consolidated Edison Company of New York, Inc.'s Opposition to Defendant's Motion to Dismiss was filed electronically. I understand that the notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/s/ Richard J. Conway
Richard J. Conway
DICKSTEIN SHAPIRO MORIN
& OSHINSKY LLP
2101 L Street, NW
Washington, DC 20037
(202) 785-9700

*Counsel of Record for*
*Consolidated Edison Company of New York Inc.*