**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **CONSOLIDATED EDISON COMPANY OF NEW YORK, INC.,** | ) | |
| **Plaintiff,** | ) | |
| **v.** | ) | **No. 04-0033C** **(Judge Wheeler)** |
| **UNITED STATES OF AMERICA,** | ) | |
| **Defendant.** | ) | |

# PLAINTIFF'S MOTION TO COMPEL DOCUMENTS FROM ENTERGY CORPORATION AND FLORIDA POWER & LIGHT ENERGY, LLC

Pursuant to Rules of the Court of Federal Claims ("RCFC") 7(b) and 45(c), Plaintiff Consolidated Edison Company of New York, Inc. ("Con Edison") respectfully moves for the entry of an Order compelling Entergy Corporation ("Entergy") and Florida Power & Light Energy, LLC ("FP&L") to produce responsive documents that Con Edison requested in subpoenas *duces tecum* served on these spent nuclear fuel ("SNF") plaintiffs on December 21, 2006. The requested documents are essential to Con Edison's case preparation.

## I. INTRODUCTION

Entergy and FP&L are among the small number of companies that have been active participants in the marketplace for buying nuclear power plants since the Government's breach of the Standard Contract on January 31, 1998. Entergy has successfully purchased multiple plants, and FP&L has successfully purchased one plant. Entergy and FP&L both have SNF claims for each of their nuclear plant acquisitions currently pending in this Court. While these two companies expressed early interest in acquiring Con Edison's Indian Point 1 & 2 nuclear

plants ("Indian Point") when they were being sold at a competitive auction in 2000, Entergy was ultimately the successful bidder for that facility in 2001. The Indian Point sales agreement provided for the retention of SNF claims by Con Edison, and Con Edison commenced its SNF case in January 2004.

One of Con Edison's central claims in this case is that the Government's breach diminished the value of Indian Point when it was sold to Entergy in 2001. Con Edison contends that the Government's breach depressed the entire marketplace for nuclear facilities by causing heightened investor risk and imposing substantial costs that would have otherwise been avoided, which resulted in fewer buyers being interested in purchasing nuclear facilities. In order for Con Edison to complete its discovery and represent the value of Indian Point in the "non-breach world" market, Con Edison needs valuation and transactional materials relating to proximate nuclear facility sales from buyers who also at least expressed a preliminary interest in purchasing Indian Point. The Court has already upheld the legal sufficiency of Con Edison's diminished value damages claim against the Government's motion to dismiss. *Consolidated Edison Co. of New York, Inc. v. United States*, 67 Fed. Cl. 285, 290 (Fed. Cl. 2005) (Lettow, J.).

## II. BACKGROUND

On December 21, 2006, Con Edison issued subpoenas to Entergy (Exh. A) and FP&L (Exh. B), requesting valuation and transactional documents related to Indian Point and similar nuclear facility acquisitions completed by Entergy and FP&L. Since November 2004, Con Edison has unsuccessfully sought these documents from the Government. In March and April 2006, Con Edison repeated requested that the Government produce "discovery materials that the Government has received or submitted in relation to the sale or purchase of Pilgrim, Indian Point

Unit 3, Fitzpatrick, Vermont Yankee, and Indian Point 1 and 2 nuclear plants."[1] March 10, 2006 Letter from D. Churchill to J. Gardner, at 2-3 (attached as Exh. C); April 18, 2006 Letter from D. Churchill to H. Lester (attached as Exh. D). The Government objected to Con Edison's requests, arguing that the requested documents were irrelevant, contained proprietary information, and that producing them would constitute an undue burden. April 12, 2006 Letter from H. Lester to D. Churchill, at 4 (attached as Exh. E).

On April 27, 2006, the Government wrote to several SNF plaintiffs, including Entergy, informing them that Con Edison sought materials they had produced to the Government. In this letter, the Government told these SNF plaintiffs that Con Edison specifically requested discovery materials "in relation to the sale of purchase of [various nuclear facilities] and, apparently, in relation to the sale or purchase of any other nuclear reactor." April 27, 2006 Letter, at 1 (attached as Exh. F). The Government went on to explain that due to limited funding, in order to comply with Con Edison's requests for production, "[the Government] would have to provide ConEd with access to all of the documents that have been produced by [various nuclear facilities]." Exh. F, at 2.

By letter dated May 5, 2006, counsel for both Entergy and FP&L objected on behalf of both companies to the Government producing their discovery materials to Con Edison. (Attached as Exh. G). While Entergy and FP&L acknowledged that the SNF protective order "permit[s] distribution of documents to company personnel to at least some degree," they argued that these documents could not be shared with Con Edison because they contained sensitive business information and the "existing protective order [did] not provide adequate protection to

[1] Con Edison did not specifically seek from the Government discovery materials in connection with FP&L's purchase of Seabrook because FP&L has not produced any documents to the Government. FP&L's case has been stayed since February 7, 2005. *FPL Energy Seabrook, LLC v. United States*, No. 04-88 (Fed. Cl. Feb. 7, 2005).

ensure that the confidential material of the utilities . . . [was] neither disclosed to their competitors nor misused by any party." Exh. G, at 2.

In light of the various objections to Con Edison obtaining these valuation and transactional materials, on August 16, 2006, Con Edison moved for the Entry of Supplemental Protective Order and Order Compelling the Production of Documents. In this Motion, Con Edison specifically asked the Court to compel the Government to produce valuation and transactional documents related to other nuclear plant sales. On August 30, 2006, Entergy and FP&L together wrote Con Edison regarding the Supplemental Protective Order. While the two companies expressed some concerns over the specific language of the proposed Supplemental Protective Order, they stated: "In summary, as has been true for some time, our clients are amenable to Con Ed's litigation counsel having access to their proprietary documents under appropriate circumstances." Attached as Exh. H, at 2. After further negotiation of the terms of the Supplement Protective Order, on August 31, 2006, this Court entered a Supplemental Agreement and Protective Order ("Supplemental Protective Order") that governs the treatment of Confidential Materials Con Edison receives from the Government or other named third parties. Both Entergy and FP&L approved and are named parties in the Supplemental Protective Order.

After this Court's entry of the Supplemental Protective Order, the Government began producing documents to Con Edison. It soon became apparent that the Government's production lacked several key documents from the Entergy and FP&L nuclear plant acquisitions that Con Edison needs to conduct its damages analysis, including "comprehensive plant valuation materials emanating from . . . Florida Power & Light" and "filed expert reports and related deposition transcripts and exhibits dealing with the partially-consolidated cases relating to the Pilgrim transaction, to which Pilgrim and Boston Edison are parties." November 30, 2006 Letter

from D. Churchill to H. Lester, at 2 (attached as Exh. I). In addition, Con Edison recently discovered that the Government failed to produce certain "supplemental" valuation materials that Entergy provided in the *Boston Edison* case with Bates Range [ENGC BECO 1st RFP-21-Suppl-1 through 65].

Due to the absence of key documents in the Government's production and Con Edison's growing frustration with the pace of discovery from the Government, on December 21, 2006, Con Edison served subpoenas *duces tecum* on Entergy and FP&L, requesting valuation and sale assessment documents related to Indian Point as well as other nuclear facilities that each company purchased around the same time. Exh. A; Exh. B. In these subpoenas, Con Edison also requested other documents, such as fossil fuel plant sale valuation documents, which are discussed below.

On January 22, 2006, Entergy and FP&L responded to Con Edison's document requests. Exh. J; Exh. K. In their responses, Entergy and FP&L agreed to produce certain responsive documents related to Indian Point, but both objected to production of any documents not related to the Indian Point transaction, arguing that such documents were irrelevant to Con Edison's case. Neither party objected on the basis of proprietary nature of any of these documents, and, indeed, both Entergy and FP&L are named parties in the Supplemental Protective Order entered in this case, so there can be no serious objection to production on that basis.

## III. <u>ARGUMENT</u>

### A. Valuation And Transactional Documents Sought By Con Edison Are Highly Relevant To Its Case Preparation.

Both Entergy and FP&L raise objections to Con Edison's document requests based on relevancy. Con Edison has the right to "obtain discovery regarding any matter, not privileged, that is relevant to the claim." RFCF 26. "Relevant information need not be admissible at the trial

if the discovery appears reasonably calculated to lead to the discovery of admissible evidence." Fed. R. Civ. Pro. 26(b)(1). Relevancy, under Rule 26, is construed broadly to include "any matter that bears on . . . any issue that is or may be in the case." *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 (1978). Indeed, even if "there is doubt over relevance, Rule 26(b)(1) indicates that the court should be permissive." *Speller v. United States*, 14 Cl. Ct. 170, 172 (Cl. Ct. 1988) (allowing plaintiff to discover third party documents where there was at least "some relationship" between the discovery requested and an issue at trial).

1. **Valuation and Transactional Documents Related To Nuclear Facilities Other Than Indian Point Are Directly Relevant To Con Edison's Damages Analysis And Rebuttal Of The Government's Defenses.**

Con Edison's document requests to Entergy and FP&L include requests for nuclear plant valuation and transactional materials relating to the nearly contemporaneous purchases of other nuclear power generating facilities by these same companies. Con Edison seeks these documents to determine how the Government's breach of the Standard Contract affected the marketplace for sales of nuclear facilities occurring contemporaneously with Con Edison's sale of Indian Point. Both Entergy and FP&L object to producing these valuation documents, arguing that such documents are irrelevant.

a. Valuation And Transactional Documents Related To Other Nuclear Facilities Will Enable Con Edison To Demonstrate The Non-Breach World Marketplace Central To Its Diminished Value Damages Claim.

Con Edison's contention is that the entire marketplace for nuclear generating facilities was depressed in the wake of DOE's failure to honor its contractual obligations to dispose of SNF at the Nation's nuclear power plants. Valuation and transactional materials related to other nuclear facility sales are not merely relevant, but central to assessing diminished value of the Indian Point facility. The Government's failure to dispose of spent nuclear fuel affected all

nuclear facilities, not just Indian Point. The only way to determine its profound influence in diminishing the value of Con Edison's units is to examine the market as a whole, not simply the Indian Point valuation documents. And, indeed, any market determination would be incomplete if it relied upon data derived solely from a single transaction and ignored similar and essentially contemporaneous transactions.

Access to valuation and transactional materials related to those nuclear facilities that were acquired by Entergy and FP&L will enable Con Edison to construct a non-breach world to demonstrate the extent to which the Government's breach diminished the value of Indian Point. It is also highly likely that those SNF-influenced components of Entergy's and FP&L's participation in the market will be treated in some identifiable manner in their documents relating to contemporaneous nuclear facility acquisitions. Entergy's and FP&L's view of SNF's effect on any nuclear facility's value (including Indian Point) may be more explicitly stated in documents relating to other contemporaneous transactions. Thus, Con Edison's search for relevant material is legitimately broader than the single Indian Point transaction to which it was a party.

Entergy and FP&L had a prominent role in the nuclear facility market. In addition to purchasing Indian Point from Con Edison in 2001, Entergy was the successful bidder for four additional plants: (1) Pilgrim (MA) in July 1999; (2) Indian Point 3 (NY) in November 2000; (3) Fitzpatrick (NY) in November 2000; and Vermont Yankee (VT) in July 2002. FP&L was the successful bidder for Seabrook (NH) in November 2002. These purchases alone represent 50% of the sales of such facilities that took place between 1999 and 2004, the time period upon which Con Edison intends to focus its market analysis. These nuclear plant transactions all implicated the <u>same</u> Standard Contract, the <u>same</u> Government failure to dispose of SNF, the <u>same</u> set of

bidders (in this case, Entergy and FP&L) that formed the market for nuclear plant sales, in the same time frame and geographic region as the Indian Point transaction. All such transactions were directly affected by the common denominator of the government's failure to dispose of SNF from these facilities, and all these nuclear facilities suffered similar consequences from the Government's breach. Access to Entergy's and FP&L's valuation and transactions documents from its nuclear acquisitions should disclose SNF-related factors that were common to all nuclear sale transactions, and thus enable Con Edison to establish how the market value of the nuclear units was determined under breach conditions, and also the diminution in value suffered by Con Edison upon the sale of Indian Point.

It cannot be seriously contested that the nuclear plant valuation and transactional documents which Entergy and FP&L seek to keep from Con Edison share the same characteristics as those directly at issue with the Indian Point transaction. These documents were prepared during the same time frame under similar regulatory requirements, and for plants in the same geographic region as Indian Point. In addition, these sales transactions all involve facilities governed by identical contracts with the Government that also suffered adverse consequences due to the Government's breach of that contract. Entergy likely used similar, if not identical, approaches when assessing the value of all five of the nuclear facilities, including Indian Point, that it purchased between 1999 and 2002.

Where transactions are as similar as those at issue here, they are certainly relevant under the broad rules of discovery. In *Potomac Electric Power Co. v. California Union Ins. Co.*, 136 F.R. 1 (D.D.C. 1990), plaintiffs brought a lawsuit to recover environmental cleanup costs from an insurance company, the court found that documents related to insurance claims for other contaminations were relevant because they involved similar insurance policies, similar breaches

of those policies, and the same insurance company. Likewise, Con Edison seeks discovery of valuation documents related to similar sales of nuclear facilities. In all of these transactions, the sellers had entered into identical SNF contracts with the Government, the Government failed to begin disposal of SNF as promised stating in January 1998, and the buyers all purchased these nuclear facilities after this date with the same certainty that unknown, but significant, costs and risks were to be incurred by reason of the Government's breach of contract.

The fact that these valuation documents relate to the sales of nuclear facilities other than Indian Point by no means diminishes their relevance in this litigation. Courts have allowed parties to introduce evidence at trial of similar transactions to establish damages. In *Gentile v. SinglePoint Financial, Inc.*, 2003 WL 1240504, at *4 (Del. Ch. March 5, 2003), minority shareholders of a non-public corporation dissented to a merger and sought to recover the fair value of their shares in the company. To determine the fair market value of plaintiffs' shares, the court found that it had to construct a non-merger valuation world "exclusive of any element of value arising from the accomplishment or expectation of the merger or consolidation." *Id.* at *4. In order to establish this but-for world to determine the fair value of their shares, the court allowed shareholders to introduce evidence of similar transactions involving public companies. *Id.* at *6. Here, Con Edison seeks to establish what the fair value of Indian Point would have been in a non-breach world, the functional equivalent of the non-merger valuation world in *Gentile*. Like the shareholders in *Gentile*, Con Edison needs access to valuation and transactional materials from other similar nuclear acquisitions in order to establish this but-for world.

Even when the relevance of similar events in establishing damages is challenged, courts have allowed discovery. In *Ferko v. National Association for Stock Car Auto Racing Inc.*, 218

F.R.D. 125, 137 (E.D. Tex. 2003), plaintiffs brought breach of contract and antitrust claims against defendant, seeking to recover lost profits they would have received from operating a premier NASCAR race. To establish plaintiffs' damages claim, the court found that profits and revenues from other NASCAR races were relevant. *Id.* "Where, as here, the damages alleged are lost profits from a NASCAR race that never occurred, profits and revenues at other NASCAR races that did occur is pertinent information." *Id.*

Similarly, in *Massachusetts School of Law at Andover v. American Bar Association*, 857 F. Supp. 455, 456 (E.D. Pa. 1994), the plaintiff sued the ABA for antitrust violations for failing to accredit the law school. The plaintiff was allowed to discover information about how accreditation affected other law schools' competitiveness in the market in order to establish the damages the law school suffered from its own lack of accreditation. *Id.* at 461. *See also Marks v. Global Mortgage Group, Inc.* 218 F.R.D. 492, 497 (S.D. Va.. 2003) (finding documents related to similar loan transactions relevant to plaintiff's fraud claim and ordering production pursuant to the terms of a protective order); *Mercer v. Allegheny Lundlum Corp.*, 125 F.R.D. 43, 44 (S.D. N.Y. 1989) (finding third party documents related to other transactions concerning defendant corporation relevant to plaintiff's establishment of damages and ordering production pursuant to the terms of a protective order); *DeSmeth v. Samsung America, Inc.*, 1998 WL 74297 (S.D.N.Y. Feb. 20, 1998) (finding documents related to transactions that defendants claimed to be wholly unrelated to the business at issue in the litigation relevant in establishing plaintiff's breach of contract claim). Here, because the requested documents relate to transactions similar to the Indian Point transaction, these documents are relevant and essential to Con Edison's diminished value damages analysis.

b. Valuation Documents Related To Other Nuclear Facility Sales Are Relevant For Con Edison's Response To The Government's Defenses.

Not only are the documents sought by Con Edison relevant to its affirmative case, but they are also relevant to Con Edison's response to the Government's defenses. The Government has expressed its intention to use such documents to defend Con Edison's claims. Indeed, the Government has made clear its intent to use materials produced by <u>any</u> SNF plaintiff in <u>any</u> SNF case.[2] The Government has repeatedly contended that it will itself use valuation data related to nuclear facility transactions to support its entitlement to an "offset" for SNF-caused diminution in value in cases before this Court where the buyer of a particular facility (such as Indian Point) is also seeking post-acquisition damages caused by the Government's breach. In developing its own defensive strategies in all of the SNF cases involving post-breach divestures of nuclear facilities, the Government will make use of the plant valuation and transactional materials of every company that expressed interest in acquiring Indian Point.

The Government has already used evidence produced by Entergy against Con Edison. In Entergy's response to a request for admission in *Boston Edison v. United States*, Entergy has contended that "the price which [Entergy] paid for Indian Point was not reduced as a result of the Government's delay in SNF acceptance under the Standard Contract." Plaintiff Entergy Nuclear Indian Point 2, LLC's Objections and Responses to Defendant's First Set of Interrogatories and Request for Admissions, *Boston Edison v. United States*, No. 03-2626C, at 2 (Fed. Cl. filed Jan. 29, 2007). Entergy's statement goes to the heart of Con Edison's claim, and the Government

[2] In briefing regarding a protective order in another SNF case, the Government stated that it "expects that, in presenting its defenses in this case as well as other cases, it will need to rely upon materials produced by [that SNF plaintiff] and other utility plaintiffs regarding the industry's understandings of the contract's terms and the industry's views of the implementation of the contract." Def.'s Resp. to Pl.'s Emergency Mot. of Prot. Order and Stay of the Parties' Exchange of Conf. Materials, *Dairyland and Power Cooperative v. United States*, No. 03-2663C (Fed. Cl. filed Aug. 4, 2006).

has already attempted to use this admission against Con Edison by citing it in its opposition to Con Edison's Motion for Enlargement of Time.

Surely, the Government will try to use this admission and other plant valuation and transactional materials it has acquired in other SNF cases against Con Edison at trial. Con Edison is entitled to discover the valuation and transactional documents related to Pilgrim, as well as other nuclear facilities, acquired by Entergy and FP&L to test Entergy's statement and anticipate the Government's defenses. Because the Government has stated that it plans on using materials produced by any SNF plaintiff in any SNF case, basic fairness dictates that Con Edison should be granted access to the same documents the Government will use against Con Edison's claim and related documents to test the veracity of the Government's assertions.

2. **Expert Reports, Deposition Transcripts, And Related Exhibits Filed in Related SNF "Buyer-Seller" Litigation Are Relevant to Con Edison's Damages Analysis.**

In the subpoena issued to Entergy, Con Edison also requested expert reports, deposition transcripts, and related exhibits filed by any party in Entergy's related SNF case, *Boston Edison Company v. United States*, Nos. 99-447C and 03-2626C (Fed. Cl. consol. July 29, 2005).[3] Exh. A, at 10. Entergy objects to producing these documents, claiming that such documents are irrelevant to Con Edison's claim.[4] Exh. J, at 8. The expert reports, deposition transcripts, and related exhibits are highly relevant to Con Edison's case preparation for two reasons. First, these

[3] These documents are also the subject of Con Edison's Motion to Compel the Government to Produce Documents Obtained In Related SNF Cases, which is being filed contemporaneously with this Motion. In the subpoena issued to Entergy, Con Edison requested expert reports and related deposition transcripts and exhibits, as well as valuation documents and related materials. In the specific context of *Boston Edison v. United States*, Con Edison clarifies that it seeks all deposition transcripts and related materials to the extent that the valuation, terms, or conditions of the Pilgrim transaction are addressed.

[4] Entergy also raises privilege objections to these requests. Con Edison does not seek privileged information and does not expect Entergy to provide it with such information.

materials are likely to contain valuation and transactional information related to the Pilgrim transaction, which will assist Con Edison in establishing its depressed marketplace damages claim as discussed above. Second, these materials are highly relevant because they will allow Con Edison to understand the Government's defensive strategies in this case. Pilgrim was sold in July 1999, and Indian Point was sold shortly thereafter. The Pilgrim sale was the first nuclear facility sold after the Government's breach of the Standard Contract in January 1998. Additionally, of the various buyer/seller SNF cases pending in the Court of Federal Claims, the *Boston Edison* case is farthest along in litigation. Access to expert reports, deposition transcripts, and related exhibits will allow Con Edison insight into how the Government intends to defend these buyer/seller SNF cases.

3. **Valuation Documents Related To Sales Of Fossil Fuel Facilities Are Relevant To Con Edison's Damages Analysis.**

Con Edison requested Entergy and FP&L to produce valuation documents related to fossil fuel facilities, including financing costs, hurdle rates, and net present value and discounted cash flow models. Exh. A, at 10-11; Exh. B, at 10. Entergy and FP&L objected to these requests, arguing that these documents "have no possible relevance to the instant action."[5] Exh. J, at 9; Exh. K, at 5-6.

Contrary to Entergy and FP&L's assertions, fossil fuel plant valuation documents are highly relevant to Con Edison's damages analysis. Under Con Edison's damages claims, the Government's breach of the Standard Contract decreased the value of all nuclear facilities. To show this diminished value, Con Edison must determine what Indian Point's value would have

[5] Entergy and FP&L also object to the temporal scope of these documents requests. Once Entergy's and FP&L's relevance objections are settled, Con Edison is willing to work with both of these companies to determine a more limited, relevant time period for the documents related to fossil fuel facility sales and acquisitions.

been had the Government not breached its contract. Since Con Edison is unable to compare SNF-affected nuclear plants with nuclear plants that were not affected by SNF issues (for the simple reason that all nuclear plants were similarly affected by the Government's breach), Con Edison must compare the market for nuclear electric generation with comparable fossil fuel and hydropower electric generation as a means of establishing what the value of Indian Point would have been absent the Government's breach. Such a comparison is valid because both nuclear and non-nuclear generating companies sell the same product -- electricity -- and with appropriate adjustments, the different types of facilities can be compared regardless of the particular technology and fuel source used to generate electricity. By comparing the market valuations of non-nuclear electric generating assets with those of nuclear generating assets, Con Edison will be able to demonstrate the added risks associated with prolonged and perhaps indefinite storage of SNF associated with the purchase of nuclear, as opposed to fossil fuel, generation. Thus, discovery of non-nuclear acquisitions is equally relevant to Con Edison's diminished value claim.

4. **Future Profitability Valuations Prepared Before The Date of Sale For Any Nuclear Facility Are Relevant.**

Entergy and FP&L also object to producing documents assessing the future profitability for Indian Point or any other nuclear facility the companies acquired after the Government's breach. (Exh. J, at 3; Exh. K at 3). Future valuation documents prepared before the date of sale of any nuclear facility are relevant to Con Edison's damages analysis. In order to show the extent to which the Government's breach diminished the value of Indian Point, Con Edison must establish the actual value of Indian Point at the time of sale. Future profitability affects the calculation of the asset's "present value;" therefore, any documents assessing Indian Point's future profitability or business prospects that were generated before Indian Point was sold

September 2001 would be relevant in determining the actual value of Indian Point at the time of its sale. Similarly, future profitability valuations prepared before the sale of any of the other nuclear facilities either Energy or FP&L acquired after the Government's breach in January 1998 will assist Con Edison in demonstrating that the Government's breach depressed the present value of all nuclear facilities in the marketplace by decreasing buyers' expectations of the future profit-making potential of these facilities.

**B. Con Edison Seeks Documents Only For Purposes of Proving Past Damages**

Con Edison requested that Entergy and FP&L produce documents assessing "business prospects or future profitability of Indian Point." (Exh. A, at 9; Exh. B, at 9). Citing *Indiana Michigan Power Co. v. United States*, 422 F.3d 1369 (Fed. Cir. 2005), both Entergy and FP&L objected to producing such documents, arguing that Con Edison is not entitled to any discovery of future profitability because it "is beyond the scope of permissible spent nuclear fuel damages claims." (Exh. J, at 3; Exh. K, at 3).

Entergy and FP&L misconstrue Con Edison's request. Con Edison agrees that *Indiana Michigan* precludes SNF plaintiffs from recovering damages that have not yet occurred, *id*. at 1378, but that is not what Con Edison seeks. Unlike the plaintiffs in *Indiana Michigan*, Con Edison no longer owns Indian Point, and its claims are those occurring in connection with the sale of Indian Point in September 2001. Con Edison therefore has no claim for damages that it has not yet suffered (a claim that admittedly would be precluded by *Indiana Michigan*). The documents that Con Edison seeks pertaining to the future profitability of Indian Point relate to the terms of the sale transactions itself. The expected future profitability of a going concern is naturally taken into account by any prospective purchaser. Although the documents reflect expectations pertaining to future events, they are utilized by buyers for the purpose of assessing

value at the time of sale. Simply put, the value of any income-producing asset is the perception of its capability to actually produce future income. Thus, Con Edison's request for documents related to the business prospects and future profitability of Indian Point is within the scope of permissible damages in this case and is not precluded by *Indiana Michigan*, since all such documents relate to the sales price of Indian Point, which is directly at issue in this case.

### C. Con Edison's Document Requests Do Not Place An Undue Burden On Either SNF Plaintiff.

For a majority of Con Edison's requests, Entergy and FP&L raise boilerplate objections that the requests are overbroad and unduly burdensome. While some costs are always associated with responding to subpoena requests, Entergy and FP&L will not suffer any undue burden responding to these requests. Neither Entergy nor FP&L are strangers to the SNF litigation; they are both plaintiffs in related buyer/seller SNF cases pending before the Court of Federal Claims. Indeed, Entergy is a plaintiff in the lead "buyer/seller" SNF case pending before Judge Lettow in *Boston Edison v. United States*, No. 99-447C and 03-2626C (Fed. Cl. consol. on July 29, 2005). Con Edison's requests for documents will not impose an undue burden because it seeks from Entergy and FP&L exactly the same documents the Government has already sought or will be seeking to defend Entergy's and FP&L's respective SNF cases. In addition, both Entergy and FP&L have already entered into a protective order with Con Edison that governs Con Edison's treatment of any confidential information. Entergy and FP&L will suffer no competitive harm in complying with the subpoena requests because Con Edison, as a result of the divesture of its nuclear generating assets at Indian Point, is no longer in the business of buying, selling, or operating nuclear generation facilities.

**REQUESTED RELIEF**

Therefore, Con Edison respectfully requests this Court to compel Entergy and FP&L to produce document responsive to Con Edison's document requests contained in subpoenas *duces tecum* served on both parties on December 21, 2006.

Dated: March 16, 2007

Respectfully submitted,

s/ David A. Churchill
DAVID A. CHURCHILL
Jenner & Block LLP
601 Thirteenth Street, N.W.
Suite 1200 South
Washington, DC 20005
(202) 639-6056
(202) 639-6066 (fax)
COUNSEL FOR PLAINTIFF

Of Counsel:

Brent L. Brandenburg, Esq.
Assistant General Counsel
Consolidated Edison Company
of New York, Inc.
4 Irving Place, Suite 1830
New York, NY 10003
(212) 460-4333

Daniel F. Stenger, Esq.
Hogan & Hartson LLP
Columbia Square
555 Thirteenth Street, N.W.
Washington, DC 20004
(202) 637-5691

Cynthia J. Robertson, Esq.
Jenner & Block LLP
601 Thirteenth Street, N.W.
Suite 1200 South
Washington, DC 20005
(202) 639-6000

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| **CONSOLIDATED EDISON COMPANY OF NEW YORK, INC.,** | |
| **Plaintiff,** | **No. 04-0033C** |
| **v.** | **(Judge Wheeler)** |
| **UNITED STATES OF AMERICA,** | |
| **Defendant.** | |

**[PROPOSED] ORDER COMPELLING ENTERGY CORPORATION AND FLORIDA POWER & LIGHT ENERGY TO PRODUCE DOCUMENTS**

Pending before this Court is Plaintiff's Motion to Compel Documents from Entergy Corporation and Florida Power & Light Energy, LLC, filed on March 16, 2007. Plaintiff's Motion to Compel is hereby GRANTED.

IT IS HEREBY ORDERED:

1. Within thirty (30) days of this Order, Entergy Corporation shall produce to Con Edison all records responsive to the Plaintiff's Request for Production of Documents contained in the subpoena *duces tecum* Con Edison served upon Entergy on December 21, 2006, and all deposition transcripts and related exhibits filed by any party in *Boston Edison v. United States*, Nos. 99-447C and 03-2626C (Fed. Cl. consol. June 29, 2005).

2. Within thirty (30) days of this Order, Florida Power & Light Energy, LLC shall produce to Con Edison all records responsive to the Plaintiff's Request for Production of Documents contained in the subpoena *duces tecum* Con Edison served upon Florida Power & Light on December 21, 2006.

IT IS SO ORDERED.

THOMAS C. WHEELER
Judge

CERTIFICATE OF FILING

I hereby certify that on March 16, 2007, a copy of the foregoing "Plaintiff's Motion to Compel Documents from Entergy Corporation and Florida Power & Light Energy, LLC" was filed electronically. I also certify that I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system and that parties may access this filing through this system.

s/ David A. Churchill

David A. Churchill
JENNER & BLOCK, LLP
601 Thirteenth Street, NW, Suite 1200
Washington, DC 20005
(202) 639-6000

*Counsel of Record for*
*Consolidated Edison Company of New York, Inc.*

CERTIFICATE OF SERVICE

I hereby certify that on March 16, 2007, a copy of the foregoing "Plaintiff's Motion to Compel Documents from Entergy Corporation and Florida Power & Light Energy, LLC" was served via electronic mail and first-class mail, postage pre-paid, upon:

Alexander D. Tomaszczuk, Esq.
Pillsbury, Winthrop, Shaw, Pittman LLP
1650 Tysons Blvd.
McLean, VA 22102-4859
alexander.tomaszczuk@pillsburylaw.com
*Counsel for Entergy Corporation and*
*Florida Power & Light Energy, LLC*

Richard J. Conway
Dickstein Shapiro LLP
1825 Eye Street, N.W.
Washington, DC 20006-5403
conwayr@dicksteinshapiro.com
*Counsel for Boston Edison Company*

s/ David A. Churchill

David A. Churchill
JENNER & BLOCK, LLP
601 Thirteenth Street, NW, Suite 1200
Washington, DC 20005
(202) 639-6000

*Counsel of Record for*
*Consolidated Edison Company of New York, Inc.*